UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

B.D. COOKE & PARTNERS LIMITED, AS
ASSIGNEE OF CITIZENS CASUALTY COMPANY
OF NEW YORK (IN LIQUIDATION),

                                        Plaintiff,

                    -against-

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON,

                                        Defendants.

---

Civil Action No. 08-CIV-3435 (RJH)

**ELECTRONICALLY FILED**

**AFFIDAVIT OF CAREY G.
CHILD IN SUPPORT OF THE
MOTION OF B.D. COOKE TO
REMAND ON GROUNDS OF
LACK OF SUBJECT MATTER
JURISDICTION**

**DISTRICT OF COLUMBIA**    ss.:

      **CAREY G. CHILD, ESQ.,** being duly sworn, deposes and says:

      1.    I am a member of the law firm of Chadbourne & Parke LLP, attorneys for

plaintiff B.D. Cooke & Partners Limited ("B.D. Cooke"). I represented B.D. Cooke in

a previous matter, *B.D. Cooke & Partners Limited, As Assignee of Citizens Cas. Co. of

New York v. Nationwide Mutual Ins. Co.*, Index No. 600655/02 (the "Nationwide

Action"), regarding the same assignment at issue in this action, in which the New York

Supreme Court, in both the trial court and the Appellate Division. I also represent B.D.

Cooke in this action. As such, I am fully familiar with the facts set forth herein.

      2.    I make this affidavit in support of B.D. Cooke's motion for an order,

pursuant to 28 U.S.C. § 1447(c), remanding this action to the New York Supreme

Court. The facts set forth are based upon my personal knowledge, and documents

prepared and maintained by Chadbourne & Parke in the ordinary course of its

representation of B.D. Cooke in this action and in the Nationwide Action.

3.     Attached as Exhibit 1 is a true and correct copy of the Verified Complaint

by which B.D. Cooke commenced this action in New York Supreme Court.

4.     Attached as Exhibit 2 is a true and correct copy of letter from James

Veach, counsel to defendants Certain Underwriters At Lloyd's, London

("Underwriters") dated April 4, 2008 by which the Underwriters demanded arbitration.

5.     Attached as Exhibit 3, is a true and correct copy of Underwriters' Notice

of Removal, as first received by Chadbourne & Parke as a courtesy copy on April 11,

2008.

6.     Attached as Exhibit 4 is a true and correct copy of the slip opinion, dated

October 15, 2003, from the Nationwide Action.

7.     Attached as Exhibit 5 is a true and correct copy of the proof of service on

Underwriters that B.D. Cooke filed in this action with the New York Supreme Court

before it was apparent that removal had been effected by notice to the clerk of such

court.  This proof of service consists of two independent parts.  First, two affidavits of

Hague Convention service executed by a commercial process server in London,

courtesy copies of which were provided to Mr. Veach by email on March 20, 2008.

Second, a letter from Mr. Veach in which Underwriters "without conceding that they

have been properly served — accept service with the understanding" that B.D. Cooke

would agree to an extension of Underwriters' time to answer or move, and which I

countersigned on or about April 7, 2008.

8.    Submitted with (and, in the case of the hard-copy courtesy copies provided

to the Court, bound with) this affidavit are true and correct copies of four additional

supporting affidavits:

First, the affidavit of John Tafuro, sworn to on February 4, 2003, and originally submitted in the Nationwide Action. Mr. Tafuro was the Director of the Reinsurance Department of the Liquidation Bureau of the New York State Department of Insurance and he explains the background of the assignment at issue in this action, which he negotiated, as well as the insurance-company liquidation that gave rise to the assignment.

Second, the affidavit of Simon Janes, sworn to on February 5, 2003, and originally submitted in the Nationwide Action. Mr. Janes was at that time a Director of B.D. Cooke and assisted with the negotiation of the assignment at issue in this action.

Third, the affidavit of Thomas McNamara, sworn to on April 25, 2008, and submitted for the first time in this action. Mr. McNamara is the Senior Vice President and Treasurer of ROM Reinsurance Management Co., Inc., ("ROM"). ROM has submitted losses to the Underwriters, which Mr. McNamara explains.

Fourth, the affidavit of Andrew David Tyler, sworn to on May 1, 2008. Mr. Tyler is Managing Director of B.D. Cooke and has for many years dealt with Lloyd's as a general matter and with representatives of Underwriters with respect to specific claims under the assignment at issue in this action.

Carey G. Child

Sworn to before me this
6th day of May, 2008.

_____
Notary Public

NANCY CANADA
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires February 28, 2009

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

B.D. COOKE & PARTNERS LIMITED, AS
ASSIGNEE OF CITIZENS CASUALTY COMPANY
OF NEW YORK (IN LIQUIDATION),

                                         Plaintiff,

                    -against-

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON,

                                         Defendants.

Index No. **650054/2008**

**VERIFIED COMPLAINT**

Plaintiff, by its attorneys, CHADBOURNE & PARKE LLP, for its complaint
alleges:

## NATURE OF THE ACTION

1.    Plaintiff B.D. Cooke & Partners Limited ("B.D. Cooke") brings this
action as the assignee of the liquidator of Citizens Casualty Company of New York
("Citizens") against defendants Certain Underwriters at Lloyd's, London ("Lloyd's
Underwriters"), who are reinsurers under reinsurance agreements assigned to
B.D. Cooke by the liquidator of Citizens.

2.    B.D. Cooke seeks declaratory relief and money damages in respect of
reinsurance claims that have been agreed to by Lloyd's Underwriters, but which they
refuse to pay based on their assertion that the assignment is subject to a "cap" on the
amount recoverable.  This Court approved that assignment, and retained jurisdiction to

resolve disputes concerning the assignment. In that regard, this Court has previously rejected another reinsurer's argument that the same assignment was subject to a cap.

## PARTIES, PERSONAL JURISDICTION, AND VENUE

3.     Plaintiff B.D. Cooke is a corporation organized and existing under the laws of the United Kingdom, having its registered address at 2 Knoll Rise, Orpington, Kent, England.

4.     Plaintiff's assignor, the liquidator of Citizens, through the New York Liquidation Bureau, had, at the time of the assignment, its principal office and its facilities involved therein within New York County at 123 William Street, New York, New York.

5.     Defendants Lloyd's Underwriters are those underwriters at Lloyd's of London that, through one or more syndicates of such underwriters, variously participated as reinsurers in one or more of the excess-of-loss reinsurance contracts listed in Exhibit A (the "Excess-of-Loss Reinsurance Agreements"). Upon information and belief, the syndicates operated in London with the individual underwriter members domiciled in many places throughout the world, possibly including various states within the United States.

6.     Upon information and belief, Lloyd's Underwriters, by their participation in one or more of the Excess-of-Loss Reinsurance Agreements, contracted to provide reinsurance to one or more members of a reinsurance pool (the "Agency Managers Pool"), specifically including contracting to provide reinsurance to Citizens. Upon information and belief, the Agency Managers Pool was operated in New York County

2

by Agency Managers, Limited, a/k/a Agency Managers, Incorporated ("Agency

Managers"). Agency Managers was a New York corporation with its principal place of

business in New York County. Citizens also was a New York corporation with its

principal place of business in New York County.

       7.     Upon information and belief, the Excess-of-Loss Reinsurance

Agreements each contain a contractual provision consenting to jurisdiction and service

of process in the following, or substantially similar, language:

> It is agreed that in the event of the failure of the Reinsurers to
> pay any amount claimed to be due hereunder, the Reinsurers at
> the request of the Reassured, will submit to the jurisdiction of
> any Court of competent jurisdiction within the United States
> and will comply with all requirements necessary to give such
> Court jurisdiction and all matters arising hereunder shall be
> determined in accordance with the law and practice of such
> Court. It is further agreed that service of process in such suit
> may be made upon Mendes and Mount, 27 William Street,
> New York, New York 10005, or their nominee or nominees,
> and that in any suit instituted against any one of them upon
> this Contract, the Reinsurers will abide by the final decision of
> such Court or of any Appellate Court in the event of an appeal.

## RELATED ACTONS

       8.     By an order dated June 17, 1971, in Index No. 40357/71, re-captioned *In*

*Re the Liquidation of Citizens Casualty Co. of New York*, (the "Liquidation

Proceeding"), this Court, among other things: (A) placed Citizens into liquidation; (B)

appointed the Superintendent of Insurance of the State of New York as liquidator (the

"Liquidator"); (C) granted the Liquidator authority to take possession of Citizens'

property and liquidate its business and affairs; and (D) vested the Liquidator with title to

all property, contracts and rights of action of Citizens.

9.      In an order dated March 6, 1997, this Court (Justice Greenfield), in the Liquidation Proceeding, approved a petition and plan by the Liquidator for early closure of the Citizens estate.  That order specifically approved the assignment at issue in this action.  In addition, the petition and plan approved by this Court's order also provided that "the Supreme Court of the State of New York, New York County, shall have continuing jurisdiction over any disputes concerning the assignments and transfers described above and their effect, except said Court shall not resolve disputes solely involving computations of amounts due thereunder."

10.     In *B.D. Cooke & Partners Limited, As Assignee of Citizens Cas. Co. of New York v. Nationwide Mutual Ins. Co.*, Index No. 600655/02 (the "Nationwide Action"), this Court resolved such a dispute concerning the assignment at issue in this action.  In a memorandum decision and order dated October 6, 2003, this Court (Justice Lowe), *inter alia,* rejected on summary judgment the contention by Nationwide Mutual Insurance Company ("Nationwide"), another reinsurer of Citizens, that the assignment was capped, and held that B.D. Cooke was entitled to collect as assignee under the assignment.  *Id., slip op. at 6, 7, 13*  In pertinent part, that decision was upheld on appeal to the First Department of the Appellate Division.  16 A.D.3d 208, 791 N.Y.S.2d 103 (Mar. 15, 2005).

## FACTS COMMON TO ALL CAUSES OF ACTIONS

### Citizens Was A Member Of The Agency Managers Pool

11.     Upon information and belief, Agency Managers operated and managed the reinsurance pool known as the Agency Managers Pool.  Certain insurance and

4

reinsurance companies agreed to participate in the Agency Managers Pool as pool members, with each pool member agreeing to assume a percentage interest in all reinsurance business written by Agency Managers on behalf of the Agency Managers Pool.

12.    Upon information and belief, Agency Managers operated the Agency Managers Pool from at least the early 1950s until 1988, when Agency Managers filed a bankruptcy petition. Agency Managers was succeeded in the administration of the Agency Managers Pool by ROM Reinsurance Management Co., Inc. ("ROM").

13.    Upon information and belief, Citizens was a member of the Agency Managers Pool and entered into a Memorandum of Agreement with Agency Managers effective on or about July 1, 1950 (the "Citizens Memorandum"). Among other things, under the Citizens' Memorandum, Citizens appointed Agency Managers as "agent for and in [Citizens'] behalf in the procuring, underwriting and servicing of policies, contracts and/or treaties of casualty reinsurance business in the United States."

**As A Member Of The Agency Managers Pool,
Citizens Reinsured The B.D. Cooke Pool**

14.    B.D. Cooke is the current manager of a pool of U.K. insurers formerly managed by Underwriting Management Agency Ltd. and C.F.&A.U. Ltd. (the "B.D. Cooke Pool"), and led by The Dominion Insurance Company Limited ("Dominion").

15.    The B.D. Cooke Pool, led by Dominion, obtained reinsurance from the Agency Managers Pool, including reinsurance whereby Citizens reinsured Dominion and the B.D. Cooke Pool.

**<u>Defendants Lloyd's Underwriters Then Reinsured Citizens</u>**

16.    Upon information and belief, Agency Managers procured reinsurance for the benefit of Citizens in respect of the reinsurance obligations that Citizens owed to Dominion, the B.D. Cooke Pool, and others.

17.    Upon information and belief, the reinsurance procured by Agency Managers for the benefit of Citizens included reinsurance known as "Inter-Office Reinsurance" obtained from other members of the Agency Managers Pool such as Nationwide, as well as excess-of-loss reinsurance procured from external reinsurers, such as Lloyd's Underwriters under various of the Excess-of-Loss Reinsurance Agreements.

**Upon The Insolvency Of Citizens, The Liquidator Is Vested
With Title To The Excess-of-Loss Reinsurance Agreements**

18.    As set forth above, on or about June 17, 1971, Citizens was declared insolvent and placed under the control of the Liquidator, who continued to administer the estate of Citizens until at least 1997, under the supervision of this Court in the Liquidation Proceeding.

19.    By virtue of Citizens' reinsurance of Dominion and the B.D. Cooke Pool, Dominion was a net creditor of the Citizens estate.

20.    This Court's order of liquidation vested the Liquidator with title to all of the property, contracts and rights of action of Citizens.

21.    Upon information and belief, the Liquidator gave notice to Citizens' reinsurers, including Lloyd's Underwriters, of the Liquidation Proceeding and that the

Liquidator had been vested by this Court with title to all of the property, contracts and rights of action of Citizens, including their reinsurance of Citizens.

**The Liquidator's Petition In The Liquidation Proceeding**

22.     In a Petition (the "Petition") sworn to on October 11, 1996 and submitted to this Court in the Liquidation Proceeding, the Liquidator stated that Dominion was the largest creditor of the Citizens estate, including on account of claims that the Liquidator determined would take years to resolve.

23.     With the express purpose of expediting the closing of the Citizens estate, the Liquidator's Petition sought this Court's approval to assign the Liquidator's rights under Citizens' reinsurance agreements to B.D. Cooke in exchange for concessions regarding Dominion's claims against the Citizens estate.

24.     Upon information and belief, Lloyd's Underwriters were given notice of the Petition.

25.     Upon information and belief, Mendes & Mount, attorneys for Lloyd's Underwriters, attended the hearing held by this Court concerning the Petition.

26.     Upon information and belief, Lloyd's Underwriters did not object to the Petition or the Liquidator's plan set forth therein.

**The Assignment Approved By This Court**

27.     In an order dated March 6, 1997 (the "Approval Order"), this Court, in the Liquidation Proceeding, approved the Petition and the Liquidator's plan set forth therein.

28.     Pursuant to the Petition and Approval Order, the Liquidator entered into an assignment to B.D. Cooke (the "Assignment") of certain of the Liquidator's rights under Citizens' reinsurance contracts, including the Inter-Office Reinsurance and the Excess-of-Loss Reinsurance Agreements.

29.     Among other things, the Assignment transfers to B.D. Cooke all of the Liquidator's "right, title, and interest in and to":

> (a)     All reinsurance Recoverables and Excess of Loss Recoverables due Assignor according to his accounts as of June 30, 1994 and uncollected by Assignor or for Assignor's account by June 30, 1995; notwithstanding the foregoing, any Reinsurance Recoverables due from Citizens as an Agency Managers Pool member to Citizens as a Cedent are not being assigned hereunder.

> (b)     All Reinsurance Agreements and Excess of Loss Agreements running in favor of Citizens or the Liquidator of Citizens effective as from July 1, 1994 except to the extent that Assignor has exercised any rights thereunder prior to February 11, 1997, together with all of the rights which Assignor would have had under such agreements if the Citizens estate were not closed pursuant to the Assignor's Plan for the closing of the Citizens' liquidation.

> (c)     Effective upon the entry of a final nonappealable order approving the Final Audit and Accounting of Citizens, all other reinsurance recoverables due Citizens not arising out of the business of the AM Pool, together with all reinsurance assets and rights of recovery under reinsurance agreements of Citizens (including, without limitation on the foregoing, those reinsurances which may not have been specifically identified as of February 11, 1997).

30.     In exchange for the Assignment, and in reliance upon the Petition and this Court's Approval Order, Dominion made concessions regarding Dominion's claims against the Citizens estate that permitted final distributions from, and closure of, the Citizens estate.

**Lloyd's Underwriters Failure To Pay Agreed Claims Under The Assignment**

31.　Upon information and belief, claims under the Excess-of-Loss Reinsurance Agreements have been handled for Lloyd's Underwriters by Equitas Management Services Limited n/k/a Resolute Management Services Limited ("Equitas") and have been presented to Equitas by ROM, as successor to Agency Managers.

32.　Upon information and belief, Equitas has signified its agreement to claims by providing an Equitas signing number.

33.　Upon information and belief, the claims agreed by Equitas include the following claims set forth in sub-Paragraphs 33.1 through 33.97 (the "Agreed Claims"):

|  | Claim | | Agreement By Equitas | | Amount Owed Under Assignment |
|---|---|---|---|---|---|
|  | Insured/Loss | ROM's Ref. # | Signing # | Date |  |
| 33.1 | Dana Corporation | A135 | 90173 | 31 Mar 2005 | $21,591.30 |
| 33.2 | Dana Corporation | B022 | 90176 | 31 Mar 2005 | $3,135.18 |
| 33.3 | Ciba Geigy | X021 | 90092 | 15 Apr 2005 | $83,742.06 |
| 33.4 | Foster Wheeler | U003 | 90163 | 27 Mar 2006 | $71,613.46 |
| 33.5 | Foster Wheeler | U003 | 90173 | 27 Mar 2006 | $6,575.46 |
| 33.6 | Foster Wheeler | V004 | 90187 | 27 Mar 2006 | $(4,315.41) |
| 33.7 | Foster Wheeler | V004 | 90200 | 27 Mar 2006 | $(18,771.45) |
| 33.8 | Foster Wheeler | W007 | 90224 | 27 Mar 2006 | $(22,907.83) |
| 33.9 | Foster Wheeler | W007 | 90239 | 27 Mar 2006 | $(10,035.80) |
| 33.10 | Foster Wheeler | X006 | 90035 | 28 Mar 2006 | $(7,502.20) |
| 33.11 | Foster Wheeler | X006 | 90041 | 28 Mar 2006 | $(15,205.48) |
| 33.12 | Foster Wheeler | Y005 | 90063 | 29 Mar 2006 | $(8,280.92) |
| 33.13 | Foster Wheeler | Y005 | 90103 | 28 Mar 2006 | $(20,274.62) |
| 33.14 | Foster Wheeler | E022 | 90080 | 28 Mar 2006 | $13,989.48 |
| 33.15 | Kaiser Aluminium | V016 | 90203 | 28 Jun 2006 | $6,916.05 |
| 33.16 | Kaiser Aluminium | V016 | 90210 | 28 Jun 2006 | $582.35 |
| 33.17 | Kaiser Aluminium | W020 | 90206 | 28 Jun 2006 | $5,830.31 |
| 33.18 | Kaiser Aluminium | W020 | 90215 | 28 Jun 2006 | $562.54 |
| 33.19 | Goodyear Tire | T020 | 90026 | 20 Sep 2006 | $75,865.99 |

| | Claim | | Agreement By Equitas | | Amount Owed Under Assignment |
|---|---|---|---|---|---|
| | Insured/Loss | ROM's Ref. # | Signing # | Date | |
| 33.20 | Goodyear Tire | U019 | 90037 | 20 Sep 2006 | $77,733.57 |
| 33.21 | Goodyear Tire | V023 | 90044 | 20 Sep 2006 | $79,554.14 |
| 33.22 | Goodyear Tire | W033 | 90048 | 20 Sep 2006 | $84,152.26 |
| 33.23 | Goodyear Tire | X039 | 90059 | 20 Sep 2006 | $77,013.15 |
| 33.24 | Goodyear Tire | Y037 | 90085 | 20 Sep 2006 | $57,411.32 |
| 33.25 | Dana Corporation | A135 | 90018 | 22 Sep 2006 | $30,551.64 |
| 33.26 | Dana Corporation | B022 | 90032 | 22 Sep 2006 | $30,030.45 |
| 33.27 | Dana Corporation | C026 | 90058 | 25 Sep 2006 | $5,987.80 |
| 33.28 | Dana Corporation | D010 | 90061 | 22 Sep 2006 | $5,473.01 |
| 33.29 | Dana Corporation | E018 | 90084 | 22 Sep 2006 | $10,861.71 |
| 33.30 | Kaiser Aluminium | V016 | 90049 | 22 Sep 2006 | $2,573.55 |
| 33.31 | Kaiser Aluminium | V016 | 90192 | 21 Sep 2006 | $7,743.89 |
| 33.32 | Kaiser Aluminium | W020 | 90016 | 22 Sep 2006 | $108.85 |
| 33.33 | Kaiser Aluminium | W020 | 90186 | 21 Sep 2006 | $12,811.19 |
| 33.34 | Kaiser Aluminium | X017 | 90123 | 21 Sep 2006 | $58,945.74 |
| 33.35 | Kaiser Aluminium | Y016 | 90128 | 21 Sep 2006 | $58,119.52 |
| 33.36 | Kaiser Aluminium | A134 | 90153 | 21 Sep 2006 | $48,423.33 |
| 33.37 | Kaiser Aluminium | B021 | 90166 | 21 Sep 2006 | $34,717.17 |
| 33.38 | Kaiser Aluminium | C022 | 90175 | 21 Sep 2006 | $34,298.38 |
| 33.39 | Kaiser Aluminium | D025 | 90185 | 21 Sep 2006 | $17,187.22 |
| 33.40 | Kaiser Aluminium | E028 | 90100 | 21 Sep 2006 | $44,685.06 |
| 33.41 | B.F. Goodrich | C034 | 90015 | 09 Nov 2006 | $21,637.75 |
| 33.42 | B.F. Goodrich | D033 | 90029 | 09 Nov 2006 | $10,714.46 |
| 33.43 | B.F. Goodrich | E042 | 90037 | 09 Nov 2006 | $15,104.19 |
| 33.44 | Union Carbide | X027 | 90130 | 16 Nov 2006 | $(4,642.38) |
| 33.45 | Union Carbide | X027 | 90138 | 16 Nov 2006 | $(677.42) |
| 33.46 | Union Carbide | Y026 | 90149 | 16 Nov 2006 | $(3,782.37) |
| 33.47 | Union Carbide | Y026 | 90156 | 16 Nov 2006 | $(479.91) |
| 33.48 | Union Carbide | Z013 | 90002 | 17 Nov 2006 | $(4,027.83) |

|  | Claim |  | Agreement By Equitas |  | Amount Owed Under Assignment |
|---|---|---|---|---|---|
|  | Insured/Loss | ROM's Ref. # | Signing # | Date |  |
| 33.49 | Union Carbide | Z013 | 90008 | 17 Nov 2006 | $(394.65) |
| 33.50 | Dana Corporation | A135 | 90194 | 13 Dec 2006 | $3,517.28 |
| 33.51 | Dana Corporation | B022 | 90251 | 14 Dec 2006 | $3,407.43 |
| 33.52 | Dana Corporation | C026 | 90269 | 14 Dec 2006 | $1,632.81 |
| 33.53 | Dana Corporation | D010 | 90311 | 14 Dec 2006 | $31.14 |
| 33.54 | Dana Corporation | E018 | 90339 | 14 Dec 2006 | $55.65 |
| 33.55 | Kaiser Aluminium | V016 | 90135 | 07 Dec 2006 | $628.53 |
| 33.56 | Kaiser Aluminium | V016 | 90139 | 07 Dec 2006 | $7,652.76 |
| 33.57 | Kaiser Aluminium | W020 | 90148 | 07 Dec 2006 | $(1,374.63) |
| 33.58 | Kaiser Aluminium | W020 | 90153 | 07 Dec 2006 | $12,381.92 |
| 33.59 | Kaiser Aluminium | X017 | 90160 | 07 Dec 2006 | $50,622.68 |
| 33.60 | Kaiser Aluminium | X017 | 90170 | 07 Dec 2006 | $25,731.18 |
| 33.61 | Kaiser Aluminium | Y016 | 90177 | 07 Dec 2006 | $49,393.65 |
| 33.62 | Kaiser Aluminium | Y016 | 90184 | 07 Dec 2006 | $26,152.05 |
| 33.63 | Kaiser Aluminium | A134 | 90193 | 07 Dec 2006 | $41,554.60 |
| 33.64 | Kaiser Aluminium | A134 | 90205 | 07 Dec 2006 | $22,858.41 |
| 33.65 | Kaiser Aluminium | B021 | 90217 | 07 Dec 2006 | $51,061.52 |
| 33.66 | Kaiser Aluminium | B021 | 90226 | 07 Dec 2006 | $10,403.46 |
| 33.67 | Kaiser Aluminium | C022 | 90233 | 07 Dec 2006 | $50,767.05 |
| 33.68 | Kaiser Aluminium | C022 | 90239 | 07 Dec 2006 | $11,261.36 |
| 33.69 | Kaiser Aluminium | C025 | 90060 | 12 Dec 2006 | $13,381.73 |
| 33.70 | Kaiser Aluminium | D025 | 90248 | 07 Dec 2006 | $25,130.81 |
| 33.71 | Kaiser Aluminium | D025 | 90088 | 08 Dec 2006 | $5,722.39 |

| | Claim | | Agreement By Equitas | | Amount Owed Under Assignment |
|---|---|---|---|---|---|
| | Insured/Loss | ROM's Ref. # | Signing # | Date | |
| 33.72 | Kaiser Aluminium | E028 | 90096 | 08 Dec 2006 | $18,790.47 |
| 33.73 | Kaiser Aluminium | E028 | 90044 | 08 Dec 2006 | $34,476.33 |
| 33.74 | Goodyear Tire | T020 | 90027 | 29 Jan 2007 | $14,176.94 |
| 33.75 | Goodyear Tire | U019 | 90031 | 29 Jan 2007 | $14,532.53 |
| 33.76 | Goodyear Tire | V023 | 90035 | 29 Jan 2007 | $14,873.24 |
| 33.77 | Goodyear Tire | W033 | 90043 | 29 Jan 2007 | $25,170.63 |
| 33.78 | Goodyear Tire | X039 | 90066 | 29 Jan 2007 | $18,456.72 |
| 33.79 | Goodyear Tire | Y037 | 90015 | 30 Jan 2007 | $17,119.46 |
| 33.80 | Goodyear Tire | T020 | 90224 | 20 Apr 2007 | $13,009.48 |
| 33.81 | Goodyear Tire | U019 | 90111 | 23 Apr 2007 | $13,204.11 |
| 33.82 | Goodyear Tire | V023 | 90120 | 23 Apr 2007 | $13,397.89 |
| 33.83 | Minnesota Minning | X022 | 90012 | 30 Jul 2007 | $95,696.05 |
| 33.84 | Minnesota Minning | Y025 | 90024 | 30 Jul 2007 | $75,250.51 |
| 33.85 | American Cyanamid | A083 | 90070 | 07 Aug 2007 | $16,211.00 |
| 33.86 | Union Carbide | X013 | 90046 | 08 Oct 2007 | $11,630.73 |
| 33.87 | Minnesota Minning | X022 | 90053 | 08 Oct 2007 | $11,442.86 |
| 33.88 | Minnesota Minning | Y025 | 90060 | 08 Oct 2007 | $8,823.14 |
| 33.89 | Hercules | A136 | 90046 | 04 Dec 2007 | $14,299.70 |
| 33.90 | Hercules | B024 | 90053 | 04 Dec 2007 | $14,281.33 |
| 33.91 | Hercules | C028 | 90058 | 04 Dec 2007 | $14,275.22 |
| 33.92 | Hercules | E039 | 90064 | 04 Dec 2007 | $9,957.28 |
| 33.93 | Georgia Pacific | W026 | 90036 | 04 Dec 2007 | $10,274.47 |
| 33.94 | Georgia Pacific | X032 | 90042 | 04 Dec 2007 | $7,298.18 |
| 33.95 | Dresser Industries | W031 | 90119 | 05 Dec 2007 | $3,534.41 |
| 33.96 | Dresser Industries | X037 | 90112 | 05 Dec 2007 | $3,181.62 |
| 33.97 | Dresser Industries | Y034 | 90128 | 05 Dec 2007 | $3,137.27 |
| | | | | Total | $1,903,420.61 |

34.     Despite demand, Lloyd's Underwriters have failed to pay to B.D. Cooke

reinsurance recoverables due to B.D. Cooke, as Citizens' assignee, in respect of the

Agreed Claims.

35. The amount now due from Lloyd's Underwriters in respect of the Agreed Claims is no less than $1,903,420.61, exclusive of interest and costs.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Declaratory Relief)

36. The allegations of Paragraphs 1 through 35 are realleged and incorporated by reference herein.

37. Lloyd's Underwriters, through Equitas, have premised their refusal to pay amounts due to B.D. Cooke under the Assignment in respect of the Agreed Claims upon their contention that the Assignment caps the amount that can be recovered by B.D. Cooke.

38. Lloyd's Underwriters, through Equitas, have also asserted that the Assignment constitutes a novation of the Excess-of-Loss Reinsurance Agreements and that such novation purportedly means that Lloyd's Underwriters are relieved of liability by virtue of a separate agreement not at issue in this action.

39. The Lloyd's Underwriters' interpretations of the Assignment referenced in Paragraphs 37 and 38 are contrary to the terms of the Assignment, the Petition and this Court's Approval Order, and contrary to this Court's decisions on summary judgment in the Nationwide Action against Lloyd's Underwriters' fellow reinsurer.

40. As a result of the events described herein, an actual, ripe controversy of a justiciable nature presently exists between B.D. Cooke and Lloyd's Underwriters concerning the meaning and effect of Assignment, including with respect to past, present, and future amounts due to B.D. Cooke under the Assignment.

41.     B.D. Cooke and Lloyd's Underwriters have adverse legal interests in regard to the meaning and effect of the Assignment.

42.     The controversy is of sufficient immediacy as to justify the entry of a declaratory judgment.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Breach of Contract)**

43.     The allegations of Paragraphs 1 through 42 are realleged and incorporated by reference herein.

44.     This cause of action is asserted in this action expressly subject to, and without waiver of, arbitration of any disputes under the Excess-of-Loss Reinsurance Agreements as provided in any arbitration clauses contained in such Excess-of-Loss Reinsurance Agreements.  However, there are no apparent disputes between the parties concerning the Excess-of-Loss Reinsurance Agreements with respect to the Agreed Claims, which were instead agreed to by Lloyd's Underwriters, as set forth in Paragraph 33, and sub-Paragraphs 33.1 through 33.97.  Lloyd's Underwriters, through Equitas, have explained their failure to pay the Agreed Claims solely on bases other than the Excess-of-Loss Reinsurance Agreements.  If, and to the extent, there are, or there are deemed to be, disputes within any arbitration provision of any of the Excess-of-Loss Reinsurance Agreements, B.D. Cooke expressly reserves the right to arbitrate such disputes.

45.     Lloyd's Underwriters entered into the Excess-of-Loss Reinsurance Agreements, whereby they reinsured Citizens.

46.     All relevant rights of Citizens under the Excess-of-Loss Reinsurance Agreements were vested in the Liquidator, and assigned by the Liquidator to B.D. Cooke.

47.     Despite demand, Lloyd's Underwriters have not paid B.D. Cooke in respect of the Agreed Claims and, in failing to do so, have breached their contractual obligations to B.D. Cooke, as assignee, under the Excess-of-Loss Reinsurance Agreements.

48.     By reason of the foregoing, B.D. Cooke has been damaged in an amount no less than $1,903,420.61, exclusive of interest and costs.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Account Stated)

49.     The allegations of Paragraphs 1 through 48 are realleged and incorporated by reference herein.

50.     This cause of action is asserted in this action expressly subject to, and without waiver of, arbitration of any disputes under the Excess-of-Loss Reinsurance Agreements as provided in any arbitration clauses contained in such Excess-of-Loss Reinsurance Agreements.  However, there are no apparent disputes between the parties concerning the Excess-of-Loss Reinsurance Agreements with respect to the Agreed Claims, which were instead agreed to by Lloyd's Underwriters, as set forth in Paragraph 33, and sub-Paragraphs 33.1 through 33.97.  Lloyd's Underwriters, through Equitas, have explained their failure to pay the Agreed Claims solely on bases other than the Excess-of-Loss Reinsurance Agreements.  If, and to the extent, there are, or there are deemed to be, disputes within any arbitration provision of any of the Excess-of-Loss

Reinsurance Agreements, B.D. Cooke expressly reserves the right to arbitrate such disputes.

