UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

B.D. COOKE & PARTNERS LIMITED, as Assignee of
Citizens Casualty Company of New York (in liquidation)

              Plaintiff,

   -against-

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON,

            Defendants.

-------------------------------------------------------------------------X

Civil Action No.
08-CIV-3435 (RJH)

**Affirmation in Support of
Motion to Compel Arbitration**

James Veach, affirms that:

1.     I am an attorney admitted to practice law in the States of New York and New Jersey and before this Court. I am also a member of the firm of Mound, Cotton, Wollan & Greengrass, counsel for defendant Certain Underwriters at Lloyd's, London (Underwriters). This affirmation reflects both personal knowledge and knowledge derived from my review of court records and, in some instances, correspondence exchanged between the parties, some of which is attached.

2.     I submit this affirmation in support of Underwriter's motion to compel the arbitration of all matters set out in a summons and verified complaint filed by B.D. Cooke & Partners Limited (Cooke) in the Supreme Court, New York County, Index No. 08/650051 (Cooke Action). A copy of the Cooke complaint is attached as Ex. 1.

3.     On April, 7, 2008, Underwriters removed the Cooke Action to this Court pursuant to the special removal provisions of the Convention on the Recognition and Enforcement of

Foreign Arbitral Awards, as enforced by Chapter 2 of the Federal Arbitration Act, a United States treaty (Convention).  9 U.S.C. § 205.

4.    Cooke alleges in its verified complaint that Underwriters owe Cooke $1,903,420.61 in "reinsurance recoverables" due Cooke under the terms of certain "Excess-of-Loss Reinsurance Agreements" (excess reinsurance contracts) that were assigned by the Liquidator of Citizens Casualty Insurance Company (Citizens).  Those contracts are purportedly identified in Exhibit "A" to the Complaint.  Ex. 1, ¶¶ 33, 34, and Ex. "A."

5.    I say "purportedly" because many of the excess-of-loss reinsurance contracts identified in the Complaint's Ex. "A" have no bearing on any amounts allegedly due Cooke pursuant to the assignment described more fully below.  Citizens Casualty ceased underwriting pursuant to an order of liquidation entered on  June 17, 1971 (and, in all likelihood stopped assuming or ceding reinsurance business well before that date).  The liquidation order ended Citizens' corporate existence.  Citizens did not enter into any reinsurance agreements after June 17, 1971.  Thus, none of the reinsurance contracts identified on Ex. "A" that were executed after that date concern the $1,903,420.61 allegedly owed Cooke.

6.    On April 4, 2008,  Underwriters demanded arbitration of all matters alleged and raised in the Cooke complaint.  A copy of the demand for arbitration served on Cooke's counsel is attached as Ex. 2.

7.    On April 7, 2008,  your affiant e-mailed plaintiff Cooke's counsel asking if Cooke would agree to arbitrate the matters raised in the Cooke complaint.  Later that day, Cooke's counsel advised that Cooke had not yet determined whether counsel should be authorized to

accept service of the demand, but without regard to whether the demand to arbitrate was "otherwise valid." Counsel will confer with his client, but in the interim Underwriters sent another copy of its demand to Cooke's offices in the United Kingdom. Ex. 2.

8.      Pursuant to: (1) explicit and broad agreements to arbitrate contained within every excess reinsurance contract at issue in the Cooke Action; and (2) the Convention, defendant Underwriters seeks an order compelling arbitration and dismissing or staying the Cooke complaint.

## A.      Background

9.      Before proceeding any further, we provide some background on the parties and their history. We will not explore the merits of the issues raised in the Cooke complaint; those issues must be arbitrated pursuant to the explicit and broad arbitration agreements contained in the excess reinsurance contracts that were assigned to Cooke.

10.     Rather, the following background and Underwriters' accompanying memorandum of law explain:

(1)     why the parties agreed to have reinsurance professionals resolve their differences pursuant to broad arbitration agreements;

(2)     how a dispute between a London Market reinsurer and Underwriters at Lloyd's, London must, under the terms of the subject reinsurance contracts, be arbitrated in New York City; and

(3)     why the Convention requires that the Cooke action be dismissed and the parties directed to arbitrate their differences.

## B.     The Parties

11.     Note that Citizens executed none of the excess reinsurance contracts identified on Cooke's Ex. "A." All of the reinsurance contracts referred to on Ex. "A" were executed by Agency Managers, Ltd., later Agency Managers, Inc., (Agency Managers), a reinsurance underwriting manager. Agency Managers acted on behalf of members of the Agency Managers pool.

12.     Citizens participated in the Agency Managers pool from the early 1950s. Membership in the Agency Managers pool varied year by year. Agency Managers, as the pool manager, underwrote (accepted or rejected) risks, settled claims (after the initial insurer settled its loss and paid it), and kept accounting records showing the pool's (and its members') profit or loss.

13.     Agency Managers also arranged for reinsurance of the pool's assumed reinsurance or retrocessional reinsurance, i.e., reinsurance of reinsurance contracts. (This Court may be fully familiar with these reinsurance terms, but we are taking to heart Circuit Justice Richard Posner's advice that counsel not assume familiarity with reinsurance terminology and remember that "every esoteric term used by the reinsurance industry has a counterpart in ordinary English." Indiana Lumbermens Mutual Ins. Co. v. Reinsurance Results, Inc., Docket No. 07-1823 (January 16, 2008). We have supplied definitions where relevant and will continue to do so if the Court requests.)

14.     The Agency Managers pool members operated pursuant to an inter-company pooling agreement. A copy of that agreement is attached as Ex. 3. The inter-company pooling agreement changed as members joined or left the pool and their pool participation changed.

15.    Plaintiff Cooke managed a pool of reinsurers that accepted reinsurance risk.  In some respects, the Agency Managers pool and the Cooke pool were similar -- both assumed retrocessional risk, i.e., reinsurance of other reinsurance arrangements.  In other respects, the two pools differed.  For example,  the Agency Managers members were, for the most part, U.S. companies, whereas the  Cooke retrocessionaires were located in the U.K.  (Just as Agency Managers, Ltd. had become Agency Managers, Inc., the Cooke pool had also previously been managed by another pool manager -- CF & A.U., Ltd.  and U.M.A., Ltd. -- that had assigned their rights to Cooke.)

16.    The Agency Managers and Cooke pools shared a common denominator -- The Dominion Insurance Company Limited (Dominion).  Dominion was domiciled in the U.K. (Dominion also operated a U.S. Branch located in New York.  And Dominion at one point incorporated in New York a separate entity - Dominion America Insurance Company (Dominion America).  Dominion America later also failed and was liquidated.)  This dispute concerns the U.K. Dominion, which ceased doing business years ago and, on information and belief, is in run-off in the U.K.)

17.    Dominion (UK) played several roles in the Citizens story.  Among other things, Dominion wrote excess layer insurance contracts -- insurance contracts that operated above a primary policy.  Companies such as The Hartford, Travelers, Allstate, and others issued casualty policies to large U.S. companies such as Dana Corporation, Kaiser Aluminum, and Goodyear Tire.  Dominion would then provide excess coverage that operated above the limits of those primary policies.  Dominion ceded some of its premium and risk from these excess policies to the Agency Managers Pool thus reinsuring the liabilities it had assumed from these large U.S. companies.

18.    Dominion was also a member of the B.D. Cooke pool.  Indeed, Dominion was the lead member of the Cooke pool.  Cooke, acting on behalf of its pool members -- including Dominion -- ceded business from its pool members to Agency Managers to reinsure some of  the Cooke members' liabilities.

19.    Citizens was the lead member of the Agency Managers pool (just as Dominion was the lead member of the Cooke pool).  Indeed,  Cooke/Dominion -- the relationship between Cooke and Dominion remains to be explored -- ceded so much business to the Agency Managers pool that Cooke eventually became the Agency Managers pool's largest creditor (and thus Citizens' largest reinsurance creditor).

20.    Dominion, as the lead company in the Cooke pool, <u>also</u> assumed its share of certain reinsurance business ceded by Agency Managers.  As noted, Dominion's ownership interest in Cooke is unclear, but, on information and belief, Dominion controlled Cooke.

21.    The Cooke pool arranged for a further retrocession of risk by reinsuring the liabilities that it assumed from the Agency Managers pool pursuant to excess of loss reinsurance contracts, some of which are the subject of this action.  Reinsurance contracts are often characterized as either quota share or excess of loss contracts.

22.    "Under quota share reinsurance, the reinsurer takes a fixed percentage of the risk on each covered policy.  Under excess of loss reinsurance, the reinsurer is only liable under the policy if certain conditions (such as claims above a certain amount or the occurrence of a catastrophe) are met." <u>Compagnie de Reassurance d'Ile de France v. New England Reins. Corp.</u>, 944 F. Supp. 986 (D. Mass. 1996).

23.    On information and belief, Agency Managers also arranged for a quota share retrocession of the Agency Managers pool's liabilities pursuant to a quota share contract. While the quota share contract may affect the computation of the amounts allegedly due from Underwriters, the quota share contract is not directly at issue in this proceeding.

### C.    The Arbitration Agreements

24.    Every excess reinsurance contract identified in the Cooke complaint contains a broad and explicit arbitration agreement, arbitration being the almost universally accepted method of resolving disputes among parties to a reinsurance contract. This is particularly true with respect to international, retrocessional arrangements involving many different insurers, reinsurers, pool managers, intermediaries, brokers, Lloyd's syndicates, run-off vehicles, and run-off managers.

25.    Most of the excess reinsurance contracts identified in the Cooke complaint's Ex. "A" contain the following agreement to arbitrate:

> Any dispute arising under this Contract shall be submitted to a court of arbitration composed of two arbitrators, one to be appointed by the Reassured and the other by the Reinsurers. The arbitrators shall, before entering upon the reference, appoint an umpire. The arbitrators and the umpire shall consider this Contract an honourable engagement rather than merely a legal obligation (sic) they are relieved of all judicial formalities and may abstain from following the strict rules of law. The award of the arbitrators or, in the event of their disagreement, of the umpire, shall be precedent to any liability or right of action of either party. The costs of the references and of the award shall be in the discretion of the arbitrators or umpire, as the case may be, who may direct to

7

and by whom and in what manner the same shall be paid. <u>The seat of arbitration shall be New York, N.Y</u> (emphasis added).

A representative contract containing this wording is attached as Ex. 4.

      26.    A few of the excess reinsurance contracts contain the following agreement to arbitrate:

> Should an irreconcilable difference of opinion arise between the parties to this Agreement as to the interpretation of this Agreement or transactions with respect to this agreement, such difference shall be submitted to arbitration upon the request of one of the parties, one arbiter to be chosen by the Manager and one by the Retrocessionaire, and an umpire to be chosen by the two arbiters before they enter into arbitration.

> Should the arbiters fail to agree upon the choice of an umpire within 30 days of the appointment of the last arbiter, then either arbiter, or both together, may request the Superintendent of Insurance of the State in which arbitration is to be held (or the official in charge of Insurance matters whatever his title may be) to appoint an umpire. Should this official decline to make such an appointment, then following notice from said official of such declination, or 30 days following the date such request was made if no response has been received from said official, either arbiter or both together, may petition the court in the state where arbitration is to be held to appoint an umpire.

> In the event that either party should fail to choose an arbiter within sixty (60) days following written request by the other party to enter upon arbitration, the requesting party may choose two arbiters who shall in turn choose an umpire before entering into arbitration.

> Each party shall present their case to the arbiters and the umpire within thirty (30) days of the appointment of the umpire and the written decision of any two of the three shall be final and binding upon the Manager, the Members and the Retrocessionaire.

> The arbiters and the umpire are relieved from all judicial formalities and may abstain from the strict rules of law, interpreting this agreement as an honourable undertaking rather than as a merely legal obligation. By agreement between any two of the three, they may extend the time intervals contained in this article.
>
> The arbiters and the umpire shall be active or retired disinterested executive officers of insurance or reinsurance companies.
>
> Each party shall pay the fee of its chosen arbiter and half of the fee of the umpire: the remaining costs of arbitration shall be paid as the written decision directs. In the event both arbiters are chosen by one party, the fees of the arbiters and the umpire shall be equally divided between the parties.
>
> Unless otherwise mutually agreed between the manager and the Retrocessionaire any arbitration shall take place in New York, New York

A representative contract containing this agreement to arbitrate appears under Ex. 5, but it is unclear if any excess reinsurance contract executed after June 17, 1971 is at issue in this proceeding.

27.    The representative excess reinsurance contracts attached as Exs. 4 and 5 were executed by: (1) Agency Managers, acting for Citizens and its fellow Agency Managers pool members; and (2) Underwriters (including a few London Market reinsurers). By "Underwriters," we mean entities that underwrite reinsurance risk and are members of Lloyd's, London, entities that are comprised of individuals or "Names" who invest in these syndicates. For a description of Lloyd's as it existed at one point relevant to this dispute, see Roby v. Corporation of Lloyd's, 996 F.2d 1353, 1357 (2d Cir. 1993).

28.    (In addition to Underwriters, reinsurance intermediaries in London also solicited London Market Companies, i.e., U.K. insurance or reinsurance companies that assumed

9

reinsurance risk, to participate on the excess reinsurance contracts.  Dominion, for example, participated on one or more of the excess of loss reinsurance agreements (and thus wound up retro-reinsuring itself).)  Ex. 5.

29.     As noted, and on information and belief, <u>every</u> excess reinsurance contract identified in the Cooke complaint's Ex. "A" contains an explicit and broad agreement to arbitrate any "dispute" or "irreconcilable difference * * * arising under" the subject excess of loss reinsurance contracts.

### D.     The Assignment

30.     As noted above, on June 17, 1971, Citizens, which had been incorporated in New York as a property and casualty insurer in 1928, became subject to an order of liquidation issued pursuant to New York Insurance Laws.  <u>See</u> <u>Schenck v. Citizens Cas. Co. of New York</u>, 66 Misc.2d 811, 322 N.Y.S.2d 483 (Supreme Ct., N.Y. Co. 1971).  As required by the liquidation order, Citizens' liquidator -- the then-New York Superintendent of Insurance --  sent notices to all potential creditors pursuant to former New York Insurance Law § 542, now NYIL § 7432(b).  Those creditors included Dominion and the Cooke pool.

31.     More than 8,000 proofs of loss were filed during the course of Citizens' liquidation, including proofs from Cooke/ Dominion.  The Cooke/Dominion proofs covered:

(1) losses paid by the cedant that had not been indemnified;

(2) reported but unpaid losses for which Dominion maintained reserves (also known as outstanding loss reserves); and

(3) losses that had been incurred but not yet reported (IBNR).

Many of the Dominion/Cooke losses were asbestos-related or environmental claims and thus generated considerable IBNR.

32.    Two decades passed, but the Citizens estate remained open.  The Liquidator could not calculate Citizens' liabilities and distribute its assets in part because of the continuously reported IBNR on asbestos and environmental claims.  Without a bar date, the IBNR on claims submitted by cedants such as Cooke/Dominion would continue to grow (and make it difficult for the Liquidator to make a final determination of Citizens' liability and thus a final distribution of its assets).  See, e.g., Final Report on the Liquidation of Citizens Casualty Company of New York, p. 9, Ex. 6.

33.    The Cooke/Dominion claim - as did many other creditors' claims against the Citizens estate - continued to grow, but Citizens' liquidator could not pay its reinsurance creditors.  (Guaranty funds and associations in New York and other states paid policyholder creditors, but these guaranty organizations then had their own claims against the estate and their own priority for reimbursement.)

34.    Pursuant to the insolvency provisions built into the excess reinsurance contracts, Citizens' reinsurance indemnity contracts became liability contracts.  Citizens' liquidator needed only allow a given loss before demanding payment from Citizens' reinsurer.  But the Liquidator could not allow a claim for loss reserves or IBNR and these liabilities continued to grow.

35.    On information and belief, Dominion assigned its claim against Citizens to Cooke.  In 1988, Agency Managers failed and filed a Chapter 7 petition in Bankruptcy.  The

Agency Managers pool members, including Citizens' Liquidator, retained a run-off manager,

Run-Off Management Inc. (ROM), to fill the void left by Agency Managers. See Petition for an

Order approving the Liquidator's plan to expedite closing of the Citizens Estate, ¶ 8, a copy of

which is attached as Ex. 7. The Liquidator also retained ROM to bill amounts due to Citizens

from both its fellow pool members and defendant Underwriters

36.     In 1993, Dominion/Cooke approached the New York Insurance Department's

Liquidation Bureau with a proposal. See letter from S. McCann to J. Tafuro, dated October 4,

1993, a copy of which is attached as Ex. 8. At that point, the Cooke/Dominion claim for

outstanding losses and IBNR made up more than half of the total value of claims against the

estate.

37.     The Dominion/Cooke proposal evolved over the next four years, but eventually,

the Liquidator agreed to a Plan that:

> (1) set a June 30, 1994 bar date to stop the submission of additional
> losses;
> (2) paid all reinsurance creditors, except Cooke/Dominion, 100% of their
> allowed claims for paid claims and outstanding losses as shown on the
> Liquidator's books and records at June 30, 1994;
> (3) paid Cooke/Dominion 100% of its paid losses on the Liquidator's
> books and records at June 30, 1994; and
> (4) "assign(ed) to Cooke/Dominion all reinsurance recoverables due to
> Citizens on the claims presented by Citizens' reinsurance creditors."

Final Report, Ex. 6, pp. 9-10.

38.    The Petition to approve the Plan to expedite Citizens' closing included the subject "Assignment." Ex. 9. The Liquidator provided notice to Citizens' creditors -- not necessarily its reinsurers -- and appeared before the Liquidation Court at a hearing.

39.    Pursuant to a Corrected Order entered on March 6, 1997, the Liquidation Court:

      (1) granted the Petition;

      (2) approved the Plan; and

      (3) in accordance with the Plan, approved the Assignment. Corrected Order, dated March 6, 1997, a copy of which is attached as Ex. 10.

40.    A year later, the Liquidator filed his Final Report. Ex. 6. Pursuant to an Order Directing Entry of Final Judgment, entered on March 26, 1998, see Ex. 11, the Citizens estate was closed, Citizens' liquidator discharged of all responsibilities and liabilities, and the liquidation proceeding terminated.

41.    The Assignment allowed Cooke, "on behalf of the B.D. Cooke Pool," all of the Liquidator's rights and interest in:

      (1) Citizens' "Reinsurance Recoverables," i.e., reinsurance owed by Citizens' pool members to Citizens and Citizens' "Excess of Loss Recoverables," i.e., reinsurance owed under the excess of loss reinsurance contracts due the Liquidator, but uncollected by the Liquidator as of June 30, 1994;

      (2) "All Reinsurance Agreements and Excess of Loss Agreements running in favor of Citizens or the Liquidator"; and

      (3) all other reinsurance recoverables due to Citizens, but "not arising out of the business of the" Agency Managers pool.

Ex. 9.

42.    The Assignment transferred not just the proceeds of the excess of loss reinsurance agreements, but the agreements themselves.  In short, the Liquidator stepped out of the shoes of Citizens, shoes that the Liquidator had filled as soon as the liquidation began, and Cooke stepped into the same shoes.  Citizens no longer existed; Citizens corporate charter had been dissolved in 1971 and the Citizen estate had been closed in 1998.  The parties to the subject excess of loss reinsurance contracts were now-- functionally -- Cooke and Underwriters.

### E.    The Nationwide Case

43.    After the Citizens estate closed,  ROM continued to process losses and seek to recover reinsurance for those members of the Agency Managers pool that contracted with ROM to do so.  (Not all pool members engaged ROM and ROM stopped acting for the Liquidator after the estate  closed.)

44.    In or about 2001, a dispute developed between Nationwide Mutual Insurance Company (Nationwide) and Cooke in its capacity as an assignee of Citizens' "Reinsurance Recoverables," i.e., the inter-company pooling obligations.  Nationwide belonged to the Agency Managers pool and -- Cooke alleged -- owed Cooke  "Reinsurance Recoverables" that would otherwise be due Citizens pursuant to the inter-company pooling agreement.  Ex. 1.  Nationwide refused to pay and counsel in this action demanded arbitration.  Ex. 12.

45.    Nationwide chose not to arbitrate.  Instead, the parties agreed that Cooke would commence an action in Supreme Court, New York County.  B.D. Cooke & Partners Ltd. v Nationwide Mutual Ins. Co., Index No. 600655/02; see Cooke complaint, ¶ 10.

46.     In its suit, Nationwide attacked the assignment and sought, among other things, a determination that would:

> (1) limit Cooke's reinsurance recoveries to claims reflected on the Liquidator's books at June 30, 1994;
>
> (2) bar Cooke from recovering on any claims that arose after March 26, 1998, the date that the Citizens estate closed; and
>
> (3) declare that because Cooke could only recover what Citizens or the Liquidator could recover -- and because the Citizens estate had been closed -- Nationwide was "no longer liable for any claim."

Nationwide moved for summary judgment and Cooke cross-moved for summary relief, including a declaratory judgment on its behalf. The trial court denied Nationwide's motion, but ruled in Cooke's favor on all but a single issue involving certain rights of off-set. The Appellate Division, First Department affirmed, but reversed the trial court with respect to rights of off-set. 16 A.D. 3d 208, 291 N.Y.S.2d 103 (1 Dep't 2005)

47.     The Nationwide litigation concerned neither the excess of loss reinsurance agreements nor the arbitration agreements contained in the excess of loss reinsurance agreements at issue in this proceeding.

## F.   Cooke's Complaint; Underwriters' Demand for Arbitration

48.     At some point after the Citizens estate closed, ROM began billing Underwriters. The ROM billings did not refer to the assignment. Nor did ROM break out amounts specifically owed to Citizens. Instead, ROM billed Underwriters for losses that it paid on behalf of Citizens

and many other pool members. ROM, however, did not identify which losses or what part of those losses involved Citizens or the Citizens/Cooke/Dominion assignment.

49.    In or about 2007, Resolute Management Services, Ltd., (Resolute) acting on behalf of Underwriters, began questioning the ROM statements and asking for information. Dominion, by-passing ROM, came directly to Resolute. The exchanges between Dominion and Resolute, acting for Underwriters, concerned Resolute's request for information on these belatedly-submitted losses, how the losses were computed, and whether losses submitted to Underwriters fell within the assignment.

50.    Resolute did not, as alleged in the Cooke complaint,  "signif(y) its agreement to claims," either by affixing certain 'signing' numbers," Complaint ¶ 32, or otherwise conceding that certain losses were subject to the Assignment.  Resolute reserves its right to dispute these allegations before the arbitration court.

51.    The exchanges between Dominion and Resolute led to further requests for information, including our  letter to counsel dated January 28, 2008, a copy of which is enclosed as Ex. 13.  Counsel for Dominion/Cooke never answered our January 28th letter.  Instead, counsel for Cooke, which had initiated what later became the  Nationwide litigation with a demand for arbitration,  commenced this action.

52.    Cooke's second and third causes of action in this proceeding -- breach of contract and account stated -- are:

> expressly subject to, and without waiver of, arbitration of any
> disputes under the Excess of Loss Reinsurance Agreements as
> provided in any arbitration clauses contained in such Excess of
> Loss Reinsurance Agreements * * * and * * * B.D. Cooke

expressly reserves the right to arbitrate such dispute. (emphasis added)

Cooke Complaint, ¶ ¶ 44, 50.  Thus, Cooke <u>relies</u> on the arbitration agreements contained in the excess of loss reinsurance contracts and intends to enjoy their benefits.

53.    Underwriters, pursuant to their demand for arbitration,  Aff. Ex. 2, seek a determination whether specific losses fall within the assignment, whether the losses sought were properly computed, and whether Dominion commuted the excess of loss reinsurance agreements that were assigned.

54.    The subject dispute falls within the Convention in that:

(1)  there is an agreement in writing to arbitrate the subject of the dispute;

(2) the agreement calls for arbitration within the territory of a signatory of the Convention;

(3) the agreement to arbitrate arises out of a contractual commercial relationship; and

(4) at least one of the parties to the agreement to arbitrate is not an American citizen.

<u>See</u>  <u>Ledee v. Ceramiche Ragno</u>, 684 F.2d 184 (1st Cir. 1982) and additional authority cited in Underwriters' accompanying Memorandum of Law at p. 9.

55.    For these and other reasons more fully presented in Underwriters' Memorandum of Law, defendant Underwriters respectfully requests that this Court:

(1) compel  Cooke to arbitrate;

(2) dismiss this action pending completion of the arbitration; and

(3) grant such other relief as may be warranted.

I declare under penalty of perjury that the foregoing is true and correct.

_____
James Veach  (JV-1525)

Dated: May 9, 2008
       New York, New York

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK          )
                                                    ss:
COUNTY OF NEW YORK    )

Jacob Mendelsohn, being duly sworn, deposes and says:

That deponent is not a party to this action, is over the age of 18 years and resides in Brooklyn, New York.

That on the 9th day of May, 2008 deponent served upon all parties the annexed **Affirmation in Support of Motion to Compel Arbitration** via the Court's ECF System:

Jacob Mendelsohn

Sworn to Before Me This
9th day of May, 2008

Notary Public

**IRENE SIEGEL**
Notary Public State of New York
No. 41-4872330
Qualified in Queens County
Commission Expires October 14, 2010

**Exhibit 1**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒

B.D. COOKE & PARTNERS LIMITED, as Assignee of          Index No.
Citizens Casualty Company of New York (in liquidation)

                  Plaintiff(s),

        -*against*-                          **Summons**

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON

                       Date Index No. Purchased:    February 26, 2008

                  Defendant(s).

‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒

    To the above named Defendant(s)

        CERTAIN UNDERWRITERS AT LLOYD'S, LONDON
        c/o RESOLUTE MANAGEMENT SERVICES LIMITED
        33 St. Mary Axe, London, EC3A 8LL, United Kingdom

        You are hereby summoned to answer the complaint in this action and to serve
a copy of your answer, or, if the complaint is not served with this summons, to serve
a notice of appearance, on the Plaintiff's attorney within 20 days after the service of
this summons, exclusive of the day of service (or within 30 days after the service is
complete if this summons is not personally delivered to you within the State of New
York); and in case of your failure to appear or answer, judgment will be taken against
you by default for the relief demanded in the complaint.

        The basis of venue is residence of Plaintiff's assignor at the time of the assignment
which is 123 William Street, New York, New York; Plaintiff's designation.

Dated: New York, New York

        February 26, 2008

                      CHADBOURNE & PARKE LLP

                      by _____
                        John F. Finnegan

              **Attorneys for Plaintiff**

              B.D. COOKE & PARTNERS LIMITED, as
              Assignee of Citizens Casualty Company of New
              York (in liquidation)

              30 Rockefeller Plaza
              New York, New York 10112
              212-408-5100

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

B.D. COOKE & PARTNERS LIMITED, AS
ASSIGNEE OF CITIZENS CASUALTY COMPANY
OF NEW YORK (IN LIQUIDATION),

Plaintiff,

-against-

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON,

Defendants.

Index No.

**VERIFIED COMPLAINT**

---

Plaintiff, by its attorneys, CHADBOURNE & PARKE LLP, for its complaint alleges:

## NATURE OF THE ACTION

1.    Plaintiff B.D. Cooke & Partners Limited ("B.D. Cooke") brings this action as the assignee of the liquidator of Citizens Casualty Company of New York ("Citizens") against defendants Certain Underwriters at Lloyd's, London ("Lloyd's Underwriters"), who are reinsurers under reinsurance agreements assigned to B.D. Cooke by the liquidator of Citizens.

2.    B.D. Cooke seeks declaratory relief and money damages in respect of reinsurance claims that have been agreed to by Lloyd's Underwriters, but which they refuse to pay based on their assertion that the assignment is subject to a "cap" on the amount recoverable.  This Court approved that assignment, and retained jurisdiction to

resolve disputes concerning the assignment. In that regard, this Court has previously rejected another reinsurer's argument that the same assignment was subject to a cap.

## PARTIES, PERSONAL JURISDICTION, AND VENUE

3.      Plaintiff B.D. Cooke is a corporation organized and existing under the laws of the United Kingdom, having its registered address at 2 Knoll Rise, Orpington, Kent, England.

4.      Plaintiff's assignor, the liquidator of Citizens, through the New York Liquidation Bureau, had, at the time of the assignment, its principal office and its facilities involved therein within New York County at 123 William Street, New York, New York.

5.      Defendants Lloyd's Underwriters are those underwriters at Lloyd's of London that, through one or more syndicates of such underwriters, variously participated as reinsurers in one or more of the excess-of-loss reinsurance contracts listed in Exhibit A (the "Excess-of-Loss Reinsurance Agreements"). Upon information and belief, the syndicates operated in London with the individual underwriter members domiciled in many places throughout the world, possibly including various states within the United States.

6.      Upon information and belief, Lloyd's Underwriters, by their participation in one or more of the Excess-of-Loss Reinsurance Agreements, contracted to provide reinsurance to one or more members of a reinsurance pool (the "Agency Managers Pool"), specifically including contracting to provide reinsurance to Citizens. Upon information and belief, the Agency Managers Pool was operated in New York County

2

by Agency Managers, Limited, a/k/a Agency Managers, Incorporated ("Agency

Managers"). Agency Managers was a New York corporation with its principal place of

business in New York County. Citizens also was a New York corporation with its

principal place of business in New York County.

7.    Upon information and belief, the Excess-of-Loss Reinsurance

Agreements each contain a contractual provision consenting to jurisdiction and service

of process in the following, or substantially similar, language:

> It is agreed that in the event of the failure of the Reinsurers to
> pay any amount claimed to be due hereunder, the Reinsurers
> at the request of the Reassured, will submit to the jurisdiction of
> any Court of competent jurisdiction within the United States
> and will comply with all requirements necessary to give such
> Court jurisdiction and all matters arising hereunder shall be
> determined in accordance with the law and practice of such
> Court. It is further agreed that service of process in such suit
> may be made upon Mendes and Mount, 27 William Street,
> New York, New York 10005, or their nominee or nominees,
> and that in any suit instituted against any one of them upon
> this Contract. the Reinsurers will abide by the final decision of
> such Court or of any Appellate Court in the event of an appeal.

## RELATED ACTONS

8.    By an order dated June 17, 1971, in Index No. 40357/71, re-captioned *In

Re the Liquidation of Citizens Casualty Co. of New York*, (the "Liquidation

Proceeding"), this Court, among other things:  (A) placed Citizens into liquidation; (B)

appointed the Superintendent of Insurance of the State of New York as liquidator (the

"Liquidator"); (C) granted the Liquidator authority to take possession of Citizens'

property and liquidate its business and affairs; and (D) vested the Liquidator with title to

all property, contracts and rights of action of Citizens.

3

9.      In an order dated March 6, 1997, this Court (Justice Greenfield), in the

Liquidation Proceeding, approved a petition and plan by the Liquidator for early closure

of the Citizens estate. That order specifically approved the assignment at issue in this

action. In addition, the petition and plan approved by this Court's order also provided

that "the Supreme Court of the State of New York, New York County, shall have

continuing jurisdiction over any disputes concerning the assignments and transfers

described above and their effect, except said Court shall not resolve disputes solely

involving computations of amounts due thereunder."

10.     In *B.D. Cooke & Partners Limited, As Assignee of Citizens Cas. Co. of

New York v. Nationwide Mutual Ins. Co.*, Index No. 600655/02 (the "Nationwide

Action"), this Court resolved such a dispute concerning the assignment at issue in this

action. In a memorandum decision and order dated October 6, 2003, this Court (Justice

Lowe), *inter alia*, rejected on summary judgment the contention by Nationwide Mutual

Insurance Company ("Nationwide"), another reinsurer of Citizens, that the assignment

was capped, and held that B.D. Cooke was entitled to collect as assignee under the

assignment. *Id., slip op. at 6, 7, 13* In pertinent part, that decision was upheld on appeal

to the First Department of the Appellate Division. 16 A.D.3d 208, 791 N.Y.S.2d 103

(Mar. 15, 2005).

## FACTS COMMON TO ALL CAUSES OF ACTIONS

### Citizens Was A Member Of The Agency Managers Pool

11.     Upon information and belief, Agency Managers operated and managed

the reinsurance pool known as the Agency Managers Pool. Certain insurance and

4

reinsurance companies agreed to participate in the Agency Managers Pool as pool members, with each pool member agreeing to assume a percentage interest in all reinsurance business written by Agency Managers on behalf of the Agency Managers Pool.

12.    Upon information and belief, Agency Managers operated the Agency Managers Pool from at least the early 1950s until 1988, when Agency Managers filed a bankruptcy petition.  Agency Managers was succeeded in the administration of the Agency Managers Pool by ROM Reinsurance Management Co., Inc. ("ROM").

13.    Upon information and belief, Citizens was a member of the Agency Managers Pool and entered into a Memorandum of Agreement with Agency Managers effective on or about July 1, 1950 (the "Citizens Memorandum").  Among other things, under the Citizens' Memorandum, Citizens appointed Agency Managers as "agent for and in [Citizens'] behalf in the procuring, underwriting and servicing of policies, contracts and/or treaties of casualty reinsurance business in the United States."

**As A Member Of The Agency Managers Pool,**
**Citizens Reinsured The B.D. Cooke Pool**

14.    B.D. Cooke is the current manager of a pool of U.K. insurers formerly managed by Underwriting Management Agency Ltd. and C.F.&A.U. Ltd. (the "B.D. Cooke Pool"), and led by The Dominion Insurance Company Limited ("Dominion").

15.    The B.D. Cooke Pool, led by Dominion, obtained reinsurance from the Agency Managers Pool, including reinsurance whereby Citizens reinsured Dominion and the B.D. Cooke Pool.

5

**Defendants Lloyd's Underwriters Then Reinsured Citizens**

16.    Upon information and belief, Agency Managers procured reinsurance for the benefit of Citizens in respect of the reinsurance obligations that Citizens owed to Dominion, the B.D. Cooke Pool, and others.