51.     Lloyd's Underwriters have expressly or impliedly agreed to reinsurance billings for reinsurance recoverables due to B.D. Cooke, as Citizens' assignee, thereby establishing an account stated in respect of the Agreed Claims.

WHEREFORE, plaintiff B.D. Cooke demands judgment against the defendants Lloyd's Undewriters as follows:

1.     On plaintiff's First cause of action, a declaration as to the meaning and effect of the Assignment, including without limitation that (A) there is no cap on the amount that B.D. Cooke is entitled to collect under the Assignment; and (B) the Assignment is an assignment and does not constitute a novation of any of the assigned reinsurance agreements;

2.     On plaintiff's Second and Third causes of action, subject to Paragraphs 44 and 50, judgment in the amount of $1,903,420.61, plus the amounts of any other agreed or account-stated claims under the Assignment, plus interest at the applicable rate;

3.     On all causes of action, judgment granting plaintiff costs, disbursements and attorneys' fees in prosecuting this action; and

4.    Judgment granting such other and further relief as the Court may deem

just and proper.

Dated:    New York, New York          CHADBOURNE & PARKE LLP
          February 26, 2008

                                      By _____
                                              John F. Finnegan
                                      Attorneys for Plaintiff
                                      30 Rockefeller Plaza
                                      New York, New York  10112
                                      (212) 408-5100

Carey G. Child
Anne Linder
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 974-5600

          Of Counsel

17

**Exhibit A Page 1**

## Agency Managers London Reinsurance Program
(Placed through Willis Faber & Dumas / Sam Hogg)

| | | | |
|---|---|---|---|
| 1952 ULW4642 | 1st Cas XL | 23 Nov 1951 to 31 Dec 1952 | US$ 350,000 xs US$ 150,000 |
| 1953 ULW4642 | 1st Cas XL | 12 months at 1 Jan 1953 | US$ 350,000 xs US$ 150,000 |
| 1954 UMW4642 | 1st Cas XL | 12 months at 1 Jan 1954 | US$ 350,000 xs US$ 150,000 |
| 1955 UNW4642 | 1st Cas XL | 12 months at 1 Jan 1955 | US$ 350,000 xs US$ 150,000 |
| UNW5261 | 2nd Cas XL | 23 Sep 1954 to 31 Dec 1955 | US$ 500,000 xs US$ 500,000 |
| 1956 UPW4642 | 1st Cas XL | 12 months at 1 Jan 1956 | US$ 350,000 xs US$  50,000 |
| UPW5261 | 2nd Cas XL | 12 months at 1 Jan 1956 | US$ 500,000 xs US$ 500,000 |
| UPW5541 | Clash XL | 12 months at 1 Jan 1956 | US$ 300,000 xs US$ 150,000 |
| 1957 UQW4642 | 1st Cas XL | 12 months at 1 Jan 1957 | US$ 350,000 xs US$ 150,000 |
| UQW5261 | 2nd Cas XL | 12 months at 1 Jan 1957 | US$ 500,000 xs US$ 500,000 |
| UQW5541 | Clash XL | 12 months at 1 Jan 1957 | US$ 300,000 xs US$ 150,000 |
| 1958 URW4642 | 1st Cas XL | 12 months at 1 Jan 1958 | US$ 350,000 xs US$ 150,000 |
| URW5261 | 2nd Cas XL | 12 months at 1 Jan 1958 | US$ 500,000 xs US$ 500,000 |
| URW5541 | Clash XL | 12 months at 1 Jan 1958 | US$ 300,000 xs US$ 150,000 |
| 1959 USW4642 | 1st Cas XL | 12 months at 1 Jan 1959 | US$ 350,000 xs US$ 150,000 |
| USW5261 | 2nd Cas XL | 12 months at 1 Jan 1959 | US$ 500,000 xs US$ 500,000 |
| USW5541 | Clash XL | 12 months at 1 Jan 1959 | US$ 300,000 xs US$ 150,000 |
| 1960 UTW4642 | 1st Cas XL | 12 months at 1 Jan 1960 | US$ 350,000 xs US$ 150,000 |
| UTW5261 | 2nd Cas XL | 12 months at 1 Jan 1960 | US$ 500,000 xs US$ 500,000 |
| UTW5541 | Clash XL | 12 months at 1 Jan 1960 | US$ 300,000 xs US$ 150,000 |
| 1961 UUW4642 | 1st Cas XL | 12 months at 1 Jan 1961 | US$ 350,000 xs US$ 150,000 |
| UUW5261 | 2nd Cas XL | 12 months at 1 Jan 1961 | US$ 500,000 xs US$ 500,000 |
| UUW5541 | Clash XL | 12 months at 1 Jan 1961 | US$ 300,000 xs US$ 150,000 |
| 1962 UVW4642 | 1st Cas XL | 12 months at 1 Jan 1962 | US$ 350,000 xs US$ 150,000 |
| UVW5261 | 2nd Cas XL | 12 months at 1 Jan 1962 | US$ 500,000 xs US$ 500,000 |
| UVW5541 | Clash XL | 12 months at 1 Jan 1962 | US$ 300,000 xs US$ 150,000 |
| 1963 UXW4642 | 1st Cas XL | 12 months at 1 Jan 1963 | US$ 350,000 xs US$ 150,000 |
| UXW5261 | 2nd Cas XL | 12 months at 1 Jan 1963 | US$ 500,000 xs US$ 500,000 |
| UXW5541 | Clash XL | 12 months at 1 Jan 1963 | US$ 300,000 xs US$ 150,000 |
| 1964 UYW4642 | 1st Cas XL | 12 months at 1 Jan 1964 | US$ 350,000 xs US$ 150,000 |
| UYW5261 | 2nd Cas XL | 12 months at 1 Jan 1964 | US$ 500,000 xs US$ 500,000 |
| UYW5541 | Clash XL | 12 months at 1 Jan 1964 | US$ 300,000 xs US$ 150,000 |

**Exhibit A Page 2**

| | | | |
|---|---|---|---|
| 1965 UZW4642 | 1st Cas XL | 12 months at 1 Jan 1965 | US$ 350,000 xs US$ 150,000 |
| UZW5261 | 2nd Cas XL | 12 months at 1 Jan 1965 | US$ 500,000 xs US$ 500,000 |
| UZW5541 | Clash XL | 12 months at 1 Jan 1965 | US$ 300,000 xs US$ 150,000 |
| | | | |
| 1966 UAX4647 | 1st Cas XL | 12 months at 1 Jan 1966 | US$ 350,000 xs US$ 150,000 |
| UAX5261 | 2nd Cas XL | 12 months at 1 Jan 1966 | US$ 500,000 xs US$ 500,000 |
| UAX5541 | Clash XL | 12 months at 1 Jan 1966 | US$ 300,000 xs US$ 150,000 |
| | | | |
| 1967 UBX4642 | 1st Cas XL | 12 months at 1 Jan 1967 | US$ 350,000 xs US$ 150,000 |
| UBX5261 | 2nd Cas XL | 12 months at 1 Jan 1967 | US$ 500,000 xs US$ 500,000 |
| UBX5541 | Clash XL | 12 months at 1 Jan 1967 | US$ 300,000 xs US$ 150,000 |
| | | | |
| 1968 UCX4642 | 1st Cas XL | 12 months at 1 Jan 1968 | US$ 350,000 xs US$ 150,000 |
| UCX5261 | 2nd Cas XL | 12 months at 1 Jan 1968 | US$ 500,000 xs US$ 500,000 |
| UCX3665 | 3rd Cas XL | 12 months at 1 Jan 1968 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| UCX5541 | Clash XL | 12 months at 1 Jan 1968 | US$ 350,000 xs US$ 150,000 |
| | | | |
| 1969 UDX4642 | 1st Cas XL | 12 months at 1 Jan 1969 | 80% of US$ 525,000 xs US$ 175,000 |
| UDX5261 | 2nd Cas XL | 12 months at 1 Jan 1969 | 80% of US$ 500,000 xs US$ 500,000 |
| UDX3665 | 3rd Cas XL | 12 months at 1 Jan 1969 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| UDX5541 | Clash XL | 12 months at 1 Jan 1969 | US$ 500,000 xs US$ 175,000 |
| | | | |
| 1970 UEX0018 | 1st Cas XL | 12 months at 1 Jan 1970 | 80% of US$ 525,000 xs US$ 175,000 |
| | | extended to 31 Mar 1971 | 80% of US$ 500,000 xs US$ 200,000 |
| UEX0019 | 2nd Cas XL | 12 months at 1 Jan 1970 | 80% of US$ 500,000 xs US$ 500,000 |
| | | extended to 31 Mar 1971 | 80% of US$ 500,000 xs US$ 500,000 |
| UEX3665 | 3rd Cas XL | 12 months at 1 Jan 1970 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | | extended to 31 Mar 1971 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| UEX5541 | Clash XL | 12 months at 1 Jan 1970 | US$ 325,000 xs US$ 150,000 |
| | | extended to 31 Mar 1971 | US$ 400,000 xs US$ 200,000 |
| | | | |
| 1971 UFX0397 | 1st Cas XL | 1 Apr 1971 to 31 Dec 1971 | 32.5% of US$ 300,000 xs US$ 200,000 |
| UFX0398 | 2nd Cas XL | 1 Apr 1971 to 31 Dec 1971 | 80% of US$ 500,000 xs US$ 500,000 |
| UFX3665 | 3rd Cas XL | 1 Apr 1971 to 31 Dec 1971 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| UFX0399 | Clash XL | 1 Apr 1971 to 31 Dec 1971 | US$ 400,000 xs US$ 200,000 |
| | | | |
| 1972 UGX0397 | 1st Cas XL | 12 months at 1 Jan 1972 | 32.5% of US$ 300,000 xs US$ 200,000 |
| UGX0398 | 2nd Cas XL | 12 months at 1 Jan 1972 | 80% of US$ 500,000 xs US$ 500,000 |
| UGX3665 | 3rd Cas XL | 12 months at 1 Jan 1972 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| UGX0399 | Clash XL | 12 months at 1 Jan 1972 | US$ 400,000 xs US$ 200,000 |
| | | | |
| 1973 UHX0552 | 2nd XL RU | 12 months at 1 Jan 1973 | 35% of US$ 4,000,000 xs US$ 1,000,000 |
| | | | |
| 1974 UIX0552 | 2nd XL RU | 12 months at 1 Jan 1974 | 35% of US$ 4,000,000 xs US$ 1,000,000 |
| | | | |
| 1975 UKX0753 | 1st Cas XL | 12 months at 1 Jan 1975 | 13.83% of US$ 750,000 xs US$ 250,000 |
| UKX0754 | 2nd Cas XL | 12 months at 1 Jan 1975 | 56.55% of US$ 1,000,000 xs US$ 1,000,000 |
| UKX0755 | 3rd Cas XL | 12 months at 1 Jan 1975 | 67% of US$ 2,500,000 xs US$ 2,500,000 |
| UKX0753 | Clash XL | 12 months at 1 Jan 1975 | 13.83% of US$ 750,000 xs US$ 250,000 |

# MOUND COTTON WOLLAN & GREENGRASS

### COUNSELLORS AT LAW

### ONE BATTERY PARK PLAZA
### NEW YORK, NY 10004-1486

———

(212) 804-4200

FAX: (212) 344-8066

WWW.MOUNDCOTTON.COM

NEW YORK, NY
NEWARK, NJ
GARDEN CITY, NY
SAN FRANCISCO, CA
FORT LAUDERDALE, FL

James D. Veach
212-804-4233
jveach@moundcotton.com

April 4, 2008

**Via E-Mail, Federal Express, and**
**Certified Mail -- Return Receipt Requested**

Carey G. Child, Esq.
Chadbourne & Parke LLP
1200 New Hampshire Avenue, NW
Washington, DC 20036

Re:  B.D. Cooke v. Certain Underwriters at Lloyd's, London
Excess of Loss Casualty Retrocession Contracts
Our File Number:  3038.001

Dear Mr. Child:

As you know, we represent Certain Underwriters at Lloyd's, London (Underwriters) with respect to various excess of loss casualty retrocession contracts identified in Schedule "A" annexed to a verified complaint filed by B.D. Cooke & Partners Limited (Cooke) in the Supreme Court, New York County, on February 26, 2008.  A copy of the complaint and accompanying summons appears under Tab 1.  We know from our conversations that your firm represents Cooke.

Pursuant to the agreements to arbitrate contained in the retrocession contracts, Underwriters demands that the claims and demands set forth in the complaint be submitted to a court of arbitration sitting in New York, New York.   Underwriters reserves the right to supplement this arbitration demand to address additional disputes "arising under" the retrocession contracts,  including whether:

- B. D. Cooke and Lloyd's commuted the retrocession contracts pursuant to a commutation agreement executed in February 2002;

- balances identified in the complaint, ¶33, come within the terms of a 1997 assignment of certain excess of loss casualty retrocession contracts from the Liquidator of Citizens Casualty Insurance Company, an insurer whose corporate charter was dissolved and which no longer exists, to Cooke;

MOUND COTTON WOLLAN & GREENGRASS

Carey G. Child, Esq.
April 4, 2008
Page 2

- specific losses identified in the Complaint, ¶33, come within the coverage provided by the retrocession contracts; and

- declaratory relief with respect to any future losses or claims should be granted.

Underwriters will seek from the court of arbitration an order:

1. giving Underwriters access to all books and records maintained by Cooke and its agents, including, but not limited to, ROM Reinsurance Management Company, Inc. (ROM) relating to losses purportedly subject to the assignment including, but not limited to, those claims identified in paragraph 33 of the annexed complaint, Tab 1;

2. providing that the 2002 commutation agreement extinguished any obligation to indemnify assignee Cooke;

3. directing that B.D. Cooke reimburse Lloyd's for any losses that Lloyd's has paid to date in error; and

4. awarding Underwriters the expenses and costs of the arbitration including Underwriters attorneys' fees.

The instant demand does not constitute an admission of coverage or a waiver of any rights with respect to the claims identified in the complaint, ¶33, or an admission of coverage or a waiver of any rights with respect to the contracts identified in schedule "A" annexed to the complaint.

Underwriters requests that Cooke choose its arbiter. If Cooke fails to choose its arbiter within sixty days, Underwriters will exercise its right to choose two arbiters who will in turn choose an umpire.

Please forward all future communications with respect to this arbitration to the undersigned.

Very truly yours,

Jam Vech.

cc: John R. Finnegan, Esq.

Attachment

# TAB 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------

B.D. COOKE & PARTNERS LIMITED, as Assignee of          Index No.
Citizens Casualty Company of New York (in liquidation)

Plaintiff(s),

-*against*-                              **Summons**

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON

Date Index No. Purchased:     February 26, 2008

Defendant(s).
------------------------------------------------------------

To the above named Defendant(s)

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON
c/o RESOLUTE MANAGEMENT SERVICES LIMITED
33 St. Mary Axe, London, EC3A 8LL, United Kingdom

You are hereby summoned to answer the complaint in this action and to serve
a copy of your answer, or, if the complaint is not served with this summons, to serve
a notice of appearance, on the Plaintiff's attorney within 20 days after the service of
this summons, exclusive of the day of service (or within 30 days after the service is
complete if this summons is not personally delivered to you within the State of New
York); and in case of your failure to appear or answer, judgment will be taken against
you by default for the relief demanded in the complaint.

The basis of venue is residence of Plaintiff's assignor at the time of the assignment
which is 123 William Street, New York, New York; Plaintiff's designation.

Dated: New York, New York

February 26, 2008

CHADBOURNE & PARKE LLP

by _____
John F. Finnegan
**Attorneys for Plaintiff**
B.D. COOKE & PARTNERS LIMITED, as
Assignee of Citizens Casualty Company of New
York (in liquidation)

30 Rockefeller Plaza
New York, New York 10112
212-408-5100

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

B.D. COOKE & PARTNERS LIMITED, AS
ASSIGNEE OF CITIZENS CASUALTY COMPANY
OF NEW YORK (IN LIQUIDATION),

                                          Plaintiff,

                  -against-

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON,

                                  Defendants.

Index No.

**VERIFIED COMPLAINT**

---

         Plaintiff, by its attorneys, CHADBOURNE & PARKE LLP, for its complaint alleges:

## NATURE OF THE ACTION

       1.      Plaintiff B.D. Cooke & Partners Limited ("B.D. Cooke") brings this action as the assignee of the liquidator of Citizens Casualty Company of New York ("Citizens") against defendants Certain Underwriters at Lloyd's, London ("Lloyd's Underwriters"), who are reinsurers under reinsurance agreements assigned to B.D. Cooke by the liquidator of Citizens.

       2.      B.D. Cooke seeks declaratory relief and money damages in respect of reinsurance claims that have been agreed to by Lloyd's Underwriters, but which they refuse to pay based on their assertion that the assignment is subject to a "cap" on the amount recoverable. This Court approved that assignment, and retained jurisdiction to

resolve disputes concerning the assignment.  In that regard, this Court has previously rejected another reinsurer's argument that the same assignment was subject to a cap.

## PARTIES, PERSONAL JURISDICTION, AND VENUE

3.    Plaintiff B.D. Cooke is a corporation organized and existing under the laws of the United Kingdom, having its registered address at 2 Knoll Rise, Orpington, Kent, England.

4.    Plaintiff's assignor, the liquidator of Citizens, through the New York Liquidation Bureau, had, at the time of the assignment, its principal office and its facilities involved therein within New York County at 123 William Street, New York, New York.

5.    Defendants Lloyd's Underwriters are those underwriters at Lloyd's of London that, through one or more syndicates of such underwriters, variously participated as reinsurers in one or more of the excess-of-loss reinsurance contracts listed in Exhibit A (the "Excess-of-Loss Reinsurance Agreements").  Upon information and belief, the syndicates operated in London with the individual underwriter members domiciled in many places throughout the world, possibly including various states within the United States.

6.    Upon information and belief, Lloyd's Underwriters, by their participation in one or more of the Excess-of-Loss Reinsurance Agreements, contracted to provide reinsurance to one or more members of a reinsurance pool (the "Agency Managers Pool"), specifically including contracting to provide reinsurance to Citizens.  Upon information and belief, the Agency Managers Pool was operated in New York County

2

by Agency Managers, Limited, a/k/a Agency Managers, Incorporated ("Agency

Managers").  Agency Managers was a New York corporation with its principal place of

business in New York County.  Citizens also was a New York corporation with its

principal place of business in New York County.

       7.      Upon information and belief, the Excess-of-Loss Reinsurance

Agreements each contain a contractual provision consenting to jurisdiction and service

of process in the following, or substantially similar, language:

> It is agreed that in the event of the failure of the Reinsurers to
> pay any amount claimed to be due hereunder, the Reinsurers at
> the request of the Reassured, will submit to the jurisdiction of
> any Court of competent jurisdiction within the United States
> and will comply with all requirements necessary to give such
> Court jurisdiction and all matters arising hereunder shall be
> determined in accordance with the law and practice of such
> Court.  It is further agreed that service of process in such suit
> may be made upon Mendes and Mount, 27 William Street,
> New York, New York 10005, or their nominee or nominees,
> and that in any suit instituted against any one of them upon
> this Contract, the Reinsurers will abide by the final decision of
> such Court or of any Appellate Court in the event of an appeal.

## RELATED ACTONS

       8.      By an order dated June 17, 1971, in Index No. 40357/71, re-captioned *In

Re the Liquidation of Citizens Casualty Co. of New York*, (the "Liquidation

Proceeding"), this Court, among other things:  (A) placed Citizens into liquidation; (B)

appointed the Superintendent of Insurance of the State of New York as liquidator (the

"Liquidator"); (C) granted the Liquidator authority to take possession of Citizens'

property and liquidate its business and affairs; and (D) vested the Liquidator with title to

all property, contracts and rights of action of Citizens.

3

9.      In an order dated March 6, 1997, this Court (Justice Greenfield), in the Liquidation Proceeding, approved a petition and plan by the Liquidator for early closure of the Citizens estate.  That order specifically approved the assignment at issue in this action.  In addition, the petition and plan approved by this Court's order also provided that "the Supreme Court of the State of New York, New York County, shall have continuing jurisdiction over any disputes concerning the assignments and transfers described above and their effect, except said Court shall not resolve disputes solely involving computations of amounts due thereunder."

10.     In *B.D. Cooke & Partners Limited, As Assignee of Citizens Cas. Co. of New York v. Nationwide Mutual Ins. Co.*, Index No. 600655/02 (the "Nationwide Action"), this Court resolved such a dispute concerning the assignment at issue in this action.  In a memorandum decision and order dated October 6, 2003, this Court (Justice Lowe), *inter alia,* rejected on summary judgment the contention by Nationwide Mutual Insurance Company ("Nationwide"), another reinsurer of Citizens, that the assignment was capped, and held that B.D. Cooke was entitled to collect as assignee under the assignment.  *Id., slip op. at 6, 7, 13*  In pertinent part, that decision was upheld on appeal to the First Department of the Appellate Division.  16 A.D.3d 208, 791 N.Y.S.2d 103 (Mar. 15, 2005).

### FACTS COMMON TO ALL CAUSES OF ACTIONS

#### Citizens Was A Member Of The Agency Managers Pool

11.     Upon information and belief, Agency Managers operated and managed the reinsurance pool known as the Agency Managers Pool.  Certain insurance and

4

reinsurance companies agreed to participate in the Agency Managers Pool as pool members, with each pool member agreeing to assume a percentage interest in all reinsurance business written by Agency Managers on behalf of the Agency Managers Pool.

12.    Upon information and belief, Agency Managers operated the Agency Managers Pool from at least the early 1950s until 1988, when Agency Managers filed a bankruptcy petition.  Agency Managers was succeeded in the administration of the Agency Managers Pool by ROM Reinsurance Management Co., Inc. ("ROM").

13.    Upon information and belief, Citizens was a member of the Agency Managers Pool and entered into a Memorandum of Agreement with Agency Managers effective on or about July 1, 1950 (the "Citizens Memorandum").  Among other things, under the Citizens' Memorandum, Citizens appointed Agency Managers as "agent for and in [Citizens'] behalf in the procuring, underwriting and servicing of policies, contracts and/or treaties of casualty reinsurance business in the United States."

**As A Member Of The Agency Managers Pool,**
**Citizens Reinsured The B.D. Cooke Pool**

14.    B.D. Cooke is the current manager of a pool of U.K. insurers formerly managed by Underwriting Management Agency Ltd. and C.F.&A.U. Ltd. (the "B.D. Cooke Pool"), and led by The Dominion Insurance Company Limited ("Dominion").

15.    The B.D. Cooke Pool, led by Dominion, obtained reinsurance from the Agency Managers Pool, including reinsurance whereby Citizens reinsured Dominion and the B.D. Cooke Pool.

**Defendants Lloyd's Underwriters Then Reinsured Citizens**

16.     Upon information and belief, Agency Managers procured reinsurance for the benefit of Citizens in respect of the reinsurance obligations that Citizens owed to Dominion, the B.D. Cooke Pool, and others.

17.     Upon information and belief, the reinsurance procured by Agency Managers for the benefit of Citizens included reinsurance known as "Inter-Office Reinsurance" obtained from other members of the Agency Managers Pool such as Nationwide, as well as excess-of-loss reinsurance procured from external reinsurers, such as Lloyd's Underwriters under various of the Excess-of-Loss Reinsurance Agreements.

**Upon The Insolvency Of Citizens, The Liquidator Is Vested
With Title To The Excess-of-Loss Reinsurance Agreements**

18.     As set forth above, on or about June 17, 1971, Citizens was declared insolvent and placed under the control of the Liquidator, who continued to administer the estate of Citizens until at least 1997, under the supervision of this Court in the Liquidation Proceeding.

19.     By virtue of Citizens' reinsurance of Dominion and the B.D. Cooke Pool, Dominion was a net creditor of the Citizens estate.

20.     This Court's order of liquidation vested the Liquidator with title to all of the property, contracts and rights of action of Citizens.

21.     Upon information and belief, the Liquidator gave notice to Citizens' reinsurers, including Lloyd's Underwriters, of the Liquidation Proceeding and that the

6

Liquidator had been vested by this Court with title to all of the property, contracts and rights of action of Citizens, including their reinsurance of Citizens.

**The Liquidator's Petition In The Liquidation Proceeding**

22.    In a Petition (the "Petition") sworn to on October 11, 1996 and submitted to this Court in the Liquidation Proceeding, the Liquidator stated that Dominion was the largest creditor of the Citizens estate, including on account of claims that the Liquidator determined would take years to resolve.

23.    With the express purpose of expediting the closing of the Citizens estate, the Liquidator's Petition sought this Court's approval to assign the Liquidator's rights under Citizens' reinsurance agreements to B.D. Cooke in exchange for concessions regarding Dominion's claims against the Citizens estate.

24.    Upon information and belief, Lloyd's Underwriters were given notice of the Petition.

25.    Upon information and belief, Mendes & Mount, attorneys for Lloyd's Underwriters, attended the hearing held by this Court concerning the Petition.

26.    Upon information and belief, Lloyd's Underwriters did not object to the Petition or the Liquidator's plan set forth therein.

**The Assignment Approved By This Court**

27.    In an order dated March 6, 1997 (the "Approval Order"), this Court, in the Liquidation Proceeding, approved the Petition and the Liquidator's plan set forth therein.

28.     Pursuant to the Petition and Approval Order, the Liquidator entered into an assignment to B.D. Cooke (the "Assignment") of certain of the Liquidator's rights under Citizens' reinsurance contracts, including the Inter-Office Reinsurance and the Excess-of-Loss Reinsurance Agreements.

29.     Among other things, the Assignment transfers to B.D. Cooke all of the Liquidator's "right, title, and interest in and to":

> (a)     All reinsurance Recoverables and Excess of Loss Recoverables due Assignor according to his accounts as of June 30, 1994 and uncollected by Assignor or for Assignor's account by June 30, 1995; notwithstanding the foregoing, any Reinsurance Recoverables due from Citizens as an Agency Managers Pool member to Citizens as a Cedent are not being assigned hereunder.

> (b)     All Reinsurance Agreements and Excess of Loss Agreements running in favor of Citizens or the Liquidator of Citizens effective as from July 1, 1994 except to the extent that Assignor has exercised any rights thereunder prior to February 11, 1997, together with all of the rights which Assignor would have had under such agreements if the Citizens estate were not closed pursuant to the Assignor's Plan for the closing of the Citizens' liquidation.

> (c)     Effective upon the entry of a final nonappealable order approving the Final Audit and Accounting of Citizens, all other reinsurance recoverables due Citizens not arising out of the business of the AM Pool, together with all reinsurance assets and rights of recovery under reinsurance agreements of Citizens (including, without limitation on the foregoing, those reinsurances which may not have been specifically identified as of February 11, 1997).

30.     In exchange for the Assignment, and in reliance upon the Petition and this Court's Approval Order, Dominion made concessions regarding Dominion's claims against the Citizens estate that permitted final distributions from, and closure of, the Citizens estate.

8

<u>Lloyd's Underwriters Failure To Pay Agreed Claims Under The Assignment</u>

31.    Upon information and belief, claims under the Excess-of-Loss

Reinsurance Agreements have been handled for Lloyd's Underwriters by Equitas

Management Services Limited n/k/a Resolute Management Services Limited ("Equitas")

and have been presented to Equitas by ROM, as successor to Agency Managers.

32.    Upon information and belief, Equitas has signified its agreement to

claims by providing an Equitas signing number.