17.    Upon information and belief, the reinsurance procured by Agency Managers for the benefit of Citizens included reinsurance known as "Inter-Office Reinsurance" obtained from other members of the Agency Managers Pool such as Nationwide, as well as excess-of-loss reinsurance procured from external reinsurers, such as Lloyd's Underwriters under various of the Excess-of-Loss Reinsurance Agreements.

**Upon The Insolvency Of Citizens, The Liquidator Is Vested With Title To The Excess-of-Loss Reinsurance Agreements**

18.    As set forth above, on or about June 17, 1971, Citizens was declared insolvent and placed under the control of the Liquidator, who continued to administer the estate of Citizens until at least 1997, under the supervision of this Court in the Liquidation Proceeding.

19.    By virtue of Citizens' reinsurance of Dominion and the B.D. Cooke Pool, Dominion was a net creditor of the Citizens estate.

20.    This Court's order of liquidation vested the Liquidator with title to all of the property, contracts and rights of action of Citizens.

21.    Upon information and belief, the Liquidator gave notice to Citizens' reinsurers, including Lloyd's Underwriters, of the Liquidation Proceeding and that the

6

Liquidator had been vested by this Court with title to all of the property, contracts and rights of action of Citizens, including their reinsurance of Citizens.

**The Liquidator's Petition In The Liquidation Proceeding**

22.     In a Petition (the "Petition") sworn to on October 11, 1996 and submitted to this Court in the Liquidation Proceeding, the Liquidator stated that Dominion was the largest creditor of the Citizens estate, including on account of claims that the Liquidator determined would take years to resolve.

23.     With the express purpose of expediting the closing of the Citizens estate, the Liquidator's Petition sought this Court's approval to assign the Liquidator's rights under Citizens' reinsurance agreements to B.D. Cooke in exchange for concessions regarding Dominion's claims against the Citizens estate.

24.     Upon information and belief, Lloyd's Underwriters were given notice of the Petition.

25.     Upon information and belief, Mendes & Mount, attorneys for Lloyd's Underwriters, attended the hearing held by this Court concerning the Petition.

26.     Upon information and belief, Lloyd's Underwriters did not object to the Petition or the Liquidator's plan set forth therein.

**The Assignment Approved By This Court**

27.     In an order dated March 6, 1997 (the "Approval Order"), this Court, in the Liquidation Proceeding, approved the Petition and the Liquidator's plan set forth therein.

7

28.     Pursuant to the Petition and Approval Order, the Liquidator entered into an assignment to B.D. Cooke (the "Assignment") of certain of the Liquidator's rights under Citizens' reinsurance contracts, including the Inter-Office Reinsurance and the Excess-of-Loss Reinsurance Agreements.

29.     Among other things, the Assignment transfers to B.D. Cooke all of the Liquidator's "right, title, and interest in and to":

(a)     All reinsurance Recoverables and Excess of Loss Recoverables due Assignor according to his accounts as of June 30, 1994 and uncollected by Assignor or for Assignor's account by June 30, 1995; notwithstanding the foregoing, any Reinsurance Recoverables due from Citizens as an Agency Managers Pool member to Citizens as a Cedent are not being assigned hereunder.

(b)     All Reinsurance Agreements and Excess of Loss Agreements running in favor of Citizens or the Liquidator of Citizens effective as from July 1, 1994 except to the extent that Assignor has exercised any rights thereunder prior to February 11, 1997, together with all of the rights which Assignor would have had under such agreements if the Citizens estate were not closed pursuant to the Assignor's Plan for the closing of the Citizens' liquidation.

(c)     Effective upon the entry of a final nonappealable order approving the Final Audit and Accounting of Citizens, all other reinsurance recoverables due Citizens not arising out of the business of the AM Pool, together with all reinsurance assets and rights of recovery under reinsurance agreements of Citizens (including, without limitation on the foregoing, those reinsurances which may not have been specifically identified as of February 11, 1997).

30.     In exchange for the Assignment, and in reliance upon the Petition and this Court's Approval Order, Dominion made concessions regarding Dominion's claims against the Citizens estate that permitted final distributions from, and closure of, the Citizens estate.

8

**Lloyd's Underwriters Failure To Pay Agreed Claims Under The Assignment**

31.    Upon information and belief, claims under the Excess-of-Loss

Reinsurance Agreements have been handled for Lloyd's Underwriters by Equitas

Management Services Limited n/k/a Resolute Management Services Limited ("Equitas")

and have been presented to Equitas by ROM, as successor to Agency Managers.

32.    Upon information and belief, Equitas has signified its agreement to

claims by providing an Equitas signing number.

33.    Upon information and belief, the claims agreed by Equitas include the

following claims set forth in sub-Paragraphs 33.1 through 33.97 (the "Agreed Claims"):

| | Claim | | Agreement By Equitas | | Amount Owed Under Assignment |
|---|---|---|---|---|---|
| | Insured/Loss | ROM's Ref. # | Signing # | Date | |
| 33.1 | Dana Corporation | A135 | 90173 | 31 Mar 2005 | $21,591.30 |
| 33.2 | Dana Corporation | B022 | 90176 | 31 Mar 2005 | $3,135.18 |
| 33.3 | Ciba Geigy | X021 | 90092 | 15 Apr 2005 | $83,742.06 |
| 33.4 | Foster Wheeler | U003 | 90163 | 27 Mar 2006 | $71,613.46 |
| 33.5 | Foster Wheeler | U003 | 90173 | 27 Mar 2006 | $6,575.46 |
| 33.6 | Foster Wheeler | V004 | 90187 | 27 Mar 2006 | $(4,315.41) |
| 33.7 | Foster Wheeler | V004 | 90200 | 27 Mar 2006 | $(18,771.45) |
| 33.8 | Foster Wheeler | W007 | 90224 | 27 Mar 2006 | $(22,907.83) |
| 33.9 | Foster Wheeler | W007 | 90239 | 27 Mar 2006 | $(10,035.80) |
| 33.10 | Foster Wheeler | X006 | 90035 | 28 Mar 2006 | $(7,502.20) |
| 33.11 | Foster Wheeler | X006 | 90041 | 28 Mar 2006 | $(15,205.48) |
| 33.12 | Foster Wheeler | Y005 | 90063 | 29 Mar 2006 | $(8,280.92) |
| 33.13 | Foster Wheeler | Y005 | 90103 | 28 Mar 2006 | $(20,274.62) |
| 33.14 | Foster Wheeler | E022 | 90080 | 28 Mar 2006 | $13,989.48 |
| 33.15 | Kaiser Aluminium | V016 | 90203 | 28 Jun 2006 | $6,916.05 |
| 33.16 | Kaiser Aluminium | V016 | 90210 | 28 Jun 2006 | $582.35 |
| 33.17 | Kaiser Aluminium | W020 | 90206 | 28 Jun 2006 | $5,830.31 |
| 33.18 | Kaiser Aluminium | W020 | 90215 | 28 Jun 2006 | $562.54 |
| 33.19 | Goodyear Tire | T020 | 90026 | 20 Sep 2006 | $75,865.99 |

9

| | Claim | | Agreement By Equitas | | Amount |
| | Insured/Loss | ROM's Ref. # | Signing # | Date | Owed Under Assignment |
|---|---|---|---|---|---|
| 33.20 | Goodyear Tire | U019 | 90037 | 20 Sep 2006 | $77,733.57 |
| 33.21 | Goodyear Tire | V023 | 90044 | 20 Sep 2006 | $79,554.14 |
| 33.22 | Goodyear Tire | W033 | 90048 | 20 Sep 2006 | $84,152.26 |
| 33.23 | Goodyear Tire | X039 | 90059 | 20 Sep 2006 | $77,013.15 |
| 33.24 | Goodyear Tire | Y037 | 90085 | 20 Sep 2006 | $57,411.32 |
| 33.25 | Dana Corporation | A135 | 90018 | 22 Sep 2006 | $30,551.64 |
| 33.26 | Dana Corporation | B022 | 90032 | 22 Sep 2006 | $30,030.45 |
| 33.27 | Dana Corporation | C026 | 90058 | 25 Sep 2006 | $5,987.80 |
| 33.28 | Dana Corporation | D010 | 90061 | 22 Sep 2006 | $5,473.01 |
| 33.29 | Dana Corporation | E018 | 90084 | 22 Sep 2006 | $10,861.71 |
| 33.30 | Kaiser Aluminium | V016 | 90049 | 22 Sep 2006 | $2,573.55 |
| 33.31 | Kaiser Aluminium | V016 | 90192 | 21 Sep 2006 | $7,743.89 |
| 33.32 | Kaiser Aluminium | W020 | 90016 | 22 Sep 2006 | $108.85 |
| 33.33 | Kaiser Aluminium | W020 | 90186 | 21 Sep 2006 | $12,811.19 |
| 33.34 | Kaiser Aluminium | X017 | 90123 | 21 Sep 2006 | $58,945.74 |
| 33.35 | Kaiser Aluminium | Y016 | 90128 | 21 Sep 2006 | $58,119.52 |
| 33.36 | Kaiser Aluminium | A134 | 90153 | 21 Sep 2006 | $48,423.33 |
| 33.37 | Kaiser Aluminium | B021 | 90166 | 21 Sep 2006 | $34,717.17 |
| 33.38 | Kaiser Aluminium | C022 | 90175 | 21 Sep 2006 | $34,298.38 |
| 33.39 | Kaiser Aluminium | D025 | 90185 | 21 Sep 2006 | $17,187.22 |
| 33.40 | Kaiser Aluminium | E028 | 90100 | 21 Sep 2006 | $44,685.06 |
| 33.41 | B.F. Goodrich | C034 | 90015 | 09 Nov 2006 | $21,637.75 |
| 33.42 | B.F. Goodrich | D033 | 90029 | 09 Nov 2006 | $10,714.46 |
| 33.43 | B.F. Goodrich | E042 | 90037 | 09 Nov 2006 | $15,104.19 |
| 33.44 | Union Carbide | X027 | 90130 | 16 Nov 2006 | $(4,642.38) |
| 33.45 | Union Carbide | X027 | 90138 | 16 Nov 2006 | $(677.42) |
| 33.46 | Union Carbide | Y026 | 90149 | 16 Nov 2006 | $(3,782.37) |
| 33.47 | Union Carbide | Y026 | 90156 | 16 Nov 2006 | $(479.91) |
| 33.48 | Union Carbide | Z013 | 90002 | 17 Nov 2006 | $(4,027.83) |

| | Claim | | Agreement By Equitas | | Amount Owed Under Assignment |
|---|---|---|---|---|---|
| | Insured/Loss | ROM's Ref. # | Signing # | Date | |
| 33.49 | Union Carbide | Z013 | 90008 | 17 Nov 2006 | $(394.65) |
| 33.50 | Dana Corporation | A135 | 90194 | 13 Dec 2006 | $3,517.28 |
| 33.51 | Dana Corporation | B022 | 90251 | 14 Dec 2006 | $3,407.43 |
| 33.52 | Dana Corporation | C026 | 90269 | 14 Dec 2006 | $1,632.81 |
| 33.53 | Dana Corporation | D010 | 90311 | 14 Dec 2006 | $31.14 |
| 33.54 | Dana Corporation | E018 | 90339 | 14 Dec 2006 | $55.65 |
| 33.55 | Kaiser Aluminium | V016 | 90135 | 07 Dec 2006 | $628.53 |
| 33.56 | Kaiser Aluminium | V016 | 90139 | 07 Dec 2006 | $7,652.76 |
| 33.57 | Kaiser Aluminium | W020 | 90148 | 07 Dec 2006 | $(1,374.63) |
| 33.58 | Kaiser Aluminium | W020 | 90153 | 07 Dec 2006 | $12,381.92 |
| 33.59 | Kaiser Aluminium | X017 | 90160 | 07 Dec 2006 | $50,622.68 |
| 33.60 | Kaiser Aluminium | X017 | 90170 | 07 Dec 2006 | $25,731.18 |
| 33.61 | Kaiser Aluminium | Y016 | 90177 | 07 Dec 2006 | $49,393.65 |
| 33.62 | Kaiser Aluminium | Y016 | 90184 | 07 Dec 2006 | $26,152.05 |
| 33.63 | Kaiser Aluminium | A134 | 90193 | 07 Dec 2006 | $41,554.60 |
| 33.64 | Kaiser Aluminium | A134 | 90205 | 07 Dec 2006 | $22,858.41 |
| 33.65 | Kaiser Aluminium | B021 | 90217 | 07 Dec 2006 | $51,061.52 |
| 33.66 | Kaiser Aluminium | B021 | 90226 | 07 Dec 2006 | $10,403.46 |
| 33.67 | Kaiser Aluminium | C022 | 90233 | 07 Dec 2006 | $50,767.05 |
| 33.68 | Kaiser Aluminium | C022 | 90239 | 07 Dec 2006 | $11,261.36 |
| 33.69 | Kaiser Aluminium | C025 | 90060 | 12 Dec 2006 | $13,381.73 |
| 33.70 | Kaiser Aluminium | D025 | 90248 | 07 Dec 2006 | $25,130.81 |
| 33.71 | Kaiser Aluminium | D025 | 90088 | 08 Dec 2006 | $5,722.39 |

11

| | Claim | | Agreement By Equitas | | Amount |
|---|---|---|---|---|---|
| | Insured/Loss | ROM's Ref. # | Signing # | Date | Owed Under Assignment |
| 33.72 | Kaiser Aluminium | E028 | 90096 | 08 Dec 2006 | $18,790.47 |
| 33.73 | Kaiser Aluminium | E028 | 90044 | 08 Dec 2006 | $34,476.33 |
| 33.74 | Goodyear Tire | T020 | 90027 | 29 Jan 2007 | $14,176.94 |
| 33.75 | Goodyear Tire | U019 | 90031 | 29 Jan 2007 | $14,532.53 |
| 33.76 | Goodyear Tire | V023 | 90035 | 29 Jan 2007 | $14,873.24 |
| 33.77 | Goodyear Tire | W033 | 90043 | 29 Jan 2007 | $25,170.63 |
| 33.78 | Goodyear Tire | X039 | 90066 | 29 Jan 2007 | $18,456.72 |
| 33.79 | Goodyear Tire | Y037 | 90015 | 30 Jan 2007 | $17,119.46 |
| 33.80 | Goodyear Tire | T020 | 90224 | 20 Apr 2007 | $13,009.48 |
| 33.81 | Goodyear Tire | U019 | 90111 | 23 Apr 2007 | $13,204.11 |
| 33.82 | Goodyear Tire | V023 | 90120 | 23 Apr 2007 | $13,397.89 |
| 33.83 | Minnesota Minning | X022 | 90012 | 30 Jul 2007 | $95,696.05 |
| 33.84 | Minnesota Minning | Y025 | 90024 | 30 Jul 2007 | $75,250.51 |
| 33.85 | American Cyanamid | A083 | 90070 | 07 Aug 2007 | $16,211.00 |
| 33.86 | Union Carbide | X013 | 90046 | 08 Oct 2007 | $11,630.73 |
| 33.87 | Minnesota Minning | X022 | 90053 | 08 Oct 2007 | $11,442.86 |
| 33.88 | Minnesota Minning | Y025 | 90060 | 08 Oct 2007 | $8,823.14 |
| 33.89 | Hercules | A136 | 90046 | 04 Dec 2007 | $14,299.70 |
| 33.90 | Hercules | B024 | 90053 | 04 Dec 2007 | $14,281.33 |
| 33.91 | Hercules | C028 | 90058 | 04 Dec 2007 | $14,275.22 |
| 33.92 | Hercules | E039 | 90064 | 04 Dec 2007 | $9,957.28 |
| 33.93 | Georgia Pacific | W026 | 90036 | 04 Dec 2007 | $10,274.47 |
| 33.94 | Georgia Pacific | X032 | 90042 | 04 Dec 2007 | $7,298.18 |
| 33.95 | Dresser Industries | W031 | 90119 | 05 Dec 2007 | $3,534.41 |
| 33.96 | Dresser Industries | X037 | 90112 | 05 Dec 2007 | $3,181.62 |
| 33.97 | Dresser Industries | Y034 | 90128 | 05 Dec 2007 | $3,137.27 |
| | | | | Total | $1,903,420.61 |

34.    Despite demand, Lloyd's Underwriters have failed to pay to B.D. Cooke reinsurance recoverables due to B.D. Cooke, as Citizens' assignee, in respect of the Agreed Claims.

12

35.    The amount now due from Lloyd's Underwriters in respect of the Agreed

Claims is no less than $1,903,420.61, exclusive of interest and costs.

### AS AND FOR A FIRST CAUSE OF ACTION
#### (Declaratory Relief)

36.    The allegations of Paragraphs 1 through 35 are realleged and incorporated

by reference herein.

37.    Lloyd's Underwriters, through Equitas, have premised their refusal to pay

amounts due to B.D. Cooke under the Assignment in respect of the Agreed Claims upon

their contention that the Assignment caps the amount that can be recovered by

B.D. Cooke.

38.    Lloyd's Underwriters, through Equitas, have also asserted that the

Assignment constitutes a novation of the Excess-of-Loss Reinsurance Agreements and

that such novation purportedly means that Lloyd's Underwriters are relieved of liability

by virtue of a separate agreement not at issue in this action.

39.    The Lloyd's Underwriters' interpretations of the Assignment referenced

in Paragraphs 37 and 38 are contrary to the terms of the Assignment, the Petition and

this Court's Approval Order, and contrary to this Court's decisions on summary

judgment in the Nationwide Action against Lloyd's Underwriters' fellow reinsurer.

40.    As a result of the events described herein, an actual, ripe controversy of a

justiciable nature presently exists between B.D. Cooke and Lloyd's Underwriters

concerning the meaning and effect of Assignment, including with respect to past,

present, and future amounts due to B.D. Cooke under the Assignment.

41.    B.D. Cooke and Lloyd's Underwriters have adverse legal interests in regard to the meaning and effect of the Assignment.

42.    The controversy is of sufficient immediacy as to justify the entry of a declaratory judgment.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract)

43.    The allegations of Paragraphs 1 through 42 are realleged and incorporated by reference herein.

44.    This cause of action is asserted in this action expressly subject to, and without waiver of, arbitration of any disputes under the Excess-of-Loss Reinsurance Agreements as provided in any arbitration clauses contained in such Excess-of-Loss Reinsurance Agreements. However, there are no apparent disputes between the parties concerning the Excess-of-Loss Reinsurance Agreements with respect to the Agreed Claims, which were instead agreed to by Lloyd's Underwriters, as set forth in Paragraph 33, and sub-Paragraphs 33.1 through 33.97. Lloyd's Underwriters, through Equitas, have explained their failure to pay the Agreed Claims solely on bases other than the Excess-of-Loss Reinsurance Agreements. If, and to the extent, there are, or there are deemed to be, disputes within any arbitration provision of any of the Excess-of-Loss Reinsurance Agreements, B.D. Cooke expressly reserves the right to arbitrate such disputes.

45.    Lloyd's Underwriters entered into the Excess-of-Loss Reinsurance Agreements, whereby they reinsured Citizens.

14

46.    All relevant rights of Citizens under the Excess-of-Loss Reinsurance Agreements were vested in the Liquidator, and assigned by the Liquidator to B.D. Cooke.

47.    Despite demand, Lloyd's Underwriters have not paid B.D. Cooke in respect of the Agreed Claims and, in failing to do so, have breached their contractual obligations to B.D. Cooke, as assignee, un der the Excess-of-Loss Reinsurance Agreements.

48.    By reason of the foregoing, B.D. Cooke has been damaged in an amount no less than $1,903,420.61, exclusive of interest and costs.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Account Stated)

49.    The allegations of Paragraphs 1 through 48 are realleged and incorporated by reference herein.

50.    This cause of action is asserted in this action expressly subject to, and without waiver of, arbitration of any disputes under the Excess-of-Loss Reinsurance Agreements as provided in any arbitration clauses contained in such Excess-of-Loss Reinsurance Agreements. However, there are no apparent disputes between the parties concerning the Excess-of-Loss Reinsurance Agreements with respect to the Agreed Claims, which were instead agreed to by Lloyd's Underwriters, as set forth in Paragraph 33, and sub-Paragraphs 33.1 through 33.97. Lloyd's Underwriters, through Equitas, have explained their failure to pay the Agreed Claims solely on bases other than the Excess-of-Loss Reinsurance Agreements. If, and to the extent, there are, or there are deemed to be, disputes within any arbitration provision of any of the Excess-of-Loss

15

Reinsurance Agreements, B.D. Cooke expressly reserves the right to arbitrate such disputes.

51.     Lloyd's Underwriters have expressly or impliedly agreed to reinsurance billings for reinsurance recoverables due to B.D. Cooke, as Citizens' assignee, thereby establishing an account stated in respect of the Agreed Claims.

WHEREFORE, plaintiff B.D. Cooke demands judgment against the defendants Lloyd's Underwriters as follows:

1.     On plaintiff's First cause of action, a declaration as to the meaning and effect of the Assignment, including without limitation that (A) there is no cap on the amount that B.D. Cooke is entitled to collect under the Assignment; and (B) the Assignment is an assignment and does not constitute a novation of any of the assigned reinsurance agreements;

2.     On plaintiff's Second and Third causes of action, subject to Paragraphs 44 and 50, judgment in the amount of $1,903,420.61, plus the amounts of any other agreed or account-stated claims under the Assignment, plus interest at the applicable rate;

3.     On all causes of action, judgment granting plaintiff costs, disbursements and attorneys' fees in prosecuting this action; and

16

4.    Judgment granting such other and further relief as the Court may deem

just and proper.

Dated:    New York, New York          CHADBOURNE & PARKE LLP
          February 26, 2008

          By_____
                        John F. Finnegan
          Attorneys for Plaintiff
          30 Rockefeller Plaza
          New York, New York  10112
          (212) 408-5100

Carey G. Child
Anne Linder
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 974-5600

          Of Counsel

17

Exhibit A Page 1

## Agency Managers London  Reinsurance Program
Placed through Willis Faber & Dumas - Bert Hogg

| 1952 | ULW4642 | 1st Cas XL  | 23 Nov 1951 to 31 Dec 1952 | US$ 350,000 xs US$ 150,000 |
| 1953 | ULW4642 | 1st Cas XL  | 12 months at 1 Jan 1953    | US$ 350,000 xs US$ 150,000 |
| 1954 | UMW4642 | 1st Cas XL  | 12 months at 1 Jan 1954    | US$ 350,000 xs US$ 150,000 |
| 1955 | UNW4642 | 1st Cas XL  | 12 months at 1 Jan 1955    | US$ 350,000 xs US$ 150,000 |
|      | UNW5261 | 2nd Cas XL  | 23 Sep 1954 to 31 Dec 1955 | US$ 500,000 xs US$ 500,000 |
| 1956 | UPW4642 | 1st Cas XL  | 12 months at 1 Jan 1956    | US$ 350,000 xs US$  50,000 |
|      | UPW5261 | 2nd Cas XL  | 12 months at 1 Jan 1956    | US$ 500,000 xs US$ 500,000 |
|      | UPW5541 | Clash XL    | 12 months at 1 Jan 1956    | US$ 300,000 xs US$  50,000 |
| 1957 | UQW4642 | 1st Cas XL  | 12 months at 1 Jan 1957    | US$ 350,000 xs US$ 150,000 |
|      | UQW5261 | 2nd Cas XL  | 12 months at 1 Jan 1957    | US$ 500,000 xs US$ 500,000 |
|      | UQW5541 | Clash XL    | 12 months at 1 Jan 1957    | US$ 300,000 xs US$ 150,000 |
| 1958 | URW4642 | 1st Cas XL  | 12 months at 1 Jan 1958    | US$ 350,000 xs US$ 150,000 |
|      | URW5261 | 2nd Cas XL  | 12 months at 1 Jan 1958    | US$ 500,000 xs US$ 500,000 |
|      | URW5541 | Clash XL    | 12 months at 1 Jan 1958    | US$ 300,000 xs US$ 150,000 |
| 1959 | USW4642 | 1st Cas XL  | 12 months at 1 Jan 1959    | US$ 350,000 xs US$ 150,000 |
|      | USW5261 | 2nd Cas XL  | 12 months at 1 Jan 1959    | US$ 500,000 xs US$ 500,000 |
|      | USW5541 | Clash XL    | 12 months at 1 Jan 1959    | US$ 300,000 xs US$ 150,000 |
| 1960 | UTW4642 | 1st Cas XL  | 12 months at 1 Jan 1960    | US$ 350,000 xs US$ 150,000 |
|      | UTW5261 | 2nd Cas XL  | 12 months at 1 Jan 1960    | US$ 500,000 xs US$ 500,000 |
|      | UTW5541 | Clash XL    | 12 months at 1 Jan 1960    | US$ 300,000 xs US$ 150,000 |
| 1961 | UUW4642 | 1st Cas XL  | 12 months at 1 Jan 1961    | US$ 350,000 xs US$ 150,000 |
|      | UUW5261 | 2nd Cas XL  | 12 months at 1 Jan 1961    | US$ 500,000 xs US$ 500,000 |
|      | UUW5541 | Clash XL    | 12 months at 1 Jan 1961    | US$ 300,000 xs US$ 150,000 |
| 1962 | UVW4642 | 1st Cas XL  | 12 months at 1 Jan 1962    | US$ 350,000 xs US$ 150,000 |
|      | UVW5261 | 2nd Cas XL  | 12 months at 1 Jan 1962    | US$ 500,000 xs US$ 500,000 |
|      | UVW5541 | Clash XL    | 12 months at 1 Jan 1962    | US$ 300,000 xs US$ 150,000 |
| 1963 | UXW4642 | 1st Cas XL  | 12 months at 1 Jan 1963    | US$ 350,000 xs US$ 150,000 |
|      | UXW5261 | 2nd Cas XL  | 12 months at 1 Jan 1963    | US$ 500,000 xs US$ 500,000 |
|      | UXW5541 | Clash XL    | 12 months at 1 Jan 1963    | US$ 300,000 xs US$ 150,000 |
| 1964 | UYW4642 | 1st Cas XL  | 12 months at 1 Jan 1964    | US$ 350,000 xs US$ 150,000 |
|      | UYW5261 | 2nd Cas XL  | 12 months at 1 Jan 1964    | US$ 500,000 xs US$ 500,000 |
|      | UYW5541 | Clash XL    | 12 months at 1 Jan 1964    | US$ 300,000 xs US$ 150,000 |

Exhibit A Page 2

| Year | Ref | Type | Period | Limit |
|---|---|---|---|---|
| 1965 | UZX4642 | 1st Cas XL | 12 months at 1 Jan 1965 | US$ 350,000 xs US$ 150,000 |
| | UZX5261 | 2nd Cas XL | 12 months at 1 Jan 1965 | US$ 500,000 xs US$ 500,000 |
| | UZX5541 | Clash XL | 12 months at 1 Jan 1965 | US$ 300,000 xs US$ 150,000 |
| 1966 | UAX4642 | 1st Cas XL | 12 months at 1 Jan 1966 | US$ 350,000 xs US$ 150,000 |
| | UAX5261 | 2nd Cas XL | 12 months at 1 Jan 1966 | US$ 500,000 xs US$ 500,000 |
| | UAX5541 | Clash XL | 12 months at 1 Jan 1966 | US$ 300,000 xs US$ 150,000 |
| 1967 | UBX4642 | 1st Cas XL | 12 months at 1 Jan 1967 | US$ 350,000 xs US$ 150,000 |
| | UBX5261 | 2nd Cas XL | 12 months at 1 Jan 1967 | US$ 500,000 xs US$ 500,000 |
| | UBX5541 | Clash XL | 12 months at 1 Jan 1967 | US$ 300,000 xs US$ 150,000 |
| 1968 | UCX4642 | 1st Cas XL | 12 months at 1 Jan 1968 | US$ 350,000 xs US$ 150,000 |
| | UCX5261 | 2nd Cas XL | 12 months at 1 Jan 1968 | US$ 500,000 xs US$ 500,000 |
| | UCX3665 | 3rd Cas XL | 12 months at 1 Jan 1968 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | UCX5541 | Clash XL | 12 months at 1 Jan 1968 | US$ 300,000 xs US$ 150,000 |
| 1969 | UDX4642 | 1st Cas XL | 12 months at 1 Jan 1969 | 80% of US$ 325,000 xs US$ 175,000 |
| | UDX5261 | 2nd Cas XL | 12 months at 1 Jan 1969 | 80% of US$ 500,000 xs US$ 500,000 |
| | UDX3665 | 3rd Cas XL | 12 months at 1 Jan 1969 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | UDX5541 | Clash XL | 12 months at 1 Jan 1969 | US$ 300,000 xs US$ 125,000 |
| 1970 | UEX0018 | 1st Cas XL | 12 months at 1 Jan 1970 extended to 31 Mar 1971 | 80% of US$ 325,000 xs US$ 175,000 |
| | UEX0019 | 2nd Cas XL | 12 months at 1 Jan 1970 extending to 31 Mar 1971 | 80% of US$ 500,000 xs US$ 500,000 |
| | UEX3665 | 3rd Cas XL | 12 months at 1 Jan 1970 extended to 31 Mar 1971 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | UEX5541 | Clash XL | 12 months at 1 Jan 1970 extended to 31 Mar 1971 | US$ 325,000 xs US$ 150,000 |
| 1971 | UFX0397 | 1st Cas XL | 1 Apr 1971 to 31 Dec 1971 | 32.5% of US$ 300,000 xs US$ 200,000 |
| | UFX0398 | 2nd Cas XL | 1 Apr 1971 to 31 Dec 1971 | 50% of US$ 500,000 xs US$ 500,000 |
| | UFX0648 | 3rd Cas XL | 1 Apr 1971 to 31 Dec 1971 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | UFX0399 | Clash XL | 1 Apr 1971 to 31 Dec 1971 | US$ 400,000 xs US$ 200,000 |
| 1972 | UGX0397 | 1st Cas XL | 12 months at 1 Jan 1972 | 32.5% of US$ 300,000 xs US$ 200,000 |
| | UGX0398 | 2nd Cas XL | 12 months at 1 Jan 1972 | 50% of US$ 500,000 xs US$ 500,000 |
| | UGX3665 | 3rd Cas XL | 12 months at 1 Jan 1972 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | UGX0397 | Clash XL | 12 months at 1 Jan 1972 | US$ 400,000 xs US$ 200,000 |
| 1973 | UHX0552 | 2nd XL RJI | 12 months at 1 Jan 1973 | 7.5% of US$ 4,000,000 xs US$ 1,000,000 |
| 1974 | UIX0552 | 2nd XL RJI | 12 months at 1 Jan 1974 | 8.5% of US$ 4,000,000 xs US$ 1,000,000 |
| 1975 | UKX0753 | 1st Cas XL | 12 months at 1 Jan 1975 | 13.87% of US$ 250,000 xs US$ 250,000 |
| | UKX0754 | 2nd Cas XL | 12 months at 1 Jan 1975 | 58.33% of US$ 1,000,000 xs US$ 500,000 |
| | UKX0755 | 3rd Cas XL | 12 months at 1 Jan 1975 | 65% of US$ 2,500,000 xs US$ 2,500,000 |
| | UKX0753 | Clash XL | 12 months at 1 Jan 1975 | 13.83% of US$ 250,000 xs US$ 250,000 |

**Exhibit 2**

MOUND COTTON WOLLAN & GREENGRASS

COUNSELLORS AT LAW

ONE BATTERY PARK PLAZA
NEW YORK, NY 10004-1486
————

NEW YORK, NY
NEWARK, NJ
GARDEN CITY, NY
SAN FRANCISCO, CA
FORT LAUDERDALE, FL

James D. Veach
212-804-4233
jveach@moundcotton.com

(212) 804-4200

FAX: (212) 344-8066

WWW.MOUNDCOTTON.COM

April 4, 2008

**Via E-Mail, Federal Express, and**
**Certified Mail -- Return Receipt Requested**

Carey G. Child, Esq.
Chadbourne & Parke LLP
1200 New Hampshire Avenue, NW
Washington, DC 20036

Re:     B.D. Cooke v. Certain Underwriters at Lloyd's, London
          Excess of Loss Casualty Retrocession Contracts
          <u>Our File Number: 3038.001</u>

Dear Mr. Child:

As you know, we represent Certain Underwriters at Lloyd's, London (Underwriters) with respect to various excess of loss casualty retrocession contracts identified in Schedule "A" annexed to a verified complaint filed by B.D. Cooke & Partners Limited (Cooke) in the Supreme Court, New York County, on February 26, 2008. A copy of the complaint and accompanying summons appears under Tab 1. We know from our conversations that your firm represents Cooke.

Pursuant to the agreements to arbitrate contained in the retrocession contracts, Underwriters demands that the claims and demands set forth in the complaint be submitted to a court of arbitration sitting in New York, New York. Underwriters reserves the right to supplement this arbitration demand to address additional disputes "arising under" the retrocession contracts, including whether:

- B. D. Cooke and Lloyd's commuted the retrocession contracts pursuant to a commutation agreement executed in February 2002;

- balances identified in the complaint, ¶33, come within the terms of a 1997 assignment of certain excess of loss casualty retrocession contracts from the Liquidator of Citizens Casualty Insurance Company, an insurer whose corporate charter was dissolved and which no longer exists, to Cooke;

MOUND COTTON WOLLAN & GREENGRASS

Carey G. Child, Esq.
April 4, 2008
Page 2

- specific losses identified in the Complaint, ¶33, come within the coverage provided by the retrocession contracts; and

- declaratory relief with respect to any future losses or claims should be granted.

Underwriters will seek from the court of arbitration an order:

1.  giving Underwriters access to all books and records maintained by Cooke and its agents, including, but not limited to, ROM Reinsurance Management Company, Inc. (ROM) relating to losses purportedly subject to the assignment including, but not limited to, those claims identified in paragraph 33 of the annexed complaint, Tab 1;

2.  providing that the 2002 commutation agreement extinguished any obligation to indemnify assignee Cooke;

3.  directing that B.D. Cooke reimburse Lloyd's for any losses that Lloyd's has paid to date in error; and

4.  awarding Underwriters the expenses and costs of the arbitration including Underwriters attorneys' fees.