33.    Upon information and belief, the claims agreed by Equitas include the

following claims set forth in sub-Paragraphs 33.1 through 33.97 (the "Agreed Claims"):

| | Claim | | Agreement By Equitas | | Amount Owed Under Assignment |
|---|---|---|---|---|---|
| | Insured/Loss | ROM's Ref. # | Signing # | Date | |
| 33.1 | Dana Corporation | A135 | 90173 | 31 Mar 2005 | $21,591.30 |
| 33.2 | Dana Corporation | B022 | 90176 | 31 Mar 2005 | $3,135.18 |
| 33.3 | Ciba Geigy | X021 | 90092 | 15 Apr 2005 | $83,742.06 |
| 33.4 | Foster Wheeler | U003 | 90163 | 27 Mar 2006 | $71,613.46 |
| 33.5 | Foster Wheeler | U003 | 90173 | 27 Mar 2006 | $6,575.46 |
| 33.6 | Foster Wheeler | V004 | 90187 | 27 Mar 2006 | $(4,315.41) |
| 33.7 | Foster Wheeler | V004 | 90200 | 27 Mar 2006 | $(18,771.45) |
| 33.8 | Foster Wheeler | W007 | 90224 | 27 Mar 2006 | $(22,907.83) |
| 33.9 | Foster Wheeler | W007 | 90239 | 27 Mar 2006 | $(10,035.80) |
| 33.10 | Foster Wheeler | X006 | 90035 | 28 Mar 2006 | $(7,502.20) |
| 33.11 | Foster Wheeler | X006 | 90041 | 28 Mar 2006 | $(15,205.48) |
| 33.12 | Foster Wheeler | Y005 | 90063 | 29 Mar 2006 | $(8,280.92) |
| 33.13 | Foster Wheeler | Y005 | 90103 | 28 Mar 2006 | $(20,274.62) |
| 33.14 | Foster Wheeler | E022 | 90080 | 28 Mar 2006 | $13,989.48 |
| 33.15 | Kaiser Aluminium | V016 | 90203 | 28 Jun 2006 | $6,916.05 |
| 33.16 | Kaiser Aluminium | V016 | 90210 | 28 Jun 2006 | $582.35 |
| 33.17 | Kaiser Aluminium | W020 | 90206 | 28 Jun 2006 | $5,830.31 |
| 33.18 | Kaiser Aluminium | W020 | 90215 | 28 Jun 2006 | $562.54 |
| 33.19 | Goodyear Tire | T020 | 90026 | 20 Sep 2006 | $75,865.99 |

9

| | Claim | | Agreement By Equitas | | Amount Owed Under Assignment |
|---|---|---|---|---|---|
| | Insured/Loss | ROM's Ref. # | Signing # | Date | |
| 33.20 | Goodyear Tire | U019 | 90037 | 20 Sep 2006 | $77,733.57 |
| 33.21 | Goodyear Tire | V023 | 90044 | 20 Sep 2006 | $79,554.14 |
| 33.22 | Goodyear Tire | W033 | 90048 | 20 Sep 2006 | $84,152.26 |
| 33.23 | Goodyear Tire | X039 | 90059 | 20 Sep 2006 | $77,013.15 |
| 33.24 | Goodyear Tire | Y037 | 90085 | 20 Sep 2006 | $57,411.32 |
| 33.25 | Dana Corporation | A135 | 90018 | 22 Sep 2006 | $30,551.64 |
| 33.26 | Dana Corporation | B022 | 90032 | 22 Sep 2006 | $30,030.45 |
| 33.27 | Dana Corporation | C026 | 90058 | 25 Sep 2006 | $5,987.80 |
| 33.28 | Dana Corporation | D010 | 90061 | 22 Sep 2006 | $5,473.01 |
| 33.29 | Dana Corporation | E018 | 90084 | 22 Sep 2006 | $10,861.71 |
| 33.30 | Kaiser Aluminium | V016 | 90049 | 22 Sep 2006 | $2,573.55 |
| 33.31 | Kaiser Aluminium | V016 | 90192 | 21 Sep 2006 | $7,743.89 |
| 33.32 | Kaiser Aluminium | W020 | 90016 | 22 Sep 2006 | $108.85 |
| 33.33 | Kaiser Aluminium | W020 | 90186 | 21 Sep 2006 | $12,811.19 |
| 33.34 | Kaiser Aluminium | X017 | 90123 | 21 Sep 2006 | $58,945.74 |
| 33.35 | Kaiser Aluminium | Y016 | 90128 | 21 Sep 2006 | $58,119.52 |
| 33.36 | Kaiser Aluminium | A134 | 90153 | 21 Sep 2006 | $48,423.33 |
| 33.37 | Kaiser Aluminium | B021 | 90166 | 21 Sep 2006 | $34,717.17 |
| 33.38 | Kaiser Aluminium | C022 | 90175 | 21 Sep 2006 | $34,298.38 |
| 33.39 | Kaiser Aluminium | D025 | 90185 | 21 Sep 2006 | $17,187.22 |
| 33.40 | Kaiser Aluminium | E028 | 90100 | 21 Sep 2006 | $44,685.06 |
| 33.41 | B.F. Goodrich | C034 | 90015 | 09 Nov 2006 | $21,637.75 |
| 33.42 | B.F. Goodrich | D033 | 90029 | 09 Nov 2006 | $10,714.46 |
| 33.43 | B.F. Goodrich | E042 | 90037 | 09 Nov 2006 | $15,104.19 |
| 33.44 | Union Carbide | X027 | 90130 | 16 Nov 2006 | $(4,642.38) |
| 33.45 | Union Carbide | X027 | 90138 | 16 Nov 2006 | $(677.42) |
| 33.46 | Union Carbide | Y026 | 90149 | 16 Nov 2006 | $(3,782.37) |
| 33.47 | Union Carbide | Y026 | 90156 | 16 Nov 2006 | $(479.91) |
| 33.48 | Union Carbide | Z013 | 90002 | 17 Nov 2006 | $(4,027.83) |

| | Claim | | Agreement By Equitas | | Amount |
| | Insured/Loss | ROM's Ref. # | Signing # | Date | Owed Under Assignment |
|---|---|---|---|---|---|
| 33.49 | Union Carbide | Z013 | 90008 | 17 Nov 2006 | $(394.65) |
| 33.50 | Dana Corporation | A135 | 90194 | 13 Dec 2006 | $3,517.28 |
| 33.51 | Dana Corporation | B022 | 90251 | 14 Dec 2006 | $3,407.43 |
| 33.52 | Dana Corporation | C026 | 90269 | 14 Dec 2006 | $1,632.81 |
| 33.53 | Dana Corporation | D010 | 90311 | 14 Dec 2006 | $31.14 |
| 33.54 | Dana Corporation | E018 | 90339 | 14 Dec 2006 | $55.65 |
| 33.55 | Kaiser Aluminium | V016 | 90135 | 07 Dec 2006 | $628.53 |
| 33.56 | Kaiser Aluminium | V016 | 90139 | 07 Dec 2006 | $7,652.76 |
| 33.57 | Kaiser Aluminium | W020 | 90148 | 07 Dec 2006 | $(1,374.63) |
| 33.58 | Kaiser Aluminium | W020 | 90153 | 07 Dec 2006 | $12,381.92 |
| 33.59 | Kaiser Aluminium | X017 | 90160 | 07 Dec 2006 | $50,622.68 |
| 33.60 | Kaiser Aluminium | X017 | 90170 | 07 Dec 2006 | $25,731.18 |
| 33.61 | Kaiser Aluminium | Y016 | 90177 | 07 Dec 2006 | $49,393.65 |
| 33.62 | Kaiser Aluminium | Y016 | 90184 | 07 Dec 2006 | $26,152.05 |
| 33.63 | Kaiser Aluminium | A134 | 90193 | 07 Dec 2006 | $41,554.60 |
| 33.64 | Kaiser Aluminium | A134 | 90205 | 07 Dec 2006 | $22,858.41 |
| 33.65 | Kaiser Aluminium | B021 | 90217 | 07 Dec 2006 | $51,061.52 |
| 33.66 | Kaiser Aluminium | B021 | 90226 | 07 Dec 2006 | $10,403.46 |
| 33.67 | Kaiser Aluminium | C022 | 90233 | 07 Dec 2006 | $50,767.05 |
| 33.68 | Kaiser Aluminium | C022 | 90239 | 07 Dec 2006 | $11,261.36 |
| 33.69 | Kaiser Aluminium | C025 | 90060 | 12 Dec 2006 | $13,381.73 |
| 33.70 | Kaiser Aluminium | D025 | 90248 | 07 Dec 2006 | $25,130.81 |
| 33.71 | Kaiser Aluminium | D025 | 90088 | 08 Dec 2006 | $5,722.39 |

11

| | Claim | | Agreement By Equitas | | Amount |
| | Insured/Loss | ROM's Ref. # | Signing # | Date | Owed Under Assignment |
|---|---|---|---|---|---|
| 33.72 | Kaiser Aluminium | E028 | 90096 | 08 Dec 2006 | $18,790.47 |
| 33.73 | Kaiser Aluminium | E028 | 90044 | 08 Dec 2006 | $34,476.33 |
| 33.74 | Goodyear Tire | T020 | 90027 | 29 Jan 2007 | $14,176.94 |
| 33.75 | Goodyear Tire | U019 | 90031 | 29 Jan 2007 | $14,532.53 |
| 33.76 | Goodyear Tire | V023 | 90035 | 29 Jan 2007 | $14,873.24 |
| 33.77 | Goodyear Tire | W033 | 90043 | 29 Jan 2007 | $25,170.63 |
| 33.78 | Goodyear Tire | X039 | 90066 | 29 Jan 2007 | $18,456.72 |
| 33.79 | Goodyear Tire | Y037 | 90015 | 30 Jan 2007 | $17,119.46 |
| 33.80 | Goodyear Tire | T020 | 90224 | 20 Apr 2007 | $13,009.48 |
| 33.81 | Goodyear Tire | U019 | 90111 | 23 Apr 2007 | $13,204.11 |
| 33.82 | Goodyear Tire | V023 | 90120 | 23 Apr 2007 | $13,397.89 |
| 33.83 | Minnesota Minning | X022 | 90012 | 30 Jul 2007 | $95,696.05 |
| 33.84 | Minnesota Minning | Y025 | 90024 | 30 Jul 2007 | $75,250.51 |
| 33.85 | American Cyanamid | A083 | 90070 | 07 Aug 2007 | $16,211.00 |
| 33.86 | Union Carbide | X013 | 90046 | 08 Oct 2007 | $11,630.73 |
| 33.87 | Minnesota Minning | X022 | 90053 | 08 Oct 2007 | $11,442.86 |
| 33.88 | Minnesota Minning | Y025 | 90060 | 08 Oct 2007 | $8,823.14 |
| 33.89 | Hercules | A136 | 90046 | 04 Dec 2007 | $14,299.70 |
| 33.90 | Hercules | B024 | 90053 | 04 Dec 2007 | $14,281.33 |
| 33.91 | Hercules | C028 | 90058 | 04 Dec 2007 | $14,275.22 |
| 33.92 | Hercules | E039 | 90064 | 04 Dec 2007 | $9,957.28 |
| 33.93 | Georgia Pacific | W026 | 90036 | 04 Dec 2007 | $10,274.47 |
| 33.94 | Georgia Pacific | X032 | 90042 | 04 Dec 2007 | $7,298.18 |
| 33.95 | Dresser Industries | W031 | 90119 | 05 Dec 2007 | $3,534.41 |
| 33.96 | Dresser Industries | X037 | 90112 | 05 Dec 2007 | $3,181.62 |
| 33.97 | Dresser Industries | Y034 | 90128 | 05 Dec 2007 | $3,137.27 |
| | | | | Total | $1,903,420.61 |

34.    Despite demand, Lloyd's Underwriters have failed to pay to B.D. Cooke reinsurance recoverables due to B.D. Cooke, as Citizens' assignee, in respect of the Agreed Claims.

35.     The amount now due from Lloyd's Underwriters in respect of the Agreed Claims is no less than $1,903,420.61, exclusive of interest and costs.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>
<u>(Declaratory Relief)</u>

36.     The allegations of Paragraphs 1 through 35 are realleged and incorporated by reference herein.

37.     Lloyd's Underwriters, through Equitas, have premised their refusal to pay amounts due to B.D. Cooke under the Assignment in respect of the Agreed Claims upon their contention that the Assignment caps the amount that can be recovered by B.D. Cooke.

38.     Lloyd's Underwriters, through Equitas, have also asserted that the Assignment constitutes a novation of the Excess-of-Loss Reinsurance Agreements and that such novation purportedly means that Lloyd's Underwriters are relieved of liability by virtue of a separate agreement not at issue in this action.

39.     The Lloyd's Underwriters' interpretations of the Assignment referenced in Paragraphs 37 and 38 are contrary to the terms of the Assignment, the Petition and this Court's Approval Order, and contrary to this Court's decisions on summary judgment in the Nationwide Action against Lloyd's Underwriters' fellow reinsurer.

40.     As a result of the events described herein, an actual, ripe controversy of a justiciable nature presently exists between B.D. Cooke and Lloyd's Underwriters concerning the meaning and effect of Assignment, including with respect to past, present, and future amounts due to B.D. Cooke under the Assignment.

13

41.    B.D. Cooke and Lloyd's Underwriters have adverse legal interests in regard to the meaning and effect of the Assignment.

42.    The controversy is of sufficient immediacy as to justify the entry of a declaratory judgment.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract)

43.    The allegations of Paragraphs 1 through 42 are realleged and incorporated by reference herein.

44.    This cause of action is asserted in this action expressly subject to, and without waiver of, arbitration of any disputes under the Excess-of-Loss Reinsurance Agreements as provided in any arbitration clauses contained in such Excess-of-Loss Reinsurance Agreements.  However, there are no apparent disputes between the parties concerning the Excess-of-Loss Reinsurance Agreements with respect to the Agreed Claims, which were instead agreed to by Lloyd's Underwriters, as set forth in Paragraph 33, and sub-Paragraphs 33.1 through 33.97.  Lloyd's Underwriters, through Equitas, have explained their failure to pay the Agreed Claims solely on bases other than the Excess-of-Loss Reinsurance Agreements.  If, and to the extent, there are, or there are deemed to be, disputes within any arbitration provision of any of the Excess-of-Loss Reinsurance Agreements, B.D. Cooke expressly reserves the right to arbitrate such disputes.

45.    Lloyd's Underwriters entered into the Excess-of-Loss Reinsurance Agreements, whereby they reinsured Citizens.

14

46.    All relevant rights of Citizens under the Excess-of-Loss Reinsurance Agreements were vested in the Liquidator, and assigned by the Liquidator to B.D. Cooke.

47.    Despite demand, Lloyd's Underwriters have not paid B.D. Cooke in respect of the Agreed Claims and, in failing to do so, have breached their contractual obligations to B.D. Cooke, as assignee,un der the Excess-of-Loss Reinsurance Agreements.

48.    By reason of the foregoing, B.D. Cooke has been damaged in an amount no less than $1,903,420.61, exclusive of interest and costs.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Account Stated)

49.    The allegations of Paragraphs 1 through 48 are realleged and incorporated by reference herein.

50.    This cause of action is asserted in this action expressly subject to, and without waiver of, arbitration of any disputes under the Excess-of-Loss Reinsurance Agreements as provided in any arbitration clauses contained in such Excess-of-Loss Reinsurance Agreements.  However, there are no apparent disputes between the parties concerning the Excess-of-Loss Reinsurance Agreements with respect to the Agreed Claims, which were instead agreed to by Lloyd's Underwriters, as set forth in Paragraph 33, and sub-Paragraphs 33.1 through 33.97.  Lloyd's Underwriters, through Equitas, have explained their failure to pay the Agreed Claims solely on bases other than the Excess-of-Loss Reinsurance Agreements.  If, and to the extent, there are, or there are deemed to be, disputes within any arbitration provision of any of the Excess-of-Loss

Reinsurance Agreements, B.D. Cooke expressly reserves the right to arbitrate such disputes.

51.    Lloyd's Underwriters have expressly or impliedly agreed to reinsurance billings for reinsurance recoverables due to B.D. Cooke, as Citizens' assignee, thereby establishing an account stated in respect of the Agreed Claims.

WHEREFORE, plaintiff B.D. Cooke demands judgment against the defendants Lloyd's Undewriters as follows:

1.    On plaintiff's First cause of action, a declaration as to the meaning and effect of the Assignment, including without limitation that (A) there is no cap on the amount that B.D. Cooke is entitled to collect under the Assignment; and (B) the Assignment is an assignment and does not constitute a novation of any of the assigned reinsurance agreements;

2.    On plaintiff's Second and Third causes of action, subject to Paragraphs 44 and 50, judgment in the amount of \$1,903,420.61, plus the amounts of any other agreed or account-stated claims under the Assignment, plus interest at the applicable rate;

3.    On all causes of action, judgment granting plaintiff costs, disbursements and attorneys' fees in prosecuting this action; and

16

4.     Judgment granting such other and further relief as the Court may deem

just and proper.

Dated:     New York, New York                CHADBOURNE & PARKE LLP
           February 26, 2008

                                             By_____
                                                        John F. Finnegan
                                             Attorneys for Plaintiff
                                             30 Rockefeller Plaza
                                             New York, New York  10112
                                             (212) 408-5100

Carey G. Child
Anne Linder
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 974-5600

           Of Counsel

17

**Exhibit A Page 1**

## Agency Managers London Reinsurance Program

(Placed through Willis Faber & Dumas / Bem Dogg)

| 1952 | UJW4642 | 1st Cas XL | 23 Nov 1951 to 31 Dec 1952 | US$ 350,000 xs US$ 150,000 |
| 1953 | ULW4642 | 1st Cas XL | 12 months at 1 Jan 1953 | US$ 350,000 xs US$ 150,000 |
| 1954 | UMW4642 | 1st Cas XL | 12 months at 1 Jan 1954 | US$ 350,000 xs US$ 150,000 |
| 1955 | UNW4642 | 1st Cas XL | 12 months at 1 Jan 1955 | US$ 350,000 xs US$ 150,000 |
| | JNW5261 | 2nd Cas XL | 23 Sep 1954 to 31 Dec 1955 | US$ 500,000 xs US$ 500,000 |
| 1956 | UPW4642 | 1st Cas XL | 12 months at 1 Jan 1956 | US$ 350,000 xs US$ 150,000 |
| | UPW5261 | 2nd Cas XL | 12 months at 1 Jan 1956 | US$ 500,000 xs US$ 500,000 |
| | UPW5541 | Clash XL | 12 months at 1 Jan 1956 | US$ 500,000 xs US$ 500,000 |
| 1957 | UQW4642 | 1st Cas XL | 12 months at 1 Jan 1957 | US$ 350,000 xs US$ 150,000 |
| | UQW5261 | 2nd Cas XL | 12 months at 1 Jan 1957 | US$ 500,000 xs US$ 500,000 |
| | UQW5541 | Clash XL | 12 months at 1 Jan 1957 | US$ 500,000 xs US$ 500,000 |
| 1958 | URW4642 | 1st Cas XL | 12 months at 1 Jan 1958 | US$ 350,000 xs US$ 150,000 |
| | URW5261 | 2nd Cas XL | 12 months at 1 Jan 1958 | US$ 500,000 xs US$ 500,000 |
| | URW5541 | Clash XL | 12 months at 1 Jan 1958 | US$ 500,000 xs US$ 500,000 |
| 1959 | USW4642 | 1st Cas XL | 12 months at 1 Jan 1959 | US$ 350,000 xs US$ 150,000 |
| | USW5261 | 2nd Cas XL | 12 months at 1 Jan 1959 | US$ 500,000 xs US$ 500,000 |
| | USW5541 | Clash XL | 12 months at 1 Jan 1959 | US$ 500,000 xs US$ 500,000 |
| 1960 | UTW4642 | 1st Cas XL | 12 months at 1 Jan 1960 | US$ 350,000 xs US$ 150,000 |
| | UTW5261 | 2nd Cas XL | 12 months at 1 Jan 1960 | US$ 500,000 xs US$ 500,000 |
| | UTW5541 | Clash XL | 12 months at 1 Jan 1960 | US$ 500,000 xs US$ 500,000 |
| 1961 | UUW4642 | 1st Cas XL | 12 months at 1 Jan 1961 | US$ 350,000 xs US$ 150,000 |
| | UUW5261 | 2nd Cas XL | 12 months at 1 Jan 1961 | US$ 500,000 xs US$ 500,000 |
| | UUW5541 | Clash XL | 12 months at 1 Jan 1961 | US$ 500,000 xs US$ 500,000 |
| 1962 | UWW4642 | 1st Cas XL | 12 months at 1 Jan 1962 | US$ 350,000 xs US$ 150,000 |
| | UWW5261 | 2nd Cas XL | 12 months at 1 Jan 1962 | US$ 500,000 xs US$ 500,000 |
| | UWW5541 | Clash XL | 12 months at 1 Jan 1962 | US$ 500,000 xs US$ 500,000 |
| 1963 | UXW4642 | 1st Cas XL | 12 months at 1 Jan 1963 | US$ 350,000 xs US$ 150,000 |
| | UXW5261 | 2nd Cas XL | 12 months at 1 Jan 1963 | US$ 500,000 xs US$ 500,000 |
| | UXW5541 | Clash XL | 12 months at 1 Jan 1963 | US$ 500,000 xs US$ 500,000 |
| 1964 | UYW4642 | 1st Cas XL | 12 months at 1 Jan 1964 | US$ 350,000 xs US$ 150,000 |
| | UYW5261 | 2nd Cas XL | 12 months at 1 Jan 1964 | US$ 500,000 xs US$ 500,000 |
| | UYW5541 | Clash XL | 12 months at 1 Jan 1964 | US$ 500,000 xs US$ 500,000 |

**Exhibit A Page 2**

| | | | |
|---|---|---|---|
| 1965 UZW4642 | 1st Cas XL | 12 months at 1 Jan 1965 | US$ 350,000 xs US$ 150,000 |
| UZW5261 | 2nd Cas XL | 12 months at 1 Jan 1965 | US$ 500,000 xs US$ 500,000 |
| UZW5541 | Clash XL | 12 months at 1 Jan 1965 | US$ 300,000 xs US$ 150,000 |
| 1966 UAX4642 | 1st Cas XL | 12 months at 1 Jan 1966 | US$ 350,000 xs US$ 150,000 |
| UAX5261 | 2nd Cas XL | 12 months at 1 Jan 1966 | US$ 500,000 xs US$ 500,000 |
| UAX5541 | Clash XL | 12 months at 1 Jan 1966 | US$ 300,000 xs US$ 150,000 |
| 1967 UDX4642 | 1st Cas XL | 12 months at 1 Jan 1967 | US$ 350,000 xs US$ 150,000 |
| UBX5261 | 2nd Cas XL | 12 months at 1 Jan 1967 | US$ 500,000 xs US$ 500,000 |
| UBX5541 | Clash XL | 12 months at 1 Jan 1967 | US$ 300,000 xs US$ 150,000 |
| 1968 UCX4642 | 1st Cas XL | 12 months at 1 Jan 1968 | US$ 350,000 xs US$ 150,000 |
| UCX5261 | 2nd Cas XL | 12 months at 1 Jan 1968 | US$ 500,000 xs US$ 500,000 |
| UCX5665 | 3rd Cas XL | 12 months at 1 Jan 1968 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| UCX5541 | Clash XL | 12 months at 1 Jan 1968 | US$ 300,000 xs US$ 150,000 |
| 1969 UDX4642 | 1st Cas XL | 12 months at 1 Jan 1969 | 80% of US$ 325,000 xs US$ 175,000 |
| UDX5961 | 2nd Cas XL | 12 months at 1 Jan 1969 | 80% of US$ 500,000 xs US$ 500,000 |
| UDX5665 | 3rd Cas XL | 12 months at 1 Jan 1969 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| UDX5541 | Clash XL | 12 months at 1 Jan 1969 | US$ 300,000 xs US$ 175,000 |
| 1970 UFX0008 | 1st Cas XL | 12 months at 1 Jan 1970 | 80% of US$ 325,000 xs US$ 175,000 |
| | | extended to 31 Mar 1971 | 80% of US$ 325,000 xs US$ 200,000 |
| UFX0019 | 2nd Cas XL | 12 months at 1 Jan 1970 | 80% of US$ 500,000 xs US$ 500,000 |
| | | extended to 31 Mar 1971 | 80% of US$ 500,000 xs US$ 500,000 |
| UBX2665 | 3rd Cas XL | 12 months at 1 Jan 1970 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | | extended to 31 Mar 1971 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| UFX5541 | Clash XL | 12 months at 1 Jan 1970 | US$ 325,000 xs US$ 150,000 |
| | | extended to 31 Mar 1971 | US$ 400,000 xs US$ 200,000 |
| 1971 UFX0397 | 1st Cas XL | 1 Apr 1971 to 31 Dec 1971 | 32.5% of US$ 300,000 xs US$ 200,000 |
| UFX0598 | 2nd Cas XL | 1 Apr 1971 to 31 Dec 1971 | 50% of US$ 500,000 xs US$ 500,000 |
| UFX0648 | 3rd Cas XL | 1 Apr 1971 to 31 Dec 1971 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| UFX0599 | Clash XL | 1 Apr 1971 to 31 Dec 1971 | US$ 400,000 xs US$ 200,000 |
| 1972 UGX0397 | 1st Cas XL | 12 months at 1 Jan 1972 | 32.5% of US$ 300,000 xs US$ 200,000 |
| UGX0398 | 2nd Cas XL | 12 months at 1 Jan 1972 | 50% of US$ 500,000 xs US$ 500,000 |
| UGX0665 | 3rd Cas XL | 12 months at 1 Jan 1972 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| UGX0399 | Clash XL | 12 months at 1 Jan 1972 | US$ 400,000 xs US$ 200,000 |
| 1973 UHX0652 | 2nd XL R/I | 12 months at 1 Jan 1973 | 35% of US$ 4,000,000 xs US$ 1,000,000 |
| 1974 UJX0552 | 2nd XL R/I | 12 months at 1 Jan 1974 | 35% of US$ 4,000,000 xs US$ 1,000,000 |
| 1975 UKX0753 | 1st Cas XL | 12 months at 1 Jan 1975 | 13.83% of US$ 750,000 xs US$ 250,000 |
| UKX0754 | 2nd Cas XL | 12 months at 1 Jan 1975 | 58.33% of US$ 1,000,000 xs US$ 1,000,000 |
| UKX0755 | 3rd Cas XL | 12 months at 1 Jan 1975 | 67% of US$ 2,500,000 xs US$ 2,500,000 |
| UKX0753 | Clash XL | 12 months at 1 Jan 1975 | 13.83% of US$ 750,000 xs US$ 250,000 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X
B.D. COOKE & PARTNERS LIMITED, as Assignee of
Citizens Casualty Company of New York (in liquidation)        **CIVIL ACTION NO.**

          Plaintiff,

                                                 **NOTICE OF REMOVAL**

     -against-

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON,

          Defendants.
--------------------------------------------------------------------------X

TO:    THE HONORABLE JUDGES OF THE
        UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF NEW YORK

        Pursuant to the New York Convention on the Recognition and Enforcement of Foreign

Arbitral Awards, June 10, 1958, and its implementing legislation, Chapter Two of the Federal

Arbitration Act, 9 U.S.C. § 201, et seq. (Convention), defendant Certain Underwriters at Lloyd's,

London (Underwriters) by its attorneys, Mound, Cotton, Wollan & Greengrass, hereby remove

the above-referenced action to the United States District Court for the Southern District of New

York.

        1.      On February 26, 2008, plaintiff B.D. Cooke & Partners Limited (Cooke) filed in

the Supreme Court, New York County, a verified summons and complaint captioned <u>B.D. Cooke</u>

<u>& Partners Limited, as Assignee of Citizens Casualty Company of New York (in Liquidation) v.</u>

<u>Certain Underwriters at Lloyd's, London</u> and purchased Index No. 08/650051 (Cooke action).  A

copy of the Summons and Verified Complaint is annexed as Ex. 1 (Complaint).

        2.      The Complaint seeks both declaratory relief and damages with respect to one or

more of about five dozen "Excess-of-Loss Reinsurance Contracts" (excess reinsurance contracts)

identified on a schedule annexed to the Complaint as Ex. "A." The Complaint alleges -- "upon information and belief" -- that each of these excess reinsurance contracts contains a provision consenting to jurisdiction and quotes from one of the excess reinsurance contracts that the parties "agree that service of process . . . may be made upon Mendes and Mount, 27 William Street, New York, New York 10005 . . . ." Complaint ¶ 7. We attach as Ex. 2 a copy of a representative excess reinsurance contract containing this passage.

3.      On information and belief, Cooke has yet to serve process upon Mendes & Mount in New York City.  Instead, on March 17, 2008, a process server attempted to effect service by leaving a copy of the summons and complaint with the secretary for Equitas Ltd. and Resolute Management Services, Ltd. in London, neither of which is authorized to accept service for Underwriters.  It is unclear why Cooke has not relied on the contractual method of service provided by the subject reinsurance contracts or whether service has been otherwise properly effected.

4.      Nevertheless, proceeding on the assumption that Cooke will eventually effect service, Underwriters demanded arbitration of every claim and demand set forth in the Cooke complaint.  A copy of the Underwriters' demand for arbitration is attached as Ex. 3. Underwriters' petition to remove the Cooke action to this Court pursuant to the special removal provisions for non-domestic arbitrations contained in Section 205 of the Convention's implementing legislation.  9 U.S.C. § 205.

5.      The special removal procedures provided by Congress under 9 U.S.C. § 205 are liberally construed.  York Hannover Holding A.G. v. American Arbitration Association, 794 F. Supp. 118, 122 (S.D.N.Y. 1992); citing Cam S.A. v. ICC Tankers, Inc., No. 88 Civ. 9274, 1989

WL 51815 (S.D.N.Y., May 10, 1989); Dale Metals Corp. v. Kiwa Chemical Industry Co., 442

F.Supp. 78, 80, 81 n. 1 (S.D.N.Y.1977); see also Matter of Ferrara S.p.A., 441 F.Supp. 778, 779-

80 and 80 n. 2 (S.D.N.Y.1977), aff'd, 580 F.2d 1044 (2d Cir.1978).  A broad construction of the

right to remove disputes under the Convention satisfies the "need for encouraging international

arbitration and for putting no roadblocks in its way."  Fotochrome, Inc. v. Copal Co. Ltd., 517

F.2d 512, 516, 519 (2d Cir. 1975);  see also Scherk v. Alberto-Culver, Co. 417 U.S. 506, 520 n.

15, 94 S. Ct. 2449, n. 15 (1974); Industrial Risk Insurers v. M.A.N. Gutenhoffnungshutte 141

F.3d at 1434 (11th Cir. 1998).


   6.  In order to remove an action under Section 205, a defendant only need

show that:

> (1) the action "relates to an arbitration agreement … falling under the Convention;
> and
>
> (2) removal occurred "before the trial" of that action.

See New Avex, Inc. v. Socata Aircraft, Inc., 2002 WL 1998193 (S.D.N.Y. August 29, 2002);

Kenney, Becker LLP v. Kenney,  494 F. Supp. 2d 252, 254 (S.D.N.Y. 2007).


   7. Chapter Two of the Federal Arbitration Act confers jurisdiction over actions arising

under the Convention.

> An action or proceeding falling under the Convention shall
> be deemed to arise under the laws of the treaties of the
> United States.  The district courts of the United States …
> shall have original jurisdiction over such an action or
> proceedings, regardless of the amount in controversy.

9 U.S.C. § 203 (emphasis added).  Thus, the Convention -- Chapter 2 of the Federal Arbitration

Action -- "contains both a statutory grant of subject matter jurisdiction  * * * and (a) statutory

grant of removal jurisdiction." <u>Banco de Santander Central Hispano, S.A. v. Consalvi Intern,</u>
<u>Inc.</u>, 425 F. Supp. 2d 421, 431(S.D.N.Y 2006)

8.    With respect to whether arbitration agreements contained within the subject
reinsurance contracts fall under the Convention, a U.S. Court need only determine whether:

    a. there is an agreement in writing to arbitrate the subject of the dispute;

    b. the arbitration agreement calls for arbitration in the territory of a Convention
    signatory;

    c. the agreement arises out of a legal relationship considered to be commercial;
    and

    d. at least one party to the agreement is not an American citizen, <u>i.e.</u>, the "subject
matter (of the dispute) is not entirely domestic in scope." <u>Best Concrete Mix Corp, et al. v.</u>
<u>Lloyd's of London Underwriters</u>, 413 F.Supp.2d 182, 186-187 (E.D.N.Y. 2006) citing <u>U.S. Titan,</u>
<u>Inc. v. Guangzhou Zhen Hua Shipping Co.</u>, 241 F.3d 135, 146 (2d Cir. 2001); <u>see</u> <u>also</u> <u>Walker &</u>
<u>Zanger (West Coast) Ltd. v. Stone Design S.A.</u>, 4 F. Supp. 2d 931 (C.D. Cal. 1997); <u>Sphere</u>
<u>Drake Insurance Limited v. Clarendon National Insurance Company</u>, 263 F.3d 26, 29 (2d Cir.
2001); <u>Apple & Eve, LLC v. Yantai North Andrre Juice Co., Ltd</u>. 499 F. Supp. 2d 245, 247
(E.D.N.Y. 2007).

9. The grounds for removal need not appear on the face of the complaint or pleading.
<u>Employers Insurance of Wausau v. Certain Underwriters at Lloyd's, London</u>,  787 F. Supp. 165,
169 (W.D. Wisc. 1992).  In this case, however, the <u>face</u> of the Cooke complaint demonstrates
that the subject arbitration agreements fall within the Convention and permit removal.

### a. **Agreement to Arbitrate**

10. The Cooke complaint seeks damages and declaratory relief on a series of excess reinsurance contracts, all of which contain explicit, detailed arbitration agreements. Complaint, ¶¶ 5, 33, and Complaint Ex. "A." Most of these contracts contain the following arbitration agreement:

> Any dispute arising under this Contract shall be submitted to a court of arbitration composed of two arbitrators , one to be appointed by the Reassured and the other by the Reinsurers. The arbitrators shall, before entering upon the reference, appoint an umpire. The arbitrators and the umpire shall consider this Contract an honourable engagement rather than merely a legal obligation [and] they are relieved of all judicial formalities and may abstain from following the strict rules of law. The award of the arbitrators or, in the event of their disagreement, of the umpire, shall be precedent to any liability or right of action of either party. The costs of the references and of the award shall be in the discretion of the arbitrators or umpire, as the case may be, who may direct to and by whom and in what manner the same shall be paid. The seat of arbitration shall be New York, N.Y.

A representative contract containing this provision is attached as Ex. 2.

11. The remaining excess reinsurance contracts contain the following agreement to arbitrate:

> Should an irreconcilable difference of opinion arise between the parties to this Agreement as to the interpretation of this Agreement or transactions with respect to this agreement, such difference shall be submitted to arbitration upon the request of one of the parties, one arbiter to be chosen by the Manager and one by the Retrocessionaire, and an umpire to be chosen by the two arbiters before they enter into arbitration.
>
> Should the arbiters fail to agree upon the choice of an umpire within 30 days of the appointment of the last arbiter, then either arbiter, or both together, may request the

Superintendent of Insurance of the State in which arbitration is to be held (or the official in charge of Insurance matters whatever his title may be) to appoint an umpire. Should this official decline to make such an appointment, then following notice from said official of such declination, or 30 days following the date such request was made if no response has been received from said official, either arbiter or both together, may petition the court in the state where arbitration is to be held to appoint an umpire.

In the event that either party should fail to choose an arbiter within sixty (60) days following written request by the other party to enter upon arbitration, the requesting party may choose two arbiters who shall in turn choose an umpire before entering into arbitration.

Each party shall present their case to the arbiters and the umpire within thirty (30) days of the appointment of the umpire and the written decision of any two of the three shall be final and binding upon the Manager, the Members and the Retrocessionaire.

The arbiters and the umpire are relieved from all judicial formalities and may abstain from the strict rules of law, interpreting this agreement as an honourable undertaking rather than as a merely legal obligation. By agreement between any two of the three, they may extend the time intervals contained in this article.

The arbiters and the umpire shall be active or retired disinterested executive officers of insurance or reinsurance companies.

Each party shall pay the fee of its chosen arbiter and half of the fee of the umpire: the remaining costs of arbitration shall be paid as the written decision directs. In the event both arbiters are chosen by one party, the fees of the arbiters and the umpire shall be equally divided between the parties.

Unless otherwise mutually agreed between the manager and the Retrocessionaire any arbitration shall take place in New York, New York.

A representative excess reinsurance contract containing this provision is attached as Ex. 4.