The instant demand does not constitute an admission of coverage or a waiver of any rights with respect to the claims identified in the complaint, ¶33, or an admission of coverage or a waiver of any rights with respect to the contracts identified in schedule "A" annexed to the complaint.

Underwriters requests that Cooke choose its arbiter. If Cooke fails to choose its arbiter within sixty days, Underwriters will exercise its right to choose two arbiters who will in turn choose an umpire.

Please forward all future communications with respect to this arbitration to the undersigned.

Very truly yours,

*[signature]*

cc: John R. Finnegan, Esq.

Attachment

# TAB 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B.D. COOKE & PARTNERS LIMITED, as Assignee of          Index No.
Citizens Casualty Company of New York (in liquidation)

                        Plaintiff(s),

              - against -                               **Summons**

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON

                                            Date Index No. Purchased:   February 26, 2008

                        Defendant(s).
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       To the above named Defendant(s)
          CERTAIN UNDERWRITERS AT LLOYD'S, LONDON
          c/o RESOLUTE MANAGEMENT SERVICES LIMITED
          33 St. Mary Axe, London, EC3A 8LL, United Kingdom

       You are hereby summoned to answer the complaint in this action and to serve
a copy of your answer, or, if the complaint is not served with this summons, to serve
a notice of appearance, on the Plaintiff's attorney within 20 days after the service of
this summons, exclusive of the day of service (or within 30 days after the service is
complete if this summons is not personally delivered to you within the State of New
York); and in case of your failure to appear or answer, judgment will be taken against
you by default for the relief demanded in the complaint.

       The basis of venue is residence of Plaintiff's assignor at the time of the assignment
which is 123 William Street, New York, New York; Plaintiff's designation.

Dated: New York, New York

       February 26, 2008

                              CHADBOURNE & PARKE LLP

                              by _____
                                   John E. Finnegan
                              **Attorneys for Plaintiff**
                              B.D. COOKE & PARTNERS LIMITED, as
                              Assignee of Citizens Casualty Company of New
                              York (in liquidation)

                              30 Rockefeller Plaza
                              New York, New York 10112
                              212-408-5100

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

B.D. COOKE & PARTNERS LIMITED, AS
ASSIGNEE OF CITIZENS CASUALTY COMPANY
OF NEW YORK (IN LIQUIDATION),                    Index No.

                        Plaintiff,               **VERIFIED COMPLAINT**

            -against-

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON,

                        Defendants.

Plaintiff, by its attorneys, CHADBOURNE & PARKE LLP, for its complaint

alleges:

## NATURE OF THE ACTION

1.      Plaintiff B.D. Cooke & Partners Limited ("B.D. Cooke") brings this

action as the assignee of the liquidator of Citizens Casualty Company of New York

("Citizens") against defendants Certain Underwriters at Lloyd's, London ("Lloyd's

Underwriters"), who are reinsurers under reinsurance agreements assigned to

B.D. Cooke by the liquidator of Citizens.

2.      B.D. Cooke seeks declaratory relief and money damages in respect of

reinsurance claims that have been agreed to by Lloyd's Underwriters, but which they

refuse to pay based on their assertion that the assignment is subject to a "cap" on the

amount recoverable.  This Court approved that assignment, and retained jurisdiction to

resolve disputes concerning the assignment. In that regard, this Court has previously

rejected another reinsurer's argument that the same assignment was subject to a cap.

## PARTIES, PERSONAL JURISDICTION, AND VENUE

3.    Plaintiff B.D. Cooke is a corporation organized and existing under the

laws of the United Kingdom, having its registered address at 2 Knoll Rise, Orpington,

Kent, England.

4.    Plaintiff's assignor, the liquidator of Citizens, through the New York

Liquidation Bureau, had, at the time of the assignment, its principal office and its

facilities involved therein within New York County at 123 William Street, New York,

New York.

5.    Defendants Lloyd's Underwriters are those underwriters at Lloyd's of

London that, through one or more syndicates of such underwriters, variously participated

as reinsurers in one or more of the excess-of-loss reinsurance contracts listed in

Exhibit A (the "Excess-of-Loss Reinsurance Agreements"). Upon information and

belief, the syndicates operated in London with the individual underwriter members

domiciled in many places throughout the world, possibly including various states within

the United States.

6.    Upon information and belief, Lloyd's Underwriters, by their participation

in one or more of the Excess-of-Loss Reinsurance Agreements, contracted to provide

reinsurance to one or more members of a reinsurance pool (the "Agency Managers

Pool"), specifically including contracting to provide reinsurance to Citizens. Upon

information and belief, the Agency Managers Pool was operated in New York County

2

by Agency Managers, Limited, a/k/a Agency Managers, Incorporated ("Agency

Managers").  Agency Managers was a New York corporation with its principal place of

business in New York County.  Citizens also was a New York corporation with its

principal place of business in New York County.

      7.      Upon information and belief, the Excess-of-Loss Reinsurance

Agreements each contain a contractual provision consenting to jurisdiction and service

of process in the following, or substantially similar, language:

> It is agreed that in the event of the failure of the Reinsurers to
> pay any amount claimed to be due hereunder, the Reinsurers at
> the request of the Reassured, will submit to the jurisdiction of
> any Court of competent jurisdiction within the United States
> and will comply with all requirements necessary to give such
> Court jurisdiction and all matters arising hereunder shall be
> determined in accordance with the law and practice of such
> Court.  It is further agreed that service of process in such suit
> may be made upon Mendes and Mount, 27 William Street,
> New York, New York 10005, or their nominee or nominees,
> and that in any suit instituted against any one of them upon
> this Contract, the Reinsurers will abide by the final decision of
> such Court or of any Appellate Court in the event of an appeal.

## RELATED ACTONS

      8.      By an order dated June 17, 1971, in Index No. 40357/71, re-captioned *In

Re the Liquidation of Citizens Casualty Co. of New York*, (the "Liquidation

Proceeding"), this Court, among other things:  (A) placed Citizens into liquidation; (B)

appointed the Superintendent of Insurance of the State of New York as liquidator (the

"Liquidator"); (C) granted the Liquidator authority to take possession of Citizens'

property and liquidate its business and affairs; and (D) vested the Liquidator with title to

all property, contracts and rights of action of Citizens.

3

9.    In an order dated March 6, 1997, this Court (Justice Greenfield), in the Liquidation Proceeding, approved a petition and plan by the Liquidator for early closure of the Citizens estate. That order specifically approved the assignment at issue in this action. In addition, the petition and plan approved by this Court's order also provided that "the Supreme Court of the State of New York, New York County, shall have continuing jurisdiction over any disputes concerning the assignments and transfers described above and their effect, except said Court shall not resolve disputes solely involving computations of amounts due thereunder."

10.    In *B.D. Cooke & Partners Limited, As Assignee of Citizens Cas. Co. of New York v. Nationwide Mutual Ins. Co.*, Index No. 600655/02 (the "Nationwide Action"), this Court resolved such a dispute concerning the assignment at issue in this action. In a memorandum decision and order dated October 6, 2003, this Court (Justice Lowe), *inter alia*, rejected on summary judgment the contention by Nationwide Mutual Insurance Company ("Nationwide"), another reinsurer of Citizens, that the assignment was capped, and held that B.D. Cooke was entitled to collect as assignee under the assignment. *Id., slip op. at 6, 7, 13* In pertinent part, that decision was upheld on appeal to the First Department of the Appellate Division. 16 A.D.3d 208, 791 N.Y.S.2d 103 (Mar. 15, 2005).

## FACTS COMMON TO ALL CAUSES OF ACTIONS

### Citizens Was A Member Of The Agency Managers Pool

11.    Upon information and belief, Agency Managers operated and managed the reinsurance pool known as the Agency Managers Pool. Certain insurance and

4

reinsurance companies agreed to participate in the Agency Managers Pool as pool members, with each pool member agreeing to assume a percentage interest in all reinsurance business written by Agency Managers on behalf of the Agency Managers Pool.

12.     Upon information and belief, Agency Managers operated the Agency Managers Pool from at least the early 1950s until 1988, when Agency Managers filed a bankruptcy petition.  Agency Managers was succeeded in the administration of the Agency Managers Pool by ROM Reinsurance Management Co., Inc. ("ROM").

13.     Upon information and belief, Citizens was a member of the Agency Managers Pool and entered into a Memorandum of Agreement with Agency Managers effective on or about July 1, 1950 (the "Citizens Memorandum").  Among other things, under the Citizens' Memorandum, Citizens appointed Agency Managers as "agent for and in [Citizens'] behalf in the procuring, underwriting and servicing of policies, contracts and/or treaties of casualty reinsurance business in the United States."

**As A Member Of The Agency Managers Pool,**
**Citizens Reinsured The B.D. Cooke Pool**

14.     B.D. Cooke is the current manager of a pool of U.K. insurers formerly managed by Underwriting Management Agency Ltd. and C.F.&A.U. Ltd. (the "B.D. Cooke Pool"), and led by The Dominion Insurance Company Limited ("Dominion").

15.     The B.D. Cooke Pool, led by Dominion, obtained reinsurance from the Agency Managers Pool, including reinsurance whereby Citizens reinsured Dominion and the B.D. Cooke Pool.

5

**Defendants Lloyd's Underwriters Then Reinsured Citizens**

16.    Upon information and belief, Agency Managers procured reinsurance for the benefit of Citizens in respect of the reinsurance obligations that Citizens owed to Dominion, the B.D. Cooke Pool, and others.

17.    Upon information and belief, the reinsurance procured by Agency Managers for the benefit of Citizens included reinsurance known as "Inter-Office Reinsurance" obtained from other members of the Agency Managers Pool such as Nationwide, as well as excess-of-loss reinsurance procured from external reinsurers, such as Lloyd's Underwriters under various of the Excess-of-Loss Reinsurance Agreements.

**Upon The Insolvency Of Citizens, The Liquidator Is Vested With Title To The Excess-of-Loss Reinsurance Agreements**

18.    As set forth above, on or about June 17, 1971, Citizens was declared insolvent and placed under the control of the Liquidator, who continued to administer the estate of Citizens until at least 1997, under the supervision of this Court in the Liquidation Proceeding.

19.    By virtue of Citizens' reinsurance of Dominion and the B.D. Cooke Pool, Dominion was a net creditor of the Citizens estate.

20.    This Court's order of liquidation vested the Liquidator with title to all of the property, contracts and rights of action of Citizens.

21.    Upon information and belief, the Liquidator gave notice to Citizens' reinsurers, including Lloyd's Underwriters, of the Liquidation Proceeding and that the

6

Liquidator had been vested by this Court with title to all of the property, contracts and rights of action of Citizens, including their reinsurance of Citizens.

**The Liquidator's Petition In The Liquidation Proceeding**

22.    In a Petition (the "Petition") sworn to on October 11, 1996 and submitted to this Court in the Liquidation Proceeding, the Liquidator stated that Dominion was the largest creditor of the Citizens estate, including on account of claims that the Liquidator determined would take years to resolve.

23.    With the express purpose of expediting the closing of the Citizens estate, the Liquidator's Petition sought this Court's approval to assign the Liquidator's rights under Citizens' reinsurance agreements to B.D. Cooke in exchange for concessions regarding Dominion's claims against the Citizens estate.

24.    Upon information and belief, Lloyd's Underwriters were given notice of the Petition.

25.    Upon information and belief, Mendes & Mount, attorneys for Lloyd's Underwriters, attended the hearing held by this Court concerning the Petition.

26.    Upon information and belief, Lloyd's Underwriters did not object to the Petition or the Liquidator's plan set forth therein.

**The Assignment Approved By This Court**

27.    In an order dated March 6, 1997 (the "Approval Order"), this Court, in the Liquidation Proceeding, approved the Petition and the Liquidator's plan set forth therein.

7

28.     Pursuant to the Petition and Approval Order, the Liquidator entered into an assignment to B.D. Cooke (the "Assignment") of certain of the Liquidator's rights under Citizens' reinsurance contracts, including the Inter-Office Reinsurance and the Excess-of-Loss Reinsurance Agreements.

29.     Among other things, the Assignment transfers to B.D. Cooke all of the Liquidator's "right, title, and interest in and to":

(a)     All reinsurance Recoverables and Excess of Loss Recoverables due Assignor according to his accounts as of June 30, 1994 and uncollected by Assignor or for Assignor's account by June 30, 1995; notwithstanding the foregoing, any Reinsurance Recoverables due from Citizens as an Agency Managers Pool member to Citizens as a Cedent are not being assigned hereunder.

(b)     All Reinsurance Agreements and Excess of Loss Agreements running in favor of Citizens or the Liquidator of Citizens effective as from July 1, 1994 except to the extent that Assignor has exercised any rights thereunder prior to February 11, 1997, together with all of the rights which Assignor would have had under such agreements if the Citizens estate were not closed pursuant to the Assignor's Plan for the closing of the Citizens' liquidation.

(c)     Effective upon the entry of a final nonappealable order approving the Final Audit and Accounting of Citizens, all other reinsurance recoverables due Citizens not arising out of the business of the AM Pool, together with all reinsurance assets and rights of recovery under reinsurance agreements of Citizens (including, without limitation on the foregoing, those reinsurances which may not have been specifically identified as of February 11, 1997).

30.     In exchange for the Assignment, and in reliance upon the Petition and this Court's Approval Order. Dominion made concessions regarding Dominion's claims against the Citizens estate that permitted final distributions from, and closure of, the Citizens estate.

8

**Lloyd's Underwriters Failure To Pay Agreed Claims Under The Assignment**

31.    Upon information and belief, claims under the Excess-of-Loss Reinsurance Agreements have been handled for Lloyd's Underwriters by Equitas Management Services Limited n/k/a Resolute Management Services Limited ("Equitas") and have been presented to Equitas by ROM, as successor to Agency Managers.

32.    Upon information and belief, Equitas has signified its agreement to claims by providing an Equitas signing number.

33.    Upon information and belief, the claims agreed by Equitas include the following claims set forth in sub-Paragraphs 33.1 through 33.97 (the "Agreed Claims"):

| | Claim | | Agreement By Equitas | | Amount Owed Under Assignment |
|---|---|---|---|---|---|
| | Insured/Loss | ROM's Ref. # | Signing # | Date | |
| 33.1 | Dana Corporation | A135 | 90173 | 31 Mar 2005 | $21,591.30 |
| 33.2 | Dana Corporation | B022 | 90176 | 31 Mar 2005 | $3,135.18 |
| 33.3 | Ciba Geigy | X021 | 90092 | 15 Apr 2005 | $83,742.06 |
| 33.4 | Foster Wheeler | U003 | 90163 | 27 Mar 2006 | $71,613.46 |
| 33.5 | Foster Wheeler | U003 | 90173 | 27 Mar 2006 | $6,575.46 |
| 33.6 | Foster Wheeler | V004 | 90187 | 27 Mar 2006 | $(4,315.41) |
| 33.7 | Foster Wheeler | V004 | 90200 | 27 Mar 2006 | $(18,771.45) |
| 33.8 | Foster Wheeler | W007 | 90224 | 27 Mar 2006 | $(22,907.83) |
| 33.9 | Foster Wheeler | W007 | 90239 | 27 Mar 2006 | $(10,035.80) |
| 33.10 | Foster Wheeler | X006 | 90035 | 28 Mar 2006 | $(7,502.20) |
| 33.11 | Foster Wheeler | X006 | 90041 | 28 Mar 2006 | $(15,205.48) |
| 33.12 | Foster Wheeler | Y005 | 90063 | 29 Mar 2006 | $(8,280.92) |
| 33.13 | Foster Wheeler | Y005 | 90103 | 28 Mar 2006 | $(20,274.62) |
| 33.14 | Foster Wheeler | E022 | 90080 | 28 Mar 2006 | $13,989.48 |
| 33.15 | Kaiser Aluminium | V016 | 90203 | 28 Jun 2006 | $6,916.05 |
| 33.16 | Kaiser Aluminium | V016 | 90210 | 28 Jun 2006 | $582.35 |
| 33.17 | Kaiser Aluminium | W020 | 90206 | 28 Jun 2006 | $5,830.31 |
| 33.18 | Kaiser Aluminium | W020 | 90215 | 28 Jun 2006 | $562.54 |
| 33.19 | Goodyear Tire | T020 | 90026 | 20 Sep 2006 | $75,865.99 |

| | Claim | | Agreement By Equitas | | Amount |
| | Insured/Loss | ROM's Ref. # | Signing # | Date | Owed Under Assignment |
|---|---|---|---|---|---|
| 33.20 | Goodyear Tire | U019 | 90037 | 20 Sep 2006 | $77,733.57 |
| 33.21 | Goodyear Tire | V023 | 90044 | 20 Sep 2006 | $79,554.14 |
| 33.22 | Goodyear Tire | W033 | 90048 | 20 Sep 2006 | $84,152.26 |
| 33.23 | Goodyear Tire | X039 | 90059 | 20 Sep 2006 | $77,013.15 |
| 33.24 | Goodyear Tire | Y037 | 90085 | 20 Sep 2006 | $57,411.32 |
| 33.25 | Dana Corporation | A135 | 90018 | 22 Sep 2006 | $30,551.64 |
| 33.26 | Dana Corporation | B022 | 90032 | 22 Sep 2006 | $30,030.45 |
| 33.27 | Dana Corporation | C026 | 90058 | 25 Sep 2006 | $5,987.80 |
| 33.28 | Dana Corporation | D010 | 90061 | 22 Sep 2006 | $5,473.01 |
| 33.29 | Dana Corporation | E018 | 90084 | 22 Sep 2006 | $10,861.71 |
| 33.30 | Kaiser Aluminium | V016 | 90049 | 22 Sep 2006 | $2,573.55 |
| 33.31 | Kaiser Aluminium | V016 | 90192 | 21 Sep 2006 | $7,743.89 |
| 33.32 | Kaiser Aluminium | W020 | 90016 | 22 Sep 2006 | $108.85 |
| 33.33 | Kaiser Aluminium | W020 | 90186 | 21 Sep 2006 | $12,811.19 |
| 33.34 | Kaiser Aluminium | X017 | 90123 | 21 Sep 2006 | $58,945.74 |
| 33.35 | Kaiser Aluminium | Y016 | 90128 | 21 Sep 2006 | $58,119.52 |
| 33.36 | Kaiser Aluminium | A134 | 90153 | 21 Sep 2006 | $48,423.33 |
| 33.37 | Kaiser Aluminium | B021 | 90166 | 21 Sep 2006 | $34,717.17 |
| 33.38 | Kaiser Aluminium | C022 | 90175 | 21 Sep 2006 | $34,298.38 |
| 33.39 | Kaiser Aluminium | D025 | 90185 | 21 Sep 2006 | $17,187.22 |
| 33.40 | Kaiser Aluminium | E028 | 90100 | 21 Sep 2006 | $44,685.06 |
| 33.41 | B.F. Goodrich | C034 | 90015 | 09 Nov 2006 | $21,637.75 |
| 33.42 | B.F. Goodrich | D033 | 90029 | 09 Nov 2006 | $10,714.46 |
| 33.43 | B.F. Goodrich | E042 | 90037 | 09 Nov 2006 | $15,104.19 |
| 33.44 | Union Carbide | X027 | 90130 | 16 Nov 2006 | $(4,642.38) |
| 33.45 | Union Carbide | X027 | 90138 | 16 Nov 2006 | $(677.42) |
| 33.46 | Union Carbide | Y026 | 90149 | 16 Nov 2006 | $(3,782.37) |
| 33.47 | Union Carbide | Y026 | 90156 | 16 Nov 2006 | $(479.91) |
| 33.48 | Union Carbide | Z013 | 90002 | 17 Nov 2006 | $(4,027.83) |

| | Claim | | Agreement By Equitas | | Amount Owed Under Assignment |
| | Insured/Loss | ROM's Ref. # | Signing # | Date | |
|---|---|---|---|---|---|
| 33.49 | Union Carbide | Z013 | 90008 | 17 Nov 2006 | $(394.65) |
| 33.50 | Dana Corporation | A135 | 90194 | 13 Dec 2006 | $3,517.28 |
| 33.51 | Dana Corporation | B022 | 90251 | 14 Dec 2006 | $3,407.43 |
| 33.52 | Dana Corporation | C026 | 90269 | 14 Dec 2006 | $1,632.81 |
| 33.53 | Dana Corporation | D010 | 90311 | 14 Dec 2006 | $31.14 |
| 33.54 | Dana Corporation | E018 | 90339 | 14 Dec 2006 | $55.65 |
| 33.55 | Kaiser Aluminium | V016 | 90135 | 07 Dec 2006 | $628.53 |
| 33.56 | Kaiser Aluminium | V016 | 90139 | 07 Dec 2006 | $7,652.76 |
| 33.57 | Kaiser Aluminium | W020 | 90148 | 07 Dec 2006 | $(1,374.63) |
| 33.58 | Kaiser Aluminium | W020 | 90153 | 07 Dec 2006 | $12,381.92 |
| 33.59 | Kaiser Aluminium | X017 | 90160 | 07 Dec 2006 | $50,622.68 |
| 33.60 | Kaiser Aluminium | X017 | 90170 | 07 Dec 2006 | $25,731.18 |
| 33.61 | Kaiser Aluminium | Y016 | 90177 | 07 Dec 2006 | $49,393.65 |
| 33.62 | Kaiser Aluminium | Y016 | 90184 | 07 Dec 2006 | $26,152.05 |
| 33.63 | Kaiser Aluminium | A134 | 90193 | 07 Dec 2006 | $41,554.60 |
| 33.64 | Kaiser Aluminium | A134 | 90205 | 07 Dec 2006 | $22,858.41 |
| 33.65 | Kaiser Aluminium | B021 | 90217 | 07 Dec 2006 | $51,061.52 |
| 33.66 | Kaiser Aluminium | B021 | 90226 | 07 Dec 2006 | $10,403.46 |
| 33.67 | Kaiser Aluminium | C022 | 90233 | 07 Dec 2006 | $50,767.05 |
| 33.68 | Kaiser Aluminium | C022 | 90239 | 07 Dec 2006 | $11,261.36 |
| 33.69 | Kaiser Aluminium | C025 | 90060 | 12 Dec 2006 | $13,381.73 |
| 33.70 | Kaiser Aluminium | D025 | 90248 | 07 Dec 2006 | $25,130.81 |
| 33.71 | Kaiser Aluminium | D025 | 90088 | 08 Dec 2006 | $5,722.39 |

| | Claim | | Agreement By Equitas | | Amount |
|---|---|---|---|---|---|
| | Insured/Loss | ROM's Ref. # | Signing # | Date | Owed Under Assignment |
| 33.72 | Kaiser Aluminium | E028 | 90096 | 08 Dec 2006 | $18,790.47 |
| 33.73 | Kaiser Aluminium | E028 | 90044 | 08 Dec 2006 | $34,476.33 |
| 33.74 | Goodyear Tire | T020 | 90027 | 29 Jan 2007 | $14,176.94 |
| 33.75 | Goodyear Tire | U019 | 90031 | 29 Jan 2007 | $14,532.53 |
| 33.76 | Goodyear Tire | V023 | 90035 | 29 Jan 2007 | $14,873.24 |
| 33.77 | Goodyear Tire | W033 | 90043 | 29 Jan 2007 | $25,170.63 |
| 33.78 | Goodyear Tire | X039 | 90066 | 29 Jan 2007 | $18,456.72 |
| 33.79 | Goodyear Tire | Y037 | 90015 | 30 Jan 2007 | $17,119.46 |
| 33.80 | Goodyear Tire | T020 | 90224 | 20 Apr 2007 | $13,009.48 |
| 33.81 | Goodyear Tire | U019 | 90111 | 23 Apr 2007 | $13,204.11 |
| 33.82 | Goodyear Tire | V023 | 90120 | 23 Apr 2007 | $13,397.89 |
| 33.83 | Minnesota Minning | X022 | 90012 | 30 Jul 2007 | $95,696.05 |
| 33.84 | Minnesota Minning | Y025 | 90024 | 30 Jul 2007 | $75,250.51 |
| 33.85 | American Cyanamid | Λ083 | 90070 | 07 Aug 2007 | $16,211.00 |
| 33.86 | Union Carbide | X013 | 90046 | 08 Oct 2007 | $11,630.73 |
| 33.87 | Minnesota Minning | X022 | 90053 | 08 Oct 2007 | $11,442.86 |
| 33.88 | Minnesota Minning | Y025 | 90060 | 08 Oct 2007 | $8,823.14 |
| 33.89 | Hercules | Λ136 | 90046 | 04 Dec 2007 | $14,299.70 |
| 33.90 | Hercules | B024 | 90053 | 04 Dec 2007 | $14,281.33 |
| 33.91 | Hercules | C028 | 90058 | 04 Dec 2007 | $14,275.22 |
| 33.92 | Hercules | E039 | 90064 | 04 Dec 2007 | $9,957.28 |
| 33.93 | Georgia Pacific | W026 | 90036 | 04 Dec 2007 | $10,274.47 |
| 33.94 | Georgia Pacific | X032 | 90042 | 04 Dec 2007 | $7,298.18 |
| 33.95 | Dresser Industries | W031 | 90119 | 05 Dec 2007 | $3,534.41 |
| 33.96 | Dresser Industries | X037 | 90112 | 05 Dec 2007 | $3,181.62 |
| 33.97 | Dresser Industries | Y034 | 90128 | 05 Dec 2007 | $3,137.27 |
| | | | | Total | $1,903,420.61 |

34.    Despite demand, Lloyd's Underwriters have failed to pay to B.D. Cooke reinsurance recoverables due to B.D. Cooke, as Citizens' assignee, in respect of the Agreed Claims.

12

35.     The amount now due from Lloyd's Underwriters in respect of the Agreed Claims is no less than $1,903,420.61, exclusive of interest and costs.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Declaratory Relief)

36.     The allegations of Paragraphs 1 through 35 are realleged and incorporated by reference herein.

37.     Lloyd's Underwriters, through Equitas, have premised their refusal to pay amounts due to B.D. Cooke under the Assignment in respect of the Agreed Claims upon their contention that the Assignment caps the amount that can be recovered by B.D. Cooke.

38.     Lloyd's Underwriters, through Equitas, have also asserted that the Assignment constitutes a novation of the Excess-of-Loss Reinsurance Agreements and that such novation purportedly means that Lloyd's Underwriters are relieved of liability by virtue of a separate agreement not at issue in this action.

39.     The Lloyd's Underwriters' interpretations of the Assignment referenced in Paragraphs 37 and 38 are contrary to the terms of the Assignment, the Petition and this Court's Approval Order, and contrary to this Court's decisions on summary judgment in the Nationwide Action against Lloyd's Underwriters' fellow reinsurer.

40.     As a result of the events described herein, an actual, ripe controversy of a justiciable nature presently exists between B.D. Cooke and Lloyd's Underwriters concerning the meaning and effect of Assignment, including with respect to past, present, and future amounts due to B.D. Cooke under the Assignment.

13

41.    B.D. Cooke and Lloyd's Underwriters have adverse legal interests in regard to the meaning and effect of the Assignment.

42.    The controversy is of sufficient immediacy as to justify the entry of a declaratory judgment.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract)

43.    The allegations of Paragraphs 1 through 42 are realleged and incorporated by reference herein.

44.    This cause of action is asserted in this action expressly subject to, and without waiver of, arbitration of any disputes under the Excess-of-Loss Reinsurance Agreements as provided in any arbitration clauses contained in such Excess-of-Loss Reinsurance Agreements. However, there are no apparent disputes between the parties concerning the Excess-of-Loss Reinsurance Agreements with respect to the Agreed Claims, which were instead agreed to by Lloyd's Underwriters, as set forth in Paragraph 33, and sub-Paragraphs 33.1 through 33.97. Lloyd's Underwriters, through Equitas, have explained their failure to pay the Agreed Claims solely on bases other than the Excess-of-Loss Reinsurance Agreements. If, and to the extent, there are, or there are deemed to be, disputes within any arbitration provision of any of the Excess-of-Loss Reinsurance Agreements, B.D. Cooke expressly reserves the right to arbitrate such disputes.

45.    Lloyd's Underwriters entered into the Excess-of-Loss Reinsurance Agreements, whereby they reinsured Citizens.

14

46.    All relevant rights of Citizens under the Excess-of-Loss Reinsurance Agreements were vested in the Liquidator, and assigned by the Liquidator to B.D. Cooke.

47.    Despite demand, Lloyd's Underwriters have not paid B.D. Cooke in respect of the Agreed Claims and, in failing to do so, have breached their contractual obligations to B.D. Cooke, as assignee, un der the Excess-of-Loss Reinsurance Agreements.

48.    By reason of the foregoing, B.D. Cooke has been damaged in an amount no less than $1,903,420.61, exclusive of interest and costs.

### AS AND FOR A THIRD CAUSE OF ACTION
### (Account Stated)

49.    The allegations of Paragraphs 1 through 48 are realleged and incorporated by reference herein.

50.    This cause of action is asserted in this action expressly subject to, and without waiver of, arbitration of any disputes under the Excess-of-Loss Reinsurance Agreements as provided in any arbitration clauses contained in such Excess-of-Loss Reinsurance Agreements. However, there are no apparent disputes between the parties concerning the Excess-of-Loss Reinsurance Agreements with respect to the Agreed Claims, which were instead agreed to by Lloyd's Underwriters, as set forth in Paragraph 33, and sub-Paragraphs 33.1 through 33.97. Lloyd's Underwriters, through Equitas, have explained their failure to pay the Agreed Claims solely on bases other than the Excess-of-Loss Reinsurance Agreements. If, and to the extent, there are, or there are deemed to be, disputes within any arbitration provision of any of the Excess-of-Loss

15

Reinsurance Agreements, B.D. Cooke expressly reserves the right to arbitrate such disputes.

51.    Lloyd's Underwriters have expressly or impliedly agreed to reinsurance billings for reinsurance recoverables due to B.D. Cooke, as Citizens' assignee, thereby establishing an account stated in respect of the Agreed Claims.

WHEREFORE, plaintiff B.D. Cooke demands judgment against the defendants Lloyd's Underwriters as follows:

1.    On plaintiff's First cause of action, a declaration as to the meaning and effect of the Assignment, including without limitation that (A) there is no cap on the amount that B.D. Cooke is entitled to collect under the Assignment; and (B) the Assignment is an assignment and does not constitute a novation of any of the assigned reinsurance agreements;

2.    On plaintiff's Second and Third causes of action, subject to Paragraphs 44 and 50, judgment in the amount of $1,903,420.61, plus the amounts of any other agreed or account-stated claims under the Assignment, plus interest at the applicable rate;

3.    On all causes of action, judgment granting plaintiff costs, disbursements and attorneys' fees in prosecuting this action; and

16

4.     Judgment granting such other and further relief as the Court may deem

just and proper.