Thus, all of the subject reinsurance contracts contain broad and explicit agreements to arbitrate,

arbitration being the customary and favored method of resolving reinsurance disputes. See,

Sumitomo Marine & Fire Ins. Co. v. Cologne Reinsurance Company of America, 75 N.Y.2d

295, 298, 552 N.Y.S.2d 891 (1990)


### b. Arbitration is within a Signatory State


12.     Both the United Kingdom and the United States are signatories of the Convention,

9 U.S.C. § 201, which was drafted in New York City and is often referred to as the New York

Convention.  Plaintiff Cooke is a corporation organized under U.K. law.  Cooke is located in

England and is the assignee of the Liquidator of Citizens Casualty Insurance Company, a

liquidated New York insurer whose estate has been closed.  Complaint ¶, ¶ 1, 2.  According to

the complaint, Underwriters operate through one or more syndicates whose individual

underwriter members are domiciled in many locations, including, according to the complaint,

various states within the United States.  Complaint ¶ 5.


13.     All of the arbitration agreements that appear in  the subject excess of loss

contracts call for arbitration in New York City.  Under the Convention, neither of the parties

must be American citizens so long as they are citizens of another signatory nation and the

agreement to arbitrate calls for arbitration in the territory of a Convention signatory.  Banco de

Santander Central Hispano, 425 F. Supp. at 421.  (Convention applies to a dispute concerning

an arbitration agreement between a Spanish bank and a British Virgin Islands investment

company, but calls for arbitration in New York City).

## c. Legal Relationship is Commercial

14.      This dispute involves moneys allegedly due under retrocessional reinsurance contracts that are purely commercial.  Complaint, ¶¶ 31-33;  see, Kenney, Becker LLP v. Kenney, 494 F.Supp.2d at 252.


## d. At least one Party to Agreement is not an American Citizen

15.      As alleged in the Complaint, Cooke, a U.K. entity, commenced the subject action and satisfies the requirement that the dispute involve at least one non-American party.

16.      There are no issues of fact as to the making of the arbitration agreements contained in the subject excess reinsurance contracts.  Indeed, Cooke seeks to preserve its right to arbitrate disputes under the agreement.  Cooke seeks both:

          i. declaratory relief (1st cause of action; complaint ¶¶ 36 -42);  and

          ii. damages of $1,903,420.61 on two theories -- breach of contract and account stated (2nd and 3rd causes of action; complaint ¶¶ 43 - 51).  Cooke alleges that its account stated theory is "expressly subject to, and without waiver of, arbitration of any disputes" under the subject retrocessional agreements "as provided in any arbitration clauses contained in such Excess-of-Loss Reinsurance Agreement."  Complaint ¶¶ 44, 50.


17.      Thus, Cooke concedes that the arbitration agreements contained in the subject retrocessional contracts apply, and sought to avoid waiving its right to arbitrate by litigating in the Supreme Court, New York County.

18.    Cooke has no need to "reserve" its "right" to arbitrate. All of Cooke's claims and causes of action set forth in the complaint, and all of Cooke's causes of action "arise under" the subject contracts. Cooke, therefore, is "obliged" to arbitrate its differences with Underwriters under the explicit terms of the broad arbitration agreements quoted above.

### State Court Jurisdiction

19.    Cooke alludes to an order of the Supreme Court, New York County, entered in March 1997 approving a petition and plan to close the Citizens estate. Complaint ¶ 9. Without alleging that Lloyd's approved the plan, Cooke alleges that Lloyd's failed to object to the plan and that the plan included an assignment to Cooke of all "right, title, and interest in and to . . . all Excess of Loss Agreements running in favor of Citizens or the Liquidator of Citizens . . . ." Complaint ¶ 29.

20.    Cooke alleges that the order approving the plan also "provided that 'the Supreme Court, New York County, shall have continuing jurisdiction over any disputes concerning the assignments and transfers described above and their effect, except that said Court shall not resolve disputes solely involving computations of amounts due thereunder.'" Complaint ¶ 9.

21.    It is not entirely clear why Cooke quotes from the Supreme Court order approving the plan to close the Citizens estate. Nevertheless, in implementing the Convention, Congress intended -- and the Supreme Court has repeatedly held -- that:

> as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense.

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626, 105 S. Ct. 3346 (1983).  Underwriters respectfully requests leave to provide further authority and argument with respect to any argument seeking to remand on a theory that the matters raised in its complaint are not subject to arbitration.

22.    For example, if Cooke argues that by operation of the McCarran-Ferguson Act, the order approving a plan to close the Citizens estate somehow "reverse pre-empts" the Convention, a U.S. treaty, Lloyd's notes that the Convention supersedes the McCarran-Ferguson Act for several reasons.

23.    First, Congress implemented the Convention in 1970, many years after enacting the McCarran-Ferguson Act. The Convention requires the enforcement of international arbitration agreements and "leaves little room for courts to recognize a defense under a federal law, such as the McCarran-Ferguson Act, which was enacted prior to the implementation of the Convention . . . ." Goshawk Dedicated Limited v. Portsmouth Settlement Co Inc., 466 F. Supp. 2d 1293, 1304 (N.D. Ga. 2006) citing Industrial Risk Insurers, 141 F.3d at 1441("As an exercise of the Congress' treaty power and as federal law, '[t]he Convention must be enforced according to its terms over all prior inconsistent rules of law.")

24.    Second, the McCarran-Ferguson act applies only to inter-state and not foreign commerce. In Re Arbitration Between The West Of England Ship Owners Mutual Ins. Ass'n (Luxembourg) & Am. Marine Corp., No. 91-3645. 1992 WL 37700, at 4-5 (E.D. La. Feb. 18, 1992); ("The McCarran-Ferguson Act does not apply to contracts made under the Convention, as

it was intended to apply only to interstate commerce, not to foreign commerce. Likewise, the Convention makes clear that it does not apply to purely interstate disputes."); see also Antillean Marine Shipping Corp. v. Through Transp. Mut. Ins., Ltd., No. 02-22196-CIV, 2002 WL 32075793, at *3 (S.D.Fla. Oct. 31, 2002) (relying on West of England Ship Owners and stating that the McCarran-Ferguson Act "does not apply to international insurance contracts made under the Convention" because it provides that "the states, and only the states, can regulate the substantive content of insurance contracts," which "was intended to apply only to interstate commerce, and not foreign commerce"); see also McDermott Int'l, Inc. v. Underwriters at Lloyd's of London, at *4 (E.D.La. Feb. 14, 1992); Continental Ins. Co. v. Jantran, Inc., 906 F.Supp. 362, 366 (E.D.La.1995); McDermott Int'l, Inc. v. Underwriters at Lloyd's, No. 91-841, 1996 WL 291803, at *4 (May 30, 1996) (original McDermott case on motion to confirm award), aff'd on other grounds, 120 F.3d 583 (5th Cir.1997); Jantran, Inc. v. Sphere Drake Ins., P.L.C., No. 2:96CV085-D-B, 1997 WL 88259, at *1 (N.D.Miss. Feb. 18, 1997); Assuranceforeningen Skuld (Gjensidig) v. Apollo Ship Chandlers, Inc., 847 So.2d 991, 993 (Fla.Ct.App.2003).

25.    The Second Circuit agrees despite having ruled to the contrary in earlier decisions involving on-going (as opposed to completed and closed) liquidation proceedings. Stephens v. Nat'l Distillers and Chem. Corp., 69 F.3d 1226, 1231 n. 5 (2d Cir. 1995)("there is some indication in the legislative history of the McCarran-Ferguson Act that it was intended to apply only to 'interstate Commerce Clause legislation").

26.    Third, courts that declined to honor arbitration agreements, even those subject to the Convention, did so because of their concern that arbitration would somehow infringe on the

"exclusive jurisdiction" of courts overseeing receiverships. <u>Knickerbocker Agency v. Holz</u>, 4

N.Y.2d 245, 149 N.E.2d 885, 173 N.Y.S.2d 602 (1958); <u>see also</u> <u>Corcoran v. Ardra, Ins. Co.</u>

<u>Ltd.</u>, 842 F.2d 31 (2d Cir. N.Y., Mar. 17, 1998). In this case, Citizens corporate charter was

dissolved in 1971 and its estate was closed in 1998.


27.    No court oversees the Citizens receivership and the order that Cooke quotes in its

complaint, ¶ 9, does not confer "<u>exclusive</u>" jurisdiction on the Supreme Court, New York

County, as did the statute relied upon in <u>Knickerbocker</u>.


28.  Nor does the Supreme Court's willingness to entertain certain applications

concerning the Assignment infringe on this Court's jurisdiction over this proceeding. It is the

general rule in this Circuit that "'when only jurisdiction is specified the clause will generally not

be enforced without some further language indicating the parties' intent to make jurisdiction

exclusive.'" <u>Boutari and Son v. Attiki Importers</u>, 22 F3d 51, 52-53 quoting Docksider, Ltd. v. Sea

Technology, Ltd. 875 F.2d 762, 764 (9th Cir. 1989)(additional citations omitted); <u>see also</u> <u>City</u>

<u>of New York v. Pullman, Inc.</u>, 477 F. Supp. 438, 442 n. 11 (S.D.N.Y. 1979)("[A]n agreement

*conferring* jurisdiction in one forum will not be interpreted as *excluding* jurisdiction elsewhere

unless it contain specific language of exclusion . . . ."). Neither the Petition nor the Final Order

approving the Plan conferred exclusive or mandatory jurisdiction over matters relating to the

Assignment.

29. This Court has original jurisdiction to entertain and adjudicate this action pursuant to 28 U.S.C. §1331.  Pursuant to 9 U.S.C. § 1446(a), copies of all process, pleadings, and orders which have been served upon the defendants are annexed hereto.

WHEREFORE, it is respectfully requested that this Court accept jurisdiction of the above-entitled action now pending before the Supreme Court of the State of New York, County of New York, and that the Cooke action be removed to this Court.

Dated: New York, New York
      April 7, 2008

                                 **CERTAIN UNDERWRITERS AT LLOYD'S, LONDON**

                                 _____
                                 James Veach (JV - 1525)
                                 Joshua L. Milrad (JM - 2105)
                                 MOUND COTTON WOLLAN & GREENGRASS
                                 Attorneys for defendant
                                     Certain Underwriters at Lloyd's London
                                 One Battery Park Plaza
                                 New York, New York 10004
                                 Tel: (212) 804-4200
                                 Fax: (212) 804-8066

To:

John F. Finnegan, Esq.
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY 10112
   - and –
Carey G. Child, Esq.
Chadbourne & Parke LLP
1200 New Hampshire Avenue, NW
Washington, DC 20036

Attorneys for B.D. Cooke & Partners Limited

13

Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------

B.D. COOKE & PARTNERS LIMITED, as Assignee of          Index No.
Citizens Casualty Company of New York (in liquidation)

                      Plaintiff(s),

          - *against* -                                **Summons**

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON

                                        Date Index No. Purchased:     February 26, 2008

                      Defendant(s).
------------------------------------

        To the above named Defendant(s)

          CERTAIN UNDERWRITERS AT LLOYD'S, LONDON
          c/o RESOLUTE MANAGEMENT SERVICES LIMITED
          33 St. Mary Axe, London, EC3A 8LL, United Kingdom

        You are hereby summoned to answer the complaint in this action and to serve
a copy of your answer, or, if the complaint is not served with this summons, to serve
a notice of appearance, on the Plaintiff's attorney within 20 days after the service of
this summons, exclusive of the day of service (or within 30 days after the service is
complete if this summons is not personally delivered to you within the State of New
York); and in case of your failure to appear or answer, judgment will be taken against
you by default for the relief demanded in the complaint.

        The basis of venue is residence of Plaintiff's assignor at the time of the assignment
which is 123 William Street, New York, New York; Plaintiff's designation.

Dated: New York, New York
        February 26, 2008

                              CHADBOURNE & PARKE LLP

                              by _____
                                    John F. Finnegan
                              Attorneys for Plaintiff
                              B.D. COOKE & PARTNERS LIMITED, as
                              Assignee of Citizens Casualty Company of New
                              York (in liquidation)

                              30 Rockefeller Plaza
                              New York, New York 10112
                              212-408-5100

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

B.D. COOKE & PARTNERS LIMITED, AS
ASSIGNEE OF CITIZENS CASUALTY COMPANY
OF NEW YORK (IN LIQUIDATION),

|                                      |                         |
|                                      | Index No.               |

                            Plaintiff,           **VERIFIED COMPLAINT**

               -against-

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON,

                        Defendants.

---

        Plaintiff, by its attorneys, CHADBOURNE & PARKE LLP, for its complaint alleges:

## NATURE OF THE ACTION

        1.     Plaintiff B.D. Cooke & Partners Limited ("B.D. Cooke") brings this action as the assignee of the liquidator of Citizens Casualty Company of New York ("Citizens") against defendants Certain Underwriters at Lloyd's, London ("Lloyd's Underwriters"), who are reinsurers under reinsurance agreements assigned to B.D. Cooke by the liquidator of Citizens.

        2.     B.D. Cooke seeks declaratory relief and money damages in respect of reinsurance claims that have been agreed to by Lloyd's Underwriters, but which they refuse to pay based on their assertion that the assignment is subject to a "cap" on the amount recoverable. This Court approved that assignment, and retained jurisdiction to

resolve disputes concerning the assignment. In that regard, this Court has previously rejected another reinsurer's argument that the same assignment was subject to a cap.

## PARTIES, PERSONAL JURISDICTION, AND VENUE

3.      Plaintiff B.D. Cooke is a corporation organized and existing under the laws of the United Kingdom, having its registered address at 2 Knoll Rise, Orpington, Kent, England.

4.      Plaintiff's assignor, the liquidator of Citizens, through the New York Liquidation Bureau, had, at the time of the assignment, its principal office and its facilities involved therein within New York County at 123 William Street, New York, New York.

5.      Defendants Lloyd's Underwriters are those underwriters at Lloyd's of London that, through one or more syndicates of such underwriters, variously participated as reinsurers in one or more of the excess-of-loss reinsurance contracts listed in Exhibit A (the "Excess-of-Loss Reinsurance Agreements"). Upon information and belief, the syndicates operated in London with the individual underwriter members domiciled in many places throughout the world, possibly including various states within the United States.

6.      Upon information and belief, Lloyd's Underwriters, by their participation in one or more of the Excess-of-Loss Reinsurance Agreements, contracted to provide reinsurance to one or more members of a reinsurance pool (the "Agency Managers Pool"), specifically including contracting to provide reinsurance to Citizens. Upon information and belief, the Agency Managers Pool was operated in New York County

2

by Agency Managers, Limited, a/k/a Agency Managers, Incorporated ("Agency

Managers"). Agency Managers was a New York corporation with its principal place of

business in New York County. Citizens also was a New York corporation with its

principal place of business in New York County.

7.    Upon information and belief, the Excess-of-Loss Reinsurance

Agreements each contain a contractual provision consenting to jurisdiction and service

of process in the following, or substantially similar, language:

> It is agreed that in the event of the failure of the Reinsurers to
> pay any amount claimed to be due hereunder, the Reinsurers at
> the request of the Reassured, will submit to the jurisdiction of
> any Court of competent jurisdiction within the United States
> and will comply with all requirements necessary to give such
> Court jurisdiction and all matters arising hereunder shall be
> determined in accordance with the law and practice of such
> Court. It is further agreed that service of process in such suit
> may be made upon Mendes and Mount, 27 William Street,
> New York, New York 10005, or their nominee or nominees,
> and that in any suit instituted against any one of them upon
> this Contract, the Reinsurers will abide by the final decision of
> such Court or of any Appellate Court in the event of an appeal.

## RELATED ACTONS

8.    By an order dated June 17, 1971, in Index No. 40357/71, re-captioned *In

Re the Liquidation of Citizens Casualty Co. of New York*, (the "Liquidation

Proceeding"), this Court, among other things: (A) placed Citizens into liquidation; (B)

appointed the Superintendent of Insurance of the State of New York as liquidator (the

"Liquidator"); (C) granted the Liquidator authority to take possession of Citizens'

property and liquidate its business and affairs; and (D) vested the Liquidator with title to

all property, contracts and rights of action of Citizens.

3

9.      In an order dated March 6, 1997, this Court (Justice Greenfield), in the

Liquidation Proceeding, approved a petition and plan by the Liquidator for early closure

of the Citizens estate.  That order specifically approved the assignment at issue in this

action.  In addition, the petition and plan approved by this Court's order also provided

that "the Supreme Court of the State of New York, New York County, shall have

continuing jurisdiction over any disputes concerning the assignments and transfers

described above and their effect, except said Court shall not resolve disputes solely

involving computations of amounts due thereunder."

10.      In *B.D. Cooke & Partners Limited, As Assignee of Citizens Cas. Co. of*

*New York v. Nationwide Mutual Ins. Co.*, Index No. 600655/02 (the "Nationwide

Action"), this Court resolved such a dispute concerning the assignment at issue in this

action.  In a memorandum decision and order dated October 6, 2003, this Court (Justice

Lowe), *inter alia,* rejected on summary judgment the contention by Nationwide Mutual

Insurance Company ("Nationwide"), another reinsurer of Citizens, that the assignment

was capped, and held that B.D. Cooke was entitled to collect as assignee under the

assignment.  *Id., slip op. at 6, 7, 13*  In pertinent part, that decision was upheld on appeal

to the First Department of the Appellate Division.  16 A.D.3d 208, 791 N.Y.S.2d 103

(Mar. 15, 2005).

## FACTS COMMON TO ALL CAUSES OF ACTIONS

### Citizens Was A Member Of The Agency Managers Pool

11.      Upon information and belief, Agency Managers operated and managed

the reinsurance pool known as the Agency Managers Pool.  Certain insurance and

4

reinsurance companies agreed to participate in the Agency Managers Pool as pool members, with each pool member agreeing to assume a percentage interest in all reinsurance business written by Agency Managers on behalf of the Agency Managers Pool.

12.    Upon information and belief, Agency Managers operated the Agency Managers Pool from at least the early 1950s until 1988, when Agency Managers filed a bankruptcy petition.  Agency Managers was succeeded in the administration of the Agency Managers Pool by ROM Reinsurance Management Co., Inc. ("ROM").

13.    Upon information and belief, Citizens was a member of the Agency Managers Pool and entered into a Memorandum of Agreement with Agency Managers effective on or about July 1, 1950 (the "Citizens Memorandum").  Among other things, under the Citizens' Memorandum, Citizens appointed Agency Managers as "agent for and in [Citizens'] behalf in the procuring, underwriting and servicing of policies, contracts and/or treaties of casualty reinsurance business in the United States."

**As A Member Of The Agency Managers Pool,**
**Citizens Reinsured The B.D. Cooke Pool**

14.    B.D. Cooke is the current manager of a pool of U.K. insurers formerly managed by Underwriting Management Agency Ltd. and C.F.&A.U. Ltd. (the "B.D. Cooke Pool"), and led by The Dominion Insurance Company Limited ("Dominion").

15.    The B.D. Cooke Pool, led by Dominion, obtained reinsurance from the Agency Managers Pool, including reinsurance whereby Citizens reinsured Dominion and the B.D. Cooke Pool.

**Defendants Lloyd's Underwriters Then Reinsured Citizens**

16.    Upon information and belief, Agency Managers procured reinsurance for the benefit of Citizens in respect of the reinsurance obligations that Citizens owed to Dominion, the B.D. Cooke Pool, and others.

17.    Upon information and belief, the reinsurance procured by Agency Managers for the benefit of Citizens included reinsurance known as "Inter-Office Reinsurance" obtained from other members of the Agency Managers Pool such as Nationwide, as well as excess-of-loss reinsurance procured from external reinsurers, such as Lloyd's Underwriters under various of the Excess-of-Loss Reinsurance Agreements.

**Upon The Insolvency Of Citizens, The Liquidator Is Vested
With Title To The Excess-of-Loss Reinsurance Agreements**

18.    As set forth above, on or about June 17, 1971, Citizens was declared insolvent and placed under the control of the Liquidator, who continued to administer the estate of Citizens until at least 1997, under the supervision of this Court in the Liquidation Proceeding.

19.    By virtue of Citizens' reinsurance of Dominion and the B.D. Cooke Pool, Dominion was a net creditor of the Citizens estate.

20.    This Court's order of liquidation vested the Liquidator with title to all of the property, contracts and rights of action of Citizens.

21.    Upon information and belief, the Liquidator gave notice to Citizens' reinsurers, including Lloyd's Underwriters, of the Liquidation Proceeding and that the

Liquidator had been vested by this Court with title to all of the property, contracts and rights of action of Citizens, including their reinsurance of Citizens.

**The Liquidator's Petition In The Liquidation Proceeding**

22.    In a Petition (the "Petition") sworn to on October 11, 1996 and submitted to this Court in the Liquidation Proceeding, the Liquidator stated that Dominion was the largest creditor of the Citizens estate, including on account of claims that the Liquidator determined would take years to resolve.

23.    With the express purpose of expediting the closing of the Citizens estate, the Liquidator's Petition sought this Court's approval to assign the Liquidator's rights under Citizens' reinsurance agreements to B.D. Cooke in exchange for concessions regarding Dominion's claims against the Citizens estate.

24.    Upon information and belief, Lloyd's Underwriters were given notice of the Petition.

25.    Upon information and belief, Mendes & Mount, attorneys for Lloyd's Underwriters, attended the hearing held by this Court concerning the Petition.

26.    Upon information and belief, Lloyd's Underwriters did not object to the Petition or the Liquidator's plan set forth therein.

**The Assignment Approved By This Court**

27.    In an order dated March 6, 1997 (the "Approval Order"), this Court, in the Liquidation Proceeding, approved the Petition and the Liquidator's plan set forth therein.

28.     Pursuant to the Petition and Approval Order, the Liquidator entered into

an assignment to B.D. Cooke (the "Assignment") of certain of the Liquidator's rights

under Citizens' reinsurance contracts, including the Inter-Office Reinsurance and the

Excess-of-Loss Reinsurance Agreements.

29.     Among other things, the Assignment transfers to B.D. Cooke all of the

Liquidator's "right, title, and interest in and to":

> (a)     All reinsurance Recoverables and Excess of Loss
> Recoverables due Assignor according to his accounts as of
> June 30, 1994 and uncollected by Assignor or for Assignor's
> account by June 30, 1995; notwithstanding the foregoing, any
> Reinsurance Recoverables due from Citizens as an Agency
> Managers Pool member to Citizens as a Cedent are not being
> assigned hereunder.

> (b)     All Reinsurance Agreements and Excess of Loss
> Agreements running in favor of Citizens or the Liquidator of
> Citizens effective as from July 1, 1994 except to the extent
> that Assignor has exercised any rights thereunder prior to
> February 11, 1997, together with all of the rights which
> Assignor would have had under such agreements if the
> Citizens estate were not closed pursuant to the Assignor's Plan
> for the closing of the Citizens' liquidation.

> (c)     Effective upon the entry of a final nonappealable order
> approving the Final Audit and Accounting of Citizens, all
> other reinsurance recoverables due Citizens not arising out of
> the business of the AM Pool, together with all reinsurance
> assets and rights of recovery under reinsurance agreements of
> Citizens (including, without limitation on the foregoing, those
> reinsurances which may not have been specifically identified
> as of February 11, 1997).

30.     In exchange for the Assignment, and in reliance upon the Petition and this

Court's Approval Order, Dominion made concessions regarding Dominion's claims

against the Citizens estate that permitted final distributions from, and closure of, the

Citizens estate.

**Lloyd's Underwriters Failure To Pay Agreed Claims Under The Assignment**

31.    Upon information and belief, claims under the Excess-of-Loss Reinsurance Agreements have been handled for Lloyd's Underwriters by Equitas Management Services Limited n/k/a Resolute Management Services Limited ("Equitas") and have been presented to Equitas by ROM, as successor to Agency Managers.

32.    Upon information and belief, Equitas has signified its agreement to claims by providing an Equitas signing number.

33.    Upon information and belief, the claims agreed by Equitas include the following claims set forth in sub-Paragraphs 33.1 through 33.97 (the "Agreed Claims"):

|        | Claim | | Agreement By Equitas | | Amount |
|        | Insured/Loss | ROM's Ref. # | Signing # | Date | Owed Under Assignment |
|--------|--------------|--------------|-----------|------|-----------------------|
| 33.1 | Dana Corporation | A135 | 90173 | 31 Mar 2005 | $21,591.30 |
| 33.2 | Dana Corporation | B022 | 90176 | 31 Mar 2005 | $3,135.18 |
| 33.3 | Ciba Geigy | X021 | 90092 | 15 Apr 2005 | $83,742.06 |
| 33.4 | Foster Wheeler | U003 | 90163 | 27 Mar 2006 | $71,613.46 |
| 33.5 | Foster Wheeler | U003 | 90173 | 27 Mar 2006 | $6,575.46 |
| 33.6 | Foster Wheeler | V004 | 90187 | 27 Mar 2006 | $(4,315.41) |
| 33.7 | Foster Wheeler | V004 | 90200 | 27 Mar 2006 | $(18,771.45) |
| 33.8 | Foster Wheeler | W007 | 90224 | 27 Mar 2006 | $(22,907.83) |
| 33.9 | Foster Wheeler | W007 | 90239 | 27 Mar 2006 | $(10,035.80) |
| 33.10 | Foster Wheeler | X006 | 90035 | 28 Mar 2006 | $(7,502.20) |
| 33.11 | Foster Wheeler | X006 | 90041 | 28 Mar 2006 | $(15,205.48) |
| 33.12 | Foster Wheeler | Y005 | 90063 | 29 Mar 2006 | $(8,280.92) |
| 33.13 | Foster Wheeler | Y005 | 90103 | 28 Mar 2006 | $(20,274.62) |
| 33.14 | Foster Wheeler | E022 | 90080 | 28 Mar 2006 | $13,989.48 |
| 33.15 | Kaiser Aluminium | V016 | 90203 | 28 Jun 2006 | $6,916.05 |
| 33.16 | Kaiser Aluminium | V016 | 90210 | 28 Jun 2006 | $582.35 |
| 33.17 | Kaiser Aluminium | W020 | 90206 | 28 Jun 2006 | $5,830.31 |
| 33.18 | Kaiser Aluminium | W020 | 90215 | 28 Jun 2006 | $562.54 |
| 33.19 | Goodyear Tire | T020 | 90026 | 20 Sep 2006 | $75,865.99 |

| | Claim | ROM's Ref. # | Agreement By Equitas | | Amount Owed Under Assignment |
| --- | --- | --- | --- | --- | --- |
| | Insured/Loss | | Signing # | Date | |
| 33.20 | Goodyear Tire | U019 | 90037 | 20 Sep 2006 | $77,733.57 |
| 33.21 | Goodyear Tire | V023 | 90044 | 20 Sep 2006 | $79,554.14 |
| 33.22 | Goodyear Tire | W033 | 90048 | 20 Sep 2006 | $84,152.26 |
| 33.23 | Goodyear Tire | X039 | 90059 | 20 Sep 2006 | $77,013.15 |
| 33.24 | Goodyear Tire | Y037 | 90085 | 20 Sep 2006 | $57,411.32 |
| 33.25 | Dana Corporation | A135 | 90018 | 22 Sep 2006 | $30,551.64 |
| 33.26 | Dana Corporation | B022 | 90032 | 22 Sep 2006 | $30,030.45 |
| 33.27 | Dana Corporation | C026 | 90058 | 25 Sep 2006 | $5,987.80 |
| 33.28 | Dana Corporation | D010 | 90061 | 22 Sep 2006 | $5,473.01 |
| 33.29 | Dana Corporation | E018 | 90084 | 22 Sep 2006 | $10,861.71 |
| 33.30 | Kaiser Aluminium | V016 | 90049 | 22 Sep 2006 | $2,573.55 |
| 33.31 | Kaiser Aluminium | V016 | 90192 | 21 Sep 2006 | $7,743.89 |
| 33.32 | Kaiser Aluminium | W020 | 90016 | 22 Sep 2006 | $108.85 |
| 33.33 | Kaiser Aluminium | W020 | 90186 | 21 Sep 2006 | $12,811.19 |
| 33.34 | Kaiser Aluminium | X017 | 90123 | 21 Sep 2006 | $58,945.74 |
| 33.35 | Kaiser Aluminium | Y016 | 90128 | 21 Sep 2006 | $58,119.52 |
| 33.36 | Kaiser Aluminium | A134 | 90153 | 21 Sep 2006 | $48,423.33 |
| 33.37 | Kaiser Aluminium | B021 | 90166 | 21 Sep 2006 | $34,717.17 |
| 33.38 | Kaiser Aluminium | C022 | 90175 | 21 Sep 2006 | $34,298.38 |
| 33.39 | Kaiser Aluminium | D025 | 90185 | 21 Sep 2006 | $17,187.22 |
| 33.40 | Kaiser Aluminium | E028 | 90100 | 21 Sep 2006 | $44,685.06 |
| 33.41 | B.F. Goodrich | C034 | 90015 | 09 Nov 2006 | $21,637.75 |
| 33.42 | B.F. Goodrich | D033 | 90029 | 09 Nov 2006 | $10,714.46 |
| 33.43 | B.F. Goodrich | E042 | 90037 | 09 Nov 2006 | $15,104.19 |
| 33.44 | Union Carbide | X027 | 90130 | 16 Nov 2006 | $(4,642.38) |
| 33.45 | Union Carbide | X027 | 90138 | 16 Nov 2006 | $(677.42) |
| 33.46 | Union Carbide | Y026 | 90149 | 16 Nov 2006 | $(3,782.37) |
| 33.47 | Union Carbide | Y026 | 90156 | 16 Nov 2006 | $(479.91) |
| 33.48 | Union Carbide | Z013 | 90002 | 17 Nov 2006 | $(4,027.83) |

10

| | Claim | | Agreement By Equitas | | Amount |
|---|---|---|---|---|---|
| | Insured/Loss | ROM's Ref. # | Signing # | Date | Owed Under Assignment |
| 33.49 | Union Carbide | Z013 | 90008 | 17 Nov 2006 | $(394.65) |
| 33.50 | Dana Corporation | A135 | 90194 | 13 Dec 2006 | $3,517.28 |
| 33.51 | Dana Corporation | B022 | 90251 | 14 Dec 2006 | $3,407.43 |
| 33.52 | Dana Corporation | C026 | 90269 | 14 Dec 2006 | $1,632.81 |
| 33.53 | Dana Corporation | D010 | 90311 | 14 Dec 2006 | $31.14 |
| 33.54 | Dana Corporation | E018 | 90339 | 14 Dec 2006 | $55.65 |
| 33.55 | Kaiser Aluminium | V016 | 90135 | 07 Dec 2006 | $628.53 |
| 33.56 | Kaiser Aluminium | V016 | 90139 | 07 Dec 2006 | $7,652.76 |
| 33.57 | Kaiser Aluminium | W020 | 90148 | 07 Dec 2006 | $(1,374.63) |
| 33.58 | Kaiser Aluminium | W020 | 90153 | 07 Dec 2006 | $12,381.92 |
| 33.59 | Kaiser Aluminium | X017 | 90160 | 07 Dec 2006 | $50,622.68 |
| 33.60 | Kaiser Aluminium | X017 | 90170 | 07 Dec 2006 | $25,731.18 |
| 33.61 | Kaiser Aluminium | Y016 | 90177 | 07 Dec 2006 | $49,393.65 |
| 33.62 | Kaiser Aluminium | Y016 | 90184 | 07 Dec 2006 | $26,152.05 |
| 33.63 | Kaiser Aluminium | A134 | 90193 | 07 Dec 2006 | $41,554.60 |
| 33.64 | Kaiser Aluminium | A134 | 90205 | 07 Dec 2006 | $22,858.41 |
| 33.65 | Kaiser Aluminium | B021 | 90217 | 07 Dec 2006 | $51,061.52 |
| 33.66 | Kaiser Aluminium | B021 | 90226 | 07 Dec 2006 | $10,403.46 |
| 33.67 | Kaiser Aluminium | C022 | 90233 | 07 Dec 2006 | $50,767.05 |
| 33.68 | Kaiser Aluminium | C022 | 90239 | 07 Dec 2006 | $11,261.36 |
| 33.69 | Kaiser Aluminium | C025 | 90060 | 12 Dec 2006 | $13,381.73 |
| 33.70 | Kaiser Aluminium | D025 | 90248 | 07 Dec 2006 | $25,130.81 |
| 33.71 | Kaiser Aluminium | D025 | 90088 | 08 Dec 2006 | $5,722.39 |

| | Claim | | Agreement By Equitas | | Amount |
|---|---|---|---|---|---|
| | Insured/Loss | ROM's Ref. # | Signing # | Date | Owed Under Assignment |
| 33.72 | Kaiser Aluminium | E028 | 90096 | 08 Dec 2006 | $18,790.47 |
| 33.73 | Kaiser Aluminium | E028 | 90044 | 08 Dec 2006 | $34,476.33 |
| 33.74 | Goodyear Tire | T020 | 90027 | 29 Jan 2007 | $14,176.94 |
| 33.75 | Goodyear Tire | U019 | 90031 | 29 Jan 2007 | $14,532.53 |
| 33.76 | Goodyear Tire | V023 | 90035 | 29 Jan 2007 | $14,873.24 |
| 33.77 | Goodyear Tire | W033 | 90043 | 29 Jan 2007 | $25,170.63 |
| 33.78 | Goodyear Tire | X039 | 90066 | 29 Jan 2007 | $18,456.72 |
| 33.79 | Goodyear Tire | Y037 | 90015 | 30 Jan 2007 | $17,119.46 |
| 33.80 | Goodyear Tire | T020 | 90224 | 20 Apr 2007 | $13,009.48 |
| 33.81 | Goodyear Tire | U019 | 90111 | 23 Apr 2007 | $13,204.11 |
| 33.82 | Goodyear Tire | V023 | 90120 | 23 Apr 2007 | $13,397.89 |
| 33.83 | Minnesota Minning | X022 | 90012 | 30 Jul 2007 | $95,696.05 |
| 33.84 | Minnesota Minning | Y025 | 90024 | 30 Jul 2007 | $75,250.51 |
| 33.85 | American Cyanamid | A083 | 90070 | 07 Aug 2007 | $16,211.00 |
| 33.86 | Union Carbide | X013 | 90046 | 08 Oct 2007 | $11,630.73 |
| 33.87 | Minnesota Minning | X022 | 90053 | 08 Oct 2007 | $11,442.86 |
| 33.88 | Minnesota Minning | Y025 | 90060 | 08 Oct 2007 | $8,823.14 |
| 33.89 | Hercules | A136 | 90046 | 04 Dec 2007 | $14,299.70 |
| 33.90 | Hercules | B024 | 90053 | 04 Dec 2007 | $14,281.33 |
| 33.91 | Hercules | C028 | 90058 | 04 Dec 2007 | $14,275.22 |
| 33.92 | Hercules | E039 | 90064 | 04 Dec 2007 | $9,957.28 |
| 33.93 | Georgia Pacific | W026 | 90036 | 04 Dec 2007 | $10,274.47 |
| 33.94 | Georgia Pacific | X032 | 90042 | 04 Dec 2007 | $7,298.18 |
| 33.95 | Dresser Industries | W031 | 90119 | 05 Dec 2007 | $3,534.41 |
| 33.96 | Dresser Industries | X037 | 90112 | 05 Dec 2007 | $3,181.62 |
| 33.97 | Dresser Industries | Y034 | 90128 | 05 Dec 2007 | $3,137.27 |
| | | | | Total | $1,903,420.61 |

34.    Despite demand, Lloyd's Underwriters have failed to pay to B.D. Cooke reinsurance recoverables due to B.D. Cooke, as Citizens' assignee, in respect of the Agreed Claims.