Dated:     New York, New York
           February 26, 2008

CHADBOURNE & PARKE LLP

By _____
              John F. Finnegan
      Attorneys for Plaintiff
      30 Rockefeller Plaza
      New York, New York  10112
      (212) 408-5100

Carey G. Child
Anne Linder
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 974-5600

          Of Counsel

17

Exhibit A Page 1

## Agency Managers London Reinsurance Program

Placed through Willis Faber & Dumas, Item Dogg)

| | | | |
|---|---|---|---|
| 1952  ULW4642 | 1st Cas XL | 23 Nov 1951 to 31 Dec 1952 | US$ 350,000 xs US$ 150,000 |
| 1953  ULW4642 | 1st Cas XL | 12 months at 1 Jan 1953 | US$ 350,000 xs US$ 150,000 |
| 1954  UMW4642 | 1st Cas XL | 12 months at 1 Jan 1954 | US$ 350,000 xs US$ 150,000 |
| 1955  UNW4642 | 1st Cas XL | 12 months at 1 Jan 1955 | US$ 350,000 xs US$ 150,000 |
|        UNW5261 | 2nd Cas XL | 23 Sep 1954 to 31 Dec 1955 | US$ 500,000 xs US$ 500,000 |
| 1956  UPW4642 | 1st Cas XL | 12 months at 1 Jan 1956 | US$ 350,000 xs US$ 50,000 |
|        UPW5261 | 2nd Cas XL | 12 months at 1 Jan 1956 | US$ 500,000 xs US$ 500,000 |
|        UPW5541 | Clash XL | 12 months at 1 Jan 1956 | US$ 300,000 xs US$ 50,000 |
| 1957  UQW4642 | 1st Cas XL | 12 months at 1 Jan 1957 | US$ 350,000 xs US$ 150,000 |
|        UQW5261 | 2nd Cas XL | 12 months at 1 Jan 1957 | US$ 500,000 xs US$ 500,000 |
|        UQW5541 | Clash XL | 12 months at 1 Jan 1957 | US$ 300,000 xs US$ 150,000 |
| 1958  URW4642 | 1st Cas XL | 12 months at 1 Jan 1958 | US$ 350,000 xs US$ 150,000 |
|        URW5261 | 2nd Cas XL | 12 months at 1 Jan 1958 | US$ 500,000 xs US$ 500,000 |
|        URW5541 | Clash XL | 12 months at 1 Jan 1958 | US$ 300,000 xs US$ 150,000 |
| 1959  USW4642 | 1st Cas XL | 12 months at 1 Jan 1959 | US$ 350,000 xs US$ 150,000 |
|        USW5261 | 2nd Cas XL | 12 months at 1 Jan 1959 | US$ 500,000 xs US$ 500,000 |
|        USW5541 | Clash XL | 12 months at 1 Jan 1959 | US$ 300,000 xs US$ 150,000 |
| 1960  UTW4642 | 1st Cas XL | 12 months at 1 Jan 1960 | US$ 350,000 xs US$ 150,000 |
|        UTW5261 | 2nd Cas XL | 12 months at 1 Jan 1960 | US$ 500,000 xs US$ 500,000 |
|        UTW5541 | Clash XL | 12 months at 1 Jan 1960 | US$ 300,000 xs US$ 150,000 |
| 1961  UUW4642 | 1st Cas XL | 12 months at 1 Jan 1961 | US$ 350,000 xs US$ 150,000 |
|        UUW5261 | 2nd Cas XL | 12 months at 1 Jan 1961 | US$ 500,000 xs US$ 500,000 |
|        UUW5541 | Clash XL | 12 months at 1 Jan 1961 | US$ 300,000 xs US$ 150,000 |
| 1962  UVW4642 | 1st Cas XL | 12 months at 1 Jan 1962 | US$ 350,000 xs US$ 150,000 |
|        UVW5261 | 2nd Cas XL | 12 months at 1 Jan 1962 | US$ 500,000 xs US$ 500,000 |
|        UVW5541 | Clash XL | 12 months at 1 Jan 1962 | US$ 300,000 xs US$ 150,000 |
| 1963  UXW4642 | 1st Cas XL | 12 months at 1 Jan 1963 | US$ 350,000 xs US$ 150,000 |
|        UXW5261 | 2nd Cas XL | 12 months at 1 Jan 1963 | US$ 500,000 xs US$ 500,000 |
|        UXW5541 | Clash XL | 12 months at 1 Jan 1963 | US$ 300,000 xs US$ 150,000 |
| 1964  UYW4642 | 1st Cas XL | 12 months at 1 Jan 1964 | US$ 350,000 xs US$ 150,000 |
|        UYW5261 | 2nd Cas XL | 12 months at 1 Jan 1964 | US$ 500,000 xs US$ 500,000 |
|        UYW5541 | Clash XL | 12 months at 1 Jan 1964 | US$ 300,000 xs US$ 150,000 |

Exhibit A Page 2

| 1965 | UZX4642 | 1st Cas XL | 12 months at 1 Jan 1965 | US$ 350,000 xs US$ 150,000 |
| | UZX5261 | 2nd Cas XL | 12 months at 1 Jan 1965 | US$ 500,000 xs US$ 500,000 |
| | UZX5541 | Clash XL | 12 months at 1 Jan 1965 | US$ 300,000 xs US$ 150,000 |
| | | | | |
| 1966 | UAX4642 | 1st Cas XL | 12 months at 1 Jan 1966 | US$ 350,000 xs US$ 150,000 |
| | UAX5261 | 2nd Cas XL | 12 months at 1 Jan 1966 | US$ 500,000 xs US$ 500,000 |
| | UAX5541 | Clash XL | 12 months at 1 Jan 1966 | US$ 300,000 xs US$ 150,000 |
| | | | | |
| 1967 | UBX4642 | 1st Cas XL | 12 months at 1 Jan 1967 | US$ 350,000 xs US$ 150,000 |
| | UBX5261 | 2nd Cas XL | 12 months at 1 Jan 1967 | US$ 500,000 xs US$ 500,000 |
| | UBX5541 | Clash XL | 12 months at 1 Jan 1967 | US$ 300,000 xs US$ 150,000 |
| | | | | |
| 1968 | UCX4642 | 1st Cas XL | 12 months at 1 Jan 1968 | US$ 350,000 xs US$ 150,000 |
| | UCX5261 | 2nd Cas XL | 12 months at 1 Jan 1968 | US$ 500,000 xs US$ 500,000 |
| | UCX3665 | 3rd Cas XL | 12 months at 1 Jan 1968 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | UCX5541 | Clash XL | 12 months at 1 Jan 1968 | US$ 300,000 xs US$ 150,000 |
| | | | | |
| 1969 | UDX4642 | 1st Cas XL | 12 months at 1 Jan 1969 | 80% of US$ 325,000 xs US$ 175,000 |
| | UDX5261 | 2nd Cas XL | 12 months at 1 Jan 1969 | 80% of US$ 500,000 xs US$ 500,000 |
| | UDX3665 | 3rd Cas XL | 12 months at 1 Jan 1969 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | UDX5541 | Clash XL | 12 months at 1 Jan 1969 | US$ 300,000 xs US$ 175,000 |
| | | | | |
| 1970 | UEX0018 | 1st Cas XL | 12 months at 1 Jan 1970 | 80% of US$ 825,000 xs US$ 175,000 |
| | | | extended to 31 Mar 1971 | 80% of US$ 300,000 xs US$ 200,000 |
| | UEX0019 | 2nd Cas XL | 12 months at 1 Jan 1970 | 80% of US$ 500,000 xs US$ 500,000 |
| | | | extended to 31 May 1971 | 80% of US$ 500,000 xs US$ 500,000 |
| | UEX2065 | 3rd Cas XL | 12 months at 1 Jan 1970 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | | | extended to 31 Mar 1971 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | UEX5541 | Clash XL | 12 months at 1 Jan 1970 | US$ 325,000 xs US$ 200,000 |
| | | | extended to 31 Mar 1971 | US$ 400,000 xs US$ 200,000 |
| | | | | |
| 1971 | UFX0397 | 1st Cas XL | 1 Apr 1971 to 31 Dec 1971 | 32.5% of US$ 300,000 xs US$ 200,000 |
| | UFX0398 | 2nd Cas XL | 1 Apr 1971 to 31 Dec 1971 | 40% of US$ 500,000 xs US$ 500,000 |
| | UFX0645 | 3rd Cas XL | 1 Apr 1971 to 31 Dec 1971 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | UFX0399 | Clash XL | 1 Apr 1971 to 31 Dec 1971 | US$ 400,000 xs US$ 200,000 |
| | | | | |
| 1972 | UGX0397 | 1st Cas XL | 12 months at 1 Jan 1972 | 32.5% of US$ 300,000 xs US$ 200,000 |
| | UGX0398 | 2nd Cas XL | 12 months at 1 Jan 1972 | 40% of US$ 500,000 xs US$ 500,000 |
| | UGX0645 | 3rd Cas XL | 12 months at 1 Jan 1972 | 100% of 65% of US$ 1,000,000 xs US$ 1,000,000 |
| | UGX0399 | Clash XL | 12 months at 1 Jan 1972 | US$ 400,000 xs US$ 200,000 |
| | | | | |
| 1973 | UHX0552 | 3rd XL R/I | 12 months at 1 Jan 1973 | 35% of US$ 4,000,000 xs US$ 1,000,000 |
| | | | | |
| 1974 | UIX0552 | 3rd XL R/I | 12 months at 1 Jan 1974 | 35% of US$ 4,000,000 xs US$ 1,000,000 |
| | | | | |
| 1975 | UKX0753 | 1st Cas XL | 12 months at 1 Jan 1975 | 13.875% of US$ 300,000 xs US$ 200,000 |
| | UKX0754 | 2nd Cas XL | 12 months at 1 Jan 1975 | 58.875% of US$ 1,000,000 xs US$ 1,000,000 |
| | UKX0755 | 3rd Cas XL | 12 months at 1 Jan 1975 | 65% of US$ 3,500,000 xs US$ 2,500,000 |
| | UKX0753 | Clash XL | 12 months at 1 Jan 1975 | 13.875% of US$ 250,000 xs US$ 250,000 |

Copy of Underwriters' demand for arbitration

sent by Federal Express

to Chief Executive Officer/General Counsel, B.D. Cooke & Partners Limited

dated April 11, 2008

## MOUND COTTON WOLLAN & GREENGRASS

### COUNSELLORS AT LAW

ONE BATTERY PARK PLAZA

NEW YORK, NY 10004-1486

—

(212) 804-4200

FAX: (212) 344-8066

WWW.MOUNDCOTTON.COM

NEW YORK, NY

NEWARK, NJ

GARDEN CITY, NY

SAN FRANCISCO, CA

James D. Veach
212-804-4233
jveach@moundcotton.com

April 11, 2008

**<u>Via Federal Express</u>**

B.D. Cooke & Partners Limited
2 Knoll Rise
Orpington, Kent
England BR6 0NX

Attn:   Chief Executive Officer/General Counsel

Re: B.D. Cooke & Partners Limited v. Certain Underwriters at
Lloyd's, London
Our File No. 3038.001

Dear Sir/Madam:

We represent defendant Certain Underwriters at Lloyd's, London in this action.

Please find enclosed another copy of Underwriters' demand for arbitration.

The original is with your counsel who, we understand, may not be authorized to accept the demand on your behalf.

Very truly yours,

cc:   Carey G. Child, Esq.
John R. Finnegan, Esq.
Anne Linder, Esq.

Enclosure

# MOUND COTTON WOLLAN & GREENGRASS

### COUNSELLORS AT LAW

### ONE BATTERY PARK PLAZA
### NEW YORK, NY 10004-1486
———

James D. Veach
212-804-4233
jveach@moundcotton.com

(212) 804-4200

FAX: (212) 344-8066

WWW.MOUNDCOTTON.COM

NEW YORK, NY
NEWARK, NJ
GARDEN CITY, NY
SAN FRANCISCO, CA
FORT LAUDERDALE, FL

April 4, 2008

**Via E-Mail, Federal Express, and**
**Certified Mail -- Return Receipt Requested**

Carey G. Child, Esq.
Chadbourne & Parke LLP
1200 New Hampshire Avenue, NW
Washington, DC 20036

Re:     B.D. Cooke v. Certain Underwriters at Lloyd's, London
         Excess of Loss Casualty Retrocession Contracts
         Our File Number:  3038.001

Dear Mr. Child:

As you know, we represent Certain Underwriters at Lloyd's, London (Underwriters) with respect to various excess of loss casualty retrocession contracts identified in Schedule "A" annexed to a verified complaint filed by B.D. Cooke & Partners Limited (Cooke) in the Supreme Court, New York County, on February 26, 2008.  A copy of the complaint and accompanying summons appears under Tab 1.  We know from our conversations that your firm represents Cooke.

Pursuant to the agreements to arbitrate contained in the retrocession contracts, Underwriters demands that the claims and demands set forth in the complaint be submitted to a court of arbitration sitting in New York, New York.   Underwriters reserves the right to supplement this arbitration demand to address additional disputes "arising under" the retrocession contracts,  including whether:

- B. D. Cooke and Lloyd's commuted the retrocession contracts pursuant to a commutation agreement executed in February 2002;

- balances identified in the complaint, ¶33, come within the terms of a 1997 assignment of certain excess of loss casualty retrocession contracts from the Liquidator of Citizens Casualty Insurance Company, an insurer whose corporate charter was dissolved and which no longer exists, to Cooke;

MOUND COTTON WOLLAN & GREENGRASS

Carey G. Child, Esq.
April 4, 2008
Page 2

- specific losses identified in the Complaint, ¶33, come within the coverage provided by the retrocession contracts; and

- declaratory relief with respect to any future losses or claims should be granted.

Underwriters will seek from the court of arbitration an order:

1.  giving Underwriters access to all books and records maintained by Cooke and its agents, including, but not limited to, ROM Reinsurance Management Company, Inc. (ROM) relating to losses purportedly subject to the assignment including, but not limited to, those claims identified in paragraph 33 of the annexed complaint, Tab 1;

2.  providing that the 2002 commutation agreement extinguished any obligation to indemnify assignee Cooke;

3.  directing that B.D. Cooke reimburse Lloyd's for any losses that Lloyd's has paid to date in error; and

4.  awarding Underwriters the expenses and costs of the arbitration including Underwriters attorneys' fees.

The instant demand does not constitute an admission of coverage or a waiver of any rights with respect to the claims identified in the complaint, ¶33, or an admission of coverage or a waiver of any rights with respect to the contracts identified in schedule "A" annexed to the complaint.

Underwriters requests that Cooke choose its arbiter. If Cooke fails to choose its arbiter within sixty days, Underwriters will exercise its right to choose two arbiters who will in turn choose an umpire.

Please forward all future communications with respect to this arbitration to the undersigned.

Very truly yours,

*[signature]*

cc: John R. Finnegan, Esq.

Attachment

**Exhibit 3**

CASUALTY REINSURANCE POOLING AGREEMENT

THIS AGREEMENT entered into as of the 1st day of October,
1951 between AGENCY MANAGERS LIMITED (hereinafter called
"Managers") and certain insurance Companies for whom they may
underwrite (all Companies being hereinafter included in the word
"Companies").

W I T N E S S E T H:

WHEREAS, each of the Companies is desirous of entering into
a pooling agreement for the distribution of its casualty rein-
surance business written through the Managers (excluding, however,
specific risks when agreed upon by the Companies) hereinafter
called "such casualty reinsurance business", and the parties
hereto are desirous of stating their mutual rights and obligations.

NOW, THEREFORE, it is mutually understood and agreed as
follows:

FIRST:    Each of the Companies does hereby agree to cede to
the others and the others hereby agree to accept, each in its
respective proportion, any and all such casualty reinsurance
business, such cession and acceptance to be made to the end that
each of the Companies shall participate in all such casualty
reinsurance business to the extent and in the percentage set forth
in the following paragraph.

SECOND:    The participation in the group by each of the Com-
panies for such casualty reinsurance business and for which each
is bound hereunder with respect to any one casualty reinsurance
policy contract, and/or reinsurance treaty is as follows:

| | |
|---|---|
| Citizens Casualty Company of New York | 50% |
| Northern Assurance Company Limited (United States Branch) | 50% |

THIRD: Such casualty reinsurance business ceded under this Agreement shall be reported by the Managers by quarterly accounts in the form set forth in the individual Company and the Managers' agreements.

The Managers are specifically authorized to effect and maintain reinsurance for the benefit of the Companies and to retain the unearned portion of all premiums on such reinsurance for the purpose of maintaining unearned premium reserves as required by the Insurance Departments of the various States.

FOURTH: It is further agreed that in the event of the insolvency of any of the Companies, the reinsurance provided by this Agreement shall be payable by the solvent Companies directly to the insolvent company or to its liquidator, receiver or statutory successor on the basis of the liability of the insolvent company under the contract or contracts reinsured without diminution because of the insolvency of the insolvent company, provided, however, that as a condition precedent to the liability of the solvent Companies to pay such reinsurance in the event of the insolvency of another, the liquidator or receiver or statutory successor of the insolvent company shall give written notice of the pendency of a claim against the insolvent company on the policy reinsured within a reasonable time after such claim is filed in the insolvency proceeding. During the pendency of such claim, the

- 2 -

solvent Companies may investigate such claim and interpose, at
their own expense, in the proceeding where such claim is to be
adjudicated any defense or defenses which they may deem available
to the insolvent company, its liquidator or receiver or statutory
successor.  The expense thus incurred by the solvent Companies
shall be chargeable, subject to court approval, against the in-
solvent company as part of the expense of liquidation to the
extent of such proportionate share of the benefit as shall accrue
to the insolvent company solely as a result of the defense under-
taken by the solvent Companies.

      FIFTH:    Any of the Companies may terminate this Agreement
by giving at least six months' written notice of termination to
the others.  Said notice shall be given not later than the 30th
day of June of any one year and such termination shall take effect
on the 31st day of December of any one year, and provided further
that no termination shall affect such casualty reinsurance busi-
ness then in force.

      Notices may be given at the addresses stated
herein and may be by ordinary mail.

      SIXTH:    Any controversy or claim arising out of or
relating to this Agreement, or any breach thereof, shall be
settled by arbitration under the rules then obtaining of the
American Arbitration Association and judgment upon the award
rendered may be entered in the highest court of the forum, state
or federal, having jurisdiction.  Arbitration shall take place
in the City of New York.

- 3 -

The Companies hereby authorize their Managers to make such amendments to this Agreement on their behalf as shall become necessary from time to time.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals, the day and year first above written.

AGENCY MANAGERS LIMITED

Number 102 Maiden Lane
New York 5, New York          BY _____
                                         Vice President


CITIZENS CASUALTY COMPANY
OF NEW YORK

Number 116 John Street
New York 38, New York          BY _____


THE NORTHERN ASSURANCE
COMPANY LIMITED

Number 135 William Street
New York 38, New York          BY _____

- 4 -

ADDENDUM NO. 1

Attached to and forming a part of Agreement between
AGENCY MANAGERS LIMITED and certain insurance companies dated the
1st day of October, 1951.

1. Effective as of midnight, the 30th day of June 1955, the
AMERICAN HOME ASSURANCE COMPANY of 111 William Street,
New York 38, New York became a participating company for
casualty reinsurance.

2. The participation of the member companies with respect
to casualty reinsurance business written or renewed on
and after midnight, the 30th day of June 1955, shall be
as set forth below:

| | |
|---|---|
| Citizens Casualty Company of New York | 33-1/3% |
| The Northern Assurance Company, Ltd. | 33-1/3% |
| American Home Assurance Company | 33-1/3% |

It is hereby noted and agreed that a copy of the origi-
nal Agreement dated 1st October, 1951 to which this Addendum No.1
is attached and forms a part thereof, has been lodged with the
American Home Assurance Company and their execution of this Ad-
dendum signifies their acceptance of the terms and conditions of
the original Agreement dated 1st October, 1951.

All other terms and conditions remain unaltered.

IN WITNESS WHEREOF, the Managers and the AMERICAN
HOME ASSURANCE COMPANY have caused these presents to be executed
in duplicate by their Executive Officers.

AGENCY MANAGERS LIMITED


BY_____

AMERICAN HOME ASSURANCE
COMPANY


_____

ADDENDUM NO. 2

Attached to and forming a part of Agreement between AGENCY MANAGERS LIMITED and certain insurance companies dated the 1st day of October, 1951.

It is hereby noted and agreed that the address of the Citizens Casualty Company of New York and the Northern Assurance Company Ltd., are amended to read as follows:

CITIZENS CASUALTY COMPANY OF NEW YORK
33 Maiden Lane, New York 38, New York

THE NORTHERN ASSURANCE COMPANY, LTD.
158 William Street, New York 38, New York

All other terms and conditions remain unaltered.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals, the day and year first above written.

AGENCY MANAGERS LIMITED

BY _____
Vice President

ADDENDUM NO. 3

Attached to and forming a part of Agreement between AGENCY
MANAGERS LIMITED and certain insurance companies dated the 1st day
of October, 1951.

1.    Effective as of midnight, the 31st day of December, 1959
the SKANDINAVIA INSURANCE COMPANY, LTD., the
CONSTITUTION INSURANCE CORPORATION OF NEW YORK
and the UNITY FIRE AND GENERAL INSURANCE COMPANY
became participating companies for casualty reinsurance.

2.    The participation of the member companies with respect to
casualty reinsurance business written or renewed on and
after midnight, the 31st day of December, 1959 shall be
as set forth below: –

| | |
|---|---|
| The Northern Assurance Company, Ltd. | 30% |
| Citizens Casualty Company of New York | 30% |
| American Home Assurance Company | 15% |
| Skandinavia Insurance Company, Ltd. | 10% |
| The Constitution Insurance Corporation of New York | 10% |
| The Unity Fire and General Insurance Company | 5% |

It is hereby noted and agreed that a copy of the original
Agreement dated 1st October, 1951 to which this Addendum No. 3 is
attached and forms a part thereof, has been lodged with the Skandinavia
Insurance Company Ltd., the Constitution Insurance Corporation of New
York, and the Unity Fire and General Insurance Company and their ex-
ecution of this Addendum signifies their acceptance of the terms and
conditions of the original Agreement dated 1st October, 1951.

All other terms and conditions remain unaltered.

IN WITNESS WHEREOF, the Managers and the SKANDINAVIA
INSURANCE COMPANY LTD., the CONSTITUTION INSURANCE
CORPORATION OF NEW YORK and the UNITY FIRE AND GENERAL
INSURANCE COMPANY have caused these presents to be executed in
duplicate by their Executive Officers.

AGENCY MANAGERS LIMITED

BY _____
Vice President

Number 102 Maiden Lane
New York 5, New York

SKANDINAVIA INSURANCE COMPANY
LIMITED

BY _____

Number 80 William Street
New York 38, New York


THE CONSTITUTION INSURANCE
CORPORATION OF NEW YORK

BY _____

Number 90 John Street
New York 38, New York


THE UNITY FIRE AND GENERAL
INSURANCE COMPANY

BY _____

Number 116 John Street
New York 38, New York

## ADDENDUM NO. 4

Attached to and forming a part of Agreement between AGENCY MANAGERS LIMITED and certain insurance companies dated the 1st day of October, 1951.

1.  Effective as of midnight, the 31st day of December 1960, the COSMOPOLITAN MUTUAL INSURANCE COMPANY became a participating company and the UNITY FIRE AND GENERAL INSURANCE COMPANY retired as a participating company for casualty reinsurance.

2.  The participation of the member companies with respect to casualty reinsurance business written or renewed on and after midnight, the 31st day of December 1960, shall be as set forth below: –

| | |
|---|---|
| The Northern Assurance Company, Ltd. | 30% |
| Citizens Casualty Company of New York | 30% |
| American Home Assurance Company | 15% |
| Skandinavia Insurance Company, Ltd. | 10% |
| The Constitution Insurance Corporation of New York | 10% |
| Cosmopolitan Mutual Insurance Company | 5% |

It is hereby noted and agreed that a copy of the original Agreement dated 1st October, 1951 to which this Addendum No. 4 is attached and forms a part thereof, has been lodged with the Cosmopolitan Mutual Insurance Company and their execution of this Addendum signifies their acceptance of the terms and conditions of the original Agreement dated 1st October, 1951.

All other terms and conditions remain unaltered.

IN WITNESS WHEREOF the Managers and the COSMOPOLITAN MUTUAL INSURANCE COMPANY have caused these presents to be executed in duplicate by their Executive Officers.

AGENCY MANAGERS LIMITED

Number 102 Maiden Lane        BY _____
New York 5, New York              Vice President

COSMOPOLITAN MUTUAL INSURANCE COMPANY

Number 10 Columbus Circle     BY _____
New York 19, New York

ADDENDUM NO. 5

Attached to and forming a part of Agreement between AGENCY MANAGERS LIMITED and certain insurance companies dated the 1st day of October, 1951.

It is hereby noted and agreed that the American Home Assurance Company have given notice to the Managers to terminate the Management Agreement dated June 15, 1955 at September 30, 1961 or a date to be mutually agreed upon.

In consequence of the foregoing it is hereby specifically agreed, in accordance with the authority provided by the second division of the Sixth Paragraph hereof, that the American Home Assurance Company shall be deemed to have given the due notice provided for in the Fifth Paragraph hereof, and the Managers hereby agree that the effective date of termination of this Agreement as respects American Home Assurance Company, shall be September 30, 1961.

This amendment may be revised by mutual agreement to be made in writing by the parties hereto.

All other terms and conditions remain unaltered.

IN WITNESS WHEREOF, the Managers and the AMERICAN HOME ASSURANCE COMPANY have caused these presents to be executed in duplicate by their Executive Officers.

AGENCY MANAGERS LIMITED


By _____
        Vice President

AMERICAN HOME ASSURANCE
COMPANY


_____

<u>ADDENDUM NO. 6</u>

Attached to and forming a part of Agreement between AGENCY MANAGERS LIMITED and certain insurance companies dated the 1st day of October, 1951.

1.  Effective as of midnight, the 31st day of December, 1961, THE INDEMNITY MARINE ASSURANCE COMPANY, LTD., and the NATIONWIDE MUTUAL INSURANCE COMPANY became participating companies for casualty reinsurance.

2.  Effective as of midnight, the 31st day of December, 1961, the AMERICAN HOME ASSURANCE COMPANY and THE NORTHERN ASSURANCE COMPANY LIMITED retired as participating companies for casualty reinsurance.

3.  The participation of the member companies with respect to casualty reinsurance business written or renewed on and after midnight, the 31st day of December, 1961 shall be as set forth below: -

| | |
|---|---|
| The Indemnity Marine Assurance Company, Ltd. | 30% |
| Citizens Casualty Company of New York | 25% |
| Cosmopolitan Mutual Insurance Company | 15% |
| The Constitution Insurance Corporation of New York | 10% |
| Skandinavia Insurance Company, Ltd. | 10% |
| Nationwide Mutual Insurance Company | 10% |

It is hereby noted and agreed that a copy of the original Agreement dated 1st October, 1951 to which this Addendum No. 6 is attached and forms a part thereof, has been lodged with THE INDEMNITY MARINE ASSURANCE COMPANY, LTD., and the NATIONWIDE MUTUAL INSURANCE COMPANY and their execution of this Addendum signifies their acceptance of the terms and conditions of the original Agreement dated 1st October, 1951.

All other terms and conditions remain unaltered.

IN WITNESS WHEREOF, the Managers and THE INDEMNITY MARINE ASSURANCE COMPANY, LTD., and the NATIONWIDE MUTUAL INSURANCE COMPANY have caused these presents to be executed in

duplicate by their Executive Officers.

AGENCY MANAGERS LIMITED

BY _____

Number 102 Maiden Lane
New York 5, New York

THE INDEMNITY MARINE ASSURANCE
COMPANY, LTD.

BY _____

Number 111 John Street
New York 38, New York

NATIONWIDE MUTUAL INSURANCE COMPANY

BY _____

Number 246 North High Street
Columbus 16, Ohio

ADDENDUM NO. 7

Attached to and forming a part of Agreement between AGENCY MANAGERS LIMITED and certain insurance companies dated the 1st day of October, 1951.

1. Effective as of midnight, the 31st day of December, 1962, the GREAT AMERICAN INSURANCE COMPANY becomes a participating company for casualty reinsurance.

2. Effective as of midnight, the 31st day of December, 1962, THE CONSTITUTION INSURANCE CORPORATION OF NEW YORK retired as a participating company for casualty reinsurance.

3. The participation of the member companies with respect to casualty reinsurance business written or renewed on and after midnight, the 31st day of December, 1962 shall be as set forth below:-

| | |
|---|---|
| The Indemnity Marine Assurance Company Limited (U. S. Branch) | 27½% |
| Citizens Casualty Company of New York | 25 % |
| Great American Insurance Company | 20 % |
| Cosmopolitan Mutual Insurance Company | 12½% |
| Nationwide Mutual Insurance Company | 10 % |
| Skandinavia Insurance Company, Ltd. | 5 % |

It is hereby noted and agreed that a copy of the original Agreement dated 1st October, 1951 to which this Addendum No. 7 is attached and forms a part thereof, has been lodged with the GREAT AMERICAN INSURANCE COMPANY and their execution of this Addendum signifies their acceptance of the terms and conditions of the original Agreement dated 1st October, 1951.

All other terms and conditions remain unaltered.

IN WITNESS WHEREOF, the Managers and the GREAT AMERICAN INSURANCE COMPANY have caused these presents to be

-1-

executed in duplicate by their Executive Officers.

AGENCY MANAGERS LIMITED

BY *[signature]* December 18. 1962

Number 102 Maiden Lane
New York 5, New York

GREAT AMERICAN INSURANCE COMPANY

BY *[signature]* January r. 1963

Number 99 John Street
New York 38, New York

-2-

<u>ADDENDUM NO. 8</u>

Attached to and forming a part of Agreement between AGENCY
MANAGERS LIMITED and certain insurance companies dated the 1st day
of October, 1951.

1.  Effective as of midnight, the 31st day of December, 1964,
    the COSMOPOLITAN MUTUAL INSURANCE COMPANY
    retired as a participating company for casualty reinsurance.

2.  Effective as of midnight, the 31st day of December, 1964,
    the participation of the NATIONWIDE MUTUAL INSURANCE
    COMPANY is increased from 10% to 22-1/2%.

3.  The participation of the member companies with respect to
    casualty reinsurance business written or renewed on and
    after midnight, the 31st day of December, 1964, shall be
    as set forth below :-

| | |
|---|---|
| The Indemnity Marine Assurance Company Limited (U. S. Branch) | 27- 1/2 % |
| Citizens Casualty Company of New York | 25- % |
| Great American Insurance Company | 20- % |
| Nationwide Mutual Insurance Company | 22- 1/2 % |
| Scandinavia Insurance Company, Ltd. | 5- % |

All other terms and conditions remain unaltered.

IN WITNESS WHEREOF, the Managers and the NATIONWIDE MUTUAL
INSURANCE COMPANY have caused these presents to be executed in
duplicate by their Executive Officers.

AGENCY MANAGERS LIMITED

_____    Nov. 19, 1964
Executive Vice President

Number 102 Maiden Lane
New York, New York, 10005

NATIONWIDE MUTUAL INSURANCE COMPANY

_____
Vice President – Special Markets

Number 246 North High Street
Columbus 16, Ohio

ADDENDUM NO. 9

Attached to and forming a part of Agreement between AGENCY
MANAGERS LIMITED and certain insurance companies dated the 1st day
of October, 1951.

1.  Effective as of midnight, the 31st day of December, 1965,
    the participation of the CITIZENS CASUALTY COMPANY OF
    NEW YORK is reduced from 25% to 12-1/2%.

2.  The participation of the member companies with respect to
    casualty reinsurance business written or renewed on and
    after midnight, the 31st day of December, 1965, shall be
    as set forth below: -

| | |
|---|---|
| The Indemnity Marine Assurance Company Limited (U. S. Branch) | 27- 1/2 % |
| Nationwide Mutual Insurance Company | 22- 1/2 % |
| Great American Insurance Company | 20- % |
| Citizens Casualty Company of New York | 12- 1/2 % |
| The Monarch Insurance Company of Ohio | 12- 1/2 % |
| Skandinavia Insurance Company, Ltd. | 5- % |

All other terms and conditions remain unaltered.

IN WITNESS WHEREOF, the Managers and the CITIZENS CASUALTY
COMPANY OF NEW YORK have caused these presents to be executed in
duplicate by their Executive Officers.

AGENCY MANAGERS LIMITED

_____
President

Number 102 Maiden Lane
New York, New York, 10005

CITIZENS CASUALTY COMPANY OF
NEW YORK

_____
President

Number 33 Maiden Lane
New York, New York, 10038

ADDENDUM NO. 10

Attached to and forming a part of Agreement between AGENCY MANAGERS LIMITED and certain insurance companies dated the 1st day of October, 1951.

1. Effective as of midnight, the 31st day of December, 1965, THE MONARCH INSURANCE COMPANY OF OHIO becomes a participating company for casualty reinsurance.

2. The participation of the member companies with respect to casualty reinsurance business written or renewed on and after midnight, the 31st day of December, 1965, shall be as set forth below: -

| | |
|---|---|
| The Indemnity Marine Assurance Company Limited (U. S. Branch) | 27- 1/2 % |
| Nationwide Mutual Insurance Company | 22- 1/2 % |
| Great American Insurance Company | 20- % |
| Citizens Casualty Company of New York | 12- 1/2 % |
| The Monarch Insurance Company of Ohio | 12- 1/2 % |
| Skandinavia Insurance Company, Ltd. | 5- % |

It is hereby noted and agreed that a copy of the original Agreement dated 1st October, 1951 to which this Addendum No. 10 is attached and forms a part thereof, has been lodged with THE MONARCH INSURANCE COMPANY OF OHIO and their execution of this Addendum signifies their acceptance of the terms and conditions of the original Agreement dated 1st October, 1951.

All other terms and conditions remain unaltered.

IN WITNESS WHEREOF, the Managers and THE MONARCH INSURANCE COMPANY OF OHIO have caused these presents to be executed in duplicate by their Executive Officers.

AGENCY MANAGERS LIMITED

Number 102 Maiden Lane
New York, New York, 10005          President

THE MONARCH INSURANCE
COMPANY OF OHIO

Number 19 Rector Street          PRESIDENT
New York, New York

## ADDENDUM NO. 11

Attached to and forming a part of Agreement between AGENCY MANAGERS LIMITED and certain insurance companies dated the 1st day of October, 1951.

1. Effective as of midnight, the 31st day of December, 1965 all rights and obligations of the Great American Insurance Company as a participating member with respect to Casualty Reinsurance are hereby transferred to and assumed by the Constellation Insurance Company, 100 William Street, New York, New York 10038 with the same force and effect as if the Constellation Insurance Company had been a participating member as of midnight, the 31st day of December, 1962, the date upon which the Great American Insurance Company became a participating company for Casualty Reinsurance.

2. The participation of the member companies with respect to Casualty Reinsurance business written or renewed on and after midnight, the 31st day of December, 1965, shall be as set forth below:

| | |
|---|---|
| The Indemnity Marine Assurance Company Limited (U.S. Branch) | 27-1/2% |
| Nationwide Mutual Insurance Company | 22-1/2% |
| Constellation Insurance Company | 20% |
| Citizens Casualty Company of New York | 12-1/2% |
| The Monarch Insurance Company of Ohio | 12-1/2% |
| Skandinavia Insurance Company, Ltd. | 5% |

All other terms and conditions remain unaltered.

IN WITNESS WHEREOF, the Managers have caused these presents to be executed by their Executive Officer.

AGENCY MANAGERS LIMITED

by _____ President

Dated at New York, New York
April 14, 1966

All other terms and conditions remain unaltered.

IN WITNESS WHEREOF, the Managers have caused these presents to be executed by their Executive Officer.

AGENCY MANAGERS LIMITED

By _____
/ President

Dated at New York, N. Y.
January 27th, 1967

-2-

ADDENDUM NO. 14

Attached to and forming a part of Agreement between AGENCY MANAGERS LIMITED and certain insurance companies dated the first day of October, 1951.

1.  Effective as of midnight, the 31st day of December 1967 the CITIZENS CASUALTY COMPANY OF NEW YORK retired as a participating company for casualty reinsurance.

2.  Effective as of midnight, the 31st day of December 1967 the AMERICAN FIDELITY FIRE INSURANCE COMPANY becomes a participating company for casualty reinsurance.