12

35.    The amount now due from Lloyd's Underwriters in respect of the Agreed

Claims is no less than $1,903,420.61, exclusive of interest and costs.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Declaratory Relief)

36.    The allegations of Paragraphs 1 through 35 are realleged and incorporated

by reference herein.

37.    Lloyd's Underwriters, through Equitas, have premised their refusal to pay

amounts due to B.D. Cooke under the Assignment in respect of the Agreed Claims upon

their contention that the Assignment caps the amount that can be recovered by

B.D. Cooke.

38.    Lloyd's Underwriters, through Equitas, have also asserted that the

Assignment constitutes a novation of the Excess-of-Loss Reinsurance Agreements and

that such novation purportedly means that Lloyd's Underwriters are relieved of liability

by virtue of a separate agreement not at issue in this action.

39.    The Lloyd's Underwriters' interpretations of the Assignment referenced

in Paragraphs 37 and 38 are contrary to the terms of the Assignment, the Petition and

this Court's Approval Order, and contrary to this Court's decisions on summary

judgment in the Nationwide Action against Lloyd's Underwriters' fellow reinsurer.

40.    As a result of the events described herein, an actual, ripe controversy of a

justiciable nature presently exists between B.D. Cooke and Lloyd's Underwriters

concerning the meaning and effect of Assignment, including with respect to past,

present, and future amounts due to B.D. Cooke under the Assignment.

13

41.     B.D. Cooke and Lloyd's Underwriters have adverse legal interests in regard to the meaning and effect of the Assignment.

42.     The controversy is of sufficient immediacy as to justify the entry of a declaratory judgment.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract)

43.     The allegations of Paragraphs 1 through 42 are realleged and incorporated by reference herein.

44.     This cause of action is asserted in this action expressly subject to, and without waiver of, arbitration of any disputes under the Excess-of-Loss Reinsurance Agreements as provided in any arbitration clauses contained in such Excess-of-Loss Reinsurance Agreements.  However, there are no apparent disputes between the parties concerning the Excess-of-Loss Reinsurance Agreements with respect to the Agreed Claims, which were instead agreed to by Lloyd's Underwriters, as set forth in Paragraph 33, and sub-Paragraphs 33.1 through 33.97.  Lloyd's Underwriters, through Equitas, have explained their failure to pay the Agreed Claims solely on bases other than the Excess-of-Loss Reinsurance Agreements.  If, and to the extent, there are, or there are deemed to be, disputes within any arbitration provision of any of the Excess-of-Loss Reinsurance Agreements, B.D. Cooke expressly reserves the right to arbitrate such disputes.

45.     Lloyd's Underwriters entered into the Excess-of-Loss Reinsurance Agreements, whereby they reinsured Citizens.

46.    All relevant rights of Citizens under the Excess-of-Loss Reinsurance Agreements were vested in the Liquidator, and assigned by the Liquidator to B.D. Cooke.

47.    Despite demand, Lloyd's Underwriters have not paid B.D. Cooke in respect of the Agreed Claims and, in failing to do so, have breached their contractual obligations to B.D. Cooke, as assignee, under the Excess-of-Loss Reinsurance Agreements.

48.    By reason of the foregoing, B.D. Cooke has been damaged in an amount no less than $1,903,420.61, exclusive of interest and costs.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Account Stated)

49.    The allegations of Paragraphs 1 through 48 are realleged and incorporated by reference herein.

50.    This cause of action is asserted in this action expressly subject to, and without waiver of, arbitration of any disputes under the Excess-of-Loss Reinsurance Agreements as provided in any arbitration clauses contained in such Excess-of-Loss Reinsurance Agreements.  However, there are no apparent disputes between the parties concerning the Excess-of-Loss Reinsurance Agreements with respect to the Agreed Claims, which were instead agreed to by Lloyd's Underwriters, as set forth in Paragraph 33, and sub-Paragraphs 33.1 through 33.97.  Lloyd's Underwriters, through Equitas, have explained their failure to pay the Agreed Claims solely on bases other than the Excess-of-Loss Reinsurance Agreements.  If, and to the extent, there are, or there are deemed to be, disputes within any arbitration provision of any of the Excess-of-Loss

15

Reinsurance Agreements, B.D. Cooke expressly reserves the right to arbitrate such disputes.

51.    Lloyd's Underwriters have expressly or impliedly agreed to reinsurance billings for reinsurance recoverables due to B.D. Cooke, as Citizens' assignee, thereby establishing an account stated in respect of the Agreed Claims.

WHEREFORE, plaintiff B.D. Cooke demands judgment against the defendants Lloyd's Undewriters as follows:

1.    On plaintiff's First cause of action, a declaration as to the meaning and effect of the Assignment, including without limitation that (A) there is no cap on the amount that B.D. Cooke is entitled to collect under the Assignment; and (B) the Assignment is an assignment and does not constitute a novation of any of the assigned reinsurance agreements;

2.    On plaintiff's Second and Third causes of action, subject to Paragraphs 44 and 50, judgment in the amount of $1,903,420.61, plus the amounts of any other agreed or account-stated claims under the Assignment, plus interest at the applicable rate;

3.    On all causes of action, judgment granting plaintiff costs, disbursements and attorneys' fees in prosecuting this action; and

4.    Judgment granting such other and further relief as the Court may deem just and proper.

Dated:    New York, New York        CHADBOURNE & PARKE LLP
          February 26, 2008

                                    By_____
                                              John F. Finnegan
                                    Attorneys for Plaintiff
                                    30 Rockefeller Plaza
                                    New York, New York  10112
                                    (212) 408-5100

Carey G. Child
Anne Linder
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 974-5600

          Of Counsel

17

**Exhibit A Page 1**

Agency Managers London  Reinsurance Program
(Placed through Willis Faber & Dumas / Bain Dawes)

| 1952 | ULW4642 | 1st Cas XL | 23 Nov 1951 to 31 Dec 1952 | US$ 350,000 xs US$ 150,000 |
|------|---------|------------|----------------------------|----------------------------|
| 1953 | ULW4642 | 1st Cas XL | 12 months at 1 Jan 1953 | US$ 350,000 xs US$ 150,000 |
| 1954 | UMW4642 | 1st Cas XL | 12 months at 1 Jan 1954 | US$ 350,000 xs US$ 150,000 |
| 1955 | UNW4662 | 1st Cas XL | 12 months at 1 Jan 1955 | US$ 350,000 xs US$ 150,000 |
|      | UNW5261 | 2nd Cas XL | 22 Sep 1955 to 31 Dec 1955 | US$ 500,000 xs US$ 500,000 |
| 1956 | UPW4642 | 1st Cas XL | 12 months at 1 Jan 1956 | US$ 350,000 xs US$ 150,000 |
|      | UPW5261 | 2nd Cas XL | 12 months at 1 Jan 1956 | US$ 500,000 xs US$ 500,000 |
|      | UPW5541 | Clash XL | 12 months at 1 Jan 1956 | US$ 300,000 xs US$ 150,000 |
| 1957 | UQW4642 | 1st Cas XL | 12 months at 1 Jan 1957 | US$ 350,000 xs US$ 150,000 |
|      | UQW5261 | 2nd Cas XL | 12 months at 1 Jan 1957 | US$ 500,000 xs US$ 500,000 |
|      | UQW5541 | Clash XL | 12 months at 1 Jan 1957 | US$ 300,000 xs US$ 150,000 |
| 1958 | URW4642 | 1st Cas XL | 12 months at 1 Jan 1958 | US$ 350,000 xs US$ 150,000 |
|      | URW5261 | 2nd Cas XL | 12 months at 1 Jan 1958 | US$ 500,000 xs US$ 500,000 |
|      | URW5541 | Clash XL | 12 months at 1 Jan 1958 | US$ 300,000 xs US$ 150,000 |
| 1959 | USW4642 | 1st Cas XL | 12 months at 1 Jan 1959 | US$ 350,000 xs US$ 150,000 |
|      | USW5261 | 2nd Cas XL | 12 months at 1 Jan 1959 | US$ 500,000 xs US$ 500,000 |
|      | USW5541 | Clash XL | 12 months at 1 Jan 1959 | US$ 300,000 xs US$ 150,000 |
| 1960 | UTW4642 | 1st Cas XL | 12 months at 1 Jan 1960 | US$ 350,000 xs US$ 150,000 |
|      | UTW5261 | 2nd Cas XL | 12 months at 1 Jan 1960 | US$ 500,000 xs US$ 500,000 |
|      | UTW5541 | Clash XL | 12 months at 1 Jan 1960 | US$ 500,000 xs US$ 150,000 |
| 1961 | UUW4642 | 1st Cas XL | 12 months at 1 Jan 1961 | US$ 350,000 xs US$ 150,000 |
|      | UUW5261 | 2nd Cas XL | 12 months at 1 Jan 1961 | US$ 500,000 xs US$ 500,000 |
|      | UUW5541 | Clash XL | 12 months at 1 Jan 1961 | US$ 300,000 xs US$ 150,000 |
| 1962 | UVW4642 | 1st Cas XL | 12 months at 1 Jan 1962 | US$ 350,000 xs US$ 150,000 |
|      | UVW5261 | 2nd Cas XL | 12 months at 1 Jan 1962 | US$ 500,000 xs US$ 500,000 |
|      | UVW5541 | Clash XL | 12 months at 1 Jan 1962 | US$ 300,000 xs US$ 150,000 |
| 1963 | UXW4642 | 1st Cas XL | 12 months at 1 Jan 1963 | US$ 350,000 xs US$ 150,000 |
|      | UXW5261 | 2nd Cas XL | 12 months at 1 Jan 1963 | US$ 500,000 xs US$ 500,000 |
|      | UXW5541 | Clash XL | 12 months at 1 Jan 1963 | US$ 300,000 xs US$ 150,000 |
| 1964 | UYW4642 | 1st Cas XL | 12 months at 1 Jan 1964 | US$ 350,000 xs US$ 150,000 |
|      | UYW5261 | 2nd Cas XL | 12 months at 1 Jan 1964 | US$ 500,000 xs US$ 500,000 |
|      | UYW5541 | Clash XL | 12 months at 1 Jan 1964 | US$ 300,000 xs US$ 150,000 |

Exhibit A Page 2

| 1965 | UZW4642 | 1st Cas XL | 12 months at 1 Jan 1965 | US$ 350,000 xs US$ 150,000 |
| | UZW5261 | 2nd Cas XL | 12 months at 1 Jan 1965 | US$ 500,000 xs US$ 500,000 |
| | UZW5541 | Clash XL | 12 months at 1 Jan 1965 | US$ 300,000 xs US$ 150,000 |
| | | | | |
| 1966 | UAX4642 | 1st Cas XL | 12 months at 1 Jan 1966 | US$ 350,000 xs US$ 150,000 |
| | UAX5261 | 2nd Cas XL | 12 months at 1 Jan 1966 | US$ 500,000 xs US$ 500,000 |
| | UAX5541 | Clash XL | 12 months at 1 Jan 1966 | US$ 300,000 xs US$ 150,000 |
| | | | | |
| 1967 | UBX4642 | 1st Cas XL | 12 months at 1 Jan 1967 | US$ 350,000 xs US$ 150,000 |
| | UBX5261 | 2nd Cas XL | 12 months at 1 Jan 1967 | US$ 500,000 xs US$ 500,000 |
| | UBX5541 | Clash XL | 12 months at 1 Jan 1967 | US$ 300,000 xs US$ 150,000 |
| | | | | |
| 1968 | UCX4642 | 1st Cas XL | 12 months at 1 Jan 1968 | US$ 350,000 xs US$ 150,000 |
| | UCX5261 | 2nd Cas XL | 12 months at 1 Jan 1968 | US$ 500,000 xs US$ 500,000 |
| | UCX3665 | 3rd Cas XL | 12 months at 1 Jan 1968 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | UCX5541 | Clash XL | 12 months at 1 Jan 1968 | US$ 300,000 xs US$ 150,000 |
| | | | | |
| 1969 | UDX4642 | 1st Cas XL | 12 months at 1 Jan 1969 | 80% of US$ 325,000 xs US$ 175,000 |
| | UDX5261 | 2nd Cas XL | 12 months at 1 Jan 1969 | 80% of US$ 500,000 xs US$ 500,000 |
| | UDX3665 | 3rd Cas XL | 12 months at 1 Jan 1969 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | UDX5541 | Clash XL | 12 months at 1 Jan 1969 | US$ 400,000 xs US$ 125,000 |
| | | | | |
| 1970 | UEX4642 | 1st Cas XL | 12 months at 1 Jan 1970 extended to 31 Mar 1971 | 80% of US$ 325,000 xs US$ 175,000 80% of US$ 300,000 xs US$ 200,000 |
| | UEX0019 | 2nd Cas XL | 12 months at 1 Jan 1970 extended to 31 Mar 1971 | 80% of US$ 500,000 xs US$ 500,000 80% of US$ 500,000 xs US$ 500,000 |
| | UEX3665 | 3rd Cas XL | 12 months at 1 Jan 1970 extended to 31 Mar 1971 | 100% of 64% of US$ 1,000,000 xs US$ 1,000,000 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | UEX5541 | Clash XL | 12 months at 1 Jan 1970 extended to 31 Mar 1971 | US$ 325,000 xs US$ 150,000 US$ 400,000 xs US$ 200,000 |
| | | | | |
| 1971 | UFX0397 | 1st Cas XL | 1 Apr 1971 to 31 Dec 1971 | 32.5% of US$ 300,000 xs US$ 200,000 |
| | UFX0598 | 2nd Cas XL | 1 Apr 1971 to 31 Dec 1971 | 50% of US$ 500,000 xs US$ 500,000 |
| | UFX3665 | 3rd Cas XL | 1 Apr 1971 to 31 Dec 1971 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | UFX0599 | Clash XL | 1 Apr 1971 to 31 Dec 1971 | US$ 400,000 xs US$ 200,000 |
| | | | | |
| 1972 | UGX0397 | 1st Cas XL | 12 months at 1 Jan 1972 | 32.5% of US$ 300,000 xs US$ 200,000 |
| | UGX0398 | 2nd Cas XL | 12 months at 1 Jan 1972 | 50% of US$ 500,000 xs US$ 500,000 |
| | UGX3665 | 3rd Cas XL | 12 months at 1 Jan 1972 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | UGX0399 | Clash XL | 12 months at 1 Jan 1972 | US$ 400,000 xs US$ 200,000 |
| | | | | |
| 1973 | UHX0552 | 2nd XL R/I | 12 months at 1 Jan 1973 | 35% of US$ 4,000,000 xs US$ 1,000,000 |
| | | | | |
| 1974 | UIX0552 | 2nd XL R/I | 12 months at 1 Jan 1974 | 35% of US$ 4,000,000 xs US$ 1,000,000 |
| | | | | |
| 1975 | UKX0752 | 1st Cas XL | 12 months at 1 Jan 1975 | 13.83% of US$ 750,000 xs US$ 250,000 |
| | UKX0754 | 2nd Cas XL | 12 months at 1 Jan 1975 | 58.82% of US$ 1,500,000 xs US$ 1,000,000 |
| | UKX0755 | 3rd Cas XL | 12 months at 1 Jan 1975 | 67% of US$ 2,500,000 xs US$ 2,500,000 |
| | UKX0753 | Clash XL | 12 months at 1 Jan 1975 | 13.83% of US$ 750,000 xs US$ 250,000 |

Exhibit 2

EXCESS OF LOSS CASUALTY RETROCESSION
CONTRACT NO. 594/67/5261

issued to

AGENCY MANAGERS LIMITED, NEW YORK
etal

by

various INSURANCE COMPANIES



594/67/5261

EXCESS OF LOSS CASUALTY RETROCESSION CONTRACT

issued to

AGENCY MANAGERS LIMITED, NEW YORK as United
States Casualty Reinsurance Managers of and on
behalf of
THE INDEMNITY MARINE ASSURANCE COMPANY LIMITED,
(U.S. Branch)
NATIONWIDE MUTUAL INSURANCE COMPANY
CONSTELLATION INSURANCE COMPANY
CITIZENS CASUALTY COMPANY OF NEW YORK
THE MONARCH INSURANCE COMPANY OF OHIO

(hereinafter called the "Reassured")

by

various INSURANCE COMPANIES

(hereinafter called the "Reinsurers")

## ARTICLE I

BUSINESS
REINSURED HEREUNDER

In consideration of the payment of premium as provided in Article
XII the Reinsurers shall indemnify the Reassured, within the limits and
subject to the terms and conditions herein set forth, in respect of the
liability attaching to them under Contracts of Reinsurance written in the
United States of America or in Canada (covering liability wheresoever occur-
ring) in respect of the following classes of insurance as set forth in Section
46 of Article 4 of the Insurance Laws of the State of New York including any
and all amendments thereto or revisions thereof :

"Accident and Health Insurance" as defined in sub-
paragraph (a) of paragraph 3.

"Water Damage Insurance" as defined in paragraph 6.

"Burglary and Theft Insurance" as defined in paragraph 7.

"Glass Insurance" as defined in paragraph 8.

"Boiler and Machinery Insurance" as defined in paragraph 9.

"Elevator Insurance" as defined in paragraph 10.

-2-

"Collision Insurance" as defined in paragraph 12.

"Personal Injury Liability Insurance" as defined in paragraph 13.

"Property Damage Liability Insurance" as defined in paragraph 14.

"Workmen's Compensation and Employers' Liability Insurance" as defined in paragraph 15.

All amendments to or revisions of the above paragraphs of Section 46 of Article 4 of the Insurance Laws of the State of New York effective during the currency of this Contract shall be immediately notified to the Reinsurers.

## ARTICLE II

### EXCLUSIONS

This Contract does not apply to :-

a) Quota Share Reinsurance Contracts where the original policy limits exceed $25,000 any one person, $50,000 any one accident for Bodily Injury Liability, and $10,000 any one accident for Property Damage Liability.

b) Business of the Reassured which is designated by them as Aviation Business provided, however, that this exclusion does not apply to Workmen's Compensation Business.

c) "Fidelity and Surety Insurance" as defined in Section 46 of Article 4 of the Insurance Laws of the State of New York, other than Fidelity Insurance when written as part of an "Umbrella" policy, provided Reinsurers shall not be liable for losses discovered or sustained prior to January 1st, 1963.

d) Credit Insurance as defined in paragraph 17 of the said Section 46.

e) Any form of financial guarantee business.

f) Liability for loss arising from the operations of the Federal Securities Acts of 1933.

g) Workmen's Compensation and Employers' Liability in respect of underground coal mining operations.

h) Protection and Indemnity business and Ocean Marine business written and classified by the Reassured as such.

It is understood and agreed, however, that except as regards the

-3-

exclusion of Surety Insurance as defined in Section 46, of Article 4 of the Insurance Laws of the State of New York, Credit Insurance as defined in paragraph 17 of the said Section 46 and any form of Financial Guarantee business, the foregoing exclusions shall not apply where the operations outlined are only incidental to the Original Insured's main operations.

It is further understood and agreed that,

i) this Contract does not apply to loss or liability excluded under the provisions of the attached Nuclear Incident Exclusion Clause - Physical Damage - Reinsurance, Nuclear Incident Exclusion Clause - Liability - Reinsurance, and Nuclear Incident Exclusion Clause - Physical Damage and Liability (Boiler and Machinery Policies) - Reinsurance.

## ARTICLE III

REINSURING CLAUSE

A.    The Reinsurers shall indemnify the Reassured for that portion of the liability attaching to them in respect of business falling within the scope of this Contract which represents the excess of the sum of $500,000 (Five hundred thousand United States Dollars) ultimate net loss in respect of each accident, the liability of the Reinsurers under this contract being limited to the sum of $500,000 (Five hundred thousand United States Dollars) ultimate net loss in respect of each accident.

B.    Notwithstanding the provisions of paragraph A of this Article, as respects liability assumed by the Reassured on both an aggregate basis and an accident basis, or on an aggregate basis alone, in respect of Property Damage Liability Insurance and Products Bodily Injury Liability Insurance providing aggregate limits of indemnity as well as per accident limits, the Reinsurers shall indemnify the Reassured for that portion of the liability attaching to them (whether due to per accident or aggregate limits, or both) which represents the excess of the sum of $500,000 (Five hundred thousand United States Dollars) ultimate net loss in the aggregate in respect of each annual premium period of each policy, or in respect of the full policy period if such period does not exceed fifteen months; but the liability of the Reinsurers under this Contract for the aggregate ultimate net loss under any such policy during said period shall not exceed $500,000 (Five hundred thousand United States Dollars). Nevertheless, if the Reassured sustain a loss in excess of $500,000 (Five hundred thousand United States Dollars) as the result of one accident which involves business falling within this paragraph B and also other business falling within the scope of this Contract, then the entire loss shall be excluded from this paragraph B and shall be settled in accordance with the other terms and conditions of this Contract.

C.    The term "policy" as used in paragraph B of this Article means a policy issued direct to an insured by a company reinsured by the Reassured.

-4-

D.      The amount of $500,000 in excess of which this Contract attaches, and the Reinsurers' limit of liability of $500,000 herein set forth, shall be applied separately to :-

    1)  Boiler and Machinery Insurances,

    2)  Personal Injury Liability and Property Damage Liability Insurances,

    3)  Workmen's Compensation and Employers' Liability Insurances,

    4)  All other insurances covered hereunder,

in respect of each reassured protected under Contracts of Reinsurance written by the Reassured.

## ARTICLE IV

### ATTACHMENT

A.      This Contract applies only to Contracts of Reinsurance entered into by the Reassured which commence or are renewed on or after January 1, 1967 and shall continue in force until cancelled by either party in accordance with the provisions of Article XX or by the mutual agreement of both parties.

B.      For the purpose of this Article all Contracts of Reinsurance entered into by the Reassured for a long or indefinite period shall be deemed to be renewed from their respective anniversary dates next following January 1st, 1967.

## ARTICLE V

### DEFINITION OF "EACH ACCIDENT"

In cases where the Reassured's contracts of reinsurance contain a definition of "each accident" such definition shall apply to this Contract, but if the Reassured's contracts of reinsurance do not contain such a definition, then the term "each accident" as used herein shall be understood to mean "each accident or occurrence or series of accidents or occurrences arising out of any one event" provided that as respects

    (a)  PRODUCTS LIABILITY

Said term shall alternatively be understood to mean "injuries to all persons proceeding from the use or consumption of one prepared or acquired lot of merchandise or product".

-5-

(b) PRODUCTS PROPERTY DAMAGE

Said term shall alternatively be understood to mean "all damage to property of others proceeding from the use or consumption of one prepared or acquired lot of merchandise or product".

(c) PROPERTY DAMAGE (other than Automobile and Products)

Said term shall alternatively subject to provisions (1) and (2) below be understood to mean "loss or losses caused by a series of operations, events or occurrences arising out of operations at one specific site and which cannot be attributed to any single one of such operations, events or occurrences, but rather to the cumulative effect of same".

In assessing each accident within the foregoing definition it is understood and agreed that

(1) the series of operations, events or occurrences shall not extend over a period longer than 12 (twelve) consecutive months

and

(2) the Reassured may elect the date on which the period of not exceeding 12 (twelve) consecutive months shall be deemed to have commenced.

In the event that the series of operations, events or occurrences extend over a period longer than 12 (twelve) consecutive months then each consecutive period of 12 months, the first of which commences on the date elected under (2) above, shall form the basis of claim under this Contract.

(d) PUBLIC LIABILITY (other than Automobile and Products)

Said term shall alternatively be understood to mean as regards each original Insured "injuries to one or more than one person resulting from infection, contagion, poisoning or contamination proceeding from or traceable to the same causative agency.

(e) An occupation or other disease suffered by an employee which disease arises out of the employment and for which the employer is liable, the same shall be deemed an accident within the meaning hereof. In case the Reassured shall within a policy year sustain several losses arising out of such an occupational or other disease of one specific kind

-6-

or class, suffered by several employees of one original Insured, such losses shall be deemed to arise out of one accident and the date of such accident shall be deemed to be the commencing date of the policy year. A loss as respects each employee affected by the disease shall be deemed to have been sustained by the Reassured at the date when compensable disability of the employee commenced and at no other date.

(f)    As regards business where the measure of loss is the "neglect, error or omission" of the insured, it is understood that neglect, error or omission shall be deemed to be an accident within the meaning hereof, and the date of loss shall be the date on which the first act of negligence, error or omission occurred, except that where the Contract of Reinsurance entered into by the Reassured grants a retro-active cover and the first such act occurred during the retroactive period it shall be deemed to have occurred on the first day of the said Contract of Reinsurance.

## ARTICLE VI

### ULTIMATE NET LOSS

A.    The term "ultimate net loss" as used herein shall mean the sum which the Reassured have become legally obligated to pay (excluding all expenses incurred by the Reassured in settlement or defence of claims) in the settlement of losses or liabilities after making deductions for all recoveries, all salvages, and all claims upon other reinsurers (whether recovered or not) other than :-

    1.    the underlying excess of loss reinsurers and

    2.    the reinsurers subscribing to the Contract referred to in paragraph D of this Article.

B.    All salvages, recoveries or payments recovered or received subsequent to a loss settlement under this Contract shall be applied as if recovered or received prior to the aforesaid settlement and all necessary adjustments shall be made by the parties hereto.

C.    Nothing in this Article shall be construed to mean that losses under this Contract are not recoverable until the Reassured's ultimate net loss has been ascertained.

D.    Recoveries under the following Excess of Loss Reinsurance Con-tract shall be disregarded for the purposes of this Article :

    "an Excess of Loss Reinsurance Contract covering up to a limit of $300,000 ultimate net loss each accident in excess of $150,000 ultimate net loss each accident and protecting

-7-

the Reassured only in the event of two or more of the
following classes

1)  Boiler and Machinery Insurances

2)  Personal Injury Liability and Property Damage
     Liability Insurances

3)  Workmen's Compensation and Employers' Liability
     Insurances

4)  All other reinsurances covered under this Contract.

and/or two or more reassureds protected under Contracts of
Reinsurance written by the Reassured being involved in any one
accident.

## ARTICLE VII

### NET RETAINED LINES

    This Contract applies only to that portion of any contract of rein-
surance which the Reassured retain net for their own account and in calcu-
lating the amount of any loss hereunder and also in computing the amount
in excess of which this Contract attaches, only loss or losses in respect of
that portion of any contract of reinsurance which the Reassured retain net
for their own account shall be included.  Recoveries made by the Reassured
from the reinsurers referred to in paragraph D of Article VI shall be dis-
regarded for the purposes of this Article.

## ARTICLE VIII

### INABILITY TO RECOVER
### FROM OTHER REINSURERS

    The amount of the Reinsurers' liability hereunder in respect of any
loss or losses shall not be increased by reason of the inability of the Re-
assured to collect from any other reinsurers (whether specific or general)
any amounts which may have become due from them, whether such inability
arises from the insolvency of such other reinsurers or otherwise.

## ARTICLE IX

### MAXIMUM RETENTION

    It is warranted that the amount retained by the Reassured net for
their own account shall not exceed

1)  $1,000,000 each accident in respect of each class of
     insurance (as set forth in Article 1 of this Contract)
     for each reassured,

-8-

2) as respects boiler and machinery insurance, a daily indemnity applying to any one location as defined in the Boiler and Machinery Manual of the National Bureau of Casualty Underwriters of $5,000 per diem provided, however, that where the contract issued by the Reassured contains no daily limit, such business shall be protected hereunder provided that the liability of the Reassured attaches in excess of a deductible of at least $2,000,000 each accident (including direct damage, if any).

## ARTICLE X

WAR EXCLUSION

A.        As regards interest under Plate Glass and All Risks business (except All Risks business accepted by the Burglary Departments of the Companies reinsured by the Reassured) no liability shall attach hereto in respect of any loss or damage which is occasioned by War, Invasion, Hostilities, Acts of Foreign Enemies, Civil War, Rebellion, Insurrection, Military or Usurped Power or Martial Law or Confiscation by order of any Government or Public Authority.

B.        As regards interest, other than Workmen's Compensation and Liability, which, at time of loss or damage, are on shore OUTSIDE the territorial limits of the United States of America and Canada, no liability shall attach hereto in respect of any such loss or damage which is occasioned by War, Invasion, Hostilities, Acts of Foreign Enemies, Civil War, Rebellion, Insurrection, Military or Usurped Power or martial law or Confiscation, by order of any Government or Public Authority.