3.  The participation of the member companies with respect to casualty reinsurance business written or renewed on or after midnight, 31st day of December 1967 shall be as set forth below:

The Indemnity Marine Assurance Company
  Limited (U.S. Branch)                          27-1/2%
Nationwide Mutual Insurance Company              22-1/2%
Constellation Reinsurance Company                20-  %
American Fidelity Fire Insurance Company         17-1/2%
The Monarch Insurance Company of Ohio            12-1/2%

It is hereby noted and agreed that a copy of the original Agreement dated 1st October, 1951 to which this Addendum No. 14 is attached and forms a part thereof, has been lodged with the AMERICAN FIDELITY FIRE INSURANCE COMPANY and their execution of this Addendum signifies their acceptance of the terms and conditions of the original Agreement dated 1st October, 1951.

All other terms and conditions remain unaltered.

IN WITNESS WHEREOF, the Managers and the AMERICAN FIDELITY FIRE INSURANCE COMPANY have caused these presents to be executed in duplicate by their Executive Officers.

                                      AGENCY MANAGERS LIMITED

Number 90 John Street
New York, New York 10038                       President
                                      AMERICAN FIDELITY FIRE
                                      INSURANCE COMPANY

Number 485 Old Country Road
Westbury, L.I., New York 11590                 President

**Exhibit 4**

EXCESS OF LOSS CASUALTY RETROCESSION
CONTRACT NO. 594/67/5261

issued to

AGENCY MANAGERS LIMITED, NEW YORK
etal

by

various INSURANCE COMPANIES



594/67/5261

EXCESS OF LOSS CASUALTY RETROCESSION CONTRACT

issued to

AGENCY MANAGERS LIMITED, NEW YORK as United
States Casualty Reinsurance Managers of and on
behalf of
THE INDEMNITY MARINE ASSURANCE COMPANY LIMITED,
(U.S. Branch)
NATIONWIDE MUTUAL INSURANCE COMPANY
CONSTELLATION INSURANCE COMPANY
CITIZENS CASUALTY COMPANY OF NEW YORK
THE MONARCH INSURANCE COMPANY OF OHIO

(hereinafter called the "Reassured")

by

various INSURANCE COMPANIES

(hereinafter called the "Reinsurers")

ARTICLE I

BUSINESS
REINSURED HEREUNDER

In consideration of the payment of premium as provided in Article
XII the Reinsurers shall indemnify the Reassured, within the limits and
subject to the terms and conditions herein set forth, in respect of the
liability attaching to them under Contracts of Reinsurance written in the
United States of America or in Canada (covering liability wheresoever occur-
ring) in respect of the following classes of insurance as set forth in Section
46 of Article 4 of the Insurance Laws of the State of New York including any
and all amendments thereto or revisions thereof :

"Accident and Health Insurance" as defined in sub-
paragraph (a) of paragraph 3.

"Water Damage Insurance" as defined in paragraph 6.

"Burglary and Theft Insurance" as defined in paragraph 7.

"Glass Insurance" as defined in paragraph 8.

"Boiler and Machinery Insurance" as defined in paragraph 9.

"Elevator Insurance" as defined in paragraph 10.

-2-

"Collision Insurance" as defined in paragraph 12.

"Personal Injury Liability Insurance" as defined in paragraph 13.

"Property Damage Liability Insurance" as defined in paragraph 14.

"Workmen's Compensation and Employers' Liability Insurance" as defined in paragraph 15.

All amendments to or revisions of the above paragraphs of Section 46 of Article 4 of the Insurance Laws of the State of New York effective during the currency of this Contract shall be immediately notified to the Reinsurers.

## ARTICLE II

## EXCLUSIONS

This Contract does not apply to :-

a) Quota Share Reinsurance Contracts where the original policy limits exceed $25,000 any one person, $50,000 any one accident for Bodily Injury Liability, and $10,000 any one accident for Property Damage Liability.

b) Business of the Reassured which is designated by them as Aviation Business provided, however, that this exclusion does not apply to Workmen's Compensation Business.

c) "Fidelity and Surety Insurance" as defined in Section 46 of Article 4 of the Insurance Laws of the State of New York, other than Fidelity Insurance when written as part of an "Umbrella" policy, provided Reinsurers shall not be liable for losses discovered or sustained prior to January 1st, 1963.

d) Credit Insurance as defined in paragraph 17 of the said Section 46.

e) Any form of financial guarantee business.

f) Liability for loss arising from the operations of the Federal Securities Acts of 1933.

g) Workmen's Compensation and Employers' Liability in respect of underground coal mining operations.

h) Protection and Indemnity business and Ocean Marine business written and classified by the Reassured as such.

It is understood and agreed, however, that except as regards the

-3-

exclusion of Surety Insurance as defined in Section 46, of Article 4 of the Insurance Laws of the State of New York, Credit Insurance as defined in paragraph 17 of the said Section 46 and any form of Financial Guarantee business, the foregoing exclusions shall not apply where the operations outlined are only incidental to the Original Insured's main operations.

It is further understood and agreed that,

i) this Contract does not apply to loss or liability excluded under the provisions of the attached Nuclear Incident Exclusion Clause - Physical Damage - Reinsurance, Nuclear Incident Exclusion Clause - Liability - Reinsurance, and Nuclear Incident Exclusion Clause - Physical Damage and Liability (Boiler and Machinery Policies) - Reinsurance.

## ARTICLE III

REINSURING CLAUSE

A.     The Reinsurers shall indemnify the Reassured for that portion of the liability attaching to them in respect of business falling within the scope of this Contract which represents the excess of the sum of $500,000 (Five hundred thousand United States Dollars) ultimate net loss in respect of each accident, the liability of the Reinsurers under this contract being limited to the sum of $500,000 (Five hundred thousand United States Dollars) ultimate net loss in respect of each accident.

B.     Notwithstanding the provisions of paragraph A of this Article, as respects liability assumed by the Reassured on both an aggregate basis and an accident basis, or on an aggregate basis alone, in respect of Property Damage Liability Insurance and Products Bodily Injury Liability Insurance providing aggregate limits of indemnity as well as per accident limits, the Reinsurers shall indemnify the Reassured for that portion of the liability attaching to them (whether due to per accident or aggregate limits, or both) which represents the excess of the sum of $500,000 (Five hundred thousand United States Dollars) ultimate net loss in the aggregate in respect of each annual premium period of each policy, or in respect of the full policy period if such period does not exceed fifteen months; but the liability of the Reinsurers under this Contract for the aggregate ultimate net loss under any such policy during said period shall not exceed $500,000 (Five hundred thousand United States Dollars).   Nevertheless, if the Reassured sustain a loss in excess of  $500,000 (Five hundred thousand United States Dollars) as the result of one accident which involves business falling within this paragraph B and also other business falling within the scope of this Contract, then the entire loss shall be excluded from this paragraph B and shall be settled in accordance with the other terms and conditions of this Contract.

C.     The term "policy" as used in paragraph B of this Article means a policy issued direct to an insured by a company reinsured by the Reassured.

-4-

D.        The amount of $500,000 in excess of which this Contract attaches, and the Reinsurers' limit of liability of $500,000 herein set forth, shall be applied separately to :-

   1) Boiler and Machinery Insurances,

   2) Personal Injury Liability and Property Damage Liability Insurances,

   3) Workmen's Compensation and Employers' Liability Insurances,

   4) All other insurances covered hereunder,

in respect of each reassured protected under Contracts of Reinsurance written by the Reassured.

## ARTICLE IV

### ATTACHMENT

A.        This Contract applies only to Contracts of Reinsurance entered into by the Reassured which commence or are renewed on or after January 1, 1967 and shall continue in force until cancelled by either party in accordance with the provisions of Article XX or by the mutual agreement of both parties.

B.        For the purpose of this Article all Contracts of Reinsurance entered into by the Reassured for a long or indefinite period shall be deemed to be renewed from their respective anniversary dates next following January 1st, 1967.

## ARTICLE V

### DEFINITION OF "EACH ACCIDENT"

In cases where the Reassured's contracts of reinsurance contain a definition of "each accident" such definition shall apply to this Contract, but if the Reassured's contracts of reinsurance do not contain such a definition, then the term "each accident" as used herein shall be understood to mean "each accident or occurrence or series of accidents or occurrences arising out of any one event" provided that as respects

   (a)  PRODUCTS LIABILITY

   Said term shall alternatively be understood to mean "injuries to all persons proceeding from the use or consumption of one prepared or acquired lot of merchandise or product".

-5-

(b)  PRODUCTS PROPERTY DAMAGE

Said term shall alternatively be understood to mean
"all damage to property of others proceeding from the
use or consumption of one prepared or acquired lot of
merchandise or product".

(c)  PROPERTY DAMAGE (other than Automobile and Products)

Said term shall alternatively subject to provisions (1)
and (2) below be understood to mean "loss or losses
caused by a series of operations, events or occurrences
arising out of operations at one specific site and which
cannot be attributed to any single one of such operations,
events or occurrences, but rather to the cumulative effect
of same".

In assessing each accident within the foregoing definition
it is understood and agreed that

(i)  the series of operations, events or occurrences
shall not extend over a period longer than 12
(twelve) consecutive months

and

(2)  the Reassured may elect the date on which the
period of not exceeding 12 (twelve) consecutive
months shall be deemed to have commenced.

In the event that the series of operations, events or
occurrences extend over a period longer than 12 (twelve)
consecutive months then each consecutive period of 12
months, the first of which commences on the date elected
under (2) above, shall form the basis of claim under this
Contract.

(d)  PUBLIC LIABILITY (other than Automobile and Products)

Said term shall alternatively be understood to mean as
regards each original Insured "injuries to one or more
than one person resulting from infection, contagion,
poisoning or contamination proceeding from or traceable
to the same causative agency.

(e)  An occupation or other disease suffered by an employee
which disease arises out of the employment and for which
the employer is liable, the same shall be deemed an
accident within the meaning hereof.  In case the Reassured
shall within a policy year sustain several losses arising out
of such an occupational or other disease of one specific kind

-6-

or class, suffered by several employees of one original Insured, such losses shall be deemed to arise out of one accident and the date of such accident shall be deemed to be the commencing date of the policy year. A loss as respects each employee affected by the disease shall be deemed to have been sustained by the Reassured at the date when compensable disability of the employee commenced and at no other date.

(f)   As regards business where the measure of loss is the "neglect, error or omission" of the insured, it is understood that neglect, error or omission shall be deemed to be an accident within the meaning hereof, and the date of loss shall be the date on which the first act of negligence, error or omission occurred, except that where the Contract of Reinsurance entered into by the Reassured grants a retroactive cover and the first such act occurred during the retroactive period it shall be deemed to have occurred on the first day of the said Contract of Reinsurance.

ARTICLE VI

## ULTIMATE NET LOSS

A.    The term "ultimate net loss" as used herein shall mean the sum which the Reassured have become legally obligated to pay (excluding all expenses incurred by the Reassured in settlement or defence of claims) in the settlement of losses or liabilities after making deductions for all recoveries, all salvages, and all claims upon other reinsurers (whether recovered or not) other than :-

   1.   the underlying excess of loss reinsurers and

   2.   the reinsurers subscribing to the Contract referred
        to in paragraph D of this Article.

B.    All salvages, recoveries or payments recovered or received subsequent to a loss settlement under this Contract shall be applied as if recovered or received prior to the aforesaid settlement and all necessary adjustments shall be made by the parties hereto.

C.    Nothing in this Article shall be construed to mean that losses under this Contract are not recoverable until the Reassured's ultimate net loss has been ascertained.

D.    Recoveries under the following Excess of Loss Reinsurance Contract shall be disregarded for the purposes of this Article :

      "an Excess of Loss Reinsurance Contract covering up to a
      limit of $300,000 ultimate net loss each accident in excess
      of $150,000 ultimate net loss each accident and protecting

-7-

the Reassured only in the event of two or more of the
following classes

1)    Boiler and Machinery Insurances

2)    Personal Injury Liability and Property Damage
      Liability Insurances

3)    Workmen's Compensation and Employers' Liability
      Insurances

4)    All other reinsurances covered under this Contract.

and/or two or more reassureds protected under Contracts of
Reinsurance written by the Reassured being involved in any one
accident.

## ARTICLE VII

NET RETAINED LINES

This Contract applies only to that portion of any contract of rein-
surance which the Reassured retain net for their own account and in calcu-
lating the amount of any loss hereunder and also in computing the amount
in excess of which this Contract attaches, only loss or losses in respect of
that portion of any contract of reinsurance which the Reassured retain net
for their own account shall be included. Recoveries made by the Reassured
from the reinsurers referred to in paragraph D of Article VI shall be dis-
regarded for the purposes of this Article,

## ARTICLE VIII

INABILITY TO RECOVER
FROM OTHER REINSURERS

The amount of the Reinsurers' liability hereunder in respect of any
loss or losses shall not be increased by reason of the inability of the Re-
assured to collect from any other reinsurers (whether specific or general)
any amounts which may have become due from them, whether such inability
arises from the insolvency of such other reinsurers or otherwise.

## ARTICLE IX

MAXIMUM RETENTION

It is warranted that the amount retained by the Reassured net for
their own account shall not exceed

1)    $1,000,000 each accident in respect of each class of
      insurance (as set forth in Article I of this Contract)
      for each reassured,

-8-

2)    as respects boiler and machinery insurance, a daily indemnity applying to any one location as defined in the Boiler and Machinery Manual of the National Bureau of Casualty Underwriters of $5,000 per diem provided, however, that where the contract issued by the Reassured contains no daily limit, such business shall be protected hereunder provided that the liability of the Reassured attaches in excess of a deductible of at least $2,000,000 each accident (including direct damage, if any).

## ARTICLE X

WAR EXCLUSION

A.        As regards interest under Plate Glass and All Risks business (except All Risks business accepted by the Burglary Departments of the Companies reinsured by the Reassured) no liability shall attach hereto in respect of any loss or damage which is occasioned by War, Invasion, Hostilities, Acts of Foreign Enemies, Civil War, Rebellion, Insurrection, Military or Usurped Power or Martial Law or Confiscation by order of any Government or Public Authority.

B.        As regards interest, other than Workmen's Compensation and Liability, which, at time of loss or damage, are on shore OUTSIDE the territorial limits of the United States of America and Canada, no liability shall attach hereto in respect of any such loss or damage which is occasioned by War, Invasion, Hostilities, Acts of Foreign Enemies, Civil War, Rebellion, Insurrection, Military or Usurped Power or martial law or Confiscation, by order of any Government or Public Authority.

## ARTICLE XI

EXCESS OF LOSS
REINSURANCE CLAUSE

This Contract in no way applies to protect any liability of the Reassured in respect of Excess of Loss Reinsurances of other Reinsurance Companies written or accepted by the Reassured and the expression "Reinsurance Companies" shall not apply to Companies normally transacting direct business but who accept some incidental reinsurance business.

## ARTICLE XII

PREMIUM

A.        The premium payable to the Reinsurers shall be calculated at the rate of 1.125% applied to the gross net earned premium income of the Reassured.

-9-

The term "gross net earned premium income" as used herein shall be understood to mean the gross earned premiums accruing to the Reassured from all business the subject matter of this Contract after deducting return premiums and premiums paid away for facultative reinsurances, recoveries under which, in accordance with the provisions of Article VI, would inure to the benefit of the Reinsurers.

B.    The Reassured shall pay to the Reinsurers a minimum annual premium of $20,000 in four quarterly instalments of $5,000 January 1st, April 1st, July 1st and October 1st of each year.

C.    The Reassured shall forward to the Reinsurers within 45 days after the close of each calendar quarter a statement of the Reassured's gross earned premium income during the quarter then immediately past and adjustment of premium shall thereupon be made in respect of each calendar year of this Contract as follows :-

   1)   if the earned premium for the first quarter exceeds $5,000 the amount in excess thereof shall thereupon be paid to the Reinsurers

   2)   if the earned premium for the first two quarters exceeds $10,000 the amount in excess thereof after deducting any additional premium paid under paragraph 1) above shall thereupon be paid to the Reinsurers

   3)   if the earned premium for the first three quarters exceeds $15,000, the amount in excess thereof after deducting any additional premium paid under paragraphs 1) and 2) above shall thereupon be paid to the Reinsurers

   4)   the statement rendered in respect of the fourth quarter shall include a recapitulation of the earned premium accruing to the Reinsurers for the first three quarters, and the total earned premium for the year shall then be determined.
       If such total earned premium :-

   a) exceeds the aggregate of :-

           (i)   the Minimum and Provisional Premium of $20,000 and

           (ii)  the total of any additional premiums paid to the Reinsurers under the provisions of paragraphs 1), 2, and 3) of this Article, the amount in excess thereof shall be paid to the Reinsurers.

   b) is less than the aggregate arrived at in paragraph (a) above, the balance shall be refunded to the Reassured,

-10-

provided nevertheless that in no event shall the
premium retained by the Reinsurers be less than
$20,000.

## ARTICLE XIII

### FEDERAL EXCISE TAX

A.      The Reinsurers have agreed to allow, for the purpose of paying
the Federal Excise Tax, one per cent of the premium payable hereon to
the extent such premium is subject to Federal Excise Tax.

B.      In the event of any return of premium becoming due hereunder,
the Reinsurers will deduct one per cent from the amount of the return;
the Reassured or its broker hereunder should take steps to recover the
tax from the U.S. Government.

## ARTICLE XIV

### ACCESS TO RECORDS

The Reinsurers, or their authorised representatives shall at all
times during the currency of this Contract, or within eighteen months after
its termination, have free access to the books and records of the Reassured
insofar as they relate to business falling within the scope of this Contract,
and in the event of any claim for loss being made hereunder the Reinsurers
shall have free access to all claims records during the continuance of this
Contract or at any time thereafter until the final settlement of all such
claims.

## ARTICLE XV

### TAX CLAUSE

In consideration of the terms under which this Contract is issued,
the Reassured undertake not to claim any deduction in respect of the premium
hereon when making Canadian Tax returns or when making tax returns,
other than Income or Profits Tax returns, to any State or Territory of the
United States or to the District of Columbia.

## ARTICLE XVI

### CLAIMS

A.      The Reassured shall advise the Reinsurers with reasonable
promptitude of any accident or event in which the Reinsurers are known to
be involved and shall, on demand, provide the Reinsurers with full
information relative thereto.

-11-

B.      The Reinsurers, through their appointed representative Mendes and Mount, 27 William Street, New York, New York 10005, shall have the right to co-operate with the Reassured in the defense and/or settlement of any claims in which the Reinsurers may be interested.

C.      All settlements made by the Reassured in co-operation with the Reinsurers' appointed representative, Mendes and Mount, shall be binding on the Reinsurers and all settlements made by the Reassured in cases where the Reinsurers have elected not to exercise their right to co-operate with the Reassured shall be binding on the Reinsurers. The Reinsurers shall pay to the Reassured any amounts that may be recoverable under this Contract within fifteen (15) days after the receipt of the necessary papers proving the loss.

## ARTICLE XVII

DIVISION OF
SETTLEMENT COSTS

Where the Reassured provide a cover under which expenses incurred by the treaty company in connection with the investigation and adjustment of claims and suits are included as a part of the loss, then such expenses shall like-wise be considered a part of the ultimate net loss hereinbefore referred to. Otherwise such expenses shall be apportioned between the Reassured and the Reinsurers in the ratio of their respective liabilities as finally determined, it being understood however that the Reinsurers shall not be liable for any part of the salaries of officials or of office expenses of the Reassured.

## ARTICLE XVIII

COMMUTATION

A.      In the event of the Reassured becoming liable to make periodical payments under any contract reinsured hereunder, the Reinsurers shall (at any time after 24 months from the date of the accident) be at liberty to redeem the payments falling due from them by the payment of a lump sum to be determined as follows: In such case the amount of the claim under this Contract may be settled by mutual agreement, but if not so settled, the Reassured and the Reinsurers shall refer the matter to two arbitrators, one to be chosen by each party and such arbitrators shall choose an umpire; in the event of the arbitrators failing to agree, the decision of the umpire shall be final and binding upon all parties. The seat of arbitration shall be in New York, N.Y.

B.      The Reinsurers' portion of the amount so determined shall be considered the amount of loss hereunder and the payment thereof shall constitute a complete release of the Reinsurers for their liability for such claim so capitalised.

-12-

## ARTICLE XIX

INSOLVENCY

A.      In the event of the insolvency of any of the Companies constituting the Reassured this reinsurance shall be payable directly to the insolvent Company, or to its liquidator, receiver, conservator or statutory successor on the basis of the liability of the insolvent company without diminution because of the insolvency of the insolvent Company or because the liquidator, receiver, conservator or statutory successor of the insolvent Company has failed to pay all or a portion of any claim.

B.      It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the insolvent Company shall give written notice to the Reinsurers of the pendency of a claim against the insolvent Company indicating the policy or bond reinsured which claim would involve a possible liability on the part of the Reinsurers within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurers may investigate such claim and interpose, at their own expense, in the proceeding where such claim is to be adjudicated any defence or defences that they may deem available to the insolvent Company or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurers shall be chargeable, subject to the approval of the court, against the insolvent Company as part of the expense of conservation or liquidation to the extent of a pro rata share of the benefit which may accrue to the insolvent Company solely as a result of the defence undertaken by the Reinsurers.

## ARTICLE XX

CANCELLATION

A.      This Contract may be terminated by either party giving at least ninety days notice to the other party stating the effective date and time on which this Contract shall terminate.

B.      In the event of this Contract being so terminated the liability of the Reinsurers shall continue in force in respect of all Contracts of reinsurance falling within the protection of this Contract which are current at the effective date of the cancellation notice until

     1)    termination of each such contract

               or

     2)    the respective anniversary date of such Contracts next
         following the effective date of cancellation,

whichever shall first occur.

-13-

## ARTICLE XXI

### ARBITRATION

Any dispute arising under this Contract shall be submitted to a court of arbitration composed of two arbitrators, one to be appointed by the Reassured and the other by the Reinsurers,  The arbitrators shall, before entering upon the reference, appoint an umpire.
The arbitrators and the umpire shall consider this Contract an honourable engagement rather than merely a legal obligation they are relieved of all judicial formalities and may abstain from following the strict rules of law. The award of the arbitrators or, in the event of their disagreement, of the umpire, shall be precedent to any liability or right of action of either party. The costs of the reference and of the award shall be in the discretion of the arbitrators or umpire, as the case may be, who may direct to and by whom and in what manner the same shall be paid.
The seat of arbitration shall be New York, N.Y.

## ARTICLE XXII

### SERVICE OF SUIT

It is agreed that in the event of the failure of the Reinsurers to pay any amount claimed to be due hereunder, the Reinsurers at the request of the Reassured, will submit to the jurisdiction of any Court of competent jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court. It is further agreed that service of process in such suit may be made upon Mendes and Mount, 27 William Street, New York, New York 10005, or their nominee or nominees, and that in any suit instituted against any one of them upon this Contract, the Reinsurers will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorised and directed to accept service of process on behalf of the Reinsurers in any such suit and/or upon the request of the Reassured to give a written undertaking to the Reassured that they will enter a general appearance upon Reinsurers' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Reinsurers hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Reassured or any beneficiary hereunder arising out of this contract of reinsurance, and hereby designate the above-named as the firm to which the said officer is authorised to mail such process or a true copy thereof.

594/UEXOC19

<u>SCHEDULE NO. 1</u>

Signed hereunder for and on behalf of the Insurance Companies
listed hereunder, by a representative of the Leading Company
who is authorised by the Leading Company and by all the other
Companies listed hereunder to sign on their behalf.

EXCESS INSURANCE COMPANY LIMITED (Leading Company)

*J. Greaves*

MANAGER NON-MARINE TREATY DEPT.
EXCESS INSURANCE CO LTD.

EXCESS INSURANCE COMPANY LIMITED 770/3800/3181    13.48%

THE DOMINION INSURANCE COMPANY LIMITED 82672    11.24%

TUREGUM INSURANCE COMPANY 414692/141    6.74%

ENGLISH & AMERICAN INSURANCE COMPANY LIMITED/
7012766A/723A    4.49%

ASSICURAZIONI GENERALI 692584 CC 8003    2.24%
                                          _____
                                          38.19%
                                          _____

-2-

3. The Companies' participation in the total coverage afforded by the contract is amended from 32.26% to 38.19% and the companies subscribing to such amended participation are the INSURANCE COMPANIES, each for its own part and not one for the other, which are listed in the Schedule attached hereto each for the proportion set against its respective name.

4. A minimum and deposit premium of $30,552 (being 38.19% of $80,000) is due hereunder in respect of the calendar year 1970 and shall be payable in equal quarterly instalments at January 1st, April 1st, July 1st and October 1st, 1970.

All other terms and conditions remain unchanged.

Signed in Schedule No.1 for and on behalf of the INSURANCE COMPANY named therein.

594/UIX0019

ADDENDUM NO. 5

to EXCESS OF LOSS CASUALTY RETROCESSION CONTRACT NO.
594/677 5261

issued to

AGENCY MANAGERS LIMITED, NEW YORK
as United States Casualty Reinsurance
Managers of and on behalf of
companies named in the Schedule of
Participating Companies attached to
this Contract, each Company part-
icipating severally and not jointly,
and their Quota Share Reinsurers.

by

certain INSURANCE COMPANIES

IT IS UNDERSTOOD AND AGREED THAT, effective January 1st 1970 :-

1. Article XII is amended as follows

   (a) Paragraph B is amended to read:

       "    The Reassured shall pay to the Reinsurers a
       minimum annual premium of $80,000 in four
       quarterly instalments of $20,000 on January 1st,
       April 1st, July 1st and October 1st of each year."

   (b) Paragraph C is amended to read:

       "    As soon as practicable after the close of
       each calendar year of this Contract the Reassured
       shall forward to the Reinsurers a statement of
       the Reassured's gross net earned premium income
       during the calendar year then immediately past and,
       if the earned premium due to the Reinsurers,
       computed as above provided, exceeds the minimum
       and provisional premium of $80,000, the amount in
       excess thereof shall be paid to the Reinsurers."

2. All premiums, losses and communications relating to this
   Contract shall be transmitted between the Reassured and
   the Reinsurers through the intermediary of Pritchard &
   Baird, Inc., 125 William Street, New York, N.Y.10038.

594/UEX 0019

ADDENDUM NO. 4

to

EXCESS OF LOSS CASUALTY RETROCESSION CONTRACT NO.0019
(formerly 594/67/5261)

issued to

AGENCY MANAGERS LIMITED, NEW YORK
as United States Casualty Reinsurance
Managers of and on behalf of the companies
named in the Schedule of Participating
Companies attached to this Contract, each
Company participating severally and not
jointly, and their Quota Share Reinsurers.

by

certain INSURANCE COMPANIES


IT IS UNDERSTOOD AND AGREED THAT, effective January 1st, 1970:

Paragraph A of Article XX is amended to read as follows:-

"A.     This Contract may be terminated at December 31st of
any year by either party giving at least 90 days' notice
to the other party of their intention so to do. "

All other terms and conditions remain unchanged.


Signed, for and on behalf of the INSURANCE COMPANIES listed in
Schedule No.1 attached to Addendum No.3, by a representative of
the Leading Company who is authorised by the Leading Company
and by all other Companies listed in the said Schedule to sign
on their behalf.


770/3900/3181.

594/UEX 0019

ADDENDUM NO. 5

to

EXCESS OF LOSS CASUALTY RETROCESSION CONTRACT NO.0019
(formerly 594/67/6261)

issued to

AGENCY MANAGERS LIMITED, NEW YORK

as United States Casualty Reinsurance
Managers of and on behalf of the Compan-
ies named in the Schedule of Participating
Companies attached to this Contract, each
company participating severally and not
jointly, and their Quota Share Reinsurers,

by

certain INSURANCE COMPANIES


IT IS UNDERSTOOD AND AGREED THAT, effective January 1st, 1970 :

    The Schedule of Participating Companies which is
    attached to the Contract is cancelled and is replaced
    by the Schedule of Participating Companies attached
    to this Addendum.


All other terms and conditions remain unchanged.


Signed, for and on behalf of the INSURANCE COMPANIES listed in
Schedule No.1 attached to Addendum No.3, by a representative of
the Leading Company who is authorised by the Leading Company
and by all other companies listed in the said Schedule to sign
on their behalf.

*J. Greaves*

ER NON-MARINE TREATY DEPT.
EXCESS INSURANCE CO LTD.

T 70 / 3800 / 3181

<u>SCHEDULE NO. 1</u>

Signed hereunder for and on behalf of the Insurance Companies
listed hereunder, by a representative of the Leading Company
who is authorised by the Leading Company and by all the other
Companies listed hereunder to sign on their behalf.

EXCESS INSURANCE COMPANY LIMITED
(Leading Company)

MANAGER · NON · MARINE POLICY DEPT
EXCESS INSURANCE CO. LTD

EXCESS INSURANCE COMPANY LIMITED          12.91%

THE DOMINION INSURANCE COMPANY LIMITED    10.75%

ENGLISH & AMERICAN INSURANCE COMPANY LIMITED    4.30%

BRITISH NATIONAL LIFE INSURANCE SOCIETY LIMITED    4.30%
per M.E. Rutty Underwriting Agency

                                          32.26%

SCHEDULE OF PARTICIPATING COMPANIES

American Consumer Insurance Company

American Liberty Insurance Company

American Mutual Liability Insurance Company

Constellation Reinsurance Company

Cosmopolitan Mutual Insurance Company

General Insurance Company of Trieste and Venice
          (U.S. Branch)

Highlands Insurance Company

Horace Mann Insurance Company

Imperial Insurance Company

The Indemnity Marine Assurance Company Limited
          (U.S. Branch)

The Monarch Insurance Company of Ohio

Public Service Mutual Insurance Company

Each Company participating to the extent of 8-1/3%
of the liability assumed severally and not jointly.

-2-

4) a minimum and deposit premium of $6,552.00 (being
   32.26% of $20,000) is due hereunder in respect of
   the calendar year 1968 and shall be payable in
   equal quarterly instalments at January 1st, April
   1st, July 1st and October 1st, 1969.

All other terms and conditions remain unchanged.

Signed in Schedule No.1 for and on behalf of the INSURANCE
COMPANIES named therein.

594/69/5261

## ADDENDUM NO. 2

### to EXCESS OF LOSS CASUALTY RETROCESSION CONTRACT

issued to

AGENCY MANAGERS LIMITED, NEW YORK
as United States Casualty Reinsurance
Managers of and on behalf of
THE INDEMNITY MARINE ASSURANCE COMPANY LIMITED
(U.S. BRANCH)
NATIONWIDE MUTUAL INSURANCE COMPANY
CONSTELLATION INSURANCE COMPANY
AMERICAN FIDELITY FIRE INSURANCE COMPANY
of WESTBURY, LONG ISLAND
THE MONARCH INSURANCE COMPANY OF OHIO

by

### certain INSURANCE COMPANIES


IT IS UNDERSTOOD AND AGREED THAT, effective January 1st 1969

1) the name of the Reassured is amended to the following:

   "      AGENCY MANAGERS LIMITED, NEW YORK
        as United States Casualty Reinsurance
        Managers of and on behalf of the
        Companies named in the Schedule of
        Participating Companies attached hereto,
        each Company participating severally and
        not jointly, and their Quota Share
        Reinsurers.                          "

2) the sum of $150,000 quoted in Paragraph D of Article
   VI is amended to $175,000;

3) the Companies subscribing to their participation
   of 32.26% of the total coverage afforded by the
   Contract are the INSURANCE COMPANIES, each for its
   own part and not one for the other, which are
   listed in the Schedule attached hereto each for the
   proportion set against its respective name;

594/68/5261

## S C H E D U L E

Signed for and on behalf of the Insurance Companies listed hereund
by a representative of the Leading Company who is authorised by th
Leading Company and by all the other Companies listed hereunder to
sign on their behalf.

EXCESS INSURANCE COMPANY LIMITED
(Leading Company)

| | |
|---|---|
| EXCESS INSURANCE COMPANY LIMITED | 13.82% |
| ORION INSURANCE COMPANY LIMITED | 2.31% |
| ENGLISH AND AMERICAN INSURANCE COMPANY LIMITED | 4.61% |
| THE DOMINION INSURANCE COMPANY LIMITED | 11.52% |
| | 32.26% |

Part 2 - to Addendum No.1

5) the Companies' participation in the total coverage afforded by the Contract is amended from 38.29% to 32.26% and the Reinsurers subscribing to such amended participation are the INSURANCE COMPANIES, each for its own part and not one for the other, listed in the schedule attached hereto each for the portion set against its respective name;

6) a minimum and deposit premium of £6,452.00 (being 32.26% of £20,000) is due hereunder in respect of the calendar year 1961 and shall be payable in equal quarterly instalments at January 1st, April 1st, July 1st and October 1st, 1961.

All other terms and conditions remain unchanged.

Signed in the attached Schedule for and on behalf of the INSURANCE COMPANIES named therein.

594/66/5261

ADDENDUM NO. 1

to EXCESS OF LOSS CASUALTY RETROCESSION CONTRACT

Issued to

AGENCY MANAGERS LIMITED, NEW YORK as United
States Casualty Reinsurance Managers of
and on behalf of
THE INDEMNITY MARINE ASSURANCE COMPANY LIMITED,
(U.S. Branch)
JEFFERSON UNITED INSURANCE COMPANY
CONSTELLATION INSURANCE COMPANY
CITIZENS CASUALTY COMPANY OF NEW YORK
THE MONARCH INSURANCE COMPANY OF OHIO

by

various INSURANCE COMPANIES

IT IS UNDERSTOOD AND AGREED THAT, effective January 1st,
1968,

1)  The name of the Reinsured is amended to the
    following:

            "AGENCY MANAGERS LIMITED, NEW YORK
         as United States Casualty Reinsurance
            Managers of and on behalf of
       THE INDEMNITY MARINE ASSURANCE COMPANY LIMITED
                    (U.S. Branch)
         JEFFERSON UNITED INSURANCE COMPANY
         CONSTELLATION INSURANCE COMPANY
         CITIZENS CASUALTY FIRE INSURANCE COMPANY
         CITIZENS, LONG ISLAND
         THE MONARCH INSURANCE COMPANY OF OHIO  "

2)  Sub-section (f) of Article IX is deleted;

3)  The net retention appearing in Article XII is
    increased to   ;

4)  The Nuclear Incident Exclusion Clause - Liability -
    Reinsurance attached to this Addendum replaces the
    Nuclear Incident Exclusion Clause - Liability -
    Reinsurance attached to the Contract;

U.S.A.