## ARTICLE XI

EXCESS OF LOSS
REINSURANCE CLAUSE

This Contract in no way applies to protect any liability of the Reassured in respect of Excess of Loss Reinsurances of other Reinsurance Companies written or accepted by the Reassured and the expression "Reinsurance Companies" shall not apply to Companies normally transacting direct business but who accept some incidental reinsurance business.

## ARTICLE XII

PREMIUM

A.        The premium payable to the Reinsurers shall be calculated at the rate of 1.125% applied to the gross net earned premium income of the Reassured.

-9-

The term "gross net earned premium income" as used herein shall be understood to mean the gross earned premiums accruing to the Reassured from all business the subject matter of this Contract after deducting return premiums and premiums paid away for facultative reinsurances, recoveries under which, in accordance with the provisions of Article VI, would inure to the benefit of the Reinsurers.

B.     The Reassured shall pay to the Reinsurers a minimum annual premium of $20,000 in four quarterly instalments of $5,000 January 1st, April 1st, July 1st and October 1st of each year.

C.     The Reassured shall forward to the Reinsurers within 45 days after the close of each calendar quarter a statement of the Reassured's gross earned premium income during the quarter then immediately past and adjustment of premium shall thereupon be made in respect of each calendar year of this Contract as follows :-

   1)   if the earned premium for the first quarter exceeds
        $5,000 the amount in excess thereof shall thereupon
        be paid to the Reinsurers

   2)   if the earned premium for the first two quarters
        exceeds $10,000 the amount in excess thereof after
        deducting any additional premium paid under paragraph
        1) above shall thereupon be paid to the Reinsurers

   3)   if the earned premium for the first three quarters
        exceeds $15,000, the amount in excess thereof after
        deducting any additional premium paid under paragraphs
        1) and 2) above shall thereupon be paid to the Reinsurers

   4)   the statement rendered in respect of the fourth quarter
        shall include a recapitulation of the earned premium
        accruing to the Reinsurers for the first three quarters,
        and the total earned premium for the year shall then
        be determined.
        If such total earned premium :-

        a) exceeds the aggregate of :-

              (i)   the Minimum and Provisional Premium
                    of $20,000 and

              (ii)  the total of any additional premiums paid
                    to the Reinsurers under the provisions of
                    paragraphs 1), 2, and 3) of this Article,
                    the amount in excess thereof shall be paid
                    to the Reinsurers.

        b) is less than the aggregate arrived at in paragraph (a)
           above, the balance shall be refunded to the Reassured,

-10-

provided nevertheless that in no event shall the
premium retained by the Reinsurers be less than
$20,000.

## ARTICLE XIII

### FEDERAL EXCISE TAX

A.     The Reinsurers have agreed to allow, for the purpose of paying
the Federal Excise Tax, one per cent of the premium payable hereon to
the extent such premium is subject to Federal Excise Tax.

B.     In the event of any return of premium becoming due hereunder,
the Reinsurers will deduct one per cent from the amount of the return;
the Reassured or its broker hereunder should take steps to recover the
tax from the U.S. Government.

## ARTICLE XIV

### ACCESS TO RECORDS

The Reinsurers, or their authorised representatives shall at all
times during the currency of this Contract, or within eighteen months after
its termination, have free access to the books and records of the Reassured
insofar as they relate to business falling within the scope of this Contract,
and in the event of any claim for loss being made hereunder the Reinsurers
shall have free access to all claims records during the continuance of this
Contract or at any time thereafter until the final settlement of all such
claims.

## ARTICLE XV

### TAX CLAUSE

In consideration of the terms under which this Contract is issued,
the Reassured undertake not to claim any deduction in respect of the premium
hereon when making Canadian Tax returns or when making tax returns,
other than Income or Profits Tax returns, to any State or Territory of the
United States or to the District of Columbia.

## ARTICLE XVI

### CLAIMS

A.     The Reassured shall advise the Reinsurers with reasonable
promptitude of any accident or event in which the Reinsurers are known to
be involved and shall, on demand, provide the Reinsurers with full
information relative thereto.

-11-

B.    The Reinsurers, through their appointed representative Mendes and Mount, 27 William Street, New York, New York 10005, shall have the right to co-operate with the Reassured in the defense and/or settlement of any claims in which the Reinsurers may be interested.

C.    All settlements made by the Reassured in co-operation with the Reinsurers' appointed representative, Mendes and Mount, shall be binding on the Reinsurers and all settlements made by the Reassured in cases where the Reinsurers have elected not to exercise their right to co-operate with the Reassured shall be binding on the Reinsurers.  The Reinsurers shall pay to the Reassured any amounts that may be recoverable under this Contract within fifteen (15) days after the receipt of the necessary papers proving the loss.

## ARTICLE XVII

DIVISION OF
SETTLEMENT COSTS

Where the Reassured provide a cover under which expenses incurred by the treaty company in connection with the investigation and adjustment of claims and suits are included as a part of the loss, then such expenses shall like-wise be considered a part of the ultimate net loss hereinbefore referred to.  Otherwise such expenses shall be apportioned between the Reassured and the Reinsurers in the ratio of their respective liabilities as finally determined, it being understood however that the Reinsurers shall not be liable for any part of the salaries of officials or of office expenses of the Reassured.

## ARTICLE XVIII

COMMUTATION

A.    In the event of the Reassured becoming liable to make periodical payments under any contract reinsured hereunder, the Reinsurers shall (at any time after 24 months from the date of the accident) be at liberty to redeem the payments falling due from them by the payment of a lump sum to be determined as follows: In such case the amount of the claim under this Contract may be settled by mutual agreement, but if not so settled, the Reassured and the Reinsurers shall refer the matter to two arbitrators, one to be chosen by each party and such arbitrators shall choose an umpire;  in the event of the arbitrators failing to agree, the decision of the umpire shall be final and binding upon all parties.  The seat of arbitration shall be in New York, N.Y.

B.    The Reinsurers' portion of the amount so determined shall be considered the amount of loss hereunder and the payment thereof shall constitute a complete release of the Reinsurers for their liability for such claim so capitalised.

-12-

ARTICLE XIX

## INSOLVENCY

A.      In the event of the insolvency of any of the Companies constituting the Reassured this reinsurance shall be payable directly to the insolvent Company, or to its liquidator, receiver, conservator or statutory successor on the basis of the liability of the insolvent company without diminution because of the insolvency of the insolvent Company or because the liquidator, receiver, conservator or statutory successor of the insolvent Company has failed to pay all or a portion of any claim.

B.      It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the insolvent Company shall give written notice to the Reinsurers of the pendency of a claim against the insolvent Company indicating the policy or bond reinsured which claim would involve a possible liability on the part of the Reinsurers within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurers may investigate such claim and interpose, at their own expense, in the proceeding where such claim is to be adjudicated any defence or defences that they may deem available to the insolvent Company or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurers shall be chargeable, subject to the approval of the court, against the insolvent Company as part of the expense of conservation or liquidation to the extent of a pro rata share of the benefit which may accrue to the insolvent Company solely as a result of the defence undertaken by the Reinsurers.

ARTICLE XX

## CANCELLATION

A.      This Contract may be terminated by either party giving at least ninety days notice to the other party stating the effective date and time on which this Contract shall terminate.

B.      In the event of this Contract being so terminated the liability of the Reinsurers shall continue in force in respect of all Contracts of reinsurance falling within the protection of this Contract which are current at the effective date of the cancellation notice until

    1)    termination of each such contract

          or

    2)    the respective anniversary date of such Contracts next
        following the effective date of cancellation,

whichever shall first occur.

-13-

## ARTICLE XXI

### ARBITRATION

Any dispute arising under this Contract shall be submitted to a court of arbitration composed of two arbitrators, one to be appointed by the Reassured and the other by the Reinsurers, The arbitrators shall, before entering upon the reference, appoint an umpire,

The arbitrators and the umpire shall consider this Contract an honourable engagement rather than merely a legal obligation they are relieved of all judicial formalities and may abstain from following the strict rules of law. The award of the arbitrators or, in the event of their disagreement, of the umpire, shall be precedent to any liability or right of action of either party. The costs of the reference and of the award shall be in the discretion of the arbitrators or umpire, as the case may be, who may direct to and by whom and in what manner the same shall be paid.

The seat of arbitration shall be New York, N.Y.

## ARTICLE XXII

### SERVICE OF SUIT

It is agreed that in the event of the failure of the Reinsurers to pay any amount claimed to be due hereunder, the Reinsurers at the request of the Reassured, will submit to the jurisdiction of any Court of competent jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court. It is further agreed that service of process in such suit may be made upon Mendes and Mount, 27 William Street, New York, New York 10005, or their nominee or nominees, and that in any suit instituted against any one of them upon this Contract, the Reinsurers will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorised and directed to accept service of process on behalf of the Reinsurers in any such suit and/or upon the request of the Reassured to give a written undertaking to the Reassured that they will enter a general appearance upon Reinsurers' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Reinsurers hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Reassured or any beneficiary hereunder arising out of this contract of reinsurance, and hereby designate the above-named as the firm to which the said officer is authorised to mail such process or a true copy thereof.

594/68/3261

## ADDENDUM NO. 1

## to EXCESS OF LOSS CASUALTY RETROCESSION CONTRACT

Issued to

AGENCY MANAGERS LIMITED, NEW YORK as United
States Casualty Reinsurance Managers of
and on behalf of
THE INDEMNITY MARINE ASSURANCE COMPANY LIMITED,
(U.S.Branch)
NORTHWESTERN MUTUAL INSURANCE COMPANY
CONSTELLATION INSURANCE COMPANY
CITIZENS CASUALTY COMPANY OF NEW YORK
THE MONARCH INSURANCE COMPANY OF OHIO

by

## various INSURANCE COMPANIES

IT IS UNDERSTOOD AND AGREED THAT, effective January 1st, 1968,

1) the name of the Reinsured is amended to the following:

"AGENCY MANAGERS LIMITED, NEW YORK
as United States Casualty Reinsurance
Managers of and on behalf of
THE INDEMNITY MARINE ASSURANCE COMPANY LIMITED
(U.S.BRANCH)
NORTHWESTERN MUTUAL INSURANCE COMPANY
CONSTELLATION INSURANCE COMPANY
CITIZENS CASUALTY INSURANCE COMPANY
SECURITY, LONG ISLAND
THE MONARCH INSURANCE COMPANY OF OHIO "

2) sub-section (c) of Article IX is deleted;

3) the rate of Premium appearing in Article XII is increased to 2.75%;

4) The Nuclear Incident Exclusion Clause - Liability -
Reinsurance attached to this Addendum replaces the
Nuclear Incident Exclusion Clause - Liability -
Reinsurance attached to the Contract;

WILLIS FABER & DUMAS LIMITED

Part B - to Addendum No.1

5) the Companies' participation in the total coverage afforded by the Contract is amended from 38.29% to 32.26% and the Reinsurers subscribing to such amended participation are the INSURANCE COMPANIES, each for its own part and not one for the other, listed in the schedule attached hereto each for the portion set against its respective name;

6) a minimum and deposit premium of £6,452.00 (being 32.26% of £20,000) is due hereunder in respect of the calendar year 1961 and shall be payable in equal quarterly instalments at January 1st, April 1st, July 1st and October 1st, 1961.

All other terms and conditions remain unchanged.

Signed in the Binding Schedule for and on behalf of the INSURANCE COMPANIES named therein.

594/68/5261

# S C H E D U L E

Signed for and on behalf of the Insurance Companies listed hereund
by a representative of the Leading Company who is authorised by th
Leading Company and by all the other Companies listed hereunder to
sign on their behalf.

EXCESS INSURANCE COMPANY LIMITED
(Leading Company)

| | |
|---|---|
| EXCESS INSURANCE COMPANY LIMITED | 13.82% |
| ORION INSURANCE COMPANY LIMITED | 2.31% |
| ENGLISH AND AMERICAN INSURANCE COMPANY LIMITED | 4.61% |
| THE DOMINION INSURANCE COMPANY LIMITED | 11.52% |
| | 32.26% |

594/69/5261

ADDENDUM NO. 2

to EXCESS OF LOSS CASUALTY RETROCESSION CONTRACT

issued to

AGENCY MANAGERS LIMITED, NEW YORK
as United States Casualty Reinsurance
Managers of and on behalf of
THE INDEMNITY MARINE ASSURANCE COMPANY LIMITED
(U.S. BRANCH)
NATIONWIDE MUTUAL INSURANCE COMPANY
CONSTELLATION INSURANCE COMPANY
AMERICAN FIDELITY FIRE INSURANCE COMPANY
of WESTBURY, LONG ISLAND
THE MONARCH INSURANCE COMPANY OF OHIO

by

certain INSURANCE COMPANIES


IT IS UNDERSTOOD AND AGREED THAT, effective January 1st 1969

   1) the name of the Reassured is amended to the following:

      "      AGENCY MANAGERS LIMITED, NEW YORK
            as United States Casualty Reinsurance
            Managers of and on behalf of the
            Companies named in the Schedule of
            Participating Companies attached hereto,
            each Company participating severally and
            not jointly, and their Quota Share
                        Reinsurers.            "

   2) the sum of $150,000 quoted in Paragraph D of Article
      VI is amended to $175,000;

   3) the Companies subscribing to their participation
      of 32.26% of the total coverage afforded by the
      Contract are the INSURANCE COMPANIES, each for its
      own part and not one for the other, which are
      listed in the Schedule attached hereto each for the
      proportion set against its respective name;

-2-

4) a minimum and deposit premium of $6,552.00 (being 32.26% of $20,000) is due hereunder in respect of the calendar year 1968 and shall be payable in equal quarterly instalments at January 1st, April 1st, July 1st and October 1st, 1969.

All other terms and conditions remain unchanged.

Signed in Schedule No.1 for and on behalf of the INSURANCE COMPANIES named therein.

## SCHEDULE OF PARTICIPATING COMPANIES

American Consumer Insurance Company

American Liberty Insurance Company

American Mutual Liability Insurance Company

Constellation Reinsurance Company

Cosmopolitan Mutual Insurance Company

General Insurance Company of Trieste and Venice
(U.S. Branch)

Highlands Insurance Company

Horace Mann Insurance Company

Imperial Insurance Company

The Indemnity Marine Assurance Company Limited
(U.S. Branch)

The Monarch Insurance Company of Ohio

Public Service Mutual Insurance Company

Each Company participating to the extent of 8-1/3%
of the liability assumed severally and not jointly.

<u>SCHEDULE NO. 1</u>

Signed hereunder for and on behalf of the Insurance Companies
listed hereunder, by a representative of the Leading Company
who is authorised by the Leading Company and by all the other
Companies listed hereunder to sign on their behalf.

EXCESS INSURANCE COMPANY LIMITED
(Leading Company)

MANAGER · NON · MARINE POLICY DEPT
EXCESS INSURANCE CO. LTD

EXCESS INSURANCE COMPANY LIMITED                    12.91%

THE DOMINION INSURANCE COMPANY LIMITED              10.75%

ENGLISH & AMERICAN INSURANCE COMPANY LIMITED         4.30%

BRITISH NATIONAL LIFE INSURANCE SOCIETY LIMITED      4.30%
per M.E. Rutty Underwriting Agency

                                                    _____

                                                    32.26%
                                                    _____

U.S.A.

NUCLEAR INCIDENT EXCLUSION CLAUSE—LIABILITY—REINSURANCE

(Approved by Lloyd's Underwriters' Fire and Non-Marine Association)

(1) This reinsurance does not cover any loss or liability accruing to the Reassured as a member of, or subscriber to, any association of insurers or reinsurers termed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association.

(2) Without in any way restricting the operation of paragraph (1) of this Clause it is understood and agreed that for all purposes of this reinsurance all the original policies of the Reassured (new, renewal and replacement) of the classes specified in Clause II of this paragraph (2) from the time specified in Clause III in this paragraph (2) shall be deemed to include the following provision (specified as the Limited Exclusion Provision):

Limited Exclusion Provision.*

I. It is agreed that the policy does not apply under any liability coverage, to *injury, sickness, disease, death or destruction* bodily injury or property damage with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability.

II. Family Automobile Policies (liability only), Special Automobile Policies (private passenger automobiles, liability only), Farmers Comprehensive Personal Liability Policies (liability only), Comprehensive Personal Liability Policies (liability only) or policies of a similar nature; and the liability portion of combination forms related to the four classes of policies stated above, such as the Comprehensive Dwelling Policy and the applicable types of Homeowners Policies.

III. The inception dates and thereafter of all original policies as described in II above, whether new, renewal or replacement, being policies which either:
(a) become effective on or after 1st May, 1960, or
(b) become effective before that date and contain the Limited Exclusion Provision set out above;
provided this paragraph (2) shall not be applicable to Family Automobile Policies, Special Automobile Policies, or policies or combination policies of a similar nature, issued by the Reassured on New York risks, until 90 days following approval of the Limited Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(3) Except for those classes of policies specified in Clause II of paragraph (2) and without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that for all purposes of this reinsurance the original liability policies of the Reassured (new, renewal and replacement) affording the following coverages:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability)

shall be deemed to include, with respect to such coverages, from the time specified in Clause V of this paragraph (3), the following provision (specified as the Broad Exclusion Provision):

Broad Exclusion Provision.*

It is agreed that the policy does not apply:

I. Under any Liability Coverage, to *injury, sickness, disease, death or destruction* bodily injury or property damage
(a) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or
(b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II. Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to *immediate medical or surgical relief*, to expenses incurred with respect

the policy is also an insured under a Mutual Atomic Energy Liability Reinsurance Association, or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability.

II. Family Automobile Policies (liability only). Special Automobile Policies (private passenger automobiles, liability only). Farmers Comprehensive Personal Liability Policies (liability only). Comprehensive Personal Liability Policies (liability only) or policies of a similar nature; and the liability portion of combination forms related to the four classes of policies stated above, such as the Comprehensive Dwelling Policy and the applicable types of Homeowners Policies.

III. The inception dates and thereafter of all original policies as described in II above, whether new, renewal or replacement, being policies which either:
(a) become effective on or after 1st May, 1960, or
(b) become effective before that date and contain the Limited Exclusion Provision set out above;

provided this paragraph (2) shall not be applicable to Family Automobile Policies, Special Automobile Policies, or policies or combination policies of a similar nature, issued by the Reassured on New York risks, until 90 days following approval of the Limited Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(3) Except for those classes of policies specified in Clause II of paragraph (2) and without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that for all purposes of this reinsurance the original liability policies of the Reassured (new, renewal and replacement) affording the following coverages: Contractual Liability, Elevator Liability, Owners, Landlords and Tenants Liability, Contractual Liability, Manufacturers and Owners or Contractors (including railroad) Protective Liability, Manufacturers Liability, Contractors Liability, Professional and Malpractice Liability, Storekeepers Liability, Product Liability, Automobile Liability including Massachusetts Motor Vehicle or Garage Liability)

shall be deemed to include, with respect to such coverages, from the time specified in Clause V of this paragraph (3), the following provision (specified as the Broad Exclusion Provision):

Broad Exclusion Provision.*

It is agreed that the policy does not apply:

I. Under any Liability Coverage, to injury, sickness, disease, death or destruction
(a) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or
(b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act or 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II. Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III. Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if
(a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;
(b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or
(c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories, or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.
(d) property damage to such nuclear facility and any property thereat.

IV. As used in this endorsement:
"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or byproduct material; "source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1955 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means
(a) any nuclear reactor,
(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,
(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,
(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,
and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.
With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.
"property damage" includes all forms of radioactive contamination of property.

V. The inception dates and thereafter of all original policies affording coverages specified in this paragraph (3), whether new, renewal or replacement, being policies which become effective on or after 1st May, 1960, provided this paragraph (3) shall not be applicable to the one or Garage and Automobile Policies issued by the Reassured on New York risks, or
(a) statutory liability insurance required under Chapter 90, General Laws of Massachusetts,
until 90 days following approval of the Broad Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(4) Without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that paragraphs (2) and (3) above are not applicable to original liability policies of the Reassured in Canada and that with respect to such policies this Clause shall be deemed to include the Nuclear Energy Liability Exclusion Provisions adopted by the Canadian Underwriters' Association or the Independent Insurance Conference of Canada.

*required in italics in the Limited Exclusion Provision and in the Broad

594/BBX0010

ADDENDUM NO. 5

to EXCESS OF LOSS CASUALTY RETROCESSION CONTRACT NO.
594/677/5261

issued to

AGENCY MANAGERS LIMITED, NEW YORK
as United States Casualty Reinsurance
Managers of and on behalf of
companies named in the Schedule of
Participating Companies attached to
this Contract, each Company part-
icipating severally and not jointly,
and their Quota Share Reinsurers.

by

certain INSURANCE COMPANIES

IT IS UNDERSTOOD AND AGREED THAT, effective January 1st 1970 :-

1. Article XII is amended as follows

    (a) Paragraph B is amended to read:

       " The Reassured shall pay to the Reinsurers a
       minimum annual premium of £80,000 in four
       quarterly instalments of £20,000 on January 1st,
       April 1st, July 1st and October 1st of each year."

    (b) Paragraph C is amended to read:

       " As soon as practicable after the close of
       each calendar year of this Contract the Reassured
       shall forward to the Reinsurers a statement of
       the Reassured's gross net earned premium income
       during the calendar year then immediately past and,
       if the earned premium due to the Reinsurers,
       computed as above provided, exceeds the minimum
       and provisional premium of £80,000, the amount in
       excess thereof shall be paid to the Reinsurers."

2. All premiums, losses and communications relating to this
    Contract shall be transmitted between the Reassured and
    the Reinsurers through the intermediary of Pritchard &
    Baird, Inc., 115 William Street, New York, N.Y.10038.

-2-

3. The Companies' participation in the total coverage afforded by the contract is amended from 32.26% to 38.19% and the companies subscribing to such amended participation are the INSURANCE COMPANIES, each for its own part and not one for the other, which are listed in the Schedule attached hereto each for the proportion set against its respective name.

4. A minimum and deposit premium of $30,552 (being 38.19% of $80,000) is due hereunder in respect of the calendar year 1970 and shall be payable in equal quarterly instalments at January 1st, April 1st, July 1st and October 1st, 1970.

All other terms and conditions remain unchanged.

Signed in Schedule No.1 for and on behalf of the INSURANCE COMPANI named therein.

594/UEXOO10

SCHEDULE NO. 1

Signed hereunder for and on behalf of the Insurance Companies
listed hereunder, by a representative of the Leading Company
who is authorised by the Leading Company and by all the other
Companies listed hereunder to sign on their behalf.

EXCESS INSURANCE COMPANY LIMITED (Leading Company)

*J. Greaves*

MANAGER NON-MARINE TREATY DEPT.
EXCESS INSURANCE CO LTD.

EXCESS INSURANCE COMPANY LIMITED 770/3800/3181    13.48%

THE DOMINION INSURANCE COMPANY LIMITED 82672    11.24%

TUREGUM INSURANCE COMPANY 414692/141    6.74%

ENGLISH & AMERICAN INSURANCE COMPANY LIMITED    4.49%
7012766A/723A

ASSICURAZIONI GENERALI 842584 cc 8003    2.24%

────────────

38.19%
────────────

594/UEX 0019

ADDENDUM NO. 4

to

EXCESS OF LOSS CASUALTY RETROCESSION CONTRACT NO.0019
(formerly 594/67/5261)

issued to

AGENCY MANAGERS LIMITED, NEW YORK
as United States Casualty Reinsurance
Managers of and on behalf of the companies
named in the Schedule of Participating
Companies attached to this Contract, each
Company participating severally and not
jointly, and their Quota Share Reinsurers.

by

certain INSURANCE COMPANIES

IT IS UNDERSTOOD AND AGREED THAT, effective January 1st, 1970:

Paragraph A of Article XX is amended to read as follows:-

"A.    This Contract may be terminated at December 31st of
any year by either party giving at least 90 days' notice
to the other party of their intention so to do. "

All other terms and conditions remain unchanged.

Signed, for and on behalf of the INSURANCE COMPANIES listed in
Schedule No.1 attached to Addendum No.3, by a representative of
the Leading Company who is authorised by the Leading Company
and by all other Companies listed in the said Schedule to sign
on their behalf.

770/3900/3181.

594/UEX 0019

ADDENDUM NO. 5

to

EXCESS OF LOSS CASUALTY RETROCESSION CONTRACT NO.0019
(formerly 594/67/6261)

issued to

AGENCY MANAGERS LIMITED, NEW YORK

as United States Casualty Reinsurance
Managers of and on behalf of the Compan-
ies named in the Schedule of Participating
Companies attached to this Contract, each
company participating severally and not
jointly, and their Quota Share Reinsurers,

by

certain INSURANCE COMPANIES

IT IS UNDERSTOOD AND AGREED THAT, effective January 1st, 1970 :

The Schedule of Participating Companies which is
attached to the Contract is cancelled and is replaced
by the Schedule of Participating Companies attached
to this Addendum.

All other terms and conditions remain unchanged.

Signed, for and on behalf of the INSURANCE COMPANIES listed in
Schedule No.1 attached to Addendum No.3, by a representative of
the Leading Company who is authorised by the Leading Company
and by all other companies listed in the said Schedule to sign
on their behalf.

*J. Greaves*

ER NON-MARINE TREATY DEPT.
EXCESS INSURANCE CO LTD.

T70/3800/3181

SCHEDULE OF PARTICIPATING COMPANIES

| Company | |
|---|---|
| American Consumer Insurance Company | 6-2/3% |
| American Liberty Insurance Company | 6-2/3% |
| Argonaut Insurance Company | 6-2/3% |
| Cosmopolitan Mutual Insurance Company | 6-2/3% |
| Financial Indemnity Company | 6-2/3% |
| General Insurance Company of Trieste and Venice (U.S. Branch) | 6-2/3% |
| Harbor Insurance Company | 6-2/3% |
| Highlands Insurance Company | 6-2/3% |
| Horace Mann Insurance Company | 6-2/3% |
| Imperial Insurance Company | 6-2/3% |
| Los Angeles Insurance Company | 6-2/3% |
| M.F.B. Mutual Insurance Company | 6-2/3% |
| The Monarch Insurance Company of Ohio | 6-2/3% |
| Public Service Mutual Insurance Company | 6-2/3% |
| Republic Indemnity Company of America | 6-2/3% |

each company participating to the extent of 62/3% of the liability assumed severally and not jointly.

594/UEX 0019

ADDENDUM NO. 6

to

EXCESS OF LOSS CASUALTY RETROCESSION CONTRACT

issued to

AGENCY MANAGERS LIMITED, NEW YORK
as United States Casualty Reinsur-
ance Managers of and on behalf of
the Companies named in the Schedule
of Participating Companies attached
to this Contract, each Company
participating severally and not jointly,
and their Quota Share Reinsurers

by

Certain INSURANCE COMPANIES

IT IS UNDERSTOOD AND AGREED THAT, effective January 1st, 1970, the Schedule
of Participating Companies attached to Addendum No.5 is amended by
replacing LOS ANGELES INSURANCE COMPANY with NATIONAL AUTOMOBILE AND
CASUALTY INSURANCE COMPANY.

All other terms and conditions remain unchanged.

Signed,for and on behalf of the INSURANCE COMPANIES listed in Schedule No.1.
attached to Addendum No.3. by a representative of the Leading Company who is
authorised by the Leading Company and by all other Companies listed in the
said Schedule to sign on their behalf.

*J. Greaves*

R. G. M. N. T. (U.K.) DEPT.
. . G. . CO. LTD.

770/3800/3181

<u>ADDENDUM NO. 7</u>

to

<u>EXCESS OF LOSS CASUALTY REINSURANCE CONTRACT</u>

issued to

AGENCY MANAGERS LIMITED, NEW YORK
as United States Casualty Reinsur-
ance Managers of and on behalf of
the Companies named in the Schedule
of Participating Companies attached
to this Contract, each Company
participating severally and not
jointly, and their Quota Share
Reinsurers

by

Certain INSURANCE COMPANIES

IT IS UNDERSTOOD AND AGREED THAT:-

1)   Paragraph A of Article I is amended to read as follows:-

"A.   This Contract may be terminated at March 31st
of any year by either party giving at least 90 days'
notice to the other party of their intention so to do.

2)   an additional deposit premium of $11,457   (being 38.19 %
of $30,000) is due and payable hereunder in respect of
the period from January 1st, 1961 to March 31st, 1961.

3)   Paragraph C of Article III is amended to read as follows:-

"    As soon as practicable after the close of each
annual period of this Contract the Reinsured shall
forward to the Underwriters a statement of the
Reinsured's gross net earned premium income during
the annual period then immediately ended, if the
earned premium then shown to the Reinsurers, and should
the premium then shown exceed the deposit
premium of $30,000, a further premium thereof
shall be paid to the Reinsurers."

– 2 –

4)    Add, as Paragraph D to Article XII, the following:-

"D.    The term "annual period" shall mean a period
of twelve calendar months ending 31st March.    "

However, the period from January 1st 1970 to March 31st
1971 is deemed to be an annual period for the purposes
of premium computation as provided in Article XII.

5)    The Schedule of Participating Companies which is attached
to Addendum No. 5 is cancelled effective January 1st, 1971
and replaced by the Schedule of Participating Companies
attached to this Addendum.


IT IS FURTHER UNDERSTOOD AND AGREED that this Contract is cancelled
effective Midnight, March 31st, 1971.  Notwithstanding the provisions
of Article XX of the Contract it is mutually agreed that no liability
shall attach to Reinsurers in respect of losses occurring after the
effective date and time of cancellation as aforesaid, and no premium
shall be payable to the Reinsurers in respect of that section of the
Reassured's contracts of reinsurance covered hereunder which is expired
at that time.


All other terms and conditions remain unchanged.




Signed hereunder, for and on behalf of the Companies listed in Schedule No.1.
attached to Addendum No.3, by a representative of the Leading Company who is
authorised by the Leading Companies and by all other Companies listed in the
said Schedule, to sign on their behalf.




13.486

1/71        170/3800/3151

SCHEDULE OF PARTICIPATING COMPANIES

American Liberty Insurance Company

Argonaut Insurance Company

Buffalo Insurance Company

Consolidated Mutual Insurance Company

Cosmopolitan Mutual Insurance Company

Financial Indemnity Company

Highlands Insurance Company

Highlands Underwriters Insurance Company

Imperial Insurance Company

M.F.B. Mutual Insurance Company

The Monarch Insurance Company of Ohio

National Automobile & Casualty Insurance Company

Republic Indemnity Company of America

Service Fire Insurance Company

Exhibit 3

# MOUND COTTON WOLLAN & GREENGRASS

### COUNSELLORS AT LAW

ONE BATTERY PARK PLAZA
NEW YORK, NY 10004-1486

(212) 804-4200

FAX: (212) 344-8066

WWW.MOUNDCOTTON.COM

NEW YORK, NY
NEWARK, NJ
GARDEN CITY, NY
SAN FRANCISCO, CA
FORT LAUDERDALE, FL

James D. Veach
212-804-4233
jveach@moundcotton.com

April 4, 2008

**Via E-Mail, Federal Express, and**
**Certified Mail -- Return Receipt Requested**

Carey G. Child, Esq.
Chadbourne & Parke LLP
1200 New Hampshire Avenue, NW
Washington, DC 20036

Re:    B.D. Cooke v. Certain Underwriters at Lloyd's, London
       Excess of Loss Casualty Retrocession Contracts
       Our File Number:  3038.001

Dear Mr. Child:

As you know, we represent Certain Underwriters at Lloyd's, London (Underwriters) with respect to various excess of loss casualty retrocession contracts identified in Schedule "A" annexed to a verified complaint filed by B.D. Cooke & Partners Limited (Cooke) in the Supreme Court, New York County, on February 26, 2008. A copy of the complaint and accompanying summons appears under Tab 1. We know from our conversations that your firm represents Cooke.