NUCLEAR INCIDENT EXCLUSION CLAUSE—LIABILITY—REINSURANCE

*(Approved by Lloyd's Underwriters' Fire and Non-Marine Association)*

(1) This reinsurance does not cover any loss or liability accruing to the Reassured as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association.

(2) Without in any way restricting the operation of paragraph (1) of this Clause it is understood and agreed that for all purposes of this reinsurance all the original policies of the Reassured (new, renewal and replacement) of the classes specified in Clause II of this paragraph (2) from the time specified in Clause III in this paragraph (2) shall be deemed to include the following provision (specified as the Limited Exclusion Provision) :

Limited Exclusion Provision.*

    I. It is agreed that the policy does not apply under any liability coverage, to *injury, sickness, disease, death or destruction* bodily injury or property damage with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability.

    II. Family Automobile Policies (liability only), Special Automobile Policies (private passenger automobiles, liability only), Farmers Comprehensive Personal Liability Policies (liability only), Comprehensive Personal Liability Policies (liability only) or policies of a similar nature; and the liability portion of combination forms related to the four classes of policies stated above, such as the Comprehensive Dwelling Policy and the applicable types of Homeowners Policies.

    III. The inception dates and thereafter of all original policies as described in II above, whether new, renewal or replacement, being policies which either:

        (a) become effective on or after 1st May, 1960, or

        (b) become effective before that date and contain the Limited Exclusion Provision set out above;

provided this paragraph (2) shall not be applicable to Family Automobile Policies, Special Automobile Policies, or policies or combination policies of a similar nature, issued by the Reassured on New York risks, until 90 days following approval of the Limited Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(3) Except for those classes of policies specified in Clause II of paragraph (2) and without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that for all purposes of this reinsurance the original liability policies of the Reassured (new, renewal and replacement) affording the following coverages :

    Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability)

shall be deemed to include, with respect to such coverages, from the time specified in Clause V of this paragraph (3), the following provision (specified as the Broad Exclusion Provision):

Broad Exclusion Provision.*

It is agreed that the policy does not apply:

    I. Under any Liability Coverage, to *injury, sickness, disease, death or destruction* bodily injury or property damage

        (a) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

        (b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    II. Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to *immediate medical or surgical relief,* to expenses incurred with respect

the policy is also an insured under any such Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Association or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability;

II. Family Automobile Policies (liability only). Special Automobile Policies (private passenger automobiles, liability only). Farmers Comprehensive Personal Liability Policies (liability only), Comprehensive Personal Liability Policies (liability only) or policies of a similar nature; and the liability portion of combination forms related to the four classes of policies stated above, such as the Comprehensive Dwelling Policy and the applicable types of Homeowners Policies.

III. The inception dates and thereafter of all original policies as described in II above, whether new, renewal or replacement, being policies which either:

(a) become effective on or after 1st May, 1960, or
(b) become effective before that date and contain the Limited Exclusion Provision set out above;

provided this paragraph (2) shall not be applicable to Family Automobile Policies, Special Automobile Policies, or policies or combination policies of a similar nature, issued by the Reassured on New York risks, until 90 days following approval of the Limited Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(3) Except for those classes of policies specified in Clause II of paragraph (2) and without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that for all purposes of this reinsurance the original liability policies of the Reassured (new, renewal and replacement) affording the following coverages :

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability)

shall be deemed to include, with respect to such coverages, from the time specified in Clause V of this paragraph (3), the following provision (specified as the Broad Exclusion Provision):

**Broad Exclusion Provision.***

It is agreed that the policy does not apply:

I. Under any Liability Coverage, to *injury, sickness, disease, death or destruction* *bodily injury or property damage*

(a) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II. Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to *immediate medical or surgical relief*, to expenses incurred with respect to *first aid*, *bodily injury, sickness, disease or death* resulting from the hazardous properties of *bodily injury* nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III. Under any Liability Coverage, to *injury, sickness, disease, death or destruction* *bodily injury or property damage* resulting from the hazardous properties of nuclear material, if

(a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c) the *injury, sickness, disease, death or destruction* arises out of the furnishing *bodily injury or property damage* by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories, or possessions or Canada, this exclusion (c) applies only to *injury or destruction of property at such nuclear facility.* *property damage to such nuclear facility and any property thereat.*

IV. As used in this endorsement: "hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or byproduct material; "source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

[ With respect to *injury to or destruction of property*, the word "injury" or "destruction" "property damage" includes all forms of radioactive contamination of property. includes all forms of radioactive contamination of property.

V. The inception dates and thereafter of all original policies affording coverages specified in this paragraph (3), whether new, renewal or replacement, being policies which become effective on or after 1st May, 1960, provided this paragraph (3) shall not be applicable to

(i) Garage and Automobile Policies issued by the Reassured on New York risks, or

(ii) statutory liability insurance required under Chapter 90, General Laws of Massachusetts,

until 90 days following approval of the Broad Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(4) Without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that paragraphs (2) and (3) above are not applicable to original liability policies of the Reassured in Canada and that with respect to such policies this Clause shall be deemed to include the Nuclear Energy Liability Exclusion Provisions adopted by the Canadian Underwriters' Association or the Independent Insurance Conference of Canada.

* printed in italics in the Limited Exclusion Provision and in the Broad

## SCHEDULE OF PARTICIPATING COMPANIES

| | |
|---|---|
| American Consumer Insurance Company | 6-2/3% |
| American Liberty Insurance Company | 6-2/3% |
| Argonaut Insurance Company | 6-2/3% |
| Cosmopolitan Mutual Insurance Company | 6-2/3% |
| Financial Indemnity Company | 6-2/3% |
| General Insurance Company of Trieste and | |
|       Venice (U.S. Branch) | 6-2/3% |
| Harbor Insurance Company | 6-2/3% |
| Highlands Insurance Company | 6-2/3% |
| Horace Mann Insurance Company | 6-2/3% |
| Imperial Insurance Company | 6-2/3% |
| Los Angeles Insurance Company | 6-2/3% |
| M.F.B. Mutual Insurance Company | 6-2/3% |
| The Monarch Insurance Company of Ohio | 6-2/3% |
| Public Service Mutual Insurance Company | 6-2/3% |
| Republic Indemnity Company of America | 6-2/3% |

each company participating to the extent of 62/3% of the
liability assumed severally and not jointly.

594/UEX 0019

ADDENDUM NO. 6

to

EXCESS OF LOSS CASUALTY RETROCESSION CONTRACT

issued to

AGENCY MANAGERS LIMITED, NEW YORK
as United States Casualty Reinsur-
ance Managers of and on behalf of
the Companies named in the Schedule
of Participating Companies attached
to this Contract, each Company
participating severally and not jointly,
and their Quota Share Reinsurers

by

Certain INSURANCE COMPANIES

IT IS UNDERSTOOD AND AGREED THAT, effective January 1st, 1970, the Schedule
of Participating Companies attached to Addendum No.5 is amended by
replacing LOS ANGELES INSURANCE COMPANY with NATIONAL AUTOMOBILE AND
CASUALTY INSURANCE COMPANY.


All other terms and conditions remain unchanged.


Signed, for and on behalf of the INSURANCE COMPANIES listed in Schedule No.1.
attached to Addendum No.3. by a representative of the Leading Company who is
authorised by the Leading Company and by all other Companies listed in the
said Schedule to sign on their behalf.


*J. Greaves*

FOR C.T. BOWRING & CO. LTD.


T70/3800/3181

ADDENDUM NO. 7

to

EXCESS OF LOSS CASUALTY RETROCESSION CONTRACT

issued to

AGENCY MANAGERS LIMITED, NEW YORK
as United States Casualty Reinsur-
ance Managers of and on behalf of
the Companies named in the Schedule
of Participating Companies attached
to this Contract, each Company
participating severally and not
Jointly, and their Quota Share
Reinsurers

_____

by

Certain INSURANCE COMPANIES

_____

IT IS UNDERSTOOD AND AGREED THAT:

1)     Paragraph A of Article VI is amended to read as follows:-

       "A.    This Contract may be terminated at March 31st
       of any year by either party giving at least 90 days'
       notice to the other party of their intention so to do.

2)     an additional deposit premium of $11,457  (being 38.19 %
       of $ 30,000) is due and payable hereunder in respect of
       the period from January 1st, 1961 to March 31st, 1961.

3)     Paragraph C of Article XII is amended to read as follows:-

       "      As soon as possible after the close of each
       annual period of this Contract the Reinsured shall
       forward to the Reinsurers a statement of the
       Reinsured's gross net earned premium income during
       the annual period then immediately past and, if the
       earned premium income to the Insurers, calculated as
       above provided, exceeds the estimated annual earned
       premium of $ ..., the difference in the deposit premium
       shall be paid to the Reinsurers.

- 2 -

4)      Add, as Paragraph D to Article XII, the following:-

        "D.    The term "annual period" shall mean a period
        of twelve calendar months ending 31st March.    "

        However, the period from January 1st 1970 to March 31st
        1971 is deemed to be an annual period for the purposes
        of premium computation as provided in Article XII.

5)      The Schedule of Participating Companies which is attached
        to Addendum No. 5 is cancelled effective January 1st, 1971
        and replaced by the Schedule of Participating Companies
        attached to this Addendum.


        IT IS FURTHER UNDERSTOOD AND AGREED that this Contract is cancelled
effective Midnight, March 31st, 1971.  Notwithstanding the provisions
of Article XX of the Contract it is mutually agreed that no liability
shall attach to Reinsurers in respect of losses occurring after the
effective date and time of cancellation as aforesaid, and no premium
shall be payable to the Reinsurers in respect of that section of the
Reassured's contracts of reinsurance covered hereunder which is unexpired
at that time.


        All other terms and conditions remain unchanged.




Signed hereunder, for and on behalf of the Companies listed in Schedule No.1.
attached to Addendum No.3, by a representative of the Leading Company who is
authorised by the Leading Companies and by all other Companies listed in the
said Schedule, to sign on their behalf.




        13.48%   .

        ../71        170/38 00/3.51

SCHEDULE OF PARTICIPATING COMPANIES

American Liberty Insurance Company

Argonaut Insurance Company

Buffalo Insurance Company

Consolidated Mutual Insurance Company

Cosmopolitan Mutual Insurance Company

Financial Indemnity Company

Highlands Insurance Company

Highlands Underwriters Insurance Company

Imperial Insurance Company

M.F.B. Mutual Insurance Company

The Monarch Insurance Company of Ohio

National Automobile & Casualty Insurance Company

Republic Indemnity Company of America

Service Fire Insurance Company

**Exhibit 5**

# INTERESTS AND LIABILITIES AGREEMENT

to the

## FIRST CASUALTY RETROCESSIONAL EXCESS OF LOSS AGREEMENT

(hereinafter called "Agreement")

entered into by and between

### AGENCY MANAGERS INC.
New York, New York

(hereinafter called the "Manager") as Reinsurance Manager for the Dominion Insurance Company of America, New York, New York and/or certain other Insurance and/or Reinsurance Companies and/or its Quota Share Reinsurers (hereinafter together called the "Members") and

(hereinafter called the Subscribing Retrocessionaire)

This Interests and Liabilities Agreement shall become effective January 1, 1975 and shall cover the net excess liability of the Members under Original Reinsurance Contracts covering Casualty Business and becoming effective on and after January 1, 1975 and shall remain effective until terminated in accordance with Article 19 of the attached Agreement.

This Agreement obligates the Subscribing Retrocessionaire for          % part of the liability and amounts set forth in the Agreement attached to this Interests and Liabilities Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate by their duly authorized representatives this    10th  day of October        1975.

AGENCY MANAGERS INC. for and on behalf of the Members as their interests may appear

Vice Chairman

and on this       day of            1975.

## SECOND CASUALTY RETROCESSIONAL EXCESS OF LOSS AGREEMENT

(hereinafter called "Agreement")

entered into by and between

### AGENCY MANAGERS INC.
New York, New York

(hereinafter called the "Manager") as Reinsurance Manager for the Dominion Insurance Company of America, New York, New York and/or certain other Insurance and/or Reinsurance Companies and/or its Quota Share Reinsurers (hereinafter together called the "Members") and

(hereinafter called the "Retrocessionaire")

WITNESSETH

In consideration of the mutual covenants hereinafter contained and upon the terms and conditions hereinafter set forth, the parties hereto agree as follows:

### ARTICLE 1

TERM

This Agreement shall become effective January 1, 1975 and shall remain in full force and effect until terminated in accord with the TERMINATION ARTICLE 19.

### ARTICLE 2

TERRITORIAL SCOPE

This Agreement shall apply to losses occurring World Wide.

### ARTICLE 3

BUSINESS REINSURED

This Agreement is to cover the net excess liability of the Members which may accrue to them from loss occurrences under Original Reinsurance Contracts covering Casualty Business, written or renewed by the Manager on behalf of the Members during the time this Agreement is in force subject to the terms and conditions contained herein.

It is warranted, however, that:

1.  The maximum acceptance on pharmaceutical risks shall be $1,000,000 except to cover for 90 days some ten risks with limits over $1,000,000, and then only for gross limits up to $1,500,000;

2.  The maximum Treaty acceptance shall be $500,000;

3.  There are no known Facultative risks written for limits in excess of $2,500,000.

<u>ARTICLE 4</u>

DEFINITIONS

A.  The term "Casualty Business" as used in this Agreement shall be understood to include the following classes of business:

A)  Automobile Bodily and Personal Injury and Property Damage
B)  Other Bodily Injury and Personal Injury and Property Damage
C)  Accident and Sickness
D)  Burglary and Theft
E)  Fidelity and Surety
F)  Workmen's Compensation and Employers' Liability including Occupational Disease
G)  Boiler and Machinery (when classified as Casualty)
H)  The Casualty portion of Multi-Peril Covers.

B.  The term "Loss Occurrence" as used in this Agreement shall follow the definition of this term, or any similar term having the same general meaning, as appearing in the Original Reinsurance Contract out of which the loss arises and the date of such Loss Occurrence shall be the date ascribed to it by the terms of the Original Reinsurance Contract: provided,

  1.  With respect to Occupational Disease and other diseases and where Original Reassured's Original Reinsurance Contracts provide for aggregate limits of liability the limits and retentions hereunder shall also apply in the aggregate any one original policy year. In the event of termination of this Agreement this aggregate protection shall cease at the next normal anniversary date of the original policy year.

"Aggregate" shall mean ultimate net losses occurring in the aggregate during any one original policy year.

"Original policy year" shall mean each separate original policy period of not exceeding twelve months commencing at the inception, anniversary or renewal date as and from the inception of this Agreement.

  2.  It is understood that, with respect to the business covered hereunder the proportion of losses under Original Reinsurance Contracts written on a so-called "Aggregate Excess" basis and a so-called "Loss Ratio" basis that can be included within these definitions shall be the same proportion as the gross loss applicable to the Original Reinsurance Contract arising out of or caused by one event or occurrence bears to the total gross loss as included within the scope of the rating period of the Original Reinsurance Contract.

C.  The term "Ultimate Net Loss" as used in this Agreement shall mean the net loss to the Members including the Members' share of loss adjustment expenses under Original Reinsurance Contract or Contracts, such loss to include expenses of litigation, if any, and all other loss expenses and expenses of the Manager or the Members (excluding, however, office expenses and salaries of officials of the Manager or of the Members). Salvages and recoveries including recoveries from all other reinsurances and/or retrocessions shall be first deducted from such loss to arrive at the amount of liability, if any, attaching hereunder.

All salvages, recoveries or payments recovered or received subsequent to any loss settlement hereunder shall be applied as if recovered or received prior to the respective settlement, and all necessary adjustments shall be made by the parties hereto.

Nothing in this clause shall be construed to mean that losses are not recoverable hereunder until the Members' Ultimate Net Loss has been ascertained.

D.   The term "Gross Net Earned Premium Income" as used in this Agreement shall mean the gross earned premium income of the Manager derived from Business, the subject matter of this Agreement, written on behalf of the Members less earned premium income paid for reinsurances or retrocessions which inure to the benefit of this Agreement.

E.   The term "Original Reassured" as used in this Agreement shall mean the company reinsured by the Manager on behalf of the Members.

F.   The term "Original Reinsurance Contract" as used in this Agreement shall mean all binders, policies, certificates, agreements (whether written or oral), treaties, bonds or contracts of reinsurance, facultative or otherwise, authorized by the Manager to Original Reassureds on behalf of the Members under the same Reinsurance Form and covering the same liability (whether issued in one Layer or more than one Layer).

G.   The term "Reinsurance Form" as used in this Agreement shall mean the type of reinsurance afforded being:

1.   Facultative per risk excess
2.   Facultative per accident excess
3.   Facultative per occurrence excess
4.   Facultative proportional
5.   Other than facultative per risk excess
6.   Other than facultative per accident excess
7.   Other than facultative per occurrence excess (including aggregate excess, excess of Loss Ratio and other excess contracts)
8.   Other than facultative proportional

each being a separate Reinsurance Form for purposes of this Agreement.

H.   The term "Agreement Year" as used in this Agreement shall mean each period of twelve consecutive calendar months beginning each January 1.

I.   The term "Losses Incurred" shall mean paid losses plus outstanding losses and all such incurred losses shall be charged to the calendar year of occurrence for the purpose of determining the rate applicable to the Agreement Year being adjusted.

## ARTICLE 5

### A.   COVER

The Retrocessionaire shall be liable for the amount of ultimate net loss in excess of an initial ultimate net loss of $250,000 each and every occurrence each and every Original Reinsurance Contract, subject to a limit of liability to the Retrocessionaire of $750,000 ultimate net loss each and every Original Reinsurance Contract.

— 3 —

B.   RETENTION COVER

The Retrocessionaire shall also be liable for the Ultimate Net Loss in excess of an initial Ultimate Net Loss of $250,000 each and every Loss Occurrence, provided the loss arises out of two or more Original Reinsurance Contracts, subject to a limit of liability to the Retrocessionaire of $750,000 each and every Loss Occurrence irrespective of the number of Original Reinsurance Contracts involved. Recoveries under paragraph A. above will be deducted when establishing Ultimate Net Loss for purposes of this paragraph.

## ARTICLE 6

### NET RETAINED LIABILITY

In calculating the amount of any loss hereunder and also in computing the amount in excess of which this Agreement attaches, only loss or losses in respect to that portion of any Original Reinsurance Contract or Contracts which the Manager retains net for the Members' account shall be included. It is understood and agreed that the amount of the Retrocessionaire's liability hereunder in respect to any loss or losses shall not be increased by reason of the inability of the Manager to collect from any other retrocessionaires, whether such inability arises from the insolvency of such other retrocessionaires or otherwise. Members may maintain reinsurances individually for their own accounts for their net shares of liability covered hereunder and such reinsurances will be ignored in determining the loss in excess of which this Agreement applies.

## ARTICLE 7

### EXCLUSIONS

This Agreement does not cover:

A.   Life Insurance, Credit Insurance, Financial Guarantee Insurance, Insolvency Insurance, Title Insurance.

B.   Business excluded by the following Nuclear Incident Exclusion Clauses: (See Attached)

   1.   Nuclear Incident Exclusion Clause-Physical Damage-Reinsurance
   2.   Nuclear Incident Exclusion Clause-Liability-Reinsurance
   3.   Nuclear Incident Exclusion Clause-Physical Damage and Liability (Boiler and Machinery Policies)-Reinsurance
   4.   Nuclear Incident Exclusion Clause-Physical Damage and Liability (Boiler and Machinery Policies)-Reinsurance-Canada.

— 4 —

C.  Aviation Hull and Aviation Liability Business (this exclusion shall not apply to Workmen's Compensation Business) except when it is an incidental part of an Original Reinsurance Contract.

D.  War risk as excluded in Original Reinsurance Contracts.

E.  Protection and Indemnity Business and Ocean Marine Business written and classified by the Manager as such.

F.  Bonds rated in the Contract Section of the Surety Association of American Manual; bonds guaranteeing payment of installment paper, mortgage principal or interest, or mortgage deficiency bonds.

G.  Business received as a member of Pools, Associations or Syndicates except that losses from Assigned Risk Plans or similar plans are not excluded.

## ARTICLE 8

### PREMIUMS AND REPORTS

The Manager shall pay the Retrocessionaire an annual deposit premium of $800.000 in installments of $200,000 at the inception of each calendar quarter during the time this Agreement is in force; within 45 days after the close of each quarter the Manager shall compute the provisional premium for the preceeding quarter by multiplying the gross net earned premium for the quarter times the provisional rate of 7½% and remitting to the Retrocessionaire the excess, if any, over $200,000.

Within 45 days after the close of each annual period, beginning January 1, 1976 a rate shall be determined by dividing the Members' gross net earned premium income for said period into the sum of 100/75ths of the incurred losses for the same period.

The annual rate as determined above shall be applied to the Members' gross net earned premium during the period. However, the maximum rate chargeable for any such period shall be 17½% and the minimum rate chargeable shall be 6%.

During the first annual period of this Agreement, being January 1, 1975 to January 1, 1976, $200.000 of unloaded losses shall be included in the 1975 rate calculation.

The annual minimum premium for each Agreement Year that this Agreement remains in effect shall be $600,000, it being understood the minimum premium does not apply with respect to coverage provided on a run-off basis following termination of this Agreement.

The rate for each annual period will be recalculated annually thereafter on the same basis until losses are final and settled or until evaluated in accordance with the provisions of the following two paragraphs.

If at the end of ten years after the close of any annual period there are losses which involve the determination of the adjusted rate for such annual period, the Manager and the Retrocessionaire shall determine the value of such claim or claims so that the final premium for the annual period involved can be calculated as provided above. If the Manager and the Retrocessionaire cannot agree to the value of any such claim they shall mutually appoint an appraiser who shall determine the value of such claim or claims.

It is agreed that the only purpose for determining the value of losses shall be in connection with the premium adjustment and such valuation shall not relieve the Retrocessionaire from any liability under this Agreement nor shall the Retrocessionaire be required to settle such claims with the Manager solely as a result of such valuation.

Within (45) days following the end of each Agreement Year the Manager will supply the Retrocessionaire a report summarizing for the Agreement Year:

1. The Members' Net Earned Premium Income
2. The Members' Written Premiums
3. Loss and Loss expense (by loss) paid by the Manager during the Agreement Year as respects losses affecting this Agreement
4. Loss and Loss expense (by loss) outstanding at the end of the Agreement Year as respects losses affecting this Agreement.

## ARTICLE 9

REINSTATEMENT

A.  As respects losses payable under paragraph A. and B. of the COVER ARTICLE, the reinstatement shall be automatic and unlimited without additional premium, other than that provided by the rating formula in Article 8, Premiums and Reports.

Nevertheless, the Retrocessionaire's liability shall never be more than $750,000 each and every Loss Occurrence, each and every Original Reinsurance Contract.

## ARTICLE 10

NOTICE OF LOSS AND LOSS SETTLEMENTS

In the event of an accident, disaster, casualty or occurrence occurring which either results in or appears to be of serious enough nature as probably to result in a loss involving this Agreement the Manager shall give notice as soon as reasonably practicable to Retrocessionaire through Guy Carpenter & Company, Inc., 110 William Street, New York, New York 10038, and the Manager shall keep the Retrocessionaire advised of all subsequent developments in connection therewith.

The Retrocessionaire agree to abide by the settlements of the Manager, such settlements to be considered as satisfactory proof of loss, and amounts falling to the share of the Retrocessionaire shall be immediately payable to the Manager by them upon reasonable evidence of the amount paid or to be paid by the Manager being presented to the Retrocessionaire through Guy Carpenter & Company, Inc. by the Manager.

## ARTICLE 11

EXCESS OF ORIGINAL POLICY LIMITS

This Agreement shall protect the Members within the limit hereof, in connection with any loss for which the Manager may be legally liable to pay in excess of the limit of its original policy, where loss in excess of the limit has been incurred because of its failure to settle within the policy limit or by reason of alleged or actual negligence, fraud or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its insured or in the preparation or prosecution of an appeal consequent upon such action.

<u>ARTICLE 12</u>

## INSPECTION OF RECORDS

The Manager shall place at the disposal of the Retrocessionaire at all reasonable times upon reasonable notice to the Manager in writing, and the Retrocessionaire shall have the right to inspect through its authorized representatives all books, records and papers of the Manager in connection with any premium payable hereunder, or claims made hereunder.

<u>ARTICLE 13</u>

## TAXES

In consideration of the terms under which this Agreement is issued, the Manager and the Members undertake not to claim any deduction in respect of the premium hereon when making tax returns other than Income or Profits Tax returns to any State or Territory or the District of Columbia.

Federal Excise Tax of 1%, as applicable, will be paid by the Retrocessionaire, it being understood and agreed that in the event of any return of premium becoming due hereunder the Retrocessionaire will deduct 1% from the amount of the return and the Manager's agent, being for this purpose the Intermediary on this Agreement, will take steps to recover the Tax from the U.S. Government.

<u>ARTICLE 14</u>

## ERRORS OR OMISSIONS

Any error, omission or oversight by the Manager shall in no way invalidate the reinsurance hereunder, provided, that such error, omission or oversight shall be corrected promptly after discovery.

<u>ARTICLE 15</u>

## CURRENCY

All transactions hereunder shall be in United States Currency. Premiums and losses, shall, for the purpose of this Agreement, be converted into United States Dollars at the rates of exchange at which they are entered in the books of the Manager.

<u>ARTICLE 16</u>

## INSOLVENCY

This reinsurance shall be payable by the Retrocessionaire on the basis of the liability of the Members under Original Reinsurance Contract or Contracts without diminution because of the insolvency of the Members.

In the event of insolvency of a Member, the Manager or the liquidator or receiver or statutory successor of the Member shall give written notice to the Retrocessionaire of the pendency of a claim against the Member on the Original Reinsurance Contract reinsured within a reasonable time after such claim is filed in the insolvency proceeding; during the pendency of such claim the Retrocessionaire may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses which it may deem available to the Member or its liquidator or receiver or statutory successor; the expense thus incurred by the Retrocessionaire shall be chargeable subject to court approval against the Member as part of the expense of liquidation to the extent of a proportionate share of the benefits which may accrue to the Member solely as a result of the defense so undertaken by the Retrocessionaire.

Where the Retrocessionaire and one or more other assuming retrocessionaires are involved in the same claim and a majority in interest elect to interpose defense to such claims, the expense shall be apportioned in accordance with the terms of the applicable reinsurance agreements as though such expense had been incurred by the insolvent Member.

ARTICLE 17

## ARBITRATION

Should an irreconcilable difference of opinion arise between the parties to this Agreement as to the interpretation of this Agreement or transactions with respect to this Agreement, such difference shall be submitted to arbitration upon the request of one of the parties, one arbiter to be chosen by the Manager and one by the Retrocessionaire and an umpire to be chosen by the two arbiters before they enter into arbitration.

Should the arbiters fail to agree upon the choice of an umpire within 30 days of the appointment of the last arbiter, then either arbiter, or both together, may request the Superintendent of Insurance of the State in which arbitration is to be held (or the official in charge of Insurance matters whatever his title may be) to appoint an umpire. Should this official decline to make such an appointment, then following notice from said official of such declination, or 30 days following the date such request was made if no response has been received from said official, either arbiter or both together, may petition the court in the state where arbitration is to be held to appoint an umpire.

In the event that either party should fail to choose an arbiter within sixty (60) days following written request by the other party to enter upon arbitration, the requesting party may choose two arbiters who shall in turn choose an umpire before entering into arbitration.

Each party shall present their case to the arbiters and the umpire within thirty (30) days of the appointment of the umpire and the written decision of any two of the three shall be final and binding upon the Manager, the Members and the Retrocessionaire.

The arbiters and the umpire are relieved from all judicial formalities and may abstain from the strict rules of law, interpreting this Agreement as an honorable undertaking rather than as a merely legal obligation. By agreement between any two of the three, they may extend the time intervals contained in this Article.

The arbiters and the umpire shall be active or retired disinterested executive officers of insurance or reinsurance companies.

Each party shall pay the fee of its chosen arbiter and half of the fee of the umpire; the remaining costs of arbitration shall be paid as the written decision directs. In the event both arbiters are chosen by one part, the fees of the arbiters and the umpire shall be equally divided between the parties.

Unless otherwise mutually agreed between the Manager and the Retrocessionaire any arbitration shall take place in New York, New York.

ARTICLE 18

LOSS RESERVES

(Applies only to those Retrocessionaires who cannot qualify for credit by any State or any other governmental authority having jurisdiction over the Manager's loss reserves.)

As regards policies or bonds issued by the Manager coming within the scope of this Agreement, the Manager agrees that when it shall file with the Insurance Department or set up on its books reserves for losses which it shall be required to set up by law it will forward to the Retrocessionaire a statement showing the proportion of such loss reserves which is applicable to them. The Retrocessionaire hereby agrees that it will apply for and secure delivery to the Manager a clean irrevocable Letter of Credit issued by First National City Bank of New York in an amount equal to Retrocessionaire's proportion of said loss reserves.

The Manager undertakes to use and apply any amounts which it may draw upon such Credit for the following purposes only:

(a)   To pay the Retrocessionaire.s share or to reimburse the Members for the Retrocessionaire's share of any liability for loss reinsured by this Agreement.

(b)   To make refund of any sum which is in excess of the actual amount required to pay Retrocessionaire's share of any liability reinsured by this Agreement.

First National City Bank of New York shall have no responsibility whatsoever in connection with the propriety of withdrawals made by the Manager or the disposition of funds withdrawn, except to see that withdrawals are made only upon the order of properly authorized representatives of the Manager.

— 9 —

## ARTICLE 19

### TERMINATION

A. Either the Manager or the Retrocessionaire shall have the right to terminate this Agreement at 12:01 a.m., Eastern Standard Time, of any January 1 by giving the other 120 days' notice via Registered Mail.

B. In the event of termination the liability of the Retricessionaire shall continue as respects coverage afforded under Original Reinsurance Contracts in force at the time of termination, including those Original Reinsurance Contracts written or renewed during the notice period, until:

   a. Termination date, or 12 months whichever occurs first, as respects Original Reinsurance Contracts written for a set term;

   b. The first anniversary date following the termination of this Agreement, or 12 months following the termination of this Agreement, whichever occurs first, as respects Original Reinsurance Contracts written for a continuous term,

and the premium payable to the Retrocessionaire for the protection afforded during this period shall be the rate prescribed in the PREMIUM AND REPORTS ARTICLE multiplied by the Net Earned Premium Income on Original Reinsurance Contracts covered during this period.

Notwithstanding the foregoing the Manager may, by giving written notice to the Retrocessionaire prior to the effective date of termination, elect to terminate the Retrocessionaire's entire liability for losses occurring subsequent to the time and date of termination.

## ARTICLE 20

### TERMINATION DURING LOSS

Should this Agreement terminate, or should an anniversary date occur, while a Loss Occurrence covered hereunder is in progress, it is understood and agreed that subject to the other terms and conditions of this Agreement, the Retrocessionaire shall be responsible for the loss in progress in the same manner and to the same extent it would have been responsible had the Agreement terminated, or anniversary date occurred at Midnight, the day following the conclusion of the loss in progress.

## ARTICLE 21

SERVICE OF SUIT

(Applies only to those Retrocessionaires who are domiciled outside the United States of America)

In the event of the failure of the Retrocessionaire hereon or any of them to pay any amount claimed to be due hereunder, the Retrocessionaire hereon, at the request of the Managers, will submit to the jurisdiction of any Court of competent jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

Service of process in such suit may be made upon Messrs. Mendes and Mount, 27 William Street, New York, New York 10005, and in any suit instituted against any one of them upon this Agreement, the Retrocessionaire will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above named are authorized and directed to accept service of process on behalf of the Retrocessionaire in any such suit and/or upon the request of the Managers to give a written undertaking to the Managers that they will enter a general appearance on behalf of the Retrocessionaire or any of them in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Retrocessionaire hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Managers or any beneficiary hereunder arising out of this Agreement, and hereby designate the above named Mendes and Mount as the firm to whom the said officer is authorized to mail such process or a true copy thereof.

## ARTICLE 22

SPECIAL PROVISION

The Manager warrants that any payments by the Retrocessionaire to the Manager shall constitute payment to the Members.

## ARTICLE 23

INTERMEDIARY CLAUSE

Guy Carpenter & Company, Inc., is hereby recognized as the Intermediary negotiating this Agreement for all business hereunder, except Canadian business, on which Guy Carpenter & Company (Canada) Limited is hereby recognized as the Intermediary. All communications relating thereto shall be transmitted to the Manager and the Retrocessionaire through Guy Carpenter & Company, Inc., 110 William Street, New York, New York 10038 (acting in behalf of themselves and Guy Carpenter & Company (Canada) Limited).

– 11 –

## NUCLEAR INCIDENT EXCLUSION CLAUSE – LIABILITY – REINSURANCE

*(Wherever the word "Reassured" appears in this clause, it shall be deemed to read "Reassured", "Reinsured", "Company", or whatever other word is employed throughout the text of the reinsurance agreement to which this clause is attached to designate the company or companies reinsured.)*

(1) This reinsurance does not cover any loss or liability accruing to the Reassured as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association.

(2) Without in any way restricting the operation of paragraph (1) of this Clause it is understood and agreed that for all purposes of this reinsurance all the original policies of the Reassured (new, renewal and replacement) of the classes specified in Clause II of this paragraph (2) from the time specified in Clause III in this paragraph (2) shall be deemed to include the following provision (specified as the Limited Exclusion Provision):

**Limited Exclusion Provision.\***

I. It is agreed that the policy does not apply under any liability coverage, to {injury, sickness, disease, death or destruction / bodily injury or property damage} with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability.