Pursuant to the agreements to arbitrate contained in the retrocession contracts, Underwriters demands that the claims and demands set forth in the complaint be submitted to a court of arbitration sitting in New York, New York. Underwriters reserves the right to supplement this arbitration demand to address additional disputes "arising under" the retrocession contracts, including whether:

- B. D. Cooke and Lloyd's commuted the retrocession contracts pursuant to a commutation agreement executed in February 2002;

- balances identified in the complaint, ¶33, come within the terms of a 1997 assignment of certain excess of loss casualty retrocession contracts from the Liquidator of Citizens Casualty Insurance Company, an insurer whose corporate charter was dissolved and which no longer exists, to Cooke;

MOUND COTTON WOLLAN & GREENGRASS

Carey G. Child, Esq.
April 4, 2008
Page 2

- specific losses identified in the Complaint, ¶33, come within the coverage provided by the retrocession contracts; and

- declaratory relief with respect to any future losses or claims should be granted.

Underwriters will seek from the court of arbitration an order:

1. giving Underwriters access to all books and records maintained by Cooke and its agents, including, but not limited to, ROM Reinsurance Management Company; Inc. (ROM) relating to losses purportedly subject to the assignment including, but not limited to, those claims identified in paragraph 33 of the annexed complaint, Tab 1;

2. providing that the 2002 commutation agreement extinguished any obligation to indemnify assignee Cooke;

3. directing that B.D. Cooke reimburse Lloyd's for any losses that Lloyd's has paid to date in error; and

4. awarding Underwriters the expenses and costs of the arbitration including Underwriters attorneys' fees.

The instant demand does not constitute an admission of coverage or a waiver of any rights with respect to the claims identified in the complaint, ¶33, or an admission of coverage or a waiver of any rights with respect to the contracts identified in schedule "A" annexed to the complaint.

Underwriters requests that Cooke choose its arbiter. If Cooke fails to choose its arbiter within sixty days, Underwriters will exercise its right to choose two arbiters who will in turn choose an umpire.

Please forward all future communications with respect to this arbitration to the undersigned.

Very truly yours,

*Jan Vedh.*

cc: John R. Finnegan, Esq.

Attachment

Exhibit 4

INTERESTS AND LIABILITIES AGREEMENT

to the

SECOND CASUALTY RETROCESSIONAL EXCESS OF LOSS AGREEMENT

(hereinafter called "Agreement")

entered into by and between

**AGENCY MANAGERS INC.**
New York, New York

(hereinafter called the "Manager") as Reinsurance Manager for the Dominion Insurance Company of America, New York, New York and/or certain other Insurance and/or Reinsurance Companies and/or its Quota Share Reinsurers (hereinafter together called the "Members") and

(hereinafter called the Subscribing Retrocessionaire)

This Interests and Liabilities Agreement shall become effective January 1, 1975 and shall cover the net excess liability of the Members under Original Reinsurance Contracts covering Casualty Business and becoming effective on and after January 1, 1975 and shall remain effective until terminated in accordance with Article 19 of the attached Agreement.

This Agreement obligates the Subscribing Retrocessionaire for         % part of the liability and amounts set forth in the Agreement attached to this Interests and Liabilities Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate by their duly authorized representatives this    10th day of October        1975.

AGENCY MANAGERS INC. for and on behalf of the Members as their interests may appear

_____
Vice Chairman

and on this        day of        1975.

# SECOND CASUALTY RETROCESSIONAL EXCESS OF LOSS AGREEMENT

(hereinafter called "Agreement")

entered into by and between

## AGENCY MANAGERS INC.
New York, New York

(hereinafter called the "Manager") as Reinsurance Manager for the Dominion Insurance Company of America, New York, New York and/or certain other Insurance and/or Reinsurance Companies and/or its Quota Share Reinsurers (hereinafter together called the "Members") and

(hereinafter called the "Retrocessionaire")

WITNESSETH

In consideration of the mutual covenants hereinafter contained and upon the terms and conditions hereinafter set forth, the parties hereto agree as follows:

### ARTICLE 1

TERM

This Agreement shall become effective January 1, 1975 and shall remain in full force and effect until terminated in accord with the TERMINATION ARTICLE 19.

### ARTICLE 2

TERRITORIAL SCOPE

This Agreement shall apply to losses occurring World Wide.

### ARTICLE 3

BUSINESS REINSURED

This Agreement is to cover the net excess liability of the Members which may accrue to them from loss occurrences under Original Reinsurance Contracts covering Casualty Business, written or renewed by the Manager on behalf of the Members during the time this Agreement is in force subject to the terms and conditions contained herein.

It is warranted, however, that:

1. The maximum acceptance on pharmaceutical risks shall be $1,000,000 except to cover for 90 days some ten risks with limits over $1,000,000, and then only for gross limits up to $1,500,000;

2. The maximum Treaty acceptance shall be $500,000;

3. There are no known Facultative risks written for limits in excess of $2,500,000.

<u>ARTICLE 4</u>

<u>DEFINITIONS</u>

A.   The term "Casualty Business" as used in this Agreement shall be understood to include the following classes of business:

A)   Automobile Bodily and Personal Injury and Property Damage
B)   Other Bodily Injury and Personal Injury and Property Damage
C)   Accident and Sickness
D)   Burglary and Theft
E)   Fidelity and Surety
F)   Workmen's Compensation and Employers' Liability including Occupational Disease
G)   Boiler and Machinery (when classified as Casualty)
H)   The Casualty portion of Multi-Peril Covers.

B.   The term "Loss Occurrence" as used in this Agreement shall follow the definition of this term, or any similar term having the same general meaning, as appearing in the Original Reinsurance Contract out of which the loss arises and the date of such Loss Occurrence shall be the date ascribed to it by the terms of the Original Reinsurance Contract: provided,

1.   With respect to Occupational Disease and other diseases and where Original Reassured's Original Reinsurance Contracts provide for aggregate limits of liability the limits and retentions hereunder shall also apply in the aggregate any one original policy year. In the event of termination of this Agreement this aggregate protection shall cease at the next normal anniversary date of the original policy year.

"Aggregate" shall mean ultimate net losses occurring in the aggregate during any one original policy year.

"Original policy year" shall mean each separate original policy period of not exceeding twelve months commencing at the inception, anniversary or renewal date as and from the inception of this Agreement.

2.   It is understood that, with respect to the business covered hereunder the proportion of losses under Original Reinsurance Contracts written on a so-called "Aggregate Excess" basis and a so-called "Loss Ratio" basis that can be included within these definitions shall be the same proportion as the gross loss applicable to the Original Reinsurance Contract arising out of or caused by one event or occurrence bears to the total gross loss as included within the scope of the rating period of the Original Reinsurance Contract.

— 2 —

C.   The term "Ultimate Net Loss" as used in this Agreement shall mean the net loss to the Members including the Members' share of loss adjustment expenses under Original Reinsurance Contract or Contracts, such loss to include expenses of litigation, if any, and all other loss expenses and expenses of the Manager or the Members (excluding, however, office expenses and salaries of officials of the Manager or of the Members). Salvages and recoveries including recoveries from all other reinsurances (except recoveries from underlying First Casualty Retrocessional Excess of Loss Reinsurance Agreement which shall be disregarded and which shall inure to the sole benefit of the Members) and/or retrocessions shall be first deducted from such loss to arrive at the amount of liability, if any, attaching hereunder.

All salvages, recoveries or payments recovered or received subsequent to any loss settlement hereunder shall be applied as if recovered or received prior to the respective settlement, and all necessary adjustments shall be made by the parties hereto.

Nothing in this clause shall be construed to mean that losses are not recoverable hereunder until the Members' Ultimate Net Loss has been ascertained.

D.   The term "Gross Net Earned Premium Income" as used in this Agreement shall mean the gross earned premium income of the Manager derived from Business, the subject matter of this Agreement, written on behalf of the Members less earned premium income paid for reinsurances or retrocessions which inure to the benefit of this Agreement.

E.   The term "Original Reassured" as used in this Agreement shall mean the company reinsured by the Manager on behalf of the Members.

F.   The term "Original Reinsurance Contract" as used in this Agreement shall mean all binders, policies, certificates, agreements (whether written or oral), treaties, bonds or contracts of reinsurance, facultative or otherwise, authorized by the Manager to Original Reassureds on behalf of the Members under the same Reinsurance Form and covering the same liability (whether issued in one Layer or more than one Layer).

G.   The term "Reinsurance Form" as used in this Agreement shall mean the type of reinsurance afforded being:

   1.   Facultative per risk excess
   2.   Facultative per accident excess
   3.   Facultative per occurrence excess
   4.   Facultative proportional
   5.   Other than facultative per risk excess
   6.   Other than facultative per accident excess
   7.   Other than facultative per occurrence excess (including aggregate excess, excess of Loss Ratio and other excess contracts)
   8.   Other than facultative proportional

each being a separate Reinsurance Form for purposes of this Agreement.

## ARTICLE 5

### COVER

The Retrocessionaire shall be liable for the amount of ultimate net loss in excess of an initial ultimate net loss of $1,000,000 each and every occurrence each and every Original Reinsurance Contract, subject to a limit of liability to the Retrocessionaire of $1,500,000 ultimate net loss each and every Original Reinsurance Contract.

## ARTICLE 6

### NET RETAINED LIABILITY

In calculating the amount of any loss hereunder and also in computing the amount in excess of which this Agreement attaches, only loss or losses in respect to that portion of any Original Reinsurance Contract or Contracts which the Manager retains net for the Members' account shall be included. It is understood and agreed that the amount of the Retrocessionaire's liability hereunder in respect to any loss or losses shall not be increased by reason of the inability of the Manager to collect from any other retrocessionaires, whether such inability arises from the insolvency of such other retrocessionaires or otherwise. Members may maintain reinsurances individually for their own accounts for their net shares of liability covered hereunder and such reinsurances will be ignored in determining the loss in excess of which this Agreement applies.

## ARTICLE 7

### EXCLUSIONS

This Agreement does not cover:

A.  Life Insurance, Credit Insurance, Financial Guarantee Insurance, Insolvency Insurance, Title Insurance.

B.  Business excluded by the following Nuclear Incident Exclusion Clauses: (See Attached)

    1.  Nuclear Incident Exclusion Clause-Physical Damage-Reinsurance
    2.  Nuclear Incident Exclusion Clause-Liability-Reinsurance
    3.  Nuclear Incident Exclusion Clause-Physical Damage and Liability (Boiler and Machinery Policies)-Reinsurance
    4.  Nuclear Incident Exclusion Clause-Physical Damage and Liability (Boiler and Machinery Policies)-Reinsurance-Canada.

C.  Aviation Hull and Aviation Liability Business (this exclusion shall not apply to Workmen's Compensation Business) except when it is an incidental part of an Original Reinsurance Contract.

D.  War risk as excluded in Original Reinsurance Contracts.

E.  Protection and Indemnity Business and Ocean Marine Business written and classified by the Manager as such.

F.  Bonds rated in the Contract Section of the Surety Association of American Manual; bonds guaranteeing payment of installment paper, mortgage principal or interest, or mortgage deficiency bonds.

G.  Business received as a member of Pools, Associations or Syndicates except that losses from Assigned Risk Plans or similar plans are not excluded.

## ARTICLE 8

### PREMIUMS AND REPORTS

A.  The Managers shall pay to the Retrocessionaires in respect of each annual period beginning January 1, 1975, during the currency of this Agreement, premium calculated by applying a rate of 4% to the Gross Net Earned Premium Income of the Members during such annual period in respect of business and subject matter of this Agreement.

B.  The term "Gross Net Earned Premium Income" as used herein shall be understood as is defined in Article 4 under Section D.

C.  A deposit premium of $500,000 shall be paid to the Retrocessionaires in quarterly installments of $125,000 at the beginning of each said quarter beginning January 1, 1975, and in no event shall the total annual premium be less than $450,000.

As soon as practicable after the close of the said twelve-month period and each annual period thereafter, the Managers shall submit to the Retrocessionaires a statement of its gross net earned premium income for the preceding twelve-month period. The premium due the Retrocessionaires for said twelve-month period shall then be calculated at a rate set forth in paragraph A., above, and if the premium thus determined equals or exceeds the deposit premium of $500,000, the balance shall be paid the Retrocessionaires. If, however, said calculated premium is less than the deposit premium of $500,000 but greater than or equal to the Minimum Premium of $450,000, the difference shall be returned to the Managers by the Retrocessionaires.

## ARTICLE 9

### REINSTATEMENT

A.  As respects losses payable under the COVER ARTICLE, the reinstatement shall be automatic and unlimited without additional premium, other than that provided by the rating formula in Article 8, Premiums and Reports.

Nevertheless, the Retrocessionaire's liability shall never be more than $1,500,000 each and every Loss Occurrence, each and every Original Reinsurance Contract.

## ARTICLE 10

### NOTICE OF LOSS AND LOSS SETTLEMENTS

In the event of an accident, disaster, casualty or occurrence occurring which either results in or appears to be of serious enough nature as probably to result in a loss involving this Agreement the Manager shall give notice as soon as reasonably practicable to Retrocessionaires through Guy Carpenter & Company, Inc., 110 William Street, New York, New York 10038, and the Manager shall keep the Retrocessionaire advised of all subsequent developments in connection therewith.

The Retrocessionaire agrees to abide by the settlements of the Manager, such settlements to be considered as satisfactory proof of loss, and amounts falling to the share of the Retrocessionaire shall be immediately payable to the Manager by them upon reasonable evidence of the amount paid or to be paid by the Manager being presented to the Retrocessionaire through Guy Carpenter & Company, Inc. by the Manager.

## ARTICLE 11

### EXCESS OF ORIGINAL POLICY LIMITS

This Agreement shall protect the Members within the limit hereof, in connection with any loss for which the Manager may be legally liable to pay in excess of the limit of its original policy, where loss in excess of the limit has been incurred because of its failure to settle within the policy limit or by reason of alleged or actual negligence, fraud or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its insured or in the preparation or prosecution of an appeal consequent upon such action.

## ARTICLE 12

### INSPECTION OF RECORDS

The Manager shall place at the disposal of the Retrocessionaire at all reasonable times upon reasonable notice to the Manager in writing, and the Retrocessionaire shall have the right to inspect through its authorized representatives all books, records and papers of the Manager in connection with any premium payable hereunder, or claims made hereunder.

## ARTICLE 13

### TAXES

In consideration of the terms under which this Agreement is issued, the Manager and the Members undertake not to claim any deduction in respect of the premium hereon when making tax returns other than Income or Profits Tax returns to any State or Territory or the District of Columbia.

Federal Excise Tax of 1%, as applicable, will be paid by the Retrocessionaire, it being understood and agreed that in the event of any return of premium becoming due hereunder the Retrocessionaire will deduct 1% from the amount of the return and the Manager's agent, being for this purpose the Intermediary on this Agreement, will take steps to recover the Tax from the U.S. Government.

## ARTICLE 14

ERRORS OR OMISSIONS

Any error, omission or oversight by the Manager shall in no way invalidate the reinsurance hereunder, provided that such error, omission or oversight shall be corrected promptly after discovery.

## ARTICLE 15

CURRENCY

All transactions hereunder shall be in United States Currency. Premiums and losses, shall, for the purpose of this Agreement, be converted into United States Dollars at the rates of exchange at which they are entered in the books of the Manager.

## ARTICLE 16

INSOLVENCY

This reinsurance shall be payable by the Retrocessionaire on the basis of the liability of the Members under Original Reinsurance Contract or Contracts without diminution because of the insolvency of the Members.

In the event of insolvency of a Member, the Manager or the liquidator or receiver or statutory successor of the Member shall give written notice to the Retrocessionaire of the pendency of a claim against the Member on the Original Reinsurance Contract reinsured within a reasonable time after such claim is filed in the insolvency proceeding; during the pendency of such claim the Retrocessionaire may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses which it may deem available to the Member or its liquidator or receiver or statutory successor; the expense thus incurred by the Retrocessionaire shall be chargeable subject to court approval against the Member as part of the expense of liquidation to the extent of a proportionate share of the benefits which may accrue to the Member solely as a result of the defense so undertaken by the Retrocessionaire.

Where the Retrocessionaire and one or more other assuming retrocessionaires are involved in the same claim and a majority in interest elect to interpose defense to such claims, the expense shall be apportioned in accordance with the terms of the applicable reinsurance agreements as though such expense had been incurred by the insolvent Member.

### ARTICLE 17

## ARBITRATION

Should an irreconcilable difference of opinion arise between the parties to this Agreement as to the interpretation of this Agreement or transactions with respect to this Agreement, such difference shall be submitted to arbitration upon the request of one of the parties, one arbiter to be chosen by the Manager and one by the Retrocessionaire and an umpire to be chosen by the two arbiters before they enter into arbitration.

Should the arbiters fail to agree upon the choice of an umpire within 30 days of the appointment of the last arbiter, then either arbiter, or both together, may request the Superintendent of Insurance of the State in which arbitration is to be held (or the official in charge of Insurance matters whatever his title may be) to appoint an umpire. Should this official decline to make such an appointment, then following notice from said official of such declination, or 30 days following the date such request was made if no response has been received from said official, either arbiter or both together, may petition the court in the state where arbitration is to be held to appoint an umpire.

In the event that either party should fail to choose an arbiter within sixty (60) days following written request by the other party to enter upon arbitration, the requesting party may choose two arbiters who shall in turn choose an umpire before entering into arbitration.

Each party shall present their case to the arbiters and the umpire within thirty (30) days of the appointment of the umpire and the written decision of any two of the three shall be final and binding upon the Manager, the Members and the Retrocessionaire.

The arbiters and the umpire are relieved from all judicial formalities and may abstain from the strict rules of law, interpreting this Agreement as an honorable undertaking rather than as a merely legal obligation. By agreement between any two of the three, they may extend the time intervals contained in this Article.

The arbiters and the umpire shall be active or retired disinterested executive officers of insurance or reinsurance companies.

Each party shall pay the fee of its chosen arbiter and half of the fee of the umpire; the remaining costs of arbitration shall be paid as the written decision directs. In the event both arbiters are chosen by one part, the fees of the arbiters and the umpire shall be equally divided between the parties.

Unless otherwise mutually agreed between the Manager and the Retrocessionaire any arbitration shall take place in New York, New York.

## ARTICLE 18

LOSS RESERVES

(Applies only to those Retrocessionaires who cannot qualify for credit by any State or any other governmental authority having jurisdiction over the Manager's loss reserves.)

As regards policies or bonds issued by the Manager coming within the scope of this Agreement, the Manager agrees that when it shall file with the Insurance Department or set up on its books reserves for losses which it shall be required to set up by law it will forward to the Retrocessionaire a statement showing the proportion of such loss reserves which is applicable to them. The Retrocessionaire hereby agrees that it will apply for and secure delivery to the Manager a clean irrevocable Letter of Credit issued by First National City Bank of New York in an amount equal to Retrocessionaire's proportion of said loss reserves.

The Manager undertakes to use and apply any amounts which it may draw upon such Credit for the following purposes only:

(a)  To pay the Retrocessionaire's share or to reimburse the Members for the Retrocessionaire's share of any liability for loss reinsured by this Agreement.

(b)  To make refund of any sum which is in excess of the actual amount required to pay Retrocessionaire's share of any liability reinsured by this Agreement.

First National City Bank of New York shall have no responsibility whatsoever in connection with the propriety of withdrawals made by the Manager or the disposition of funds withdrawn, except to see that withdrawals are made only upon the order of properly authorized representatives of the Manager.

## ARTICLE 19

TERMINATION

A.  Either the Manager or the Retrocessionaire shall have the right to terminate this Agreement at 12:01 a.m., Eastern Standard Time, of any January 1 by giving the other 120 days' notice via Registered Mail.

— 9 —

B.  In the event of termination the liability of the Retrocessionaire shall continue as respects coverage afforded under Original Reinsurance Contracts in force at the time of termination, including those Original Reinsurance Contracts written or renewed during the notice period, until:

   a.  Termination date, or 12 months whichever occurs first, as respects Original Reinsurance Contracts written for a set term;

   b.  The first anniversary date following the termination of this Agreement, or 12 months following the termination of this Agreement, whichever occurs first, as respects Original Reinsurance Contracts written for a continuous term,

and the premium payable to the Retrocessionaire for the protection afforded during this period shall be 150% of the rate prescribed in the PREMIUM AND REPORTS ARTICLE multiplied by the Gross Net Earned Premium Income on Original Reinsurance Contracts covered during this period.

Notwithstanding the foregoing the Manager may, by giving written notice to the Retrocessionaire prior to the effective date of termination, elect to terminate the Retrocessionaire's entire liability for losses occurring subsequent to the time and date of termination.

## ARTICLE 20

### TERMINATION DURING LOSS

Should this Agreement terminate, or should an anniversary date occur, while a Loss Occurrence covered hereunder is in progress, it is understood and agreed that subject to the other terms and conditions of this Agreement, the Retrocessionaire shall be responsible for the loss in progress in the same manner and to the same extent it would have been responsible had the Agreement terminated, or anniversary date occurred at Midnight, the day following the conclusion of the loss in progress.

## ARTICLE 21

### SERVICE OF SUIT

(Applies only to those Retrocessionaires who are domiciled outside the United States of America)

In the event of the failure of the Retrocessionaire hereon or any of them to pay any amount claimed to be due hereunder, the Retrocessionaire hereon, at the request of the Managers, will submit to the jurisdiction of any Court of competent jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

Service of process in such suit may be made upon Messrs. Mendes and Mount, 27 William Street, New York, New York 10005, and in any suit instituted against any one of them upon this Agreement, the Retrocessionaire will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above named are authorized and directed to accept service of process on behalf of the Retrocessionaire in any such suit and/or upon the request of the Managers to give a written undertaking to the Managers that they will enter a general appearance on behalf of the Retrocessionaire or any of them in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Retrocessionaire hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Managers or any beneficiary hereunder arising out of this Agreement, and hereby designate the above named Mendes and Mount as the firm to whom the said officer is authorized to mail such process or a true copy thereof.

## ARTICLE 22

### SPECIAL PROVISION

The Manager warrants that any payments by the Retrocessionaire to the Manager shall constitute payment to the Members.

## ARTICLE 23

### INTERMEDIARY CLAUSE

Guy Carpenter & Company, Inc., is hereby recognized as the Intermediary negotiating this Agreement for all business hereunder, except Canadian business, on which Guy Carpenter & Company (Canada) Limited is hereby recognized as the Intermediary. All communications relating thereto shall be transmitted to the Manager and the Retrocessionaire through Guy Carpenter & Company, Inc., 110 William Street, New York, New York 10038 (acting in behalf of themselves and Guy Carpenter & Company (Canada) Limited).

## NUCLEAR INCIDENT EXCLUSION CLAUSE – LIABILITY – REINSURANCE

*(Wherever the word "Reassured" appears in this clause, it shall be deemed to read "Reassured", "Reinsured", "Company", or whatever other word is employed throughout the text of the reinsurance agreement to which this clause is attached to designate the company or companies reinsured.)*

(1) This reinsurance does not cover any loss or liability accruing to the Reassured as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association.

(2) Without in any way restricting the operation of paragraph (1) of this Clause it is understood and agreed that for all purposes of this reinsurance all the original policies of the Reassured (new, renewal and replacement) of the classes specified in Clause II of this paragraph (2) from the time specified in Clause III in this paragraph (2) shall be deemed to include the following provision (specified as the Limited Exclusion Provision):

**Limited Exclusion Provision.***

    I. It is agreed that the policy does not apply under any liability coverage, to $\left\{\begin{array}{l}\text{injury, sickness, disease, death or destruction} \\ \text{bodily injury or property damage}\end{array}\right.$ with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability.

    II. Family Automobile Policies (liability only), Special Automobile Policies (private passenger automobiles, liability only), Farmers Comprehensive Personal Liability Policies (liability only), Comprehensive Personal Liability Policies (liability only) or policies of a similar nature; and the liability portion of combination forms related to the four classes of policies stated above, such as the Comprehensive Dwelling Policy and the applicable types of Homeowners Policies.

    III. The inception dates and thereafter of all original policies as described in II above, whether new, renewal or replacement, being policies which either

        (a) become effective on or after 1st May, 1960, or

        (b) become effective before that date and contain the Limited Exclusion Provision set out above; provided this paragraph (2) shall not be applicable to Family Automobile Policies, Special Automobile Policies, or policies or combination policies of a similar nature, issued by the Reassured on New York risks, until 90 days following approval of the Limited Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(3) Except for those classes of policies specified in Clause II of paragraph (2) and without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that for all purposes of this reinsurance the original liability policies of the Reassured (new, renewal and replacement) affording the following coverages:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability)

shall be deemed to include, with respect to such coverages, from the time specified in Clause V of this paragraph (3), the following provision (specified as the Broad Exclusion Provision):

**Broad Exclusion Provision.***

It is agreed that the policy does not apply:

    I. Under any Liability Coverage, to $\left\{\begin{array}{l}\text{injury, sickness, disease, death or destruction} \\ \text{bodily injury or property damage}\end{array}\right.$

        (a) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

        (b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    II. Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to $\left\{\begin{array}{l}\text{immediate medical or surgical relief,} \\ \text{first aid,}\end{array}\right.$ to expenses incurred with respect to $\left\{\begin{array}{l}\text{bodily injury, sickness, disease or death} \\ \text{bodily injury}\end{array}\right.$ resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

- 1 -

III. Under any Liability Coverage, to { *injury, sickness, disease, death or destruction* / bodily injury or property damage } resulting from the hazardous properties of nuclear material, if
    (a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;
    (b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or
    (c) the { *injury, sickness, disease, death or destruction* / bodily injury or property damage } arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to { *injury to or destruction of property at such nuclear facility.* / property damage to such nuclear facility and any property thereat. }

IV. As used in this endorsement:
"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or byproduct material; "source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means
    (a) any nuclear reactor,
    (b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,
    (c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,
    (d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,
and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;
{ *With respect to injury to or destruction of property, the word "injury" or "destruction"* / "property damage" includes all forms of radioactive contamination of property. / includes all forms of radioactive contamination of property. }

V. The inception dates and thereafter of all original policies affording coverages specified in this paragraph (3), whether new, renewal or replacement, being policies which become effective on or after 1st May, 1960, provided this paragraph (3) shall not be applicable to
    (i) Garage and Automobile Policies issued by the Reassured on New York risks, or
    (ii) statutory liability insurance required under Chapter 90, General Laws of Massachusetts, until 90 days following approval of the Broad Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(4) Without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that paragraphs (2) and (3) above are not applicable to original liability policies of the Reassured in Canada and that with respect to such policies this Clause shall be deemed to include the Nuclear Energy Liability Exclusion Provisions adopted by the Canadian Underwriters' Association or the Independent Insurance Conference of Canada.

---

*NOTE. The words printed in italics in the Limited Exclusion Provision and in the Broad Exclusion Provision shall apply only in relation to original liability policies which include a Limited Exclusion Provision or a Broad Exclusion Provision containing those words.

21/9/67

## NUCLEAR INCIDENT EXCLUSION CLAUSE – PHYSICAL DAMAGE – REINSURANCE

*(Wherever the word "Reassured" appears in this clause, it shall be deemed to read "Reassured", "Reinsured", "Company", or whatever other word is employed throughout the text of the reinsurance agreement to which this clause is attached to designate the company or companies reinsured.)*

1. This Reinsurance does not cover any loss or liability accruing to the Reassured, directly or indirectly, and whether as Insurer or Reinsurer, from any Pool of Insurers or Reinsurers formed for the purpose of covering Atomic or Nuclear Energy risks.

2. Without in any way restricting the operation of paragraph (1) of this Clause, this Reinsurance does not cover any loss or liability accruing to the Reassured, directly or indirectly and whether as Insurer or Reinsurer, from any insurance against Physical Damage (including business interruption or consequential loss arising out of such Physical Damage) to:

    I.   Nuclear reactor power plants including all auxiliary property on the site, or

    II.   Any other nuclear reactor installation, including laboratories handling radioactive materials in connection with reactor installations, and "critical facilities" as such, or

    III.   Installations for fabricating complete fuel elements or for processing substantial quantities of "special nuclear material," and for reprocessing, salvaging, chemically separating, storing or disposing of "spent" nuclear fuel or waste materials, or

    IV.   Installations other than those listed in paragraph (2) III above using substantial quantities of radioactive isotopes or other products of nuclear fission.

3. Without in any way restricting the operations of paragraphs (1) and (2) hereof, this Reinsurance does not cover any loss or liability by radioactive contamination accruing to the Reassured, directly or indirectly, and whether as Insurer or Reinsurer, from any insurance on property which is on the same site as a nuclear reactor power plant or other nuclear installation and which normally would be insured therewith except that this paragraph (3) shall not operate

    (a)   where Reassured does not have knowledge of such nuclear reactor power plant or nuclear installation, or

    (b)   where said insurance contains a provision excluding coverage for damage to property caused by or resulting from radioactive contamination, however caused. However on and after 1st January 1960 this sub-paragraph (b) shall only apply provided the said radioactive contamination exclusion provision has been approved by the Governmental Authority having jurisdiction thereof.

4. Without in any way restricting the operations of paragraphs (1), (2) and (3) hereof, this Reinsurance does not cover any loss or liability by radioactive contamination accruing to the Reassured, directly or indirectly, and whether as Insurer or Reinsurer, when such radioactive contamination is a named hazard specifically insured against.

5. It is understood and agreed that this Clause shall not extend to risks using radioactive isotopes in any form where the nuclear exposure is not considered by the Reassured to be the primary hazard.

6. The term "special nuclear material" shall have the meaning given it in the Atomic Energy Act of 1954, or by any law amendatory thereof.

7. Reassured to be sole judge of what constitutes:

    (a)   substantial quantities, and

    (b)   the extent of installation, plant or site.

12/12/57

## NUCLEAR INCIDENT EXCLUSION CLAUSE –
## PHYSICAL DAMAGE AND LIABILITY
## (BOILER AND MACHINERY POLICIES) REINSURANCE

*(Wherever the word "Reassured" appears in this clause, it shall be deemed to read "Reassured", "Reinsured", "Company", or whatever other word is employed throughout the text of the reinsurance agreement to which this clause is attached to designate the company or companies reinsured.)*

1. This Reinsurance does not cover any loss or liability accruing to the Reassured as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association.

2. Without in any way restricting the operation of paragraph (1) of this Clause it is understood and agreed that for all purposes of this Reinsurance all original Boiler and Machinery Insurance or Reinsurance contracts of the Reassured shall be deemed to include the following provisions of this paragraph:

This Policy does not apply to "loss", whether it be direct or indirect, proximate or remote

(a) from an Accident caused directly or indirectly by nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled; or

(b) from nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, caused directly or indirectly by, contributed to or aggravated by an Accident.

3. However, it is agreed that loss arising out of the use of Radioactive Isotopes in any form is not hereby excluded from reinsurance protection.

NUCLEAR INCIDENT EXCLUSION CLAUSE –

PHYSICAL DAMAGE AND LIABILITY

(BOILER AND MACHINERY POLICIES) REINSURANCE

*(Wherever the word "Reassured" appears in this clause, it shall be deemed to read "Reassured", "Reinsured", "Company", or whatever other word is employed throughout the text of the reinsurance agreement to which this clause is attached to designate the company or companies reinsured.)*

1. This Reinsurance does not cover any loss or liability accruing to the Reassured as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association.

2. Without in any way restricting the operation of paragraph (1) of this Clause it is understood and agreed that for all purposes of this Reinsurance all original Boiler and Machinery Insurance or Reinsurance contracts of the Reassured shall be deemed to include the following provisions of this paragraph:

This Policy does not apply to "loss", whether it be direct or indirect, proximate or remote

(a) from an Accident caused directly or indirectly by nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled; or

(b) from nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, caused directly or indirectly by, contributed to or aggravated by an Accident.

3. However, it is agreed that loss arising out of the use of Radioactive Isotopes in any form is not hereby excluded from reinsurance protection.

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK      )

                                    ss:

COUNTY OF NEW YORK   )

      Jacob Mendelsohn, being duly sworn, deposes and says:

      That deponent is not a party to this action, is over the age of 18 years and resides in Brooklyn, New York.

      That on the 8th day of April, 2008 deponent served the Notice of Removal upon:

John F. Finnegan, Esq.
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY 10112
   - and –
Carey G. Child, Esq.
Chadbourne & Parke LLP
1200 New Hampshire Avenue, NW
Washington, DC 20036

Attorneys for B.D. COOKE & PARTNERS LIMITED

at the address designated by said attorneys by depositing the same enclosed in a postpaid properly addressed wrapper directed to each of said attorneys at the above address via regular mail.