II. Family Automobile Policies (liability only), Special Automobile Policies (private passenger automobiles, liability only), Farmers Comprehensive Personal Liability Policies (liability only), Comprehensive Personal Liability Policies (liability only) or policies of a similar nature; and the liability portion of combination forms related to the four classes of policies stated above, such as the Comprehensive Dwelling Policy and the applicable types of Homeowners Policies.

III. The inception dates and thereafter of all original policies as described in II above, whether new, renewal or replacement, being policies which either

    (a) become effective on or after 1st May, 1960, or

    (b) become effective before that date and contain the Limited Exclusion Provision set out above; provided this paragraph (2) shall not be applicable to Family Automobile Policies, Special Automobile Policies, or policies or combination policies of a similar nature, issued by the Reassured on New York risks, until 90 days following approval of the Limited Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(3) Except for those classes of policies specified in Clause II of paragraph (2) and without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that for all purposes of this reinsurance the original liability policies of the Reassured (new, renewal and replacement) affording the following coverages:

    Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability)

shall be deemed to include, with respect to such coverages, from the time specified in Clause V of this paragraph (3), the following provision (specified as the Broad Exclusion Provision):

**Broad Exclusion Provision.\***

It is agreed that the policy does not apply:

I. Under any Liability Coverage, to {injury, sickness, disease, death or destruction / bodily injury or property damage}

    (a) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II. Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to {immediate medical or surgical relief, / first aid,} to expenses incurred with respect to {bodily injury, sickness, disease or death / bodily injury} resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

- 1 -

## NUCLEAR INCIDENT EXCLUSION CLAUSE – PHYSICAL DAMAGE – REINSURANCE

*(Wherever the word "Reassured" appears in this clause, it shall be deemed to read "Reassured", "Reinsured", "Company", or whatever other word is employed throughout the text of the reinsurance agreement to which this clause is attached to designate the company or companies reinsured.)*

1. This Reinsurance does not cover any loss or liability accruing to the Reassured, directly or indirectly, and whether as Insurer or Reinsurer, from any Pool of Insurers or Reinsurers formed for the purpose of covering Atomic or Nuclear Energy risks.

2. Without in any way restricting the operation of paragraph (1) of this Clause, this Reinsurance does not cover any loss or liability accruing to the Reassured, directly or indirectly and whether as Insurer or Reinsurer, from any insurance against Physical Damage (including business interruption or consequential loss arising out of such Physical Damage) to:

    I. Nuclear reactor power plants including all auxiliary property on the site, or

    II. Any other nuclear reactor installation, including laboratories handling radioactive materials in connection with reactor installations, and "critical facilities" as such, or

    III. Installations for fabricating complete fuel elements or for processing substantial quantities of "special nuclear material," and for reprocessing, salvaging, chemically separating, storing or disposing of "spent" nuclear fuel or waste materials, or

    IV. Installations other than those listed in paragraph (2) III above using substantial quantities of radioactive isotopes or other products of nuclear fission.

3. Without in any way restricting the operations of paragraphs (1) and (2) hereof, this Reinsurance does not cover any loss or liability by radioactive contamination accruing to the Reassured, directly or indirectly, and whether as Insurer or Reinsurer, from any insurance on property which is on the same site as a nuclear reactor power plant or other nuclear installation and which normally would be insured therewith except that this paragraph (3) shall not operate

    (a) where Reassured does not have knowledge of such nuclear reactor power plant or nuclear installation, or

    (b) where said insurance contains a provision excluding coverage for damage to property caused by or resulting from radioactive contamination, however caused. However on and after 1st January 1960 this sub-paragraph (b) shall only apply provided the said radioactive contamination exclusion provision has been approved by the Governmental Authority having jurisdiction thereof.

4. Without in any way restricting the operations of paragraphs (1), (2) and (3) hereof, this Reinsurance does not cover any loss or liability by radioactive contamination accruing to the Reassured, directly or indirectly, and whether as Insurer or Reinsurer, when such radioactive contamination is a named hazard specifically insured against.

5. It is understood and agreed that this Clause shall not extend to risks using radioactive isotopes in any form where the nuclear exposure is not considered by the Reassured to be the primary hazard.

6. The term "special nuclear material" shall have the meaning given it in the Atomic Energy Act of 1954, or by any law amendatory thereof.

7. Reassured to be sole judge of what constitutes:

    (a) substantial quantities, and

    (b) the extent of installation, plant or site.

12/12/57

## NUCLEAR INCIDENT EXCLUSION CLAUSE —
### PHYSICAL DAMAGE AND LIABILITY
### (BOILER AND MACHINERY POLICIES) REINSURANCE

*(Wherever the word "Reassured" appears in this clause, it shall be deemed to read "Reassured", "Reinsured", "Company", or whatever other word is employed throughout the text of the reinsurance agreement to which this clause is attached to designate the company or companies reinsured.)*

1. This Reinsurance does not cover any loss or liability accruing to the Reassured as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association.

2. Without in any way restricting the operation of paragraph (1) of this Clause it is understood and agreed that for all purposes of this Reinsurance all original Boiler and Machinery Insurance or Reinsurance contracts of the Reassured shall be deemed to include the following provisions of this paragraph:

This Policy does not apply to "loss", whether it be direct or indirect, proximate or remote

   (a) from an Accident caused directly or indirectly by nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled; or

   (b) from nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, caused directly or indirectly by, contributed to or aggravated by an Accident.

3. However, it is agreed that loss arising out of the use of Radioactive Isotopes in any form is not hereby excluded from reinsurance protection.

23/6/58

NUCLEAR INCIDENT EXCLUSION CLAUSE-PHYSICAL DAMAGE AND LIABILITY
(BOILER AND MACHINERY POLICIES)-REINSURANCE-CANADA

(1)    This Contract does not cover any loss or liability accruing to the Reassured as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association.

(2)    Without in any way restricting the operation of paragraph (1) of this Clause it is understood and agreed that for all purposes of this Contract all original Boiler and Machinery Insurance or Reinsurance contracts of the Reassured shall be deemed to include the following provisions of this paragraph;

This Policy does not apply to loss, whether it be direct or indirect, proximate or remote
   (a)    from an Accident caused directly or indirectly by nuclear retention, nuclear radiation contamination, all whether controlled or uncontrolled; or
   (b)    from nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, caused directly or indirectly by, contributed to or aggravated by an Accident.

(3)    However, it is agreed that loss arising out of the use of Radioactive Isotopes in any form is not hereby excluded from reinsurance protection.

(4)    Without in any way restricting the operation of paragraph (1) hereof, it is understood and agreed that policies issued by the Reassured effective on or before 31st December, 1958, shall be free from the application of the other provisions of this Clause until expiry date or 31st December, 1961, whichever first occurs, whereupon all the provisions of this Clause shall apply.

N.M.A. 1251.
29/10/59

**Exhibit 6**

# FINAL REPORT ON THE LIQUIDATION OF
## CITIZENS CASUALTY COMPANY OF NEW YORK

### INTRODUCTION

Richard S. Karpin, Assistant Special Deputy Superintendent of Insurance and Agent of Neil D. Levin, Superintendent of Insurance of the State of New York, as liquidator (the "Liquidator") of Citizens Casualty Company of New York ("Citizens") submits his final report on the liquidation of Citizens.

By Order (the "Liquidation Order") of the Supreme Court of the State of New York, County of New York, entered June 17, 1971, Citizens was adjudged to be insolvent and placed into liquidation. The Liquidation Order appointed then Superintendent of Insurance, Benjamin R. Schenck, and his successors in office as Liquidator of Citizens.

The Liquidation Order directed the Liquidator to take possession of Citizens' property and liquidate the business and affairs of Citizens pursuant to the provisions of Article XVI (now Article 74) of the Insurance Law of the State of New York.

This final report is submitted pursuant to the provisions of an order entered on the 10th day of January, 1978 which approved and ratified the Liquidator's Report, Audit and Petition (the "1977 Status Report") filed in the office of the Clerk of New York County on October 7, 1977. The 1977 Status Report is incorporated by reference herein.

The order confirming the 1977 Status Report provided, inter alia, for the closing of this proceeding, and pursuant thereto the Liquidator has taken the following actions to complete the liquidation:

1.  he has identified Citizens' policyholders and creditors and notified them to present their claims;

2.  he has marshaled Citizens' assets;

3.  he has adjudicated the claims presented by Citizens' policyholders and creditors and otherwise liquidated Citizens' business pursuant to Article XVI (now Article 74) of the New York insurance laws; and

4.  he has distributed Citizens' assets to creditors with allowed claims.

Financial statements consisting of the comparative balance sheet showing Citizens' status at the date of entry of the Liquidation Order and at December 3, 1997 and the final statement of cash receipts and disbursements is annexed hereto.

1. History

Citizens was incorporated under the laws of the State of New York on October 11, 1926 and licensed as a stock casualty insurer on October 2x, 1928. In addition to New York, it was authorized to transact business in all states (except Hawaii, Ohio and Wyoming), the District of Columbia and Puerto Rico.

As shown by an April 29, 1963 report on examination into the financial condition and affairs of Citizens by the New York State Insurance Department, Citizens was insolvent in the minimum amount of $4,490,808 as of December 31, 1957. A subsequent report on examination dated August 29, 1969 (the "1969 Report") found that Citizens was insolvent in the minimum amount of $5,269,693.

As a result, the Superintendent petitioned the court for an order placing Citizens into rehabilitation. Citizens opposed the petition. On March 12, 1970, the Appellate Division, First Department, after protracted legal proceedings, found that Citizens was insolvent in the minimum amount of $5,269,693 as of December 31, 1958 and appointed

lien Superintendent Richard E. Stewart and his successors in office as rehabilitator. A final order of rehabilitation was entered on March 23, 1970. Citizens appealed. The order was affirmed by the Court of Appeals on July 2, 1970 and became effective on August 10, 1970.

The Rehabilitator conducted the affairs and business of Citizens from the entry of the order of rehabilitation. The continued examination of Citizens' financial condition confirmed that it was insolvent. As of December 31, 1970, the Insurance Department determined that Citizens was insolvent in the minimum amount of $6,697,905. The Rehabilitator concluded that further efforts to rehabilitate Citizens would be futile. By order to show cause dated March 3, 1971, the Superintendent petitioned the court for an order terminating Citizens' rehabilitation proceeding and placing Citizens into liquidation. As stated above, the Order of Liquidation was entered on June 17, 1971.

II. Citizens Financial Condition As of the Date of Liquidation

A. Assets

The value of Citizens' assets as of the date of liquidation as reported in the 1997 status report totaled $7,417,625. The assets consisted of:

| Asset | Amount |
|---|---|
| Cash | $ 200,104 |
| Securities | $7,150,530 |
| Premiums in course of collection | $ 6,201 |
| Miscellaneous | $ 2,925 |
| Reinsurance Recoverables | $ 57,865 |
| | $7,417,625 |

5

The original reserves had subsequently been adjusted to $1,533,143 and 15,471 increase. The adjustment balances collateral savings accounts at revises not disclosed in the 1977 Status Report.

**B. Liabilities**

Citizens' liabilities consisted primarily of its reserves for losses and loss adjustment expenses. An insurance company is required to establish reserves in an amount sufficient to cover its ultimate liability for all of its insurance and reinsurance obligations. The 1969 Report indicated that Citizens' reserves for losses and loss adjustment expenses as of December 31, 1968, should have been at least $58,769,324, net of reinsurance due Citizens upon its payment of the losses and loss adjustment expenses.

Upon entry of the Liquidation Order, the Liquidator did not make an independent evaluation of Citizens' reserves. The 1969 Report had already established that Citizens' reserves exceeded its assets. As set forth above, one of the Liquidator's primary duties has been to determine Citizens' liability for the claims reflected in the reserves. As discussed below, the actual development of claims significantly exceeded the minimum reserves set forth in the 1969 Report.

**III. Liquidation Proceeding**

**A. Notice to Claimants**

The Liquidator, in accordance with former Insurance Law §542 (now §7432(b)), was required to notify all person who may have had claims against Citizens at the date of liquidation, as disclosed by its books and records, to present their claims to him by the claim filing deadline established by the court. The Liquidator mailed notices to over

4

fifteen (15) or more newspapers of the initial deferred claim question notice was published twice a week in the [...] weeks in the national editions of the New York Times, the Journal of Commerce, and the Wall Street Journal and in publications in the following cities: Los Angeles, San Francisco, Denver, Hartford, Jacksonville, Atlanta, New Orleans, Boston, Seattle, Detroit, Newark, Philadelphia, San Juan, Providence and Dallas.

The Liquidation Order established February 14, 1972 as the last day for filing claims. Pursuant to former Insurance Law §543 (now §7432(c)), only claims filed prior to the claim filing deadline, with one exception, were entitled to share in the distribution of Citizens' assets.

The exception pertained to creditors to whom the Liquidator failed to provide timely or adequate notice. A claim by a creditor who did not receive notice with sufficient time to file by February 14, 1972 was deemed timely-filed if the creditor filed a proof of claim within the period prescribed in the notice.

More than eight thousand (8,000) proofs of claim were filed in this proceeding. Seven thousand nine hundred forty four (7,944) were timely-filed or deemed timely filed. One hundred seventy one (171) proofs of claim were filed late and classified as deferred.[1]

Of the timely-filed proofs of claim, three hundred five (305) were filed by shareholders for their equity interests. These claims were never adjudicated because Citizens was insolvent and had no equity. Twenty-three (23) proofs of claims were

---

[1] The 1977 Status Report states that one hundred seventy-four (174) proofs of claim were classified as deferred. Upon reconsideration, certain proofs of claim were determined to be timely-filed or deemed timely-filed because the creditor had not received adequate notice.

withdrawn. Five (5) proofs of claims were filed for policyholder protection,[2] not actual claims. Therefore, seven thousand six hundred eleven (7,611) claims were presented for adjudication in this proceeding.

The claims, in general, fall into broad categories: return premium; losses covered by policies; reinsurance; security fund/guaranty association; and miscellaneous. Claims for return premium are claims made by policyholders for coverage that was canceled by the liquidation order or for other reasons. Claims for losses arising under policies are claims by or against Citizens' policyholders for losses covered by Citizens' policies that were in effect prior to liquidation.

Reinsurance claims are claims for payment due from Citizens by insurance companies that ceded risks to Citizens pursuant to reinsurance contracts. Reinsurance claims would also include claims for premium due to reinsurers that assumed risks from Citizens pursuant to reinsurance contracts.

Security fund/guaranty association claims are claims by the insurance security funds (the 'Security Funds") maintained pursuant to article 76 of the insurance law and article 6-A of the workers' compensation law (and their predecessor statutes) and guaranty associations in other states that perform similar functions. In addition to the Security Funds, claims were filed by guaranty associations in California, Florida, Michigan, New Jersey and North Carolina.

---

[2] Policyholders were entitled to file proofs of claim for "policyholders protection". A policyholder protection proof of claim did not seek payment of a particular claim, but provided the Policyholder the right to present claims covered by Citizens' policies that were made after the claim filing deadline.

### 1. Security Fund/Guaranty Association Claims

The Security Funds and sister state guaranty associations are maintained by statute in each state for the purpose of paying claims that are covered by policies issued by insurers that were licensed in their states which are unable, due to insolvency, to meet their insurance obligations. In general, the Security Funds and sister state guaranty associations may only make payment with respect to claims that are timely-filed in the insolvent insurer's liquidation proceeding. The Security Funds and sister state guaranty associations that paid claims and incurred expenses covered by Citizens' policies were entitled to a claim in this proceeding for reimbursement of their payment of losses and expenses. They were, in essence, subrogated to the rights of the claimants whom they paid.

Finally, miscellaneous claims against Citizens included all non-insurance related claims such as claims by attorneys for legal fees, vendors for supplies and claims by state governments for taxes.

### B. Adjudication of Claims

As stated above, seven thousand six hundred eleven (7,611) claims were adjudicated in this proceeding. In liquidation, a claim is adjudicated upon entry of a court order allowing it for a specified amount or disallowing it. An allowed claim is "allowed" to share in distribution of assets based on the amount allowed.

In total, two thousand eight hundred thirty (2,830) claims were allowed in the amount of $51,669,925. Four thousand seven hundred eighty-one (4,781) claims were disallowed. The allowed claims can be classified as follows:

7

## 1. Security Fund / Guaranty Association Claims

a) New York's Security Funds

Most allowed claims arising under policies for losses were covered by the Security Funds or sister-state guaranty associations. The Security Funds paid the total amount of $13,553,988 to claimants on one thousand three hundred ninety-three (1,393) allowed claims. Thus, the Security Funds were subrogated to the claimants' rights as creditors in this proceeding. In addition, the Security Funds incurred expenses in the amount of $3,807,795 on behalf of Citizens. Pursuant to Insurance Law §7609(a), the Security Funds were entitled to an allowed claims for their expenses.

The losses and expenses paid by the Security Funds totaled $17,361,783. Pursuant to statute, Security Fund assessments in the amount of $169,436 paid by Citizens prior to entry of the Liquidation Order were deducted from the Security Funds' claims. Thus, the Security Funds' claim was allowed in the total amount of $17,192,347.

b) Sister-State Guaranty Associations

Six sister-state guaranty associations made claims in the following amounts for the payment of losses in their states and related expense covered by Citizens' policies:

| Guaranty Association | Amount Allowed |
|---|---|
| California | $ 900,000 |
| Florida | $ 34,776 |
| Michigan | $ 256,670 |
| New Jersey (Workers Compensation) | $ 25,790 |
| New Jersey (Property and Liability) | $ 301,302 |
| North Carolina | $ 38,538 |
| Total | $1,557,076 |

8

2.  Reinsurance Claims

32.  Seventy-three (73) reinsurance claims were allowed for the total amount of $29,224,615.

3.  Miscellaneous General Creditor Claims

One thousand three hundred seventy-seven (1,377) claims were allowed in total amount of $3,695,887.

C.  Plan to Expedite Closing of Citizens

By order entered February 18, 1997, this court approved the Liquidator's plan to expedite the closing of Citizens (the "Plan"). The Plan provided that all claims that had not been presented by June 30, 1994 were barred and discharged.  The bar date provision was required to enable the Liquidator to finally determine the amount due to Citizens' reinsurance creditors.  Despite the fact that Citizens has been in liquidation since 1971, reinsurance creditors who filed timely proofs of claim continue to report losses covered by reinsurance contracts entered into prior to liquidation.  Without a bar date, reinsurance claims would have continued to develop for many years and the Liquidator would have been unable to finalize Citizens' liability or make a final distribution of assets.  Pursuant to the Plan, the amount allowed for each reinsurance claim, with one exception, was the total of the paid losses and outstanding reserves as of June 30, 1994 reported by the cedent.  Thus, Citizens' reinsurance creditors received credit for part of the losses that they have been required to pay since June 30, 1994 and which they would have reported to Citizens.

9

Citizens' largest reinsurance creditor, B.D. Cooke and Partners, Ltd of London, ("B.D. Cooke") agreed to the allowance of its claim in the amount of paid losses only. It did not receive credit for outstanding reserves reported as of the June 30, 1994 bar date. In exchange, the Liquidator assigned to B.D. Cooke all reinsurance recoverables due to Citizens on the claims presented by Citizens' reinsurance creditors. This enabled the Liquidator to wind-up the collection of assets.

### D. Collection of Assets

#### 1. 1977 Status Report

As of December 31, 1976, the Liquidator reported collections of assets in the total amount of $1,546,002.

#### 2. Inception to Final Distribution of Assets

Inception through the final distribution of assets, the Liquidator collected the total amount of $29,572,583. The collections consisted of investment income, reinsurance recoveries, salvage and subrogation. The collections are described in more detail below.

##### a. Investment Income

The Liquidator received investment income in the amount of $13,288,240 on Citizens' invested assets.

##### b. Reinsurance

Citizens ceded parts of its insurance and reinsurance obligations to various reinsurers. The Liquidator recovered the total amount of $16,181,623 from Citizens reinsurers in connection with the allowance and payment of claims and expenses in this

proceeding. All remaining reinsurance balances due were assigned to B.D. Cooke in accordance with the Plan.

5. Salvage / Subrogation

The Liquidator made salvage and subrogation recoveries in the total amount of $102,720. 

E. Disbursements

1. Expenses

a). 1977 Status Report. As of December 31, 1976, the Liquidator reported expenses paid in the amount of $1,880,672.

b) Inception to Final Distribution of Assets

Inception through the final distribution of assets, the Liquidator's administrative expenses totaled $5,590,834. The expenses consist of the following items:

| Expenses | Amount |
|---|---|
| Salaries | $3,355,714 |
| Employee Benefits | |
| Rent | 741,892 |
| Overhead (insurance, equipment, postage telephone, stationery, miscellaneous) | 758,476 |
| Legal fees | 535,293 |
| Accounting & Consulting fees | 33,737 |
| Travel | 761,235 |
| Investment | 29,308 |
| Taxes | 70,230 |
| Commissions | 3,730 |
| | 14,684 |
| | $6,304,299 |

The expenses listed above total $6,304,299. $713,465 of that amount was allocated to the Security Funds. The Security Funds paid that amount to the Citizens'

11

estate over the course of this proceeding. As set forth above, the Security Fund's claim included its expenses.

2.    Distributions

a)    1977 Status Report

As of December 31, 1976, the Liquidator had not made any distributions of assets to creditors.

b)    Inception to Final Distribution of Assets

Dividends in the total amount of $31,454,045 were paid to creditors with allowed claims. The dividends constituted sixty one percent (61%) of the total amount allowed for all claims in this proceeding.

CONCLUSION

Citizens' liquidation has been completed in compliance with article 74 of the Insurance Law (and its predecessors), the Liquidation order, the order confirming the 1977 Status Report and the Plan approved by order entered February 18, 1997. The Liquidator collected assets in the total amount of $29,572,583 against expenses in the amount of $5,590,834. As a result, the assets available for distribution were augmented by the amount of $23,981,749.

Seven thousand six hundred eleven (7,611) claims were adjudicated. Two thousand eight hundred thirty (2,830) were allowed in the amount of $51,669,925. Four thousand seven hundred eighty-one (4,781) claims were disallowed.

The Liquidator paid dividends in the total amount of $31,454,045 on allowed claims, representing 61% of the amount allowed.

12

...Citizens's liabilities have been finally determined and its assets have been marshaled and distributed. Based on the foregoing, and the filing of this final report, judgment should be entered terminating this proceeding.

Richard Karpin
Assistant Special Deputy

...COMPANY OF NEW YORK...

RICHARD L. KARPIN

**Exhibit 7**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------X
         In the Matter of        :   Index No. 40357/71

        the Liquidation of      :   <u>PETITION</u>

CITIZENS CASUALTY COMPANY OF   :
NEW YORK

                          :
-------------------------------------X

TO THE SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

        Petitioner, Edward J. Muhl, Superintendent of
Insurance of the State of New York as Liquidator of Citizens
Casualty Company of New York (the "Liquidator") by Richard S.
Karpin, Assistant Special Deputy Superintendent of Insurance
and Agent in this proceeding respectfully petitions this
Court, pursuant to Article 74 of the New York Insurance Law,
for an order allowing certain reinsurance claims and approving
the Liquidator's plan to expedite the closing of the estate of
Citizens Casualty Company of New York ("Citizens").

<u>Background</u>

        1.  Citizens was incorporated under the laws of the
State of New York on October 11, 1928 and licensed as a stock
casualty insurer on October 24, 1928.

2.    On June 17, 1971, Citizens was placed into liquidation by order of the Supreme Court of the State of New York (the "Liquidation Order") pursuant to which the Liquidator was authorized and directed to take possession of the property and liquidate the business and affairs of Citizens and was vested with title to all property, contracts and rights of action of Citizens. The Liquidation Order is attached hereto as Exhibit A.

3.    Pursuant to the Liquidation Order, all outstanding policy and other insurance obligations and all other contract obligations of Citizens were terminated and all other liability thereunder ceased on June 25, 1971. The Liquidation Order directed all persons having claims against Citizens to file such claims in the liquidation proceeding by February 14, 1972.

4.    Prior to its liquidation, Citizens along with other reinsurers, participated in a reinsurance pool managed first by Agency Managers, Ltd. ("AM") and then by Agency Managers, Inc. ("AMI") hereafter referred to as the AM Pool. The AM Pool wrote coverage reinsuring casualty risks originally insured by primary insurers known as "Cedent(s)."

5.    In some cases a Cedent contracted with only one AM Pool member who acted as the fronting company. The AM Pool

-2-

member then obtained reinsurance (generally known as "Inter Office Reinsurance") from the other members of the AM Pool pursuant to a written agreement with the AM Pool. In many instances Citizens was the fronting company initially writing the coverage of the Cedent. Hereinafter references to the "Reinsurers" shall mean the AM Pool members as reinsurers of Citizens and references to "Reinsurance Agreements" shall mean all reinsurance agreements between Citizens and the AM Pool and its members, including Inter Office Reinsurance. Balances due Citizens under Reinsurance Agreements are referred to herein as "Reinsurance Recoverables."

6. Various excess of loss reinsurers (the "Excess of Loss Reinsurers") entered into excess of loss agreements (the "Excess of Loss Agreements") whereby they reinsured the AM Pool members for the losses assumed by the AM Pool (the "Excess of Loss Recoverables").

7. A pool of insurers organized and managed by B.D. Cooke & Partners Ltd. of London, England and led by The Dominion Insurance Company Limited (said pool hereinafter being referred to as "B.D. Cooke Pool") reinsured the AM Pool members for a portion of their net losses after the application of the Excess of Loss Agreements. The Dominion Insurance Company, Ltd., a member of the B.D. Cooke Pool, was also a major Cedent to the AM Pool and is the largest creditor

-3-

of Citizens. (Attached hereto as Exhibit B is a list of the companies which participated from time to time in the B.D. Cooke Pool.) The Dominion Insurance Company, Ltd. has assigned its proof of claim in the Citizen's liquidation proceeding to the B.D. Cooke Pool. Accordingly, all amounts that would be due and payable to the Dominion Insurance Company, Ltd. from Citizens shall be paid to the B.D. Cooke Pool.

8. AMI, as successor to AM, filed a Chapter 7 petition in Bankruptcy on August 30, 1988. Thereafter, various AM Pool members, including Citizens, retained Run-Off Management, Inc. ("ROM") to administer their participation in the AM Pool. As part of its contractual obligations, ROM is billing and collecting amounts due to Citizens pursuant to the Reinsurance Agreements and Excess of Loss Agreements.

9. The Liquidator filed a Report, Audit and Petition (the "Report") with this Court on October 7, 1977 which was approved and confirmed by order of Justice Sidney H. Asch (the "Confirming Order"). The Confirming Order attached hereto as Exhibit C, provides among other things, that

(a) all timely filed claims shall be deemed allowed in the amount of any settlement or compromise by the Liquidator; and

-4-

(b)  all persons who had not filed claims in the liquidation proceeding on or before February 14, 1972 (the "Deferred Claims") are foreclosed from hereafter filing claims and sharing in the assets of Citizens except as late claims pursuant to Section 543(3) (now § 7432(c)) of the New York Insurance Law; and

(c)  after reserving funds for administrative expenses, taxes and contingencies, the Liquidator was authorized to declare and pay one or more pro-rata dividends on all claims allowed in the Citizens Liquidation proceeding, other than those covered by Articles 330, 333, 334 of the New York Insurance Law (now Article 76).

### Liquidator's Plan

10.  In order to expedite the closing of the Citizens liquidation proceeding the Liquidator recommends that:

(a)  the liability of Citizens to all timely filed reinsurance creditors, except the B.D. Cooke Pool, be fixed based on the amount of paid and outstanding losses as reflected on the Liquidator's books and records as of June 30, 1994;

-5-

(b)  the reinsurance liability of Citizens to the
B.D. Cooke Pool be fixed based on the B.D. Cooke Pool's
paid losses as reflected on the books and records of the
Liquidator as of June 30, 1994;

(c)  this Court allow the reinsurance claims listed
on Exhibit D;

(d)  this Court approve the Liquidator's assignment
to the B.D. Cooke Pool of the Reinsurance Agreements and
Excess of Loss Agreements inclusive of Reinsurance
Recoverables, Excess of Loss Recoverables and all other
reinsurance due to Citizens in the manner provided for
herein; and

(e)  this Court order that all other claims or
potential claims against Citizens which were not received
by the Liquidator and liquidated prior to June 30, 1994
be forever barred as against the Liquidator.

Each element of the Liquidator's plan will be
discussed more fully below.

### Fixing Citizens' Reinsurance Liabilities and Allowance of Claims

11.  Four Thousand Seven Hundred and Eighty Nine
(4,789) claims filed in the Citizens' liquidation proceeding

-6-

have been disallowed, One Hundred and Seventy One (171) have
been deemed deferred, One Thousand Three Hundred and Eighty
Six (1,386) have previously been allowed and Fifty One (51)
are recommended for allowance herein.  While the Confirming
Order provided that all timely filed claims would be deemed
allowed in the amount of any settlement or compromise by the
Liquidator, the Liquidator has sought this Court's review and
approval of all allowances.  The Fifty One (51) claims that
have not yet been allowed are claims arising out of the
reinsurance obligations of Citizens.

    12.  The final determination of Citizens reinsurance
liabilities will not be complete for many years.  The
Liquidator is required to consider claims which were incurred
prior to February 14, 1972, the last date for filing claims,
but reported afterward as long as a timely proof of claim has
been filed.  A proof of claim for reinsurance covers paid,
outstanding, and incurred but not reported losses ("IBNR").
Paid losses are those where company ceding business to
Citizens has already made payment.  Outstanding losses are
reserves for losses which have been reported but not yet
resolved and IBNR are projections for losses where the
incident giving rise to the loss has occurred but has not yet
been reported to the insurer.  It could take years to resolve
the outstanding and IBNR reinsurance liabilities of Citizens.

-7-

13.   In the interest of closing the estate of
Citizens and paying a dividend to creditors of at least 50% of
the amount of all allowed claims, the Liquidator is
recommending that the reinsurance obligations of Citizens
(except to the B.D. Cooke Pool) be limited to the paid and
outstanding losses reflected on the books and records of the
Liquidator as of June 30, 1994.  The B.D. Cooke Pool's claim
is being recommended for allowance in the amount of only the
paid losses of B.D. Cooke Pool as of June 30, 1994.  No
allowance shall be made to the B.D. Cooke Pool for its
outstanding losses presently reflected on the books and
records of the Liquidator as of June 30, 1994, in exchange for
which the Liquidator shall assign to the B.D. Cooke Pool
certain rights as set forth in paragraph 19 of this petition.

14.   Credit will not be given for reinsurance claims
which are not reflected on the books and records of the
Liquidator as of June 30, 1994.  The Liquidator does not
believe that the inclusion of these claims would significantly
alter any reinsurance creditor's share of Citizens' total
assets since it is projected that each reinsurance creditor's
losses will develop in proportion to the losses on the
Liquidator's books and records as of June 30, 1994.  Thus,
each creditors' proportion of Citizens total liability will
not change substantially.

-8-

15. The Liquidator believes that creditors will benefit if their reinsurance claims are fixed at this time because creditors will receive a distribution of at least 50% of the amount of their allowed claims, less any interim dividends already paid, as opposed to waiting years for a distribution. Creditors can invest their share of the distribution as they see fit. Additionally, if a distribution is made now, the Liquidator will not incur additional costs of administration, thus making more assets available to pay creditors.

16. The claims listed on Exhibit D represent the reinsurance liabilities of Citizens as reflected on the books and records of the Liquidator as of June 30, 1994 which have not previously been allowed. The Liquidator has reviewed these claims and determined that such claims are within the coverage of Citizens and that the claimants have filed timely proofs of claim. The Liquidator recommends that the claims listed on Exhibit D be allowed.

## Fixing Citizens' Non-Reinsurance Liabilities

17. In order to enable the Liquidator to make a distribution to creditors, all of Citizens' liabilities must be fixed. The Liquidator proposes that, as with Citizens' reinsurance liability, Citizens' liability to non-reinsurance creditors be fixed as of June 30, 1994. Therefore, any

-9-

creditors' claim or potential claim which was not received by the Liquidator and liquidated by June 30, 1994 shall be forever barred as against the Liquidator.

Assignment of Reinsurance and<br>Excess of Loss Reinsurance

18.  The Liquidator proposes that Citizens forego further collection of any Reinsurance Recoverables and Excess of Loss Recoverables to expedite distribution of Citizens' assets and termination of this proceeding.  The Liquidator believes that the potential reinsurance collections will not substantially enhance the distribution to be paid to creditors because while the amount available for distribution may increase, so will the losses which will share in the distribution.  Considering the administrative costs which will be incurred, the loss of the time value of money by creditors and the likelihood that creditors will not receive a greater percentage of their claims paid, the Liquidator recommends that the estate not be held open for the continued collection of reinsurance due Citizens.

19.  The Liquidator recommends that:

(a)  Effective upon entry of a final nonappealable order approving this Petition, all Reinsurance Recoverables

-10-

and Excess of Loss Recoverables due the Liquidator according
to his accounts as of June 30, 1994 and uncollected by ROM or
the Liquidator by June 30, 1995 shall be assigned and
transferred to the B.D. Cooke Pool. Any Reinsurance
Recoverables due, from Citizens as an AM Pool member, to
Citizens, as a Cedent, shall not be assigned to the B.D. Cooke
Pool.

(b) Effective upon the entry of a final
nonappealable order approving this Petition, the Reinsurance
Agreements and the Excess of Loss Agreements shall be assigned
and transferred to the B.D. Cooke Pool as from July 1, 1994,
except to the extent the Liquidator has exercised any rights
thereunder prior to the date of such order, together with all
of the rights which the Liquidator would have had thereunder
if the Citizens estate were not closed as proposed in this
Petition. Such order shall provide that the terms of such
agreements shall remain in full force and effect, but with no
further rights, obligations or liability on the part of the
Liquidator.