                                    Jacob Mendelsohn

Sworn to Before Me This
8th day of April, 2008

Notary Public

JOSHUA MILRAD
Notary Public, State of New York
No. 02MI6076517
Qualified in New York County
Commission Expires June 24, 2010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 56
----------------------------------------------------------------X
B.D. COOKE & PARTNERS LIMITED AS ASSIGNEE
OF CITIZENS CASUALTY COMPANY OF
NEW YORK (IN LIQUIDATION),

                          Plaintiff,

                    - against -                                    Index No. 600655/02

NATIONWIDE MUTUAL INSURANCE COMPANY,                        F I L E D

                          Defendant.
----------------------------------------------------------------X          OCT 1 5 2003

RICHARD B. LOWE, III.:                                      COUNTY CLERK'S OFFICE
                                                                  NEW YORK

         Plaintiff B.D. Cooke & Partners, Limited was assigned the right to collect certain monies

owed to the estate of a liquidated reinsurance company.  Plaintiff seeks to recover from one of

the liquidated company's reinsurers, defendant Nationwide Mutual Insurance Company.

         Motion sequence numbers 003 and 004 are consolidated for disposition.  In motion

sequence number 003, defendant moves for summary judgment dismissing the complaint.

Plaintiff cross-moves for summary judgment on its complaint, for a declaratory judgment, and

for dismissal of all affirmative defenses.  In motion sequence number 004, plaintiff moves for an

order sealing certain reply papers that it wants to submit in favor of its cross motion.  Defendant

cross-moves for a protective order regarding those papers.

         Reinsurance is a form of insurance where one insurer, the reinsurer, agrees to indemnify

another insurer, the cedent, for losses under policies issued by the cedent (*Travelers Cas. & Sur.

Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583, 587 [2001]).  In return for

indemnification, the cedent pays the reinsurer a premium (*id.*).  Reinsurance indemnity does not

1

arise until the cedent has paid a claim to its policyholder (*id.*).

Beginning in 1962, the liquidated company, Citizens Casualty Company of New York (Citizens), which is not a party here, and defendant were part of the same reinsurance pool, pursuant to a Casualty Reinsurance Pooling Contract (Pooling Contract). Under the Pooling Contract, each pool member agreed to assume a percentage interest in all reinsurance business written by the pool manager on behalf of the pool. Typically, the pool manager issued a reinsurance contract in the name of one of the pool members, known as the fronting company. The fronting company, often Citizens, assumed direct liabilities to the cedent and received premiums from the cedent. The pool manager then caused each pool member, including defendant, to share in the fronting company's liabilities and premiums, to the extent of each pool member's agreed percentage. Thus, Citizens both reinsured outside insurers and was itself reinsured by its fellow pool members.

There are two kinds of reinsurance. "Treaty reinsurance is obtained in advance of actual coverage and may cover any risk the primary insurer covers. *** A facultative reinsurance contract is one obtained to cover a particular risk" (*Matter of the Liquidation of Midland Ins. Co.,* 79 NY2d 253, 258 [1992]). A treaty reinsurance relationship is typically a long term one between the reinsurer and the cedent (*Matter of the Liquidation of Union Indem. Ins. Co. Of New York*, 89 NY2d 94, 106 [1996]). The reinsurer does not scrutinize the individual risks, and is obligated to accept all of the insurer's covered business (*id.*). Reinsurers do not defend against claimants, investigate claims, or attempt to settle them (*Unigard Sec. Ins. Co., Inc. v North Riv. Ins. Co.,* 79 NY2d 576, 583 [1992]).

A reinsurance contract operates only between the reinsurer and the cedent, and the

2

reinsurer is not liable to the original insured (*id.*).  The January 1960 contract between plaintiff and Citizens, whereby plaintiff ceded insurance to the pool, recites that plaintiff has uncontrolled discretion in selecting policyholders, and disposing of claims, whether settling or contesting them (Contract between plaintiff and Citizens, ¶ 3).  Citizens and defendant were treaty reinsurers, bound to reinsure plaintiff on all of its insurance business.  Plaintiff was a major cedent to the pool.  At the time that Citizens was placed into liquidation, plaintiff was the largest creditor of the defunct estate (Petition to close Citizens' liquidation [Petition], ¶ 7).

When defendant joined the pool, it assumed 10% of the reinsurance liabilities and premiums that resulted from Citizens' fronting agreements with cedents, and Citizens assumed 25%.  Other pool members assumed the remaining percentages.  Over the years, defendant's percentage participation in the pool changed.

Citizens became insolvent and was placed into liquidation under the authority of the New York Superintendent of Insurance (the liquidator) by a liquidation order, pursuant to Article 74 of the Insurance Law.  The June 1971 liquidation order terminated all of Citizens' contracts and obligations as of June 25, 1971, and directed all persons with claims against Citizens to file their proofs of claims by February 14, 1972 (Insurance Law § 7432 [b]).  The liquidator proceeded to marshal Citizens' assets for distribution to creditors (Insurance Law § 7405).

Once its contracts were cancelled, Citizens was no longer liable for any losses that took place after the liquidation began.  Citizens remained liable for losses that took place before the liquidation began, including where those reinsured by Citizens did not yet know of the loss.  The liquidator permitted those reinsured by Citizens to file proofs of claims, even when no actual loss could be reported (Petition, ¶ 12; Affidavit of John Tafuro, Director of the Reinsurance

3

Department of the Liquidation Bureau of the New York State Department of Insurance, in support of plaintiff's cross motion [Tafuro Aff.] , ¶ 12).  For example, plaintiff's proof of claim merely advised the liquidator that plaintiff had purchased reinsurance from Citizens, and did not report any particular loss.  As long as the party reinsured by Citizens filed a proof of claim by February 14, 1972, i.e., notice that coverage existed, any actual loss could be reported to the liquidator when the reinsured became aware of it, as long as the actual loss occurred before February 14, 1972 (Petition, ¶ 12).

The majority of the risks that Citizens reinsured related to environmental dangers or exposure to asbestos (Defendant's reply aff., ¶ 2; Tafuro Aff., ¶ 12).  Decades could elapse between the time that a policyholder suffered such an injury and the time that he or she became aware of the injury and notified the insurance company, and the insurance company notified the liquidator that there had been an actual loss.  Consequently, although Citizens was liable only for covering injuries that occurred before February 14, 1972, reinsurance creditors were continuing to file reports of such injuries as late as 1996 (Petition, ¶ 12; Final Report on the Liquidation of Citizens Casualty Company of New York [FR] at 9).  Although by 1996, the estate had paid over two thousand claims related to actual losses, the liquidator foresaw that reinsurance creditors would continue to file such claims for many more years, which meant that the final determination of Citizens' reinsurance liabilities would be significantly delayed (Petition, ¶ 12; FR at 7, 9).

On October 11, 1996, the liquidator petitioned the court to approve a "plan to expedite the closing of" Citizens' liquidation (FR at 9).  The liquidator suggested the following plan by which it could fix Citizens' liabilities and make a final distribution to Citizens creditors (Petition, ¶ 17).

Citizens was liable for three kinds of losses by those that it had reinsured, i.e., its cedents or reinsurance creditors: 1) a paid loss where the party ceding business to Citizens paid its policyholder; 2) an outstanding loss where the loss was reported to the cedent, but not yet resolved; and 3) a loss that was incurred but not reported (IBNR) where the incident giving rise to the loss had occurred but was not yet reported to the cedent (*id.*, ¶ 12).

To enable the liquidator to make a final distribution of Citizens' assets to creditors, all of Citizens' liabilities would have to be fixed (*id.*, ¶ 17). Citizens' liability to all reinsurance creditors who had timely filed their proofs of claims, except plaintiff, was fixed according to the amount of paid and outstanding losses as reflected on the liquidator's records as of June 30, 1994 (*id.*, ¶ 10 [a]). All claims not reflected on the liquidator's records as of that date were forever barred (*id.*, ¶ 10 [e]).

Citizen's liability to plaintiff was fixed according to the losses paid as of June 30, 1994 (*id.*, ¶ 10 [b]). In contrast to Citizens' other reinsurance creditors, plaintiff received no allowance for outstanding losses. Plaintiff withdrew its outstanding and IBNR claims, which amounted to $30.72 million, against the estate (*id.*, ¶ 19 [d]; Tafuro Aff., ¶ 15-16). In return, the liquidator assigned plaintiff all of the amounts owed to Citizens by the pool members that reinsured it (*id.*).

The pool members that reinsured Citizens owed it reinsurance recoverables, which are monies due under the reinsurance agreements (Petition ¶ 5, 6). The Petition proposed that Citizens forego further collection of any reinsurance recoverables (*id.*, ¶ 18). Instead, all reinsurance recoverables due to Citizens as of June 30, 1994, and uncollected by the liquidator as of June 30, 1995, were assigned to plaintiff (*id.*, ¶ 19 [a]). All reinsurance agreements "as from July 1, 1994, *** together with all of the rights which the Liquidator would have had thereunder

5

if the Citizens estate were not closed ***" were assigned to plaintiff (*id.*, ¶ 19 [b]).  Plaintiff

could "assert its claims for outstanding and future losses, including, but not limited to [IBNRs],

against those assets, agreements, and other rights" assigned to plaintiff (*id.*, ¶ 19 [d]).  The terms

of the reinsurance agreements would "remain in full force and effect, but with no further rights,

obligations or liability on the part of the Liquidator" (*id.*, ¶ 19 [b]).

   The liquidator also executed an Assignment agreement, assigning to plaintiff: 1) all

reinsurance recoverables due the liquidator according to his accounts as of June 30, 1994 and

uncollected by him by June 30, 1995, excluding any reinsurance recoverables due from Citizens

as a pool member to Citizens as a cedent; and 2) all reinsurance agreements running in favor of

Citizens or the liquidator effective as from July 1, 1994, except to the extent that the liquidator

exercised any rights thereunder prior to February 11, 1997, together with all the rights which the

liquidator would have had under such agreements if the Citizens estate were not closed

(Assignment, at 1-2).

   The court approved the Petition and the assignment, and the liquidation was closed in

March 1998, after the liquidator distributed the remaining assets according to the plan.  Plaintiff

commenced this action to recover the amounts that defendant, as Citizens' reinsurer, would have

had to pay the liquidator, if the liquidation had not closed.  The amount allegedly owed, as of

September 30, 2002, is $2,020,858.71.  Plaintiff also seeks a declaratory judgment that defendant

is obligated to reimburse plaintiff for all future amounts that become due as a result of

defendant's reinsurance of Citizens.

   The parties disagree over the nature of the assignment.  Defendant premises its motion to

dismiss the complaint on these main arguments: 1) plaintiff is limited to recovering claims that

6

are reflected on the liquidator's records as of June 30, 1994; 2) plaintiff may not assert any claims arising after the liquidation was finally terminated on March 26, 1998; and 3) plaintiff may only claim what Citizens or the liquidator could have claimed, and, as Citizens's liquidation has closed, it is no longer liable for any claims. If the court determines that defendant owes some monies, defendant asserts that it must be credited with certain offsets.

On a motion for summary judgment, a movant is required to establish, by competent and admissible evidence, a prima facie entitlement to judgment (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985]). If this burden is met, then the opponent to a motion for summary judgment has the affirmative burden of coming forward with competent, admissible evidence establishing the existence of a genuine triable issue of fact (*Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]).

Defendant's assertions contradict the terms of the Petition and the assignment. In an assignment, the assignee steps into the assignor's shoes and acquires whatever rights the latter had (*Matter of the Estate of Stralem*, 303 AD2d 120, 123 [2d Dept 2003]). The liquidator assigned plaintiff all reinsurance agreements running in favor of Citizens or the liquidator effective as from July 1, 1994, together with all the rights which the liquidator would have had under such agreements, if the Citizens estate did not close. In addition, the Pooling Contract included the statutory insolvency clause that, in the event one of the pool members became insolvent, the solvent members would pay the insolvent member or the liquidator on the basis of the insolvent company's liability towards those that it reinsured, without diminution because of the insolvency (Pooling Contract at 2). Insurance Law § 1308 (a) (2) urges the inclusion of that clause in reinsurance contracts, by providing that, without it, the primary insurer will not receive

7

regulatory credit for reinsurance (*Matter of the Liquidation of Midland Ins. Co.*, 79 NY2d at 258).

Defendant is not entitled to summary judgment. Regarding plaintiff's motion for summary judgment on its complaint, it may be that Citizens owes defendant some money that defendant is entitled to offset against what it owes Citizens. Reinsurers are allowed to offset monies due to them from an insolvent insurer against monies that they owe to the insolvent insurer (*id.* at 264-265). The insolvency does not place the liquidator in a better position than the insolvent party (*id.*). By the same token, plaintiff, as assignee, in addition to inheriting the liquidator's rights, inherits whatever liabilities that could have been asserted against the liquidator (*Trans-Resources, Inc. v Nausch Hogan and Murray*, 298 AD2d 27, 30 [1st Dept 2002]). The parties disagree over whether certain figures are offsets owed to defendant. Therefore, plaintiff's motion for summary judgment on its complaint and for a declaratory judgment is denied.

Defendant raises other issues that it is well to settle now (*see* CPLR 3212 [g]). Defendant alleges that plaintiff is wrongly seeking payment for claims where plaintiff has not paid the insured. Where the reinsurance contract contains the statutory insolvency clause, the reinsurer, here, defendant, is obligated to pay the liquidator his or her allocated share of any losses due under the reinsurance contract, even though the insolvent ceding company has not first made payment to the insureds on the underlying policies (*Matter of the Liquidation of Midland Ins. Co.*, 79 NY2d at 263). Reinsurance contracts are indemnity contracts, where, ordinarily, the reinsurer would not have to pay the cedent until the cedent paid its policyholder (*id.*). However, under New York law, that principle does not apply where the ceding company is insolvent (*id.*).

8

The claim need not be paid, before plaintiff may collect what the liquidator could have collected on the claim.

Defendant also asserts that the claims on which plaintiff seeks recovery were improperly processed. The manager of the reinsurance pool to which Citizens and defendant belonged kept the pool's books and records on a joint basis, thereby avoiding the costs of keeping separate records for each member for each claim (Janes Aff. in support of plaintiff's cross motion [Janes Aff.], ¶ 18; Tyler Aff. in support of plaintiff's cross motion [Tyler Aff.], ¶ 7). After the original pool manager went bankrupt in 1988, the pool members formed Run-Off-Management Reinsurance Management Company (ROM) to become its successor (La Forge Aff. in opposition to defendant's motion for summary judgment and in support of plaintiff's cross motion [La Forge Aff.], ¶ 18). Because the pool records were kept on a joint basis, it was not practicable for another entity to process the pool reinsurance separately from other non-pool reinsurance that Citizens sold (Janes Aff., ¶ 19). Therefore, the liquidator contracted with ROM to continue administering the estate, including billing amounts due to and from Citizens by other pool members, which it does to this day (Janes Aff., ¶ 19; Petition, ¶ 8). ROM receives claims from those reinsured by Citizens, evaluates, and approves or disapproves claims, and then invoices those who reinsured Citizens, such as defendant (Tyler Aff., ¶ 6).

Defendant and ROM entered into a contract, effective January 1, 1992, whereby ROM became defendant's agent for servicing reinsurance business that defendant assumed as a pool member (Contract between ROM and defendant, ¶ 1). The contract gave ROM full authority to admit, settle, adjust and pay claims and to defend any suits in defendant's name (*id.*, ¶ [2] [a]).

Plaintiff and ROM made an agreement in 1998, which, apparently was not put in writing

9

until 1999, whereby ROM engaged to collect monies from Citizens' reinsurers, pursuant to plaintiff's rights under the assignment (Contract between ROM and plaintiff, ¶ 1.1). The agreement provided that "ROM shall act as an independent contractor and not as an agent of [plaintiff] in providing services to [plaintiff] hereunder" (*id.*, ¶ 6.1). ROM advised defendant that plaintiff had engaged it to prepare accounts in accordance with terms of the assignment (Letter from ROM to defendant, dated May 13, 1998).

Plaintiff's evidence of what defendant owes is a statement that ROM provided to both parties after this action commenced, and letters and bills from ROM to defendant. ROM first billed defendant under the assignment in May 1998 (La Forge Aff., ¶ 25). Plaintiff alleges that it provides ROM with claim notices, and that ROM may approve or disapprove a claim (Tyler Aff., ¶ 6, 9). Once ROM approves a claim, it processes the claim amount to determine the financial share of each pool member, and prepares separate invoices for each (*id.*, ¶ 7). Plaintiff alleges that it has never controlled ROM or directed its action in regard to claim handling, and that ROM often acts adversely to plaintiff in evaluating claims on behalf of the pool members (*id.*, ¶ 8, 9-13). At the time that these motions were made, plaintiff and ROM were engaged in arbitration proceedings related to "ROM's attempts to impose information and documentation requirements upon [plaintiff] that [plaintiff] believes are inappropriate ***" (*id.*, ¶ 14).

Plaintiff's assertions are sufficient to show that it does not influence ROM in determining defendant's liabilities, and that it is entitled to rely on ROM's statements of defendant's liabilities, except for any offsets. Defendant objects to ROM's handling of claims of losses. According to defendant, once a claim is settled with the policyholder, there may be "issues concerning the proper allocation of the settlement among the respective insurers ***" (Kareken

10

Aff. in further support of defendant's motion for summary judgment, ¶ 4). In addition, in its handling of claims, ROM allegedly did little "to review critical reinsurance issues such as direct policy defenses, allocation issues among direct policies, the timeliness of plaintiff's notice, the number of 'occurrences' and the division of payment among reinsurers" (Greenfield Aff. in opposition to plaintiff's cross motion and in further support of defendant's motion, ¶ 13). Defendant also alleges that ROM lacked the proper documentation needed to make decisions about claims of losses.

These allegations are based upon files that ROM produced in discovery in this action. Defendant does not allege that it ever advised plaintiff that anything was wrong with ROM's handling of claims, before this action commenced. Defendant does not deny that ROM is its agent, authorized to adjust and settle claims for it.

The knowledge acquired by an agent within the scope of its agency is imputed to the principal, who is thereby bound, even if the knowledge is never communicated to the principal (*Christopher S. v Douglaston Club, Inc.*, 275 AD2d 768, 769-770 [2d Dept 2000]). A presumption exists that the agent has disclosed to the principal all the important facts with reference to the subject of the agency (*Center v Hampton Affiliates, Inc.*, 66 NY2d 782, 784 [1985]). These rules are inapplicable only when the agent abandons the principal's interests and acts for its own or another's purpose (*id.*; *Christopher S.*, 275 AD2d at 770; *see also* Restatement [Second] of Agency § 275). A principal is liable to third persons upon transactions conducted by its agent, where the agent was so authorized (Restatement [Second] of Agency § 140).

Defendant authorized ROM to handle claims of losses. Defendant makes no showing that ROM has acted against its interests or that it made any errors in determining the amount of

11

defendant's liability, except, perhaps, in regard to offsets. No matter how ROM handled the claims of losses, defendant is liable to plaintiff, based on ROM's determinations regarding whether the loss really took place, the timeliness of notice, the amount of coverage that the pool members should provide, the allocation of liability to defendant, and other matters within the scope of ROM's agency.

This brings us to plaintiff's cross motion to seal certain reply papers. Plaintiff seeks to have the court consider certain reply papers in support of its cross motion for summary judgment. These papers are statements made by ROM's witnesses in the arbitration proceeding between plaintiff and ROM, where ROM appeared on behalf of its members, including defendant. At the time that the instant motions were made, the arbitration was taking place in the United Kingdom. Plaintiff wants to show that, in the arbitration proceedings, ROM's witnesses took positions that contradict positions taken by defendant in its opposition to plaintiff's cross motion. Plaintiff obtained, through an order to show cause, a temporary order sealing those documents. Plaintiff seeks to keep these documents under seal, because the law in the United Kingdom is that statements made in arbitration must be maintained as confidential between the parties and the arbitrators. Defendant cross-moves for a protective order regarding the witness statements.

The ROM witnesses testified to the soundness of ROM's handling of claims. However, the witnesses do not address the only remaining issue of dispute, the offsets. Also, as defendant points out, the statements were made by employees that left ROM in 1997. The court does not need these papers in order to arrive at a determination.

Plaintiff may withdraw its motion to seal. In the alternative, the court can vacate the order to show cause and deny the motion, and plaintiff may leave the motion in the file unsealed.

12

The motion for a protective order is denied.

Turning now to plaintiff's motion for summary judgment dismissing defendants' affirmative defenses, the first affirmative defense is that the action is barred by the statute of frauds' provisions regarding oral contracts (General Obligations Law § 5-701). The defense is invalid, because defendant's obligation to Citizens is set forth in a written contract, the Pooling Contract. This affirmative defense is dismissed.

The second affirmative defense is that plaintiff did not give defendant timely notice of any loss. Plaintiff shows that it gave ROM notice of claims. The liquidator attests to giving defendant notice of the claims relating to it and the Petition to close the liquidation (Tafuro Aff., ¶ 8). Defendant does not specify exactly what notice it failed to receive. This defense is dismissed.

The third affirmative defense is that some of the claims for which plaintiff seeks reimbursement may be barred by court orders. This defense is based on defendant's incorrect argument that plaintiff may only recover losses reflected on the liquidator's records as of June 30, 1994. As indicated above, plaintiff's assignment goes beyond that date. This affirmative defense has no basis and is dismissed.

The fourth affirmative defense is the statute of limitations. Whether related to the statute of limitations for contracts or for indemnification claims, this defense has no merit. A cause of action in contract accrues on the date on which it is breached (*Koren-DiResta Constr. Co., Inc. v New York City School Constr. Auth.*, 293 AD2d 189, 192 [1st Dept 2002]). According to defendant's counsel, defendant paid the liquidator all that it was required to through 1997, and refused to pay ROM's invoices after the liquidation ended, which was in 1998. Assuming that

13

defendant's refusal to pay was a breach, said breach was within the six-year statute of limitations for contracts (*Koren-DiResta*, 293 AD2d at 191).

Moreover, reinsurance contracts are indemnity contracts (*Travelers Cas.*, 96 NY2d at 587; *Midland Ins.*, 79 NY2d at 258). Indemnity claims stand independent of the underlying cause of action and carry their own six-year statute of limitations, which begins to run upon payment of the claim to the third party (*McDermott v City of New York*, 50 NY2d 211, 215-18 [1980]). The assignment became effective in 1998. The limitations period on any payments that plaintiff has since made has not elapsed. Therefore, this affirmative defense is dismissed.

The fifth affirmative defense is that plaintiff may be seeking payment for money that it did not actually pay to policyholders. As stated above, the reinsurer is obligated to pay the liquidator his or her allocated share of any losses due under the reinsurance contract, even though the insolvent ceding company has not first made payment to the insureds on the underlying policies. This defense is dismissed.

The sixth affirmative defense is that plaintiff's demands may be barred by defenses against the liquidator. The only defense that defendant appears to have against the liquidator is that Citizens owes it some monies, and that it is entitled to offset what Citizens owed it against what it owes Citizens. Because defendant has shown that it may have offsets, this defense is not dismissed.

The seventh affirmative defense is that plaintiff's demands are limited, in whole or in part, because of restrictions or limitations on the rights assigned to plaintiff. The eighth affirmative defense is that plaintiff's demands may be barred, in whole or in part, by the Insurance Law. The rationales for these defenses is located in the following affirmative defenses.

14

The ninth affirmative defense is that plaintiff is seeking payment where timely proofs of claims were not filed with the liquidator.  The ninth affirmative defense is also that plaintiff is violating Insurance Law § 7432 (c). That statute provides that, a proof of claim, that is filed after the date specified, shall not share in the distribution of the assets, until the claims that were filed before the specified date are paid in full with interest.  The tenth defense is that plaintiff's claims were not approved by the liquidator.  The eleventh defense is that plaintiff's demands relate to contingent claims, which did not become absolute against Citizens on or before the last day fixed for filing claims.  The twelfth affirmative defense is that the liquidation order, by assigning rights to plaintiff without a termination date, may have violated a law.  The fourteenth affirmative defense is that plaintiff fails to state a cause of action.

None of these defenses has any merit.  The time to object to the liquidation order has passed, and there is no indication that plaintiff is seeking payment for ineligible claims.  The seventh through the twelfth affirmative defenses and the fourteenth affirmative defenses are dismissed.

The thirteenth affirmative defense is that a release bars this action.  While the liquidation was ongoing, the liquidator allowed defendant an offset.  Plaintiff proves that  this arrangement did not relate to defendant's reinsurance of Citizens in defendant's capacity as a pool member.  Plaintiff is seeking to recover from the pool members.  In response, defendant argues in favor of a different interpretation of the purported release.  It also argues that the document is ambiguous.  Defendant's arguments lack merit, as the purported release clearly does not pertain to defendant's reinsurance as a pool member, but to other reinsurance related to defendant.  Therefore the thirteenth affirmative defense is dismissed.

15

In conclusion, it is

ORDERED that motion sequence number 003, defendant's motion for summary judgment, is denied; and it is further

ORDERED that plaintiff 's cross motion for summary judgment on its complaint, for a declaratory judgment, and to dismiss the affirmative defenses is granted to the extent that all of the affirmative defenses are dismissed, except for the sixth affirmative defense, as to which the motion is denied, and the motion is otherwise denied; and it is further

ORDERED that in regard to motion sequence number 004, plaintiff's motion to seal certain reply papers, the court neither grants, nor denies it, and plaintiff has fifteen days from the date of entry of this order with notice, to advise the court whether the motion will be withdrawn or remain in the file unsealed; and it is further

ORDERED that defendant's cross motion for a protective order is denied.

Dated: October 6, 2003

ENTER:

RICHARD B. LOWE III
J.S.C.

FILED

OCT 1 5 2003

COUNTY CLERK'S OFFICE
NEW YORK

16

# SUPREME COURT OF THE STATE OF NEW YORK
# COUNTY OF NEW YORK

B.D. COOKE & PARTNERS LIMITED, as
Assignee of Citizens Casualty Company of
New York (in liquidation),

                Plaintiff(s),

   -against-

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON,

              Defendant(s).

Index No. 650054/2008

---

### Witness Statement of Service in accordance with sub paragraph (b)
### of the first paragraph of article 5, Hague Convention
### on the Service Abroad of Judicial and
### Extrajudicial Documents in Civil or Commercial Matters

---

I, DAVID LLEWELYN MORGAN, Process Server, of 4 Church Lane, Great Gonerby, Grantham, NG31 8JU, England, say as follows:

1. In the matters detailed below I was acting as agent for Graham Henry Bridgman a Solicitor of the Supreme Court of England and Wales who was in turn acting at the direction of the Central Authority of England and Wales.

2. On Monday the 17th day of March 2008 before 1700 hours I served "Certain Underwriters at Lloyd's, London, c/o Equitas Limited", the Defendant herein, with the Summons, the Verified Complaint with Exhibit A and the Notice regarding availability of Electronic Filing, together with the Hague Convention Summary of the Document to be Served and its Attachment 'A' and the Hague Convention Notice, by handing them to and leaving them with Stephen Britt, who acknowledged himself to be Company Secretary for Equitas Limited, at 33 St Mary Axe, London, EC3A 8LL, England, being its registered office, which is a method of service in accordance with English Court rules.

3. Exhibited hereto marked "A" is a bundle containing a copy of each of the documents so served by me.

4. Service has been effected, as directed by the requesting authority, in accordance with a method prescribed by the internal law of England and Wales and thus in accordance with sub paragraph (b) of the first paragraph of article 5, Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

I believe that the facts stated in this witness statement are true

Dated:        18 March 2008

Signed:

            DAVID LLEWELYN MORGAN

I hereby certify that this is a true copy of the original

Signature

G H Bridgman LLB Solicitor

Date 20 March 2008

# SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

B.D. COOKE & PARTNERS LIMITED, as
Assignee of Citizens Casualty Company of
New York (in liquidation),

                      Plaintiff(s),

-against-

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON,

                      Defendant(s).

Index No. 650054/2008

---

### Witness Statement of Service in accordance with sub paragraph (b)
### of the first paragraph of article 5, Hague Convention
### on the Service Abroad of Judicial and
### Extrajudicial Documents in Civil or Commercial Matters

---

I, **DAVID LLEWELYN MORGAN**, Process Server, of 4 Church Lane, Great Gonerby, Grantham, NG31 8JU, England, say as follows:

1. In the matters detailed below I was acting as agent for Graham Henry Bridgman a Solicitor of the Supreme Court of England and Wales who was in turn acting at the direction of the Central Authority of England and Wales.

2. On Monday the 17th day of March 2008 before 1700 hours I served "Certain Underwriters at Lloyd's, London, c/o Resolute Management Services Limited", the Defendant herein, with the Summons, the Verified Complaint with Exhibit A and the Notice regarding availability of Electronic Filing, together with the Hague Convention Summary of the Document to be Served and its Attachment 'A' and the Hague Convention Notice, by handing them to and leaving them with Stephen Britt, who acknowledged himself to be Company Secretary for Resolute Management Services Limited, at 33 St Mary Axe, London, EC3A 8LL, England, being its registered office, which is a method of service in accordance with English Court rules.

3. Exhibited hereto marked "A" is a bundle containing a copy of each of the documents so served by me.

4. Service has been effected, as directed by the requesting authority, in accordance with a method prescribed by the internal law of England and Wales and thus in accordance with sub paragraph (b) of the first paragraph of article 5, Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

I believe that the facts stated in this witness statement are true

**Dated:**        18 March 2008

**Signed:**

                **DAVID LLEWELYN MORGAN**

I hereby certify that this is a true copy of the original

Signature

G H Bridgman LLB Solicitor

Date 20 March 2008

# MOUND COTTON WOLLAN & GREENGRASS

COUNSELLORS AT LAW
ONE BATTERY PARK PLAZA
NEW YORK, NY 10004-1486

NEW YORK, NY
NEWARK, NJ
GARDEN CITY, NY
SAN FRANCISCO, CA
FORT LAUDERDALE, FL

(212) 804-4200
FAX: (212) 344-8066
WWW.MOUNDCOTTON.COM

JAMES VEACH
PARTNER
(212) 804-4233
JVeach@moundcotton.com

March 20, 2008

**Via e-mail and regular mail**

Carey G. Child, Esq.
Chadbourne & Parke LLP
1200 New Hampshire Avenue, NW
Washington, DC 20036

Re: B.D. Cooke & Partners Limited  v.
Certain Underwriters at Lloyd's, London
Index No. 650054/2008
Our file no 3038.001

Dear Mr. Child:

We are waiting the affidavit of service that you mentioned on the telephone on Tuesday.

I have spoken to our clients.  They advise that neither Equitas nor Resolute is authorized to accept service for Underwriters at Lloyd's.

At the same time, Underwriters want to resolve this dispute and suggest the following. Let us stipulate that:

1. Equitas and Resolute maintain that neither is authorized to accept service for Underwriters at Lloyd's;

2. Underwriters, nevertheless, will - without conceding that they have been properly served  - accept service with the understanding that:

224874.3

Mᴏᴜɴᴅ Cᴏᴛᴛᴏɴ Wᴏʟʟᴀɴ & Gʀᴇᴇɴɢʀᴀss

March 20, 2008
Page 2

    3.   Cooke agrees to extend Underwriters' time to answer or move with respect to the Cooke action forty-five days from the date that you, as counsel for Cooke, execute this letter.

    Thus, without agreeing that service has been properly effected, we, on Underwriters' behalf, will accept service.  In exchange, Cooke agrees that Underwriters shall have forty- five days from the date you execute this letter to answer or move.

    With respect to your application to be admitted pro hac vice, Underwriters have no objection.  Nor do Underwriters object to electronic filing of pleadings and papers.

                Very truly yours,

Acknowledged and agreed

Carey G. Child, Esq. (Partner)
Chadbourne & Parke, LLP
Counsel for B.D. Cooke
1200 New Hampshire Avenue, NW
Washington, DC 20036

224874.3