(c) Effective upon the entry of a final
nonappealable order approving the Final Audit and Accounting
of Citizens, all other reinsurance recoverables due Citizens
not arising out of business of the AM Pool together with all
reinsurance assets and rights of recovery under reinsurance
agreements of Citizens (including, without limitation on the

-11-

foregoing, those reinsurances which may not have been specifically identified as of the date of the order) shall be assigned and transferred to the B.D. Cooke Pool.

(d)  In consideration of the foregoing, the B.D. Cooke Pool has agreed to the Liquidator's valuation of its claims and agrees to forego its claim for outstanding losses which are Thirty Million Seven Hundred Twenty Two Thousand Seven Hundred Dollars ($30,722,700) as of June 30, 1994 as reflected on the Liquidator's books and records, it being understood that the B.D. Cooke Pool will assert its claims for outstanding and future losses, including, but not limited to incurred but not reported losses, against those assets, agreements and other rights being assigned to the B.D. Cooke Pool pursuant to the recommendations of the Liquidator set forth in paragraphs 19(a), (b) and (c) above.

(e)  The order approving the Petition shall also provide that the Supreme Court of the State of New York, New York County, shall have continuing jurisdiction over any disputes concerning the assignments and transfers described above and their effect, except said Court shall not resolve disputes solely involving computations of amounts due thereunder.  The Liquidator shall not be a necessary party in any such future proceeding.

-12-

Co. / Approval

20. The Liquidator respectfully requests that the Court schedule a hearing on this matter in accordance with the accompanying Order Establishing Hearing on Liquidator's Plan to Expedite Closing of Citizens Casualty Company of New York ("Order Establishing Hearing") and approve the forms of notice attached as Exhibits 1 and 2 to the Order Establishing Hearing. Notice will be provided to all of Citizens' reinsurers, all creditors with previously allowed, deferred, or pending claims, those claimants listed on Exhibit D whose claims are recommended for allowance herein, and the shareholders of Citizens. Notice shall be provided to the last known address on the books and records of Citizens.

21. There has been no previous application for the relief requested herein.

WHEREFORE, the Liquidator respectfully requests that the Court issue the Order Establishing Hearing and that a hearing be scheduled sufficiently far in the future to permit the Liquidator to provide notice, and that, upon the hearing, the Court issue an order granting the relief sought in this Petition and such other relief as is appropriate.

Edward J. Muhl
Superintendent of Insurance of
the State of New York as
Liquidator of Citizens Casualty
Company of New York

By: _____
Richard S. Karpin
Assistant Special Deputy
Superintendent of Insurance

STATE OF NEW YORK )
                  : ss.:
COUNTY OF NEW YORK)

   RICHARD S. KARPIN, being duly sworn, deposes and says:

   That he has read the foregoing Verified Petition and knows the contents thereof, and that the same is true to his own knowledge except as to the matters therein stated to be alleged upon information and belief, and as to those matters he believes it to be true; that the reason this petition is verified by this deponent rather than by the Superintendent of Insurance is that deponent is the duly appointed Assistant Special Deputy Superintendent of Insurance to take possession of the property of and liquidate the business of Citizens Casualty Company of New York, and as such is acquainted with the facts alleged therein.

   Deponent further says that the sources of his information and the grounds of his belief as to the matters stated in said Verified Petition to be alleged upon information and belief are records, books and papers of Citizens Casualty Company of New York in the possession of the Liquidator and communications made to deponent by employees and attorneys of the Liquidator.

               _____
               RICHARD S. KARPIN

Sworn to before me this
11th day of October, 1996

_____
Notary JEANETTE M. SENKO
Notary Public, State of New York
No. 31-4635668
Qualified in New York County
Commission Expires 9/30/97

1494K/JMS

-14-

**Exhibit 8**

52-54 LEADENHALL STREET LONDON EC3A 2AQ  TELEPHONE 071 481 8979  TELEX 885067DOMINS GI DX 610 CITY  FAX 071 481 4819
on behalf of



# DOMINION
INSURANCE COMPANY LIMITED

John Tafuro Esq
Director, Reinsurance Department
State of New York Insurance Department
Liquidation Bureau
123 Williams Street
New York
NEW YORK 10038-3889
USA

4th October 1993

Dear Mr Tafuro

**Citizens Casualty Company of New York**

I write further to the discussions held in your offices on 14th September regarding the possibility of vesting Citizens' reinsurance assets to the benefit of Dominion.

Dominion has large amounts of outstanding claims and IBNR reserves reinsured by Citizens and these would enable Citizens to trigger substantial reinsurance recoveries. The proposal to vest in Dominion the benefit of Citizens' reinsurance programme allows Dominion to acquiesce to the closure to the rest of the Citizens Estate. This is because Dominion will not then be subject to the prejudicial and discriminatory effect of an early closure of the Citizens Estate (which would have an unacceptably favourable effect on the London based Excess of Loss Reinsurers).

Overall, we appear to have developed an outline which will allow the Bureau to move substantially towards its goal of closing the Citizens Estate, without prejudicing Dominion's future claims.  This can be achieved if Dominion is allowed to take Citizens' reinsurance assets in respect of claims which have not yet been paid. It is important that we both have a clear view of what we are trying to achieve and, so far as possible, how we will get there. Accordingly, this letter attempts to set down my understanding of the proposals we discussed.

The issues before us should be split into 4 segments:-

i)    Other Cedants and the effect of their claims on Citizens' Reinsurers.

ii)   Dominion losses which have been paid.

iii)  Dividend levels achievable by the Estate.

iv)   Dominion losses which are unpaid.

REGISTERED IN ENGLAND NO. 451293 REGISTERED OFFICE  52-54 LEADENHALL STREET LONDON EC3A 2AQ
A MEMBER OF THE FONDIARIA GROUP

1.    Other Cedants

You will finalise the claims of all Cedants other than Dominion. We must achieve a situation, perhaps by an Order of the Court, that no further claims against the Estate can be made, other than by Dominion. (At this stage, I would remind you that Dominion is acting on behalf of a Pool, which ceded to Citizens from 1951 until 1960 in the names of the individual Pool Members. Thereafter, Dominion fronted for the others. It is my intention that the other Pool Members should be included with Dominion in this arrangement).

Finalisation of claims with other Cedants will be at a payment level commensurate with the level of dividend which the Estate will be able to sustain.

2.    Dominion Losses already paid

Dominion losses which have already been paid and accepted within the Citizens liquidated Estate, by virtue of their inclusion in ROM billings, will be admitted for dividend at the rate used for the Estate as a whole.

3.    Dividend Level achievable by the Estate

We examined the current status of the Estate and concluded that a dividend rate of 70+% could be achievable. The figures were as follows:-

| Liabilities | £000 |
|---|---|
| Gross amounts - Dividend already paid | 20,362 |
| Reinsurance Balances Payable | 16,437 |
| Reinsurance Claims Reserve - Gross | 21,258 |
| Claim Reserve - NY | 260 |
| Expense Reserve - NY | 172 |
| Other Liabilities | 261 |
| | 58,750 |

| Assets | | |
|---|---|---|
| Dividend already paid | | 10,181 |
| Free Cash & Bonds | | 10,418 |
| Other Cash & Funds | | 206 |
| Reinsurance Recoverable - Paid Losses | 12,803 | |
| - Outstanding Claims | 17,828 | |
| Less: Reserve for Uncollectable Reinsurance | (10,000) | 20,631 |
| Other Assets | | 13 |
| | | 41,449 |

There are a number of caveats and comments which need to be made in respect of the above:-

i)    If the non-recoverable reinsurance was increased to $15m, the dividend would reduce to 62%; demonstrating the importance of collecting from reinsurers.

- 2 -

ii)   If $10m of assets were available to offset, and assuming $10m of uncollectable reinsurance, then the dividend would reduce from 70% to 64%.

iii)  The analysis shows a liability of $16,437k, being reinsurance balances payable. It was estimated that roughly 80% of this amount is due to Dominion.

iv)   The analysis shows a liability for outstanding reinsurance claims of $21,258k. We did not discuss the effect of any Dominion claims within this figure, nor the effect on reinsurance recoverable (most of which would be excess of loss on Dominion claims).

v)    The analysis shows an asset of $17,828k being reinsurance recoverable on outstanding claims. The amount included therein as recoverable from Excess of Loss Reinsurers may be problematic as it in my experience that it can be extremely difficult to persuade them to make payment in respect of outstanding claims. Perhaps the Bureau would have more success in this area?

4.    Dominion Losses which are unpaid

4.1   The twin keys to this overall proposal are:-

a)  In order that we can temporarily withdraw Dominion's outstanding loss reserves and IBNR from the Estate, thereby allowing settlement with current creditors at an enhanced dividend rate, we must be assured of future recoveries from Citizens' Reinsurers. It is absolutely crucial to the continuation of this proposal that the appropriate legal framework be established so that Reinsurers can be compelled to honour valid claims made against them.

b)  I have been informed that it is essential that the Bureau satisfies itself that Dominion would not obtain advantage, compared with other creditors, from this proposal.

With regard to point a) above, when we met I was accompanied by Andrew Davis, of Davis and Davis, who are Dominion's General Counsel in the USA. It was agreed that representatives of the Bureau would liaise with Mr Davis with regard to establishing the appropriate legal framework to facilitate this proposal.

With regard to point b), we have developed a computer system here in London which replicates Citizens' underwriting and reinsurance programmes. As you are aware, Dominion undertakes a policy by policy IBNR procedure in respect of Asbestos losses. Accordingly, it has been possible for us to calculate precise cessions to Citizens on our IBNR and, by running these through the new computer system, we have been able to model this data to obtain details of how much money would be recoverable from each Reinsurer, plus Citizens own retained amount. Similar data exists within ROM in respect of outstanding losses and Mr Buccieri of ROM has run an equivalent report for me. Thus, we have been able to gain an overall picture of future recoverable amounts from Citizens' Reinsurers. (By comparing our IBNR data with the outstanding loss information produced by ROM, we were also able to cross check the workings of our own clone system).

- 3 -

4.2    The data output from the systems has been consolidated to show the total recoverable from reinsurers, as follows.

|  | $000 | $000 | See Note |
|---|---|---|---|
| Gross Outstanding/IBNR Losses |  | 43,985 | 1 |
| Recoverable from:- |  |  |  |
| Inter Office Reinsurers | 19,148 |  | 2 |
| Quota Share Reinsurers (Dominion) | 5,743 |  |  |
| Excess of Loss Reinsurers | 12,749 |  | 3 |
|  |  | 37,640 |  |
| Retention by Citizens |  | 6,345 |  |

Notes:-

4.2.1    This number is made up of Outstanding Losses of $24,587k and IBNR of $19,398k.

4.2.2    The analysis of Inter Office reinsurance is as follows:-

|  | $000 |
|---|---|
| American Home | 10 |
| Commercial Union | 8,080 |
| Constitution Re | 846 |
| Cosmopolitan | 2,672 |
| Great American | 2,449 |
| Nationwide | 2,435 |
| Nordisk | 1,928 |
|  | 19,148 |

You should note that Cosmopolitan is in liquidation.  I have reviewed "Bests" and find that all of the American companies are classified as "A" or better.  I have yet to satisfy myself of Nordisk.

4.2.3    Excess of Loss reinsurers can be analysed as follows:-

|  |  | $000 |
|---|---|---|
| a | Lloyds | 10,759 |
| b | Acceptable Companies | 882 |
| c | Unknown Companies | 74 |
| d | Companies in run-off | 868 |
| e | Companies in Liquidation | 166 |
|  |  | 12,749 |

4.2.3.1    It can be seen that Lloyds represents 84% of the total and it is therefore crucial to this proposal that they can be compelled to pay.

4.2.3.2    The figure for Acceptable Companies of $882k includes $808k in respect of Dominion and other members of the B D Cooke Pool.  The largest component of the remainder is Gerling, from whom it can be extremely difficult to extract money.

- 4 -

4.2.3.3   The Unknown Companies component is small, but is being researched via Mr Buscioti.

4.2.3.4   Companies in run-off worry me intensely. We are looking here at a proposal under which we envisage making collections from reinsurers for two decades. Given their involvement in US Casualty reinsurance, and not just limited to this treaty, I expect most of them to fold, probably sooner rather than later. Additionally, it tends to be significantly more difficult to obtain payment from companies in run-off.

4.2.3.5   The company in liquidation is English and American Insurance Company. Until 1991, they were active players in the London Market. They went into run-off in 1992 and into liquidation in 1993 – amply illustrating my concerns over the companies who are in run-off.

4.3   At a headline level, it first looks as if a dividend of 85% is obtainable ($37,640k ÷ $43,985k). This level is patently not achievable as it assumes full recoverability of all reinsurance, which cannot happen because of failed reinsurers.

There are a number of other issues which must also be taken into account when attempting to assess the effective dividend rate which Dominion could receive.

4.3.1   Currently the costs involved in administering the claims and collecting the reinsurance are met by the Estate. Under this proposal it is assumed that Dominion will bear those costs, thereby reducing the effective recovery. I have included a provision of $2m in the analysis below in respect of those costs.

4.3.2   Creditors obtaining dividend receive their money now. Under this proposal we will receive settlements from reinsurers over an extended period. It is appropriate to recognise the time value of money, and a discount factor of 20% has been applied to future recoveries (recognising the fact that although short term interest rates are low, yields in the medium term range are 5+%).

4.3.3   Returning to recoverability from reinsurers, it must be recognised that they are becoming extremely proficient at finding reasons not to pay claims. At a minimum this results in cost and delay in resolving problems; often collections have to be compromised (discounted) to achieve a settlement.

Given that the greatest part of reinsurance is collectable from Lloyds, their specific situation must also be considered. They are progressively moving towards centralised handling of old US Casualty claims, first by setting up the Specialist Claims Unit and later by establishing a reinsurer (NewCo) to reinsure these "old year problems". One of the aims of the Specialist Claims Unit is to achieve "more economical" settlements on old year

- 5 -

claims. This can only imply that they hope to become more proficient in finding ways of reducing the amount they have to pay out.

This factor, allied to the anticipated problems from reinsurers in run-off, indicates that we should reduce the expected income from reinsurers. Accordingly, in the analysis below, $5m has been deducted from the expected value of reinsurance recoverable.

4.4    The value of the future reinsurance recoveries, net of the elements discussed above, is as follows:-

$millions

| | | | |
|---|---|---|---|
| Gross Losses | | | 43.9 |
| | | | |
| Recoverable from Reinsurers: | | | |
| Inter office | | 19.1 | |
| Excess of Loss | | 12.8 | |
| | | 31.9 | |
| | | | |
| Less: Liquidated Reinsurers | | | |
| Cosmopolitan | 2.7 | | |
| English & American | .2 | (2.9) | |
| | | 29.0 | |
| | | | |
| Uncertain Recoveries | | | |
| Run-off, disputes etc) | | (5.0) | |
| | | 24.0 | |
| | | | |
| Time Value of Money | | (4.8) | |
| | | 19.2 | |
| | | | |
| Expenses | | (2.0) | |
| | | 17.2 | |
| | | | |
| Add: Recoverables from Quota Share | | | |
| (Dominion & Pool) | | 5.7 | |
| | | | |
| Total Recoverable | | 22.9 = | 52% |

(Note: The above ignores the application of offset, it is moot that the above could be presented:

| | | |
|---|---|---|
| Gross Losses | | 43.9 |
| Deduct Quota Share | | 5.7 |
| | | 38.2 |
| | | |
| Recoverable | 17.2 = | 45%) |

It can be seen from the above that the value of venting the reinsurance programme does not create a preferential situation in favour of Dominion.

5.    Conclusion

We appear to be developing the proposal along lines which should be compatible with the aims of both parties. Ultimate success can only be achieved if we can develop a legal framework which will allow Dominion to enforce the contracts of reinsurance against Citizens' retrocessionnaires. Therefore, we are reliant on our respective legal advisers to carry this forward with us.

I hope to see you in December to discuss this further. Please note that I plan to be in New York during the week commencing Monday 6th December. We can meet on any day except the Wednesday.

Yours sincerely

S I. McCann
Vice Chairman

- 7 -

**Exhibit 9**

ASSIGNMENT

FOR VALUE RECEIVED, Neil D. Levin, Superintendent of
Insurance of the State of New York, as Liquidator of Citizens
Casualty Company of New York, by Richard S. Karpin, Assistant
Special Deputy Superintendent of Insurance ("Assignor"), with
offices at 123 William Street, New York, New York 10038, hereby
assigns to B.D. Cooke Partners Limited ("Assignee"), a
corporation organized and existing under the laws of the United
Kingdom, with offices at 2 Knoll Rise, Orpington, Kent BR6 ONX,
England, on behalf of the B.D. Cooke Pool, all of its right,
title and interest in and to the following:

    (a)   All Reinsurance Recoverables and Excess of Loss
           Recoverables due Assignor according to his
           accounts as of June 30, 1994 and uncollected by
           Assignor or for Assignor's account by June 30,
           1995; notwithstanding the foregoing, any
           Reinsurance Recoverables due from Citizens as
           an AM Pool member to Citizens as a Cedent are
           not being assigned hereunder.

    (b)   All Reinsurance Agreements and Excess of Loss
           Agreements running in favor of Citizens or the
           Liquidator of Citizens effective as from July 1,
           1994 except to the extent that Assignor has

exercised any rights thereunder prior to February
11, 1997, together with all of the rights which
Assignor would have had under such agreements if
the Citizens estate were not closed pursuant to
Assignor's Plan for the closing of the Citizens'
liquidation.

(c) Effective upon the entry of a final nonappealable
order approving the Final Audit and Accounting of
Citizens, all other reinsurance recoverables due
Citizens not arising out of the business of the
AM Pool, together with all reinsurance assets
and rights of recovery under reinsurance
agreements of Citizens (including, without
limitation on the foregoing, those reinsurances
which may not have been specifically identified
as of February 11, 1997).

Assignee is authorized to receive any and all payments,
property, debts, assets, contract rights and choses in action
derived from the subject matter of this assignment and belonging
to Assignor and to give acquittances and discharges therefore
and to execute, acknowledge and deliver all receipts and
releases customary, necessary or proper as assignee of Citizens
or in its own name.

-2-

This assignment is authorized by and subject to the Order of the Honorable Edward Greenfield, Justice of the Supreme Court, New York County, dated February 11, 1997 (Index No. 40357/71) as corrected March 6, 1997. The meaning of the terms and provisions of this assignment shall have the same meaning as contained in the Petition and Plan set forth in the petition verified on October 11, 1996.

This assignment is and shall be without recourse to Assignor in any and all events.

Dated:  New York, New York
        June 25, 1997

                    NEIL D. LEVIN, Superintendent of
                    Insurance of the State of New York,
                    as Liquidator of Citizens Casualty
                    Company of New York

                    By: _____
                         RICHARD S. KARPIN,

                    Assistant Special Deputy
                    Superintendent of Insurance

-3-

STATE OF NEW YORK    )
                     :  ss.:
COUNTY OF NEW YORK   )


On the 25th day of June, 1997, before me personally came RICHARD S. KARPIN, to me known, who, being by me duly sworn, did depose and say that he is the duly appointed Assistant Special Deputy Superintendent of Insurance to take possession of the property of and liquidate the business of Citizens Casualty Company of New York and that he signed his name to the within Assignment pursuant to authority granted him by the Acting Superintendent of Insurance.

_____
            Notary Public

ANN M. KELLER
Notary Public, State of New York
No. 01KE5032692
Qualified in New York County
Commission Expires August 29, 1998

-4-

**Exhibit 10**

At IAS Part 4 of the Supreme
Court of the State of New York,
County of New York at the
Courthouse thereof, located at
60 Centre Street, on the 11th 6th
day of February , 1997
March

PRESENT:

HON. EDWARD GREENFIELD

J.S.C.

- - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of

the Liquidation of

CITIZENS CASUALTY COMPANY
OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - -

CORRECTED
ORDER

Index No. 40357/71

**FILED**        **FILED**

FEB 1 8 1997        FEB 8 1997

OFFICE        OFFICE
NEW YORK        NEW YORK

Upon reading and filing the Petition (the "Petition") of Edward J. Muhl,

predecessor to Gregory V. Serio, Acting Superintendent of Insurance of the

State of New York as Liquidator of Citizens Casualty Company of New York

("Citizens") for approval of the plan to expedite the closing of Citizens (the

"Plan"); the Order of this Court dated December 10, 1996 directing the form and

method of notice of the Petition on all the shareholders of Citizens and creditors

with allowed, deferred and pending claims and all of the reinsurers of Citizens by

mailing to the last known address on the books and records of Citizens; the

affidavits of service of Elie Heffez, Jeffrey Naimoli, Robert C. O'Loughlin, Jr. and

Burton Garrick, each sworn to December 20, 1996; the affidavit of Robyn A.

Luchs In Further Support of the Petition for the Approval of the Liquidator's Plan

to Expedite the Closing of Citizens sworn to February 10, 1997 (the "Affidavit in

Further Support"); and the objection to the Plan filed by Stewart Smith East, Inc.;

and upon due consideration:

IT IS ORDERED THAT:

1.     The Petition is granted;

2.     The Plan is approved;

3.     In accordance with the Plan:



   a) the liability *of* Citizens *to* all reinsurance creditors except,

B.D. Cooke and Partners, Ltd. of London (the "B.D. Cooke Pool"), is fixed

based on the amount of paid and outstanding losses as reflected on the

Liquidator's books and records as of June 30, 1994;

   b) the liability of Citizens to the B.D. Cooke Pool is fixed based

on the B.D. Cooke Pool's paid losses as reflected on the books and

records of the Liquidator as of June 30, 1994;

   c) the claims of the reinsurance creditors of Citizens are allowed

as recommended in the Petition and as modified by the Affidavit in Further

Support;

   d) the Liquidator's assignment to the B.D. Cooke Pool of the

reinsurance due to Citizens is approved in the manner described in the

Petition;

**Exhibit 11**



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No. 40157/77

Present EDWARD J. GREENFIELD
, Justice

In the Matter of

the Liquidation of

CITIZENS CASUALTY COMPANY OF NEW YORK

ORDER DIRECTING
ENTRY OF FINAL
JUDGMENT

-----------------------------------------x

Upon the affidavit of Stephen Ungar, sworn to the 6th day of February, 1998,
the Final Report on the Liquidation of Citizens Casualty Company of New York,
("Citizens") duly verified on the 6th day of February, 1998 by Richard S. Karpin,
Assistant Special Deputy Superintendent and Agent of NEIL D. LEVIN, Superintendent
of Insurance of the State of New York as Liquidator (the "Liquidator") of Citizens, and
and successors in office, agents, attorneys and employees are discharging the
order of this court entered January 10, 1978 approving the Liquidator's Report, Audit and
Petition filed in the office of the Clerk of New York County on October 7, 1977 and upon
due consideration, it is Ordered that:

1. The Final Report is approved;

2. The liquidator, his predecessors and successors in office, agents,
   attorneys and employees are discharged and are released from any and all
   liability arising out of this proceeding;

3. This proceeding is terminated;

4. The Clerk shall enter judgment in the form annexed hereto.

ENTER,

FILED
MAR 26 1998
COUNTY CLERK'S OFFICE
NEW YORK

EDWARD J. GREENFIELD

SU:cb
OrderDirFinJudg9

**Exhibit 12**

# CHADBOURNE
# & PARKE LLP

1200 New Hampshire Avenue NW, Washington, DC 20036
tel 202-974-5600 fax 202-974-5602

Carey G. Child
direct tel 202-974-5730  fax 202-974-6930
cchild@chadbourne.com

December 26, 2001

**By Federal Express**

Lynn Early, Esq.
General Counsel
Nationwide Mutual Insurance Company
One Nationwide Plaza
Columbus, OH. 43215

Mr. John Trucco
Wausau Insurance Companies
ICO Nationwide Indemnity Company
2000 Westwood Drive
Wausau, WI. 54402-8067

Re:  Demand for Arbitration Under the Rules and Regulations of the American
     Arbitration Association

Dear Ms. Early and Mr. Trucco:

### Arbitration Demand

On behalf of our client B.D. Cooke & Partners Ltd. ("B.D. Cooke") as assignee of
Citizens Casualty Company of New York ("Citizens") under an Assignment from the
Liquidator of Citizens dated June 25, 1997, we hereby demand arbitration against Nationwide
Mutual Insurance Company ("Nationwide") pursuant to any or each of the following: (a) the
Memorandum of Agreement between Citizens and Agency Managers, Ltd ("Agency
Managers") through which Citizens participated in the Agency Managers Pool as described
below ("Citizens' Agreement"); (b) the Memorandum of Agreement between Nationwide and
Agency Managers, however titled, through which Nationwide participated in the Agency
Managers Pool ("Nationwide Agreement"); and (c) the Casualty Reinsurance Pooling
Agreement, however titled, which effected Citizens' and Nationwide's participation in the
pool ("Pooling Agreement").

The Arbitration clause in the Citizens' Agreement provides:

In the event of any differences or disputes arising between the Company and
Managers with reference to this agreement or the terms thereof or any
business, the subject matter thereof or the respective rights or liabilities of
the Company or Managers hereunder, the same shall be referred to an
arbitration in accordance with the rules and regulations of the American
Arbitration Society in the City of New York.  The arbitration award shall be
final and conclusive and for the purposes thereof this agreement shall be
deemed to be a submission to arbitration under the New York Law.  The
arbitrators and any Umpire chosen shall in all respects interpret this
agreement as an honorable engagement between the parties and shall make

# HADBOURNE
## & PARKE LLP

-2-                                                    December 26, 2001

their award with a view to effecting the general purpose of this agreement
and the intentions of the parties hereto in a reasonable and practical manner.

On information and belief, the Nationwide Agreement contains the same or substantially-identical provisions.

On information and belief, the Pooling Agreement contained the following agreement to arbitrate, or wording to substantially the same effect:

In the event of any differences or disputes arising between the Company and the Managers with reference to this Agreement, or the terms thereof, or any business the subject matter thereof, or the respective rights, duties or liabilities of the Company or the Managers hereunder, the same shall be referred to and determined by an arbitration in the City and State of New York in accordance with the rules and regulations of the American Arbitration Association in the City of New York. The arbitration award shall be final and conclusive and for the purposes thereof this agreement shall be deemed to be a submission to arbitration under the New York Law. Each party to this Agreement shall nominate an arbitrator within sixty (60) days after receiving a demand for arbitration; the two so selected shall select an impartial umpire. The arbitrators and Umpire chosen shall in all respects interpret this agreement as an honorable engagement between the parties and shall make their award with a view to effecting the general purposes of this agreement and the intentions of the parties hereto in a reasonable and practical manner.

### Nature of the Dispute

**Background**
**Upon Information And Belief**

Nationwide and Citizens each participated in a reinsurance pool (the "Agency Managers Pool") in which the business was produced by the agency, Agency Managers, which acted as an agent for each of the pool members including Citizens and Nationwide. Each Agency Managers Pool member, including both Citizens and Nationwide, entered into an agency agreement with Agency Managers known as a Memorandum of Agreement, each of which contain arbitration clauses, and under which each Agency Managers Pool member agreed to accept a certain percentage of the Agency Managers Pool reinsurance liabilities.

Certain Agency Managers Pool members, including Citizens, acted as "fronting companies" for the Agency Managers Pool, meaning that reinsurance contracts were issued in

HADBOURNE
& PARKE LLP

-3-                                    December 26, 2001

the name of those companies for liabilities in excess of their agreed ultimate participation percentage.  The other members of the pool, including Nationwide, then reinsured these "fronting" carriers so that each participating pool member participated in accordance with its agreed percentage.

The reinsurance of the fronting reinsurers (including Citizens) by the non-fronting Agency Managers Pool members (including Nationwide) was referred to as "inter-office" reinsurance.  To ensure the ceding companies received regulatory credit for this inter-office reinsurance, the pool members entered into the Pooling Agreement.  Under this inter-office arrangement, Nationwide acts as a reinsurer of Citizens.

**The Dispute**

Citizens (a New York corporation) was liquidated by the New York Superintendent of Insurance.  The Liquidator of Citizens assigned B.D. Cooke certain of Citizens' contract rights, including rights against Nationwide as discussed above.  Nationwide owes Citizens recoveries under such contracts, which Nationwide has not paid to B.D. Cooke as assignee of Citizens, despite demand.

**The Parties**

As noted, Citizens was a New York corporation that was liquidated by the New York Superintendent of Insurance.  B.D. Cooke is Citizens' assignee.  B.D. Cooke is organized under the laws of the United Kingdom and is in the business of insurance/reinsurance at the following business address:

    5-10 Bury Street
    London EC3A 5AT
    ENGLAND

Nationwide Mutual Insurance Company is an Ohio corporation, and is in the business of insurance/reinsurance, with the following address:

    One Nationwide Plaza
    Columbus, Ohio  43216

**Relief Requested And Hearing Locale**

In this arbitration, B.D. Cooke seeks:

1.  All amounts due to B.D. Cooke from Nationwide as a result of Nationwide's reinsurance of Citizens with respect to obligations assumed by Citizens on behalf of the Agency Managers Pool as of the date of the hearing.  The amount due B.D. Cooke from Nationwide as of March 3, 2001 is $2,018,343.14.

# HADBOURNE
## & PARKE LLP

-4-                                              December 26, 2001

     2. Interest on the amounts set forth in Paragraph 1 at the judgment rate of interest applicable in New York.

     3. A declaration of Nationwide's obligation to reimburse B.D. Cooke for all future amounts due B.D. Cooke as a result of Nationwide's reinsurance of Citizens with respect to obligations assumed by Citizens on behalf of the Agency Managers Pool and that these balances will be paid within 20 days of receipt of the billing statement, with overdue balances charged with an interest rate of 10% compounded semi-annually.

     4. All fees and expenses including attorneys' fees incurred by B.D. Cooke, as assignee of Citizens as a result of this arbitration.

     5. Such other relief that may be warranted.

     B.D. Cooke reserves its rights to amend these requests and to include additional requests for relief and claims in this arbitration.

     B.D. Cooke requests a hearing in New York, New York.

### Notice

     You are herby notified that this arbitration is subject to the rules and regulations of the American Arbitration Association ("AAA") and copies this Demand, together with copies of the arbitration provisions quoted above and the Assignment by the Liquidator of Citizens, are being filed with the American Arbitration Association at its New York office, with the request that it commence the administration of the arbitration. Under the AAA rules, you may file an answering statement after notice from the administrator.

     Unless within twenty days after the service of this Demand, you apply pursuant to CPLR 7503(c), for a stay of the arbitration, you will thereafter be precluded from objecting that a valid agreement was not made or has not been complied with and from asserting in court the bar of a limitation of time.

Very truly yours,

Carey Child / wco

Carey G. Child

cc: Marianne Petillo, Esq.

**Exhibit 13**

MOUND COTTON WOLLAN & GREENGRASS

COUNSELLORS AT LAW
ONE BATTERY PARK PLAZA
NEW YORK, NY 10004-1486

(212) 804-4200
FAX: (212) 344-8066
WWW.MOUNDCOTTON.COM

NEW YORK, NY
NEWARK, NJ
GARDEN CITY, NY
SAN FRANCISCO, CA
FORT LAUDERDALE, FL

JAMES VEACH
PARTNER
(212) 804-4233
JVeach@moundcotton.com

January 28, 2008

**Via E-Mail and Federal Express**

Carey G. Child, Esq.
Chadbourne & Parke LLP
1200 New Hampshire Avenue, NW
Washington, DC 20036

      Re: Former Citizens Casualty Insurance Company
           B.D. Cooke & Partners Limited/Dominion Insurance Company Ltd.
           <u>Our file no.: 3038.001</u>

Dear Mr. Child:

      As I mentioned this morning during our telephone conversation, we are acting for Resolute Management Services Ltd. (Resolute) representing Lloyd's Syndicates with respect to a liquidated New York insurer - Citizens Casualty Insurance Company (Citizens) - and certain losses that B.D. Cooke & Partners Limited, as assignee of Citizens (B.D. Cooke), seeks to recover pursuant to a purported assignment of reinsurance arranged by Citizens' Liquidator.

      As we discussed, in order to advise Resolute, we ask to review documents that B.D. Cooke prepared in conjunction with the proposed assignment. Some of this material may be included with materials that were collected during recent litigation with Nationwide Mutual Insurance Company (Nationwide).

      We understand that through your representation of B.D. Cooke (and its assignor Dominion Insurance Company, Ltd. (Dominion)), your firm possesses copies of much -- if not most -- of the correspondence, memoranda, reports, and other documents created or exchanged relating to the assignment. If these materials were scanned, we ask for a copy of the disc. If not, we want to discuss reviewing a hard copy of those documents.

218743.4

MOUND COTTON WOLLAN & GREENGRASS

January 28, 2008
Page 2

Without limiting our request, but in order to expedite our advice, we ask that you send us copies of the following:

- Ex. "D" to the Petition in Support of the Liquidator's Plan to Expedite Closing of the Citizens Estate (Plan);

- the policy-by-policy calculation of IBNR referred to at 4.1.1 on p. 3 of Steve McCann's October 4, 1993 letter to John Tafuro at the New York Liquidation Bureau (McCann Proposal);

- the corresponding calculation of outstanding loss reserves prepared by Run-Off Management, Inc. (ROM), also referred to at 4.1.1 in the McCann Proposal at p.3;

- the backup and calculations used to prepare the McCann Proposal. specifically the backup for the excess of loss recoverables at 4.2.3 in the McCann Proposal at p. 4; and

- the allowed claims that made up the $30,722,000 figure that appears in the assignment and the Plan.

This request is part of a good faith and without-prejudice effort to resolve or, at the very least, narrow the issues in question concerning the assignment. Our review, however, is not limited to the scope or extent of the assignment only.

Please let me know how we can reimburse you for the cost of making these records available and when we can expect them. Thank you.

Very truly yours,

218743.4