UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

B.D. COOKE & PARTNERS LIMITED, AS
ASSIGNEE OF CITIZENS CASUALTY COMPANY
OF NEW YORK (IN LIQUIDATION),

                        Plaintiff,

           -against-

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON,

                    Defendants.

Civil Action No. 08-CIV-3435 (RJH)

**ELECTRONICALLY FILED**

---

### B.D. COOKE'S MEMORANDUM OF LAW IN OPPOSITION
### TO DEFENDANTS' MOTION TO STAY ACTION AND COMPEL ARBITRATION

CHADBOURNE & PARKE LLP
Carey G. Child
Attorneys for Plaintiff
30 Rockefeller Plaza
New York, New York  10112
(212) 408-5100

  -and-

1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 974-5600

LeeAnn O'Neill
Chadbourne & Parke LLP
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 974-5600

Of Counsel

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................1

COUNTER-STATEMENT OF FACTS ..................................................1

ARGUMENT....................................................................................1

I.    UNDERWRITERS' STATEMENT OF "THE FOUR CONVENTION REQUIREMENTS" IS INCOMPLETE — UNDERWRITERS MUST SHOW AN AGREEMENT TO ARBITRATE THE SUBJECT MATTER TO BE ARBITRATED THAT IS VALID AND ENFORCEABLE .........................................1

    A.    UNDERWRITERS CONCEDE THEY MUST SATISFY THE "CONVENTION REQUIREMENTS".........................................................1

    B.    THE CONVENTION REQUIRES AN AGREEMENT TO ARBITRATE THAT BOTH (1) ENCOMPASSES THE SUBJECT MATTER TO BE ARBITRATED AND (2) IS VALID AND ENFORCEABLE.................................................1

II.    THE SUBJECT MATTER OF THIS ACTION IS OUTSIDE THE SCOPE OF THE ARBITRATION AGREEMENTS RELIED UPON BY UNDERWRITERS ..................................................1

    A.    BY THEIR TERMS, THE ARBITRATION CLAUSES APPLY ONLY TO "DISPUTES ARISING UNDER" THE REINSURANCE CONTRACTS CONTAINING THEM ............................................1

    B.    UNDERWRITERS HAVE NOT EVEN ATTEMPTED TO SHOW THAT B.D. COOKE'S CLAIM FOR DECLARATORY RELIEF "ARISES UNDER" THE REINSURANCE CONTRACTS .............................1

    C.    B.D. COOKE'S CONTINGENT CLAIMS FOR MONETARY DAMAGES ALSO ARE NOT ARBITRABLE.................................1

        (1)    UNDERWRITERS FAIL TO REBUT SWORN EVIDENCE THAT — FAR FROM BEING DISPUTED UNDER THE REINSURANCE CONTRACTS — THE CLAIMS AT ISSUE HAVE BEEN AGREED BY UNDERWRITERS ....................1

        (2)    THE VEACH AFFIRMATION ALSO FAILS TO DEMONSTRATE A "DISPUTE ARISING UNDER" THE REINSURANCE CONTRACTS ..........................................1

i

III.    THE ARBITRATION AGREEMENTS RELIED UPON BY
        UNDERWRITERS ARE NOT VALID AND ENFORCEABLE UNDER THE
        CONVENTION ...................................................................................................1

        A.    THERE WAS NO NEED FOR THE 1996 ASSIGNMENT TO
              EXTINGUISH UNDERWRITERS ABILITY TO COMPEL
              ARBITRATION, THE LIQUIDATION OF CITIZENS DID THAT IN
              1971...................................................................................................1

        B.    THE EXCLUSIVE JURISDICTION OF THE LIQUIDATION
              COURT WAS A FUNCTION OF NEW YORK STATE LAW AND
              IS A COMMON FEATURE OF INSOLVENCY PROCEEDINGS
              GENERALLY.......................................................................................1

        C.    UNDERWRITERS CANNOT CLAIM SURPRISE ABOUT
              CONTINUING EXCLUSIVE JURISDICTION BY THE NEW
              YORK SUPREME COURT ...................................................................1

        D.    THERE IS NO CONFLICT WITH THE CONVENTION ..............................1

        E.    THERE IS NO ESTOPPEL ARGUMENT AVAILABLE TO
              UNDERWRITERS ..............................................................................1

CONCLUSION...................................................................................................1

**TABLE OF AUTHORITIES**

**Cases** Page

*Ace Capital Re Overseas Ltd. v. Central United Life Ins., Co.*,
   307 F.3d 24 (2d Cir. 2002)..............................................................6, 13

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*,
   170 F.3d 349 (2d Cir. 1999)...................................................................21

*Bensadoun v. Jobe-Riat*,
   316 F.3d 171 (2d Cir. 2003)....................................................................3

*Bernstein v. Centaur Ins. Co.*,
   606 F. Supp. 98 (S.D.N.Y. 1984)......................................................16, 20

*Cargill Int'l S.A. v. M/T Pavel Dybenko*,
   991 F.2d 1012 (2d Cir. 1993)...........................................................5, 19

*Cheshire Place Assoc. v. West of England Ship Owners Mut. Ins. Ass'n (Lexembourg)*,
   815 F. Supp. 593 (E.D.N.Y. 1993) ..........................................................5

*Corcoran v. Ardra Ins. Co.*,
   567 N.E.2d 969 (1990).......................................................15, 18, 19, 23

*Deloitte Noraudit A/S v. Deloitte Haskins & Sells*,
   9 F.3d 1060 (2d Cir. 1993)....................................................................21

*Enron Metals & Commodity Ltd. (In Administration) v. HIH Casualty*
   *& General Ins. Ltd. (In Provisional Liquidation)*,
   (2005) EWHC 485 (Ch.) (copy at Exhibit 2)..........................................17

*Hamilton Life Ins. Co. v. Republic National Life Ins. Co.*,
   408 F.2d 606 (2d Cir. 1969)..................................................................15

*Ideal Mut. Ins. Co. v. Phoenix Greek Gen. Inc. Co.*,
   No. 83 Civ. 4687 (CSH), 1987 WL 28636, at *1
   (S.D.N.Y. Dec. 11, 1987).....................................................................23

*In re Int'l Ribbon Mills, Ltd.*,
   325 N.E.2d 137 (N.Y. 1975)..................................................................23

*Knickerbocker Agency, Inc. v. Holz*,
   149 N.E.2d 885 (N.Y. 1958)..............................................14, 15, 16, 18, 20

*Ledee v. Ceramiche Ragno*,
   684 F.2d 184 (1st. Cir. 1982)............................................................5, 19

*Matter of Union Indem. Ins. Co. of New York*,
  521 N.Y.S.2d 617 (Sup. Ct. 1987) ............................................................................16, 17

*Meadows Indem. Co. v. Baccala & Shoop Ins. Services, Inc.*,
  760 F. Supp. 1036 (E.D.N.Y. 1991) ...................................................................................5

*Richard T. Blake & Assocs., Inc. v. Aetna Cas. & Sur. Co.*,
  681 N.Y.S.2d 73 (App. Div. 1998) ..................................................................................23

*S.A. Mineracao Da Trindade-Samitri v. Utah Int'l Inc.*,
  745 F2d 190 (2d Cir. 1984) ........................................................................................6, 7

*Smith/Enron Cogeneration Ltd. Partnership v. Smith
  Cogeneration Int'l, Inc.*, 198 F.3d 88 (2d Cir. 1999) .................................................4, 19

*Stephens v. American Int'l Ins. Co.*,
  66 F.3d 41 (2d Cir. 1995) ...............................................................................................20

*Stony Brook Marine Transp. Corp. v. Leslie Wilton*,
  1996 WL 913180, at *3 (E.D.N.Y. 1996) .........................................................................5

*Thomson-CSF v. Am. Arbitration Assoc.*,
  64 F.3d 773 (2d Cir. 1995) ................................................................................21, 22, 23

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
  241 F.3d 135 (2d Cir. 2001) .............................................................................................5

*Vesta Fire Ins. Corp. v. New Cap Reinsurance Corp.*
  244 B.R. 209 (S.D.N.Y. 2000), *aff'd In re McKenna*,
  238 F.3d 186 (2d Cir. 2001) .....................................................................................19-20

## Other Authorities

9 U.S.C. §§ 201-208 ..............................................................................................................2

Fed. R. Civ. P. 56(e) ..............................................................................................................3

N.Y. Ins. Code § 7419(b) ....................................................................................................16

U.K. Insolvency Act of 1986 § 130(2) (copy at Exhibit 1) ..................................................17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

B.D. COOKE & PARTNERS LIMITED, AS
ASSIGNEE OF CITIZENS CASUALTY COMPANY
OF NEW YORK (IN LIQUIDATION),

                Plaintiff,

      -against-

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON,

             Defendants.

Civil Action No. 08-CIV-3435 (RJH)

**ELECTRONICALLY FILED**

## B.D. COOKE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO STAY ACTION AND COMPEL ARBITRATION

Plaintiff B.D. Cooke & Partners Limited ("B.D. Cooke"), by its attorneys, Chadbourne & Parke LLP, respectfully submits this memorandum of law in opposition to defendants Certain Underwriters at Lloyd's, London ("Underwriters") motion to stay this action and compel arbitration ("Motion to Compel").

## PRELIMINARY STATEMENT

Pursuant to this Court's Order dated April 16, 2008, Underwriters' Motion to Compel is being briefed in parallel with B.D. Cooke's Motion to Remand. Because B.D. Cooke's Motion to Remand directly challenges whether this action was properly removed, and thus whether this Court has jurisdiction, B.D. Cooke's motion should be decided first.

With respect to their Motion to Compel, Underwriters' supporting memorandum of law ("Underwriters' Memo") and the supporting affirmation by counsel James Veach (the "Veach Affirmation" or "Veach Aff."), actually serve to confirm, both directly (by admissions made) and indirectly (by matters not addressed or mischaracterized), why

removal was improper, and why arbitration cannot be compelled, should this Court reach that motion.

<u>First</u>, there is no dispute that Underwriters must satisfy all of the requirements of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards and its implementing statute, 9 U.S.C. §§ 201-208 (the "Convention"). Underwriters simply fail to state that standard in full. In particular, Underwriters' own cases demonstrate that the Convention requires an agreement to arbitrate that ***actually encompasses the subject matter*** to be arbitrated and is ***valid and enforceable***.

<u>Second</u>, Underwriters admit that the only possibly-applicable arbitration agreements are contained in reinsurance contracts to which B.D. Cooke, a non-signatory, claims under only by virtue of an assignment of reinsurance assets (the "Assignment") from the New York Department of Insurance, as liquidator (the "Liquidator") of the insolvent Citizens Casualty Company of New York ("Citizens").

<u>Third</u>, with respect to the scope of those agreements to arbitrate, Underwriters admit that they encompass, by their terms, only "dispute[s] arising under" those reinsurance contracts. There are, however, no such disputes in this action.

➢ The only non-contingent cause of action — rather than "arising under" the reinsurance contracts — is for an interpretation of Assignment.

➢ The only other cause of action is a contingent claim for monetary damages, expressly premised upon there being ***no dispute*** under the reinsurance agreements. B.D. Cooke has since submitted sworn affidavits demonstrating that Underwriters have not only agreed the claims at issue, but have actually ***paid the same claims under the same contracts*** to other parties — demonstrating that there can be no possible "dispute arising under" those contracts.

<u>Fourth</u>, with respect to validity and enforceability, Underwriters face a separate, fatal impediment. Their ability to compel arbitration was extinguished in 1971, when Citizens entered liquidation. Underwriters admit that B.D. Cooke has "stepped into the shoes of" the Liquidator. Under settled New York law, the Liquidator could collect under the reinsurance contracts, but could not be compelled to arbitrate. Underwriters have failed to demonstrate any basis on which they could compel arbitration against B.D. Cooke when Underwriters ability to compel arbitration against the Liquidator, B.D. Cooke's assignee, was extinguished 25 years before the Assignment.

## COUNTER-STATEMENT OF FACTS

Rather than elaborate here a full counter-statement of facts, B.D. Cooke instead incorporates by reference the Factual and Procedural Background set forth in support of its

2

Motion to Remand. This is being done because of (1) the parallel briefing schedule and largely common factual basis for B.D. Cooke's Motion to Remand and its opposition to the Motion to Compel; and (2) more importantly, because Underwriters have submitted, in addition to their 23-page memorandum of law, an 18-page counsel affirmation, which is largely argumentative. In order to respond to the points within those two documents most likely to interest this Court, we will need to rely, for background purposes, upon the common factual and legal arguments made in support of the Motion to Remand.[1]

## ARGUMENT

### I.  Underwriters' Statement Of "The Four Convention Requirements" Is Incomplete — Underwriters Must Show An Agreement To Arbitrate *The Subject Matter To Be Arbitrated*  That is *Valid And Enforceable*

#### A.  Underwriters Concede They Must Satisfy The "Convention Requirements"

Underwriters base their removal, and this motion, solely upon the Convention. (Underwriters' Memo at 1.) They go on to state what they characterize as the "Four Convention Requirements," thus implicitly conceding that — in order to succeed on their motion — they must satisfy all requirements of the Convention, whatever they may be. (*Id.* at 9.) Underwriters claim that those "Four Convention Requirements" are:

> "(1) [a] written agreement; (2) that provides for arbitration in the territory of a signatory of the Convention; (3) the subject matter of which must be commercial; but (4) which cannot involve a dispute that is entirely domestic." (*Id.*)

---

[1]  This should not be read to suggest that B.D. Cooke accepts the factual assertions made by Underwriters' counsel not specifically rebutted here. The Veach Affirmation is largely without personal knowledge and should be disregarded to the extent it relates to any fact pertinent to this Court's decision, particularly in light of B.D. Cooke's sworn evidence. *See* Fed. R. Civ. P. 56(e); *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (summary judgment standards are appropriate where court is deciding arbitrability).

This formulation (which is a paraphrase of, rather than a direct quote from, the case cited), seems to suggest that *any* written arbitration agreement is sufficient if it meets the other stated requirements, without the need to consider, for example, whether the agreement to arbitrate (1) encompasses the subject matter to be arbitrated; and (2) is valid and enforceable. As even the cases cited by Underwriters demonstrate, that clearly is not the case.

> **B.    The Convention Requires An Agreement To Arbitrate That Both (1) Encompasses The Subject Matter to be arbitrated And (2) Is Valid And Enforceable**

In setting forth their truncated statement of "The Four Convention Requirements," Underwriters cite *Smith/Enron Cogeneration Ltd. Partnership v. Smith Cogeneration Int'l, Inc.,* even though that case never stated that those were the *only* requirements, just that they were four "basic" requirements. 198 F.3d 88, 92 (2d Cir. 1999). To the contrary, *Smith/Enron* thereafter states that construction of the Convention must begin with its text, and quotes it at length, including provisions that: (1) make clear that the Convention only applies to court actions where the court is "seized of an action in a matter in respect to which" the parties have agreed to arbitrate; and (2) provide an exemption where that "agreement is null and void, inoperative or incapable of being performed." *Id.* at 93. The *Smith/Enron* court went even further in showing that it was not enough to simply show an "agreement to arbitrate." Even though it found that that there was no dispute that the parties entered into an agreement to arbitrate, the court stated that the question before it was "whether subsequent events deprived [petitioners] of the right to compel [the respondent] to live up to that agreement." *Id.* at 95.

4

Underwriters' other cases uniformly demonstrate the same additional "Convention Requirements,"[2] to the extent it is difficult to understand Underwriters' failure to address them, except for an inability to satisfy them because: (1) the subject matter of this action is outside the scope of the arbitration agreements; and (2) those arbitration agreements have been inoperative for nearly four decades.

## II. The Subject Matter of This Action Is Outside The Scope Of The Arbitration Agreements Relied Upon By Underwriters

### A. By Their Terms, The Arbitration Clauses Apply Only To "Disputes Arising Under" The Reinsurance Contracts Containing Them

Although Underwriters discuss two different arbitration clause wordings, they concede that only one of those wordings has any possible "bearing" on this action. (Veach Aff. ¶¶ 5, 26. *See also* McNamara Aff. ¶ 12-14.[3]) That clause states the scope of the obligation to arbitrate as follows:

---

[2] *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F. 2d 1012, 1018 (2d Cir. 1993) (quoting Convention exception if the agreement is "null and void, inoperative or incapable of being performed"); *Ledee v. Ceramiche Ragno*, 684 F.2d 184, 186-87 (1st Cir. 1982) (first Convention requirement is "an agreement in writing **to arbitrate the subject of the dispute**" and is subject to an exception if the agreement is "null and void, inoperative or incapable of being performed") (emphasis added); *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 146 (2d Cir. 2001) (court to compel arbitration only of "any dispute falling within the scope of the agreement"); *Cheshire Place Assoc. v. West of England Ship Owners Mut. Ins. Ass'n (Luxembourg)*, 815 F. Supp. 593, 595 (E.D.N.Y. 1993) (issues for the court include ". . . (2) whether the dispute falls within the scope of the agreement, and (3) whether the subject matter of this dispute is not arbitrable for some reason extraneous to the agreement."); *Meadows Indem. Co. v. Baccala & Shoop Ins. Services, Inc.*, 760 F. Supp. 1036, 1040 (E.D.N.Y. 1991) ("whether there is an enforceable agreement to arbitrate a subject matter capable of settlement by arbitration, and if so, whether the scope of that agreement encompasses the claim"); *Stony Brook Marine Transp. Corp. v. Leslie Wilton*, 1996 WL 913180, at *3 (E.D.N.Y. 1996) ("whether there is an agreement in writing to arbitrate the subject of the dispute").

[3] B.D. Cooke relies upon the affidavits, submitted in support of its Motion to Remand, of Thomas McNamara ("McNamara Aff."), Carey G. Child ("Child Aff."), John Tafuro

> "Any *dispute arising under this [reinsurance] Contract* shall be submitted to a court of arbitration composed of two arbitrators, one to be appointed by the Reassured and the other by the Reinsurers." (Veach Aff. ¶ 25; McNamara Aff. ¶ 12 and Exs. 1-9, emphasis added.)

This is demonstrably an intentionally-narrow clause, in light of broader language contained elsewhere in the same and later contracts.[4] In fact, the Second Circuit — in a case relied upon by Underwriters — has recognized the "arising under" language as possibly *the most narrow wording available*. *ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24, 33 n.9 (2d Cir. 2002) (citing prior Second Circuit cases holding that the "arising under" wording is the "only" wording that "limits arbitration to a literal interpretation [of] performance of the contract") (brackets in original, citations omitted).[5]

Narrow arbitration clauses generally — to say nothing of the "gold standard" of narrow clauses used here — are not subject to the presumptions invoked by Underwriters, and any "collateral matters" generally fall "beyond [their] purview." *Ace Capital*, 307 F.3d at 33 n.9, 34. Thus, even the *slightly-broader* language any "dispute or difference aris[ing] under" an agreement "will ensure that the arbitration clause is narrowly interpreted." *S.A. Mineracao Da Trindade-Samitri v. Utah Int'l Inc.*, 745 F.2d 190, 194 (2d Cir. 1984). Given that standard and the quintessentially-narrow language used, Underwriters' Motion to

---

("Tafuro Aff."), and Simon Janes ("Janes Aff."). B.D. Cooke also submits an additional affidavit of Carey G. Child ("Child Opp. Aff.", sworn to on June 5, 2008).

[4] Those phrases apply "in the event of any failure of the Reinsurers to pay any amount claimed to be due" or to disputes arising under or relating to the contracts or transactions in respect of the contract. (McNamara Aff. Ex. 1 at Art. XIX and Ex. 10 at Art. 17.)

[5] Given what *Ace Capital* had to say about the "arising under" language, it is remarkable that Underwriters rely on that case to falsely assert that this Court should proceed as if the contracts contain "broad agreements to arbitrate." (Underwriters' Memo at 5.)

Compel fails unless they show that each matter they wish to arbitrate (1) is a dispute that (2) "arises under" the reinsurance contracts.  This they have not done.

### B.    Underwriters Have Not Even Attempted To Show That B.D. Cooke's Claim For Declaratory Relief "Arises Under" The Reinsurance Contracts

As is clear from B.D. Cooke's Verified Complaint, this action is in the first instance an action for declaratory relief regarding the meaning and effect of the Assignment. The declaratory relief sought in B.D. Cooke's First Cause of Action — and the only non-contingent cause of action — is, in its entirety, for:

> "a declaration as to the meaning and effect of the Assignment, including without limitation that (A) there is no cap on the amount that B.D. Cooke is entitled to collect under the Assignment; and (B) the Assignment is an assignment and does not constitute a novation of any of the assigned reinsurance agreements."  (Verified Complaint, First Cause of Action and first prayer for relief.)

This cause of action directly calls for interpretation of the meaning and effect of the Assignment, not the reinsurance agreements.[6]  Because it is ***at best*** a "collateral matter" addressing the effect of the Assignment upon the reinsurance contracts, rather than a "literal interpretation of performance" under them, it falls outside the scope of the narrow arbitration agreements.  *See S.A. Mineracao*, 745 F.2d at 194; *ACE Capital*, 307 F.3d at 33 n.9.

A second matter that the Underwriters seek to arbitrate is whether "B.D. Cooke and [Underwriters] commuted the retrocession agreements pursuant to a commutation agreement executed in February 2000."  (Veach Aff. Ex. 2 at 1.)  This fares no better and, once again, Underwriters do not even attempt to show that this matter is a dispute "arising under" the reinsurance agreements.  Indeed, by demanding arbitration of this matter,

---

[6]    This is confirmed by Underwriters' own words.  Their arbitration demand expressly referring to the Verified Complaint states that Underwriters seek to arbitrate whether amounts sought by B.D. Cooke "come within the terms of" the Assignment.  (Veach Aff. Ex. 2 at 1.)

Underwriters make clear their disregard for the "Convention Requirements" and whether the matter they seek to arbitrate is actually arbitrable.  In fact, in the very commutation (the "Commutation") they seek to arbitrate, Underwriters instead expressly agreed that disputes would be exclusively resolved by court, rather than arbitration:

> "The Parties hereto agree to submit to the ***exclusive jurisdiction*** of the English High Court in respect of any dispute, controversy or claim arising out of or in connection with this Agreement, or its breach, termination, formation or validity."  (Tyler Aff. Ex. 1 at 7 (emphasis added).)

The Underwriters have failed — more accurately, they have not even attempted — to satisfy the "Convention Requirement" of showing an agreement ***to arbitrate the subject matter*** of B.D. Cooke's first cause of action for declaratory relief, or any issue regarding the interpretation of the Assignment or the Commutation.  As such, Underwriters' Motion to Compel must be denied, at a minimum, with respect to B.D. Cooke first cause of action.  As set forth below, the same is also true of B.D. Cooke's contingent claims for monetary damages.

### C.    B.D. Cooke's Contingent Claims For Monetary Damages Also Are Not Arbitrable

Underwriters also seek to compel arbitration of B.D. Cooke's second and third causes of action — contingent claims for monetary damages.  Here, at least, there is a facial relation to the reinsurance agreements.  But that is not enough.  By virtue of the "Convention Requirement" of showing an agreement ***to arbitrate the subject matter***, combined with the intentionally-narrow arbitration clauses, Underwriters bear the burden of showing that these causes of action not only relate to the reinsurance agreements, but that they constitute "disputes arising under" those agreements.  They have wholly failed to meet that burden.

    (1)      **Underwriters Fail To Rebut Sworn Evidence That — Far From Being Disputed Under The Reinsurance Contracts — The Claims At Issue Have Been Agreed By Underwriters**

Underwriters bear a particularly heavy burden in attempting to show a "dispute arising under" the reinsurance contracts in respect of the second and third causes of action of the Verified Complaint.  That is because the Verified Complaint — sworn to by Andy Tyler, B.D. Cooke's Managing Director — demonstrated that Underwriters had agreed to each and every one of the claims for which B.D. Cooke seeks relief.

<u>First</u>, the Verified Complaint, in addition to stating B.D. Cooke's belief that those claims had been agreed to on behalf of Underwriters by providing "signing numbers," also provided evidence of such agreement.  (Verified Complaint ¶¶ 32-33.)  Indeed, for each and every claim, B.D. Cooke provided both the signing number and the agreement date.  (*Id.* ¶ 33.)  As Mr. Tyler — who has personal familiarity with the claims-handling and other procedures at Lloyd's — explained in his affidavit:

> "As a matter of Lloyd's practice, the agreement of a claim, evidenced by a signing number, means that there is no dispute about that claim under the reinsurance contract, and that — barring only an issue **outside** the reinsurance contract — the claims is to be paid."  (Tyler Aff. ¶¶ 1, 7, emphasis in original.)

<u>Second</u>, B.D. Cooke's second and third causes of action were expressly asserted upon the understanding that "there are no apparent disputes between the parties concerning the [reinsurance agreements] with respect to the Agreed Claims, which were instead agreed to by" Underwriters.  (Verified Complaint ¶ 44.)  The Verified Complaint further stated that "Lloyd's Underwriters, through [their exclusive agent] Equitas, have explained their failure to pay the Agreed Claims solely on bases other than" the reinsurance contracts.  (*Id*.)  As Mr. Tyler explained in his affidavit, in various communications, including face-to-face:

> "I was advised on behalf of the Underwriters that the only dispute regarding the Agreed Claims was a contention by the Underwriters that the terms of the Assignment might impose a 'cap' on the amount of money that B.D. Cooke could collect under the Assignment.  At no time during those communications, and at no time since, did the Underwriters ever identify any dispute or issue in respect of the Agreed Claims arising from the Lloyd's Reinsurance Contracts."  (Tyler Aff. ¶ 9.)

B.D. Cooke has also presented evidence from Thomas McNamara, Senior Vice President of the entity (referred to as "ROM") responsible for presenting claims under the reinsurance contracts to, among other reinsurers, Underwriters.  (McNamara Aff. ¶ 2, 5-7.) Each of those reinsurance contracts not only reinsured Citizens (and was thus, to that extent, assigned to B.D. Cooke), but also reinsured a number of other companies that were members of the "Agency Managers Casualty Pool."  (*Id.* at ¶ 6.)  As a result, Mr. McNamara was able to show that Underwriters — far beyond just "agreeing" the claims — have ***actually made payments*** to those other reinsurers ***for the same claims*** under the ***same reinsurance contracts***:

> "8. Because each of the Lloyd's Reinsurance Contracts reinsured both Citizens and other members of the Agency Managers Casualty Pool, each claim under the Lloyd's Reinsurance Contracts implicates the applicable Lloyd's Reinsurance Contract(s) both in respect of the Underwriters' reinsurance of Citizens under that contract, and in respect of their reinsurance of other members of the Agency Managers Casualty Pool under that same contract.
>
> 9.  In both cases (i.e., the reinsurance of Citizens and the reinsurance of other members of the Agency Managers Casualty Pool), identical reinsurance terms are being applied to the identical claim, under the same reinsurance contract.
>
> 10. The books and records of ROM confirm that, although Underwriters have not paid the Citizens portion of the claims listed in the chart below (which includes a cross-reference to Paragraph 33 of the Verified Complaint), Underwriters have made payments for each of those same claims, under the same Lloyd's Reinsurance Contracts, in respect of other members of the Agency Managers Casualty Pool."  (McNamara Aff. ¶¶ 8-10.)

In the face of these multiple lines of consistent, mutually reinforcing, evidence from witnesses with actual personal and ordinary-course-of-business knowledge, Underwriters respond with *one sentence*, with no supporting evidence:

> "Cooke alleges that these losses were 'agreed' by the claims manager for Underwriters.  The Underwriters' claims manager disputes those assertions, particularly the allegation that he 'agreed' to pay the claims listed in the Complaint at ¶ 33."  (Underwriters' Memo at 2-3.)

This response is remarkable not only for the lack of support, but even more for the fact that — although Underwriters chose not to burden themselves with actually providing any evidence — they still were unable to actually allege a "dispute arising under" the reinsurance contracts.

Given that failure of even *allegation*, it is not surprising that Underwriters also failed to meet B.D. Cooke's sworn *proof*:

- The specific signing numbers and dates B.D. Cooke has identified for each and every claim have not been met with any alternative explanation for how those numbers were obtained, or what they mean, if they do not mean what B.D. Cooke has shown.

- The showing that Underwriters explained their failure to pay the claims solely on bases *outside* of the reinsurance agreements has been wholly ignored.

- Underwriters certainly do not address the fact that they have already paid other reinsurers for *these same claims* under the *same contracts.*

### (2)    The Veach Affirmation Also Fails To Demonstrate A "Dispute Arising Under" The Reinsurance Contracts

Underwriters bury a half-hearted effort to *allege* a dispute in the affirmation of their counsel, in which it is stated that (in addition to the Assignment and Commutation issues dealt with above) Underwriters' arbitration demand seeks a determination "whether the losses sought were properly computed".  (Veach Aff. ¶ 53.)  Mr. Veach further asserts that "[i]n or about 2007, Resolute Management Services, Ltd., (Resolute) acting on behalf of Underwriters, began questioning the ROM statements and asking for information" which

11

resulted in "exchanges" concerning:  Resolute's requests for information, "how the losses were computed, and whether losses submitted to Underwriters fell within the assignment." (*Id*. at ¶ 49.)  He also asserts that those exchanges led to a January 28, 2008 letter from Mr. Veach to counsel for B.D. Cooke.  (*Id.* at ¶ 51 and Ex. 13.)  These assertions fall well short of demonstrating a "dispute arising under" the reinsurance contracts for several reasons.

<u>First</u>, they entirely mischaracterize the "exchanges" relied upon, which actually confirm B.D. Cooke's position that the only dispute preventing payment of the claims arose under the Assignment.  Underwriters' counsel asserts that "Counsel for Dominion/Cooke never answered our January 28th letter" and instead commenced litigation.  (Veach Aff. ¶ 51.) This precise formulation (counsel never answered) is necessary to side-step the fact that the letter was followed by communications ***between the parties*** — communications that disprove Underwriters contentions.[7]  Specifically:

- Mr. Tyler (on behalf of B.D. Cooke) sent an email to Resolute (on behalf of Underwriters), recounting that "[a]t our meeting on the 11th January 2008 you confirmed there is only one issue preventing payment which is whether there is a cap in the assignment."  (Child Opp. Aff. ¶ 4 and Ex. 1.)  Mr. Tyler also stated his understanding that Underwriters were to obtain a legal opinion on that point "by the end of that week" and that "if your legal opinion finds there is not a cap, we expect to be paid in full for those claims agreed by your claims handlers."  (*Id.*)

- In a January 30th email, Resolute purported to "clarif[y]" some points in response to Mr. Tyler's January 28th email, stating, for example, that "we did not promise a legal opinion by the end of the week of January 11th."  (*Id*.)  Resolute did not dispute, however, that the question regarding the scope of the Assignment was the only issue preventing payment, or that there were "claims agreed by your claims handlers."

- Resolute instead ***confirmed*** Mr. Tyler's understanding, stating that "we did advise that if the assignment issues were resolved, Resolute would arrange for payment subject to our earlier agreement."  (*Id*.)

---

[7]  B.D. Cooke is disappointed that Underwriters have chosen to submit to this Court the January 28th letter (Veach Aff. ¶ 51 and Ex. 13), since such communications were intended to be wholly without prejudice.  However, in light of Underwriters' selective use of that letter, B.D. Cooke is compelled to provide contextual materials.

Second, even setting aside the damning facts that arise from the prior "exchanges" relied upon by Underwriters' counsel, his allegations, even on their face, do not satisfy Underwriters burden — required by the most-narrow arbitration clause possible — of actually demonstrating a "dispute arising under" the reinsurance contracts:

- Those allegations do not even demonstrate that there is even a ***dispute***. Underwriters have not even actually ***contended*** that any of the claims listed in the Verified Complaint were not "properly computed." Were they to make such a ***contention***, that still would not be sufficient to demonstrate a ***dispute***, since it is entirely possible that B.D. Cooke would agree with Underwriters regarding mere "computational" matters.

- Even if there were such a dispute, it does not follow that it would "arise under" the reinsurance contracts, because a "dispute" regarding "computation" would be unlikely to involve a "literal interpretation [of] performance of the contract," rather than a non-arbitrable "collateral matter." *See ACE Capital*, 307 F.3d at 33 n.9, 34. The rules of mathematics, for example, are collateral to the reinsurer contracts. Indeed, given B.D. Cooke's evidence regarding prior agreement *and* payment of these claims by Underwriters, if any "computation" issues actually exist, they are almost certainly collateral to the reinsurance contracts.

For the reasons discussed above, Underwriters have failed to satisfy the "Convention Requirement" of showing an agreement to arbitrate the subject matter of even B.D. Cooke's claims for monetary damages. Since those claims are the basis of Underwriters' overreaching effort to shoehorn into arbitration the ***facially non-arbitrable*** Assignment and Commutation issues, Underwriters Motion to Compel fails in its entirety on that basis alone. An independent basis for denying that motion is discussed below.

## III. The Arbitration Agreements Relied Upon By Underwriters Are Not Valid And Enforceable Under The Convention

Even if Underwriters belatedly manufacture a purported "dispute arising under" the reinsurance contracts, that effort is moot. As demonstrated in support of B.D. Cooke's Motion to Remand, the liquidation of Citizens extinguished any ability of Underwriters to compel arbitration, even under the Convention. (*See* B.D. Cooke's Memorandum of Law In Support Of Its Motion to Remand ("BDC Remand Memo") at 13-20.) Those arguments are

13

equally applicable here, but rather than repeat an affirmative restatement of them, we instead briefly address Underwriters efforts to evade the consequences of the facts and law comprising that argument.  As explained below, those arguments depend upon mischaracterizing the liquidation of Citizens and the Assignment, upon creating a false conflict with the Convention, and upon false estoppel arguments.

### A.    There Was No Need For The 1996 Assignment To Extinguish Underwriters Ability To Compel Arbitration, The Liquidation Of Citizens Did That In 1971

Underwriters' position is based upon creating a "straw man" argument.  Specifically, Underwriters state that B.D. Cooke cannot "escape its obligation to arbitrate by arguing that the assignment of Citizens excess reinsurance contracts extended to Cooke the right to collect under those contracts, but somehow extinguished reinsurers' right to arbitrate under the same contracts."  (Underwriters' Memo at 11.)  By this "rebuttal" to an argument never made, Underwriters sidestep inconvenient facts about the Citizens' liquidation, as well as B.D. Cooke's true argument:  Underwriters ability to compel arbitration ***was extinguished by the liquidation of Citizens*** in 1971, ***not by the Assignment*** in 1996.

Citizens — the entity that had agreed to arbitrate with Underwriters — was declared insolvent, and was ***dissolved***, by an order of the New York Supreme Court dated June 17, 1971 (the "Liquidation Order").  (Tafuro Aff. Ex. 1 at DOI02059, DOI02064.)  This same order commenced the liquidation of Citizens (the "Liquidation Proceeding" or "Citizens Estate"), and "vested" the Liquidator with "title to all of the property, contracts and rights of action of" Citizens, including the reinsurance contracts.  (*Id*. Ex. 1 at DOI02060.)  The Liquidator, however, had certain rights under those contracts that Citizens did not.  Among other things, under established New York law, the Liquidator was entitled to

14

affirmatively exercise rights under the reinsurance contracts by seeking amounts owed under those contracts, without being subject to arbitration clauses contained in those same contracts, even in the face of the Convention. *Knickerbocker Agency, Inc. v. Holz*, 149 N.E.2d 885, 890 (N.Y. 1958); *Corcoran v. Ardra Ins. Co.*, 567 N.E.2d 969, 972-73, 77 N.Y.2d 225, 232 (1990) [8] On this basis the Liquidation Order established exclusive jurisdiction, which enjoined Underwriters from commencing or prosecuting an arbitration, or any other proceeding. [9] (Tafuro Aff. Ex. 1 at DOI02063-64)

In that context, it is particularly important that Underwriters concede — as they must — that B.D. Cooke "has stepped into the shoes of" the Liquidator. (Underwriters' Memo at 10.) Thus, rather than B.D. Cooke needing to argue that the 1996 Assignment "extinguished reinsurers' right to arbitrate," it is Underwriters who must show that the Assignment somehow ***revived*** a long-since-extinguished right to arbitrate. This Underwriters cannot do. Even if Underwriters had not themselves conceded that B.D. Cooke stands in the

---

[8] Underwriters attempt to suggest equivocation regarding *Knickerboker* by claiming that that "another case upheld the right to arbitrate in the context of other ***proceedings involving the liquidators of insolvent New York insurers***." (Underwriters' Memo at 19, emphasis added.) Contrary to Underwriters' characterization, *Hamilton Life Ins. Co. v. Republic Nat'l Life Ins. Co.*, 408 F.2d 606 (2d Cir. 1969), did not involve an insolvent company in liquidation; Hamilton was only in "financial difficulty" and thus only "under supervision by the New York State Insurance Department." 408 F.2d at 608. *Knickerbocker* is not mentioned and there is no indication that liquidation proceedings had been commenced, or that a liquidator had been appointed.

[9] The fact that the New York Supreme Court's jurisdiction was exclusive from the inception of the liquidation proceeding is a full and complete response to quibbling by Underwriters that such exclusivity was not restated when that court, in approving the Assignment, retained "continuing jurisdiction," subject only to those carve-outs it chose to make. (*See* Underwriters' Memo at 18.) However, Underwriters blatantly misquote (notably without referencing any source) the documents as carving out "jurisdiction with respect to 'disputes involving computations of amounts due' under the Assignment." (Underwriters' Memo at 18.) The actual language carves "disputes ***solely*** involving computations of amounts due thereunder." (Tafuro Aff. Ex. 5 at 12, emphasis added to identify language omitted by Underwriters.)

15

Liquidator's shoes, the Assignment itself precludes any other conclusion. It expressly grants B.D. Cooke not only the reinsurance contracts, but also "all of the rights which Assignor [the Liquidator] would have had under such agreements if the Citizens estate were not closed. . . ." (Tafuro Aff. Ex. 15 at 2.)

> **B.    The Exclusive Jurisdiction Of The Liquidation Court Was A Function Of New York State Law And Is A Common Feature Of Insolvency Proceedings Generally**

Unhappy with the effect of the exclusive jurisdiction granted by New York law, Underwriters apparently hope to convince this Court simply disregard it, by characterizing that exclusive jurisdictions as some kind "unprecedented," "judicially-created," "1957-era" New York anachronism, that is not even based on state law, as opposed to state "policy." (*See* Underwriters' Memo at 14-15, 19, 20.) Underwriters do not have the facts straight.

<u>First</u>, the Liquidator's exclusive jurisdiction is, in fact, based on New York statutes, not just New York policy. *Knickerbocker* based that protection upon the exclusive jurisdiction of the New York Supreme Court, flowing from the insurer insolvency statutes, including what is now N.Y. Ins. Code § 7419(b), authorizing the Supreme Court to enjoin further proceedings (as was done in the liquidation of Citizens). *Knickerbocker*, 149 N.E.2d 885. Underwriters can only argue otherwise by ignoring the fact that New York courts — interpreting their own cases and statutes — have said just the opposite. *See e.g. Matter of Union Indem. Ins. Co. of New York*, 521 N.Y.S.2d 617, 620 (Sup. Ct. 1987) (specifically holding that *Knickerbocker* represented state law, based on specific insurance insolvency statutes, and not mere "policy").[10]

---

[10]    Underwriters rely upon *Bernstein v. Centaur Ins. Co.*, 606 F. Supp. 98, 103 (S.D.N.Y. 1984) as their sole support regarding New York law. The simple expediency of

Second, contrary to Underwriters' innuendo, such exclusive jurisdiction is a not a New York parochialism, but is instead a common feature of insolvency proceedings. Under British law, for example, and presumably familiar to Underwriters, the appointment of a provisional liquidator automatically stays all other proceedings, including arbitrations. *See* U.K. Insolvency Act of 1986 § 130(2) (copy attached as Exhibit 1); *Enron Metals & Commodity Ltd. (In Administration) v. HIH Casualty & General Ins. Ltd. (In Provisional Liquidation)*, (2005) EWHC 485 (Ch.) (copy attached as Exhibit 2) (applying § 130(2) and denying a request to arbitrate).

### C.    Underwriters Cannot Claim Surprise About Continuing Exclusive Jurisdiction By The New York Supreme Court

Underwriters also attempt to distance themselves from the Liquidation Proceeding, presumably in order to insulate themselves from the effects of the plain language of the Assignment and the documents relating to the liquidation court's approval of the Assignment. For example, in a carefully-worded portion of their counsel's affirmation, Underwriters' attempt to suggest — without actually asserting — that they did not receive notice of the Liquidator's, petition and plan (the "Petition") for approval of the Assignment:

> "The Liquidator provided notice to Citizens' creditors — not necessarily its reinsurers — and appeared before the Liquidation Court at a hearing." (Veach Aff. ¶ 38.)

In fact, notice was not only made on "all of the reinsurers of Citizens. . .," but Underwriters are specifically listed in the proof of service affidavit submitted by the Liquidator. (Tafuro Aff. Ex. 14 at 1, Ex. 6 at DOI00014.) Indeed, Underwriters — through their exclusive agent, Equitas (now Resolute) — not only knew about the Petition, but also

---

KeyCiting that case in Westlaw would have revealed the wholly-undercutting *Union Indemnity* decision, which specifically refuted *Bernstein*.

engaged counsel, Mendes & Mount, to review it. (Child Opp. Aff. Ex. 2.) Despite thereby being on notice of all of the provisions demonstrating that B.D. Cooke would step into the shoes of the Liquidator, and that the New York Supreme Court would retain continuing jurisdiction, Underwriters did not object to the Petition. (Tafuro Aff. Ex. 5 at 12, Ex. 14 at BDC00772, noting objections filed, but none from Underwriters.)

### D.    There Is No Conflict With The Convention

As set forth above, and in support of the Motion to Remand, *Corcoran* makes clear that the liquidation of Citizens extinguished the ability of Underwriters to compel arbitration against the Liquidator (B.D. Cooke's assignee), even under the Convention. 567 N.E.2d 969. Underwriters attack *Corcoran* as somehow creating a conflict with the Convention and violating U.S. treaty obligations: it is, according to Underwriters, "an almost totally unprecedented exception to the otherwise unbroken support U.S. courts have shown the New York Convention;" a "judicially-implied and unique exception to enforcement of the New York Convention;" raising the question of "whether New York's 1957-era judicial exception to arbitration prevails over a United States treaty;" and is somehow based on the Convention being "reverse pre-empted" by the McCarran-Ferguson Act, a conclusion the Underwriters contend is faulty because *Knickerbocker* and *Corcoran* are based on mere New York "policy." (Underwriters' Memo at 14, 15, 19-22.)

This overwrought language invoking purported violations of international treaty obligations is nonsense. It manufactures a conflict with the Convention on the basis of something that the Convention ***expressly permits*** (and which our treaty partners also rely upon), and completely distorts the applicability of McCarran-Fergurson — an issue that is not

even reached because there simply is no need to "reverse pre-empt" the Convention since there is no conflict.

As set forth is Section I.B above, Underwriters — ignoring the holdings of even the cases they cite — steadfastly ignore the fact that their "Four Convention Requirements" must also include (in addition to an agreement to arbitrate the subject matter of the dispute), a showing that the arbitration agreement is ***valid and enforceable***.  This is because the treaty language expressly states that there is no obligation under the Convention where the court "finds that said agreement is null and void, inoperative or incapable of being performed." Convention, Art. II(3).  *See also Smith/Enron*, 198 F.3d at 93; *Cargill Int'l*, 991 F.2d at 1018; *Ledee*, 684 F.2d at 186-87.  Thus, *Corcoran* is based on the treaty language itself — just the opposite of the "almost totally unprecedented exception," as Underwriters exclaim.  *See Corcoran*, 567 N.E.2d at 972-73 (specifically relying on Convention language).

It is thus simply nonsense for Underwriters to suggest that the United States' Convention treaty partners might object to the notion that an arbitration clause would become "inoperative" as a result of the liquidation of one of the parties.  As discussed above at Section III.B, liquidations in the United Kingdom have a similar effect on as-of-right arbitration.  More importantly, the United States — and its Convention treaty partners — issue, recognize, and enforce insolvency-related injunctions against arbitration, without violating the Convention.  For example, in *Vesta Fire Ins. Corp. v. New Cap Reinsurance Corp.*, one party to a reinsurance agreement with a mandatory arbitration clause was subject to an insolvency proceeding in Australia (a signatory to the Convention), which resulted in an automatic stay of arbitrations and other proceedings.  244 B.R. 209, 211, 212 (S.D.N.Y. 2000), *aff'd In re McKenna*, 238 F. 3d 186 (2d Cir. 2001).  The courts of the United

Kingdom (also a signatory to the Convention), notwithstanding the Convention, entered an injunction to enforce the Australian stay in the United Kingdom. *Id.* The U.S. Bankruptcy Court did the same, and was upheld by the this Court, despite objections from the other party that the injunction violated the Convention. *Id.* at 211, 212. All told, in this one case, three signatories to the Convention nevertheless entered stays or injunctions against arbitrations.

Simply put, applying the Convention's own exceptions cannot possibly constitute a conflict with the Convention, and insolvency proceedings often preclude arbitration without violating the Convention. Underwriters' McCarran-Ferguson arguments are therefore simply irrelevant because there is no need for "reverse preemption" of the Convention. In any event, Underwriters' McCarran-Ferguson arguments are not the law in this Circuit as established by *Stephens v. American Int'l Ins. Co.*, 66 F.3d 41, 44-45 (2d Cir. 1995), which would allow this Court reject Underwriters arguments, even if it found a conflict with the Convention.[11]

**E.    There Is No Estoppel Argument Available To Underwriters**

Underwriters hint at, but never squarely articulate, some sort of muddled estoppel argument. After citing cases they claim support the proposition that B.D. Cooke cannot, if it has received a "direct benefit" from the reinsurance contracts, avoid arbitration under those contracts, Underwriters contend that B.D. Cooke "cannot get the benefit of indemnification, while avoiding the obligation to arbitrate." (Underwriters' Memo at 11.)

---

[11]    Underwriters necessarily acknowledge that their argument is not the law in this Circuit by arguing that *Stephens* should not be "extended" to this case. (Underwriters' Memo at 20-21.) However, no "extension" is required here. Underwriters argument is premised on *Bernstein* and the notion that *Knickerbocker* is based on mere "policy," which is incorrect as discussed above at page 4 and note 10. Underwriters' argument is similarly dependant upon a suggestion that the closure of the Citizens estate somehow restored Underwriters' long-extinguished ability to compel arbitration. This simply ignores the express language of the Assignment that B.D. Cooke would have all of the rights the Liquidator would have had "if the Citizens estate were not closed". (Tafuro Aff. Ex. 15 at 2.)

In making this argument, Underwriters have applied the caselaw in a manner that even the cases cited by Underwriters warn is improper. The required "direct benefit" is construed very narrowly, and is entirely absent here. For example, in the case principally relied upon by Underwriters, the contract containing the arbitration agreement *itself contained* provisions *directly benefiting* the non-signatories. *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 351, 353 (2d Cir. 1999).[12] In none of the cases cited by Underwriters was the "direct benefit" theory applied where, as here, the non-signatory received the benefits as a result of a separate agreement. Nor do any of those cases address the circumstances here, where B.D. Cooke claims *through* an entity against whom arbitration was not available.

To the contrary, Underwriters cite *Thomson-CSF v. Am. Arbitration Assoc.*, 64 F.3d 773 (2d Cir. 1995), which is also the authority relied upon by *American Bureau of Shipping*. In *Thomson*, the court found that the benefits claimed — if they had been obtained by the non-signatory directly under the contract containing the arbitration clause — would have been sufficient to bind the non-signatory to arbitration. 64 F.3d at 778. However, the non-signatory actually obtained those benefits by virtue of a separate agreement and, but/for that separate agreement, the non-signatory would have received no benefit. The court found that form of indirect benefit "is not the sort of benefit which this Court envisioned as the

---

[12] Similarly, in *Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, 9 F.3d 1060 (2d Cir. 1993), the arbitration agreement was contained in a settlement agreement, signed on behalf of the non-signatory (a local Deloitte member company) with the entity that owned the rights to use the name "Deloitte". *Id.* at 1064. A "direct benefit" was found on the basis that the non-signatory had received, without objection, a copy of the settlement agreement, which expressly listed the non-signatory as among those it intended to bind, and had thereafter exercised the right to use the name "Deloitte" granted in the settlement agreement. *Id.*

basis for estopping a nonsignatory from avoiding arbitration." *Id*. at 779.[13]  Thus, under

*Thomson*, in a context where the benefits to the non-signatory are by way of a separate

agreement, the proper criteria as to whether the non-signatory can be bound to arbitrate are

the "ordinary principles of contract and agency." *Id*. at 780.  The Second Circuit strongly

criticized the district court for doing what Underwriters urge here — adopting a "hybrid

approach:"

> "In so doing, the district court improperly extended the law of this Circuit and
> diluted the protections afforded nonsignatories by the ordinary principles of
> contract and agency.  A nonsignatory may not be bound to arbitrate except as
> dictated by some accepted theory under agency or contract law."  64 F.3d at
> 780 (citations and quotation marks omitted).

Here, although the Assignment allows B.D. Cooke to benefit from the reinsurance

contracts, but/for the Assignment, just as in *Thomson*, B.D. Cooke would receive no benefit

from the reinsurance contracts.  B.D. Cooke does not claim directly under the reinsurance

contracts, but only by virtue of the Assignment.  (*See e.g.* Verified Complaint ¶ 46-47.)  As

such, the proper analysis is not a "hybrid approach," combining assignment law with the

"direct benefit" theory, as offered by Underwriters.  It is instead whether "ordinary principles

---

[13]  In *Thomson*, the arbitration clause was contained in a contract by which Rediffusion
Simulation Limited ("Rediffusion") agreed to purchase computer-generated image
equipment for flight simulators from Evans & Sutherland Computer ("E&S") and E&S
agreed to supply such equipment exclusively to Rediffusion, which non-signatory
Thomson acquired under an acquisition agreement.  64 F.3d at 775.  Thomson had
previously been a competitor of Rediffusion in the flight simulator market, but after
Rediffusion was integrated into Thomson's operations and subject to its control,
"Rediffusion's share of the flight simulator market drastically decreased." *Id*. at 775-76.
The benefit at issue was that, by enforcing the E&S/Rediffusion contractual provisions
that bound E&S to supply imaging equipment only to Rediffusion, Thomson was able to
eliminate E&S as a competitor in the flight simulator market. *Id*. at 779.  Thus, although
the court concluded that Thomson obtained this benefit through the acquisition
agreement, but/for enforcement of the exclusivity provision in the E&S/Rediffusion
agreement, Thomson would not have received that benefit.

of contract and agency" applicable to the Assignment — namely, the law of assignment — bind B.D. Cooke to arbitrate. *See Thomson*, 64 F.3d at 780.

In that regard, the result under assignment law is clear, which explains why Underwriters instead proffer a hybrid approach. By basic assignment law, B.D. Cooke stepped directly into the shoes of the Liquidator, inheriting only those legal rights and obligations under the Lloyd's Reinsurance Contracts that the Liquidator would have had. *See Richard T. Blake & Assocs., Inc. v. Aetna Cas. & Sur. Co*., 681 N.Y.S.2d 73, 74-75 (App. Div. 1998) (stating that "[i]t is well established that an assignee stands in the shoes of the assignor. . ..) (*citing In re Int'l Ribbon Mills, Ltd.*, 325 N.E.2d 137, 139 (N.Y. 1975)). Thus, because the Liquidator had under *Corcoran* the precise right that Underwriters now object to — "the benefit of indemnification, while avoiding the obligation to arbitrate," B.D. Cooke now has that same right. The language of the Assignment (Tafuro Aff. Ex. 15 at 2), the cases above, and even Underwriters are all agreed on this point: B.D. Cooke "has stepped into the shoes of Citizens' liquidator," its assignor. (Underwriters' Memo at 10.)

The rights thereby conveyed includes what this Court has described as the Liquidator's right not to be compelled to arbitrate. *Ideal Mut. Ins. Co. v. Phoenix Greek Gen. Ins. Co*., No. 83 Civ. 4687 (CSH), 1987 WL 28636, at *1 (S.D.N.Y. Dec. 11, 1987) (liquidators "simply are not bound to arbitrate"). This therefore answers Underwriters' final effort to infer estoppel by (incorrectly) suggesting that B.D. Cooke has somehow invoked the arbitration clauses, either in its prior dispute with another reinsurer ("Nationwide"), or by reserving the right to arbitrate its contingent claims for monetary damages in the event there turns out to be any dispute arising under the reinsurance contracts with respect to those claims. (Underwriters' Memo at 6; Veach Aff. ¶ 44, 45, 52.) In both cases, Underwriters

23

misstate the facts,[14] but the point is moot in any event because, even if Underwriters had the facts right, there would be no estoppel issue here, since B.D. Cooke would *still* be exercising only those rights held by the Liquidator that B.D. Cooke acquired under the Assignment, specifically, the right not to be *compelled* to arbitrate.  The Liquidator was free to *elect* to arbitrate which, even accepting Underwriters' characterization, is all that B.D. Cooke has reserved the right to do.

## CONCLUSION

The Underwriters have not even attempted to meet their burden of showing that the principal matters they seek to arbitrate — the interpretation of the Assignment and the Commutation — are "dispute[s] arising under" the reinsurance contracts.  With respect to the only remaining claims, for monetary relief, Underwriters have similarly failed to show a "dispute arising under" the reinsurance agreements.  Underwriters have specifically failed to rebut sworn evidence that:  (1) they have failed to pay B.D. Cooke the specific claims at issue solely because of disputes arising under the Assignment, not under the reinsurance contracts; and (2) that they had otherwise agreed those claims under the reinsurance contracts, and have even *paid those same claims* to other reinsureds *under the same contracts*.  Underwriters have similarly failed to show how they can compel arbitration now when their ability to do so was extinguished in 1971, nearly four decades ago.  For these and the other reasons set forth above, B.D. Cooke respectfully requests that Underwriter's

---

[14]    Underwriters grossly distort the Verified Complaint by selective quotation that turns an assertion that there is nothing to arbitrate into an invocation of arbitration.  (*See* Verified Complaint ¶¶ 44, 50.)  Similarly, in the Nationwide case, upon becoming aware of it, B.D. Cooke acted in accord with the continuing jurisdiction of the New York Supreme Court.  (Child Opp. Aff. ¶¶ 7-12.)

Motion to Compel be denied in its entirety and that plaintiff be awarded such other or further

relief as may be just and proper.

Dated: Washington, D.C.                         Respectfully submitted,
      June 5, 2008

                                        CHADBOURNE & PARKE LLP


                                        By __/s Carey G. Child_____
                                          Carey G. Child (CC-3286)
                                          Attorneys for Plaintiff
                                        30 Rockefeller Plaza
                                        New York, New York 10112
                                        (212) 408-5100

                                          -and-

                                        1200 New Hampshire Avenue, N.W.
                                        Washington, D.C. 20036
                                        (202) 974-5730

EXHIBIT 1

Butterworths UK Statutes
Copyright 2008, Butterworths Tolley UK
a division of Reed Elsevier, Inc.
All rights reserved.

*** THIS DOCUMENT IS CURRENT THROUGH 25 MARCH, 2008 ***

**INSOLVENCY ACT 1986**
**1986 CHAPTER 45**

**CHAPTER VI WINDING UP BY THE COURT**
**Commencement of winding up**
Royal Assent [25 July 1986]

*Insolvency Act 1986, Ch. 45, s. 130 (Eng.)*

**130 Consequences of winding-up order**

(1) On the making of a winding-up order, a copy of the order must forthwith be forwarded by the company (or otherwise as may be prescribed) to the registrar of companies, who shall enter it in his records relating to the company.

(2) When a winding-up order has been made or a provisional liquidator has been appointed, no action or proceeding shall be proceeded with or commenced against the company or its property, except by leave of the court and subject to such terms as the court may impose.

(3) When an order has been made for winding up a company registered under section 680 of the Companies Act, no action or proceeding shall be commenced or proceeded with against the company or its property or any contributory of the company, in respect of any debt of the company, except by leave of the court, and subject to such terms as the court may impose.

(4) An order for winding up a company operates in favour of all the creditors and of all contributories of the company as if made on the joint petition of a creditor and of a contributory.

**NOTES:**

**Derivation**

This section derived from the Companies Act 1985, s 525, and the Insolvency Act 1985, Sch 6, para 29.

**Initial Commencement**

**To be appointed**

To be appointed: this Act shall come into force on the day on which the Insolvency Act 1985, Pt III comes into force: see s 443.

**Appointment**

1986 CHAPTER 45

Appointment: 29 December 1986 (being the day on which the Insolvency Act 1985, Pt III came into force): see SI 1986/1924, art 3.

**Modification**

Modified by the Building Societies Act 1986, s 90, Sch 15, and the Friendly Societies Act 1992, s 23, Sch 10.

Anything directed to be done, or which may be done, to or by the registrar of companies in Scotland by virtue of sub-s (1) above, or the assistant registrar of friendly societies for Scotland by virtue of that subsection as applied in relation to friendly societies, industrial and provident societies or building societies, shall, or (as the case may be) may, also be done to or by the Accountant in Bankruptcy: see the Scotland Act 1998, s 125, Sch 8, para 23(2), (3).

The Limited Liability Partnerships Act 2000 provides for the creation of Limited Liability Partnerships (LLPs). The Limited Liability Partnerships Regulations 2001, SI 2001/1090 regulate LLPs by applying to them, with modifications, the appropriate provisions of this Act: see SI 2001/1090, reg 5, Sch 3.

**See Further**

See further: the Companies Act 1989, ss 161, 182(4), Sch 22, paras 5, 12.

EXHIBIT 2

IN THE HIGH COURT OF JUSTICE                                     4326/2001

CHANCERY DIVISION

**[2005] EWHC 485 (Ch)**

Royal Courts of Justice

Thursday, 10th March 2005

Before:

MR. JUSTICE PUMFREY

B E T W E E N :

ENRON METALS & COMMODITY LIMITED            Applicant

- and -

HIH CASUALTY & GENERAL INSURANCE LIMITED        Respondent

_____

*Transcribed by **BEVERLEY F. NUNNERY & CO***
*Official Shorthand Writers and Tape Transcribers*
*Quality House, Quality Court, Chancery Lane, London WC2A 1HP*
***Tel: 020 7831 5627   Fax: 020 7831 7737***

_____

MR. C. HARRIS (instructed by Holman Fenwick & Willan) appeared on behalf of the Applicant.

MR. J. GOLDRING (instructed by Clyde & Co.) appeared on behalf of the Respondent.

_____

# J U D G M E N T

(As Approved by the Judge)

MR. JUSTICE PUMFREY:

1. This is an application pursuant to s.130(2) of the Insolvency Act 1986 for leave to commence arbitral proceedings against a company in provisional liquidation. The applicant and intending claimant is Enron Metals & Commodity Limited (In Administration) ("Enron") and the intended defendant and respondent to this application is HIH Casualty & General Insurance Limited ("HIH"). The proposed claim concerns a trade credit insurance policy, under the terms of which it is alleged that HIH is liable to indemnify Enron in respect of a default by Straights Resources Limited in the supply of copper cathodes against an advance payment of US$15m. The value of the claim for the purposes of the draft claim in the arbitration is put at US$2.985m, with interest in addition.

2. It is unnecessary to refer in detail to either the position which the provisional liquidators have reached in the discharge of their functions or to any other details of the provisional liquidation, since Mr. Goldring, who appears on behalf of HIH, does not rely in the context of this application upon any difficulty which might be caused by the claim in the context of the provisional liquidation; nor does he rely upon any difficulty or complexity and attendant expense associated with the proposed arbitration proceedings. His contention is that the claim is unarguably bad because HIH were not on risk at the material time. Accordingly, he submits that the claim should not go forward.

3. The basis on which this jurisdiction is to be exercised is discussed in a number of cases which are summarised in the judgment of Etherton J. in NewCap Reinsurance Corporation v. HIH, unreported, in a judgment of 28th November 2001, approved by the Court of Appeal [2002] 2 B.C.L.C. 228. The guiding principle is that identified in Re Aro [1980] Ch. 196, where Brightman L.J. said that s.231 of the Companies Act 1948 (the predecessor of s.130(2)) gave the court the freedom to do what is right and fair in all the circumstances; an exceptionally broad statement of an available discretion.

4. I observe merely that fairness in this context is fairness in the context of the provisional liquidation or liquidation as a whole, and the ascertainment of what is fair necessarily involves a consideration of the interests of the creditors as a whole and of the capacity of the provisional liquidators or liquidators to deal with the burden of the proposed litigation. These are not, as I have indicated, questions with which I am directly concerned, since the only issue with which I am confronted is a narrow one: Is the claim so bad that it would be a waste of resources to permit it to proceed to arbitration?

5.    I should also observe that the wide discretion conferred by the statute extends, in my judgment, to an assessment of the triability of a claim sought to be raised against a company, regardless of the tribunal in which the claim is sought to be raised.  As Morritt J. (as he then was) observed in <u>Re Hartlebury Printers</u> [1992] I.C.R. at p.559, at p.567:

> "The claims of the union had only derivative rights of the employees … only justiciable before the industrial tribunal. Thus, this is not a case where the rights sought to be enforced can be determined in the liquidation.  In those circumstances, I should grant leave if I am satisfied that the claim the union wishes to advance has some prima facie merit and prospects of success.  As Rogers C.J. said in <u>Capital Financial Group Limited v. Rothwells Limited</u> [1989] 15 A.C.L.R. 348-349 in relation to the provision of the company's New South Wales code in identical terms to s.130(2) of the Insolvency Act 1986, it is necessary to understand the rationale which buttresses the requirement for showing the existence of a prima facie case. The provisional liquidators and liquidator, respectively, are entitled to be protected from involvement in court proceedings which may be perhaps only of a nuisance nature or which may be thought to be totally devoid of any substance.  The resources of the company in liquidation should not be frittered away in defending baseless claims."

6.    That extract explains the sense in which the words "prima facie case" are used by Rogers C.J. and it is a corollary to this that if the claim sought to be raised in the arbitration with which I am concerned does not satisfy the CPR 24 test of a real issue to be tried, I should not contemplate granting leave under s.130(2).  There is no justification for any lower test and, for this purpose, the fact that, were HIH not in provisional liquidation, this would be a question exclusively for the arbitrators is irrelevant.

7.    The proposed reference is to be found in the bundle prepared for this application, at p.95.  The material part of the request for arbitration is to be found at p.3, subpara.(c) as follows:

> "The nature and circumstances of the dispute may be summarised briefly as follows.

<u>Background</u>

1.  The claimant entered into an agreement dated 17th September 1999 with Straights Resources Limited ('Straights') whereby the claimant would make an advance payment of US$15m which was to be repaid by deliveries of copper cathodes, with final repayment due by 15th December 2000 ('the insured contract').  The advance payment was unsecured and, on 22nd September 1999, the claimant obtained trade credit insurance against Straights' non-performance under the insured contract, that is the policy as defined and as underwritten by HIH, among others.  The lead underwriter was HIH at 70.5882%.  The share of the risk subscribed to by Cox [who was the other underwriter] was 29.4118%.

2.  Following amendments on 8th December 1999, 9th August 2000 and 13th March 2001, the sum insured was agreed to be US$14,850,000 or 90% of the amount of the first advance payment, plus interest.

3.  Pursuant to the insured contract, the advance payment was made on 15th December 1999 and copper was delivered by Straights.

4.  On 11th December 2000, Straights sought to terminate the insured contract and, on 15th December 2000, the claimant formally demanded repayment of the advance payment.

5.  Following negotiations, the claimant and Straights entered into an interim agreement on a without-prejudice basis on 4th January 2001.  Paragraph 2 of the interim agreement provided for an amended and restated loan agreement to be executed.

6.  The interim agreement was terminated by Straights on 27th March 2001, who then brought LME arbitration proceedings against the claimant.  The claimant counterclaimed.  The claimant's counterclaims were settled on 14th September 2001 for US$14.5m or US$9.8m in case of prompt payment; in either case on a full and final basis ('the settlement agreement').  On or around 28th September

1      2001, the claimant notified underwriters of their claim under
2      the policy."
3
4  The quantum of the claim is then set out.
5
6 8. HIH's point, put shortly, is that the perfecting of the amended and restated
7   loan agreement referred to in para.5 was an express condition of the extension
8   of cover under the relevant indorsement to the policy.  It never was perfected
9   and it follows that the indorsement never took effect.  Other points are also
10  relied on but it is accepted for the purpose of this application that they do not
11  affect the question whether leave should be granted.  It is therefore necessary
12  to turn, first, to the interim agreement.  As appears from the terms of the
13  proposed reference, the immediate context of the agreement is the desire by
14  Straights to terminate the insured contract.
15
16 9. The agreement is embodied in a letter of 4th January 2001, three pages in
17   length, which is headed "Without Prejudice".  It is addressed to Mr. Rea, who
18  is the chief executive of Straights Resources Limited and comes from
19  Mr. Robert Quick, whom I understand to be the senior legal counsel of
20  Enron (Europe) Limited.  So far as material, it reads as follows:
21
22     "Re Proposed Amended and Restated Secured Loan Agreement
23     with Straights Resources Limited
24
25     I refer to recent correspondence on the above.  As discussed,
26     I set out below the amended terms of our without-prejudice
27     offer.  If you are able to agree to the following terms, Enron and
28     Straights agree not to take any action against the other in respect
29     of breaches or alleged breaches under the terms of the agreement
30     dated 17th September 1999 for a period of 14 days from today's
31     date ['the interim agreement'].  If after such period the
32     documents referred to in (1) and (2) below are not perfected,
33     both parties are free to take any steps that they may wish to take
34     against the other, provided two days' written notice after the
35     14-day period is given by either party terminating the interim
36     agreement.  The parties agree that all documentation,
37     negotiations and other communications relating to the interim
38     agreement and the negotiations referred to in (1) and (2) below
39     will be treated as being without prejudice in the event of
40     termination by notice of the interim agreement."
41
42 10. This introductory paragraph sets out the nature of the transaction which is
43   being proposed in the letter.  It has the following aspects.  The first is

1    an initial, 14-day, interim agreement during which neither party takes steps
2    against the other. That interim agreement then continues from time to time
3    until terminated by one or other of the parties on two days' written notice
4    bringing the interim agreement to an end. The purpose of the ceasefire period,
5    if I may call it that, is to enable the parties to proceed with what are referred to
6    as "the negotiations referred to in (1) and (2) below". The obvious overall
7    commercial purpose is to put in place new financial arrangements for the
8    copper contract.
9
10   11.   I can turn, now, to the two (as they are put) negotiations which are specified.
11         The first is in numbered para.1:
12
13                   "Within 14 days of today's date, the parties sign in an agreed
14                   form a second-ranking fixed and floating charge granted over all
15                   the assets of Straights and perfected by registration. It is
16                   envisaged that this will occur in conjunction with exemptions of
17                   the amended and restated loan agreement, together with any
18                   appropriate inter-creditor agreement with AB&Amro [whom,
19                   I should add, already hold a first charge over Straights' assets]."
20
21         Paragraph 2:
22
23                   "Straights signs an agreed form an amended and restated loan
24                   agreement for US$15m subject to any additional fees resulting
25                   from …[and there is a reference forward to subpara.(g)]…
26                   outstanding interest and amortisation tonnage already
27                   despatched by Straights to Enron. The terms of the amended
28                   and restated loan agreement should include, but not be limited
29                   to, the following provisions."
30
31   There then follows, in lettered paras.(a) to (h), a series of what I shall call
32   necessary terms. It should be observed that these terms are not in final form.
33   So, for example, in term (b) the parties agree upon a proposed amortisation
34   schedule, according to which an amended price is defined. Proposal (c)
35   requires Straights to agree to a valuation methodology used in sch.1
36   "attached", which I was not shown, which values its net mark to market loss
37   position of all outstanding hedging agreements at - and then figures are given
38   in square brackets, since they plainly indicate an indicative value as of the date
39   of the letter. Paragraph (e) sets out a need for other standard lending terms and
40   conditions including, but not limited to, events of default, for example, in the
41   substance of those events of default in the existing AB&Amro facility and
42   including material … change and subsequent failure to provide security,
43   insolvency or other bankruptcy, breach of the terms of the loan, and other

1  ancillary documents, etc.; negative pledge in respect of further granting of pari
2  passu security, failure to deliver copper, etc., with a suitable grace period, for
3  example, 30 days, to allow for … by Straights, if applicable.  Then the
4  consequences of default are outlined in s.(f), and a fee for the arrangement is
5  prescribed in s.(g)
6
7  Then para.3 of the letter:
8
9        "In consideration of [proposal] (1), Enron agrees to extend the
10       loan as amended and restated under (2) above for a period of one
11       year, whereafter principal and interest shall be repaid forthwith."
12
13  And the letter includes these paragraphs:
14
15       "In order for this proposal to be taken forward, AB&Amro will
16       have to agree to the proposed structure.  We therefore ask you to
17       forward this fax on to Irwin Elstein [I think] at Amro for his
18       consideration.
19
20       If the above can be agreed, including the figures in 2(c), I can
21       finalise the letter.  I would then ask that you initial each page,
22       confirming Straights' agreement in principle.  We can then take
23       this to the documentation stage."
24
25  12.  The structure of the proposed transaction is clear enough from this letter.  The
26       essential change over what has gone before is the security to be granted by
27       para.1 and the precise terms of the new loan agreement specified by para.2.
28       Evidently, from an insurer's point of view, the existence of the security and the
29       precise terms of the agreement are highly material.
30
31  13.  The indorsement which is relied on as extending the cover so that the claim
32       notification which is pleaded in the draft reference is effective was scratched
33       by HIH on 23rd February 2001.  It is in the following terms:
34
35       "Underwriters hereon note and agree that, subject to execution
36       of the amended and restated loan proposal dated 4th January
37       2001 with Straights Resources, the policy period has been
38       amended to read 'period from 1st October 1999 to
39       15th February 2002, both dates inclusive'."
40
41  Then, after a note in respect of a release:
42

"Subject to the assured perfecting a second charge over the
assets of Straights Resources Limited, the financing fee of
US$375,000 outlined in the amended and restated secured loan
proposal dated 4[th] February 2001, plus any post maturity interest
being subordinate to the assured's principal outstanding and the
assured's continued application of US$20 per tonne NIFTY
copper cathodes inuring to the benefit of underwriters, an
additional minimum and deposit premium of US$221,000 …
0.23% per month on 76.5% of maximum monthly exposures
becomes due and payable to underwriters."

14. It is not suggested that the indorsement does not mean what, on its face, it
says, which is that the extension of cover is subject to the perfection of the
second charge as outlined in the amended and restated secured loan proposal
of 4th January 2001, which (it is common ground) is the letter which I have
read and, moreover, from the first line of the indorsement, that it is subject to
the execution of the amended and restated loan proposal described in that
letter. This seems to me to be too clear for argument, and the contrast with
an earlier indorsement extending cover is, in this respect, telling. So, on
12th December 2000, HIH scratched an indorsement extending the cover to
15th February 2001, and the terms of this indorsement are simply:
"Underwriters hereon note and agree that, with immediate, effect, the policy
period has been amended to read as follows."

15. That being so, there is a double condition to this indorsement. The first is the
provision of the stated security, referred to in the letter of 4th January 2001, and
the second is the execution of the amended and restated loan document. It
should be noted also that para.1 of the letter requires the charge to be perfected
by registration and, of course, to be approved by AB&Amro, who hold the
first-ranking security.

16. Taking the condition that there should be an executed amended and restated
loan agreement, HIH's contention before me is simply there is no such
agreement; such an agreement has never been executed; there is no evidence of
the existence of any such agreement; and, accordingly, it follows inexorably
that the indorsement was of no effect. What is suggested in answer to this
contention is that the countersigned letter, which was countersigned before the
indorsement was scratched (although I do not attach too much importance to
that), suffices.

17. In my judgment, it plainly does not. First of all, the letter of 4th January 2001,
in its terms, precludes that letter from being the loan agreement in question.
The loan agreement is part only of the proposed transaction, and the preamble

of the letter, which I have set out above, makes it clear that the letter itself is contingent upon termination. Termination took place on 27th March, as the proposed reference makes clear, and there is no indication that any other document came into existence down to the date of termination. On the face of it, therefore, the letter cannot stand as the agreement. But also I have regard to the following other matters which I consider militate against any conclusion that it could do so.

18. First, the specific identification of future documents, that is to say the charge and the agreement (which do not, in contemplation of the letter, yet exist), taken together with the reference in the tail of the document to the documentation stage, make it clear that the letter contemplates a further agreement.

19. Second, the words "should include, but not be limited to" in the introduction to the required terms of the amended and restated loan agreement are not apt to introduce a final and concluded set of terms for a concluded agreement.

20. Third, the use of the square brackets in identifying the various sums, to which I have referred, plainly indicate that they are undetermined figures and, indeed, the letter makes that clear on its face in the concluding paragraph, which I have read.

21. Fourthly, the need for a future agreement with AB&Amro as an additional condition, without which of course there is a risk that the security proposed will have no effect.

22. There is no suggestion that any charge was ever executed in accordance with para.1 of the letter.

23. Against all these considerations, the only indication which anybody ever considered that HIH was on risk was contained in a letter from Enron's brokers, Marsh, in the aftermath of the HIH collapse. This letter undoubtedly suggests that Enron are still covered but is principally and obviously concerned with pointing out to all Marsh's HIH insured clients that they are going to have to find a new carrier. I do not believe that this letter will bear any serious weight at all and, in those circumstances, it seems to me that all the factors point in one direction only and that is that the conditions set out in the scratched indorsement were never satisfied and that accordingly, when the agreement came to an end on 27th March, cover did not continue.

24. In those circumstances, I have formed the clear conclusion that this is a case which, on this material, had it been started in the High Court, I would have

1    struck out.  That being so, it seems to me that I should exercise the discretion
2    under s.130(2) of the Insolvency Act to prevent the reference being made to
3    the arbitrators.  I acknowledge, of course, that the parties have chosen
4    a method of dispute resolution which effectively excludes the court from the
5    consideration of the merits of this dispute.  Nonetheless, for the reasons which
6    I have given, I consider that the court is obliged to consider the merits of the
7    dispute before considering whether it ought to be allowed to go to the
8    arbitrators and if I formed the clear view that the claim is devoid of merit,
9    I should not permit it to go forward.  That is the view which I have formed
10   and, accordingly, I reject to the application for leave.
11
12   Mr. Goldring?
13
14   MR. GOLDRING:  My Lord, in those circumstances, I ask for my costs of the
15       application.
16
17   MR. JUSTICE PUMFREY:  Mr. Harris, I do not think you can do anything about
18       that.
19
20   MR. HARRIS:  No.
21
22   MR. GOLDRING:  My Lord, I will then address you on the appropriate way to deal
23       with the costs.  I was going to suggest a summary assessment.
24
25   MR. JUSTICE PUMFREY:  Twentyfour hours?
26
27   MR. GOLDRING:  Yes, the schedule was served before the hearing, so I do have
28       a schedule.  Your Lordship should have received it but ----
29
30   MR. JUSTICE PUMFREY:  No.  That said, I almost certainly have, but of course it
31       is still somewhere between here and somewhere else.
32
33   MR. GOLDRING:  My Lord, I should say that HIH already has one costs order in
34       this action.  Your Lordship will have seen Collins J. made an order not subject
35       to summary assessment, so your Lordship cannot deal with that - that will have
36       to go to detailed assessment - but this deals with the costs of the hearing before
37       your Lordship.
38
39   MR. JUSTICE PUMFREY:  How big is the bill which Collins J. has sent off to
40       detailed assessment?
41

1   MR. GOLDRING:  My Lord, I have a schedule here which has not yet been
2       provided to the other side but it is £4,500.  Your Lordship may take the view
3       that both should be dealt with …
4
5   MR. JUSTICE PUMFREY:  This is ridiculous.  I am going to give you seven days
6       to go away and agree it but if you cannot agree it - Collins J. gave you your
7       costs in any event to be taxed and paid.
8
9   MR. GOLDRING:  Yes, we did not have the schedules at that time because it was
10      all done in such a tremendous rush.
11
12  MR. JUSTICE PUMFREY:  This is not a useful way in which to spend time and
13      money: sending off sums like this for a detailed assessment.  The total bill
14      looks something like £14,000.
15
16  MR. GOLDRING:  That is correct, my Lord, yes.
17
18  MR. JUSTICE PUMFREY:  I have to tell you you are both instructed by very
19      respectable solicitors.  It must be possible for you to agree this without sending
20      it off to detailed assessment.  I will give you seven days to agree it and I will
21      consider what order to make overall if you come back.  Was Collins J.'s order
22      ever drawn?
23
24  MR. GOLDRING:  It was drawn, my Lord.  This was the expedition order; it is at
25      tab 7 of the bundle.  It was impossible to have a summary assessment at that
26      stage because, as I say ----
27
28  MR. JUSTICE PUMFREY:  It might have been helpful to have reserved them.
29
30  MR. GOLDRING:  It is para.5 of that order.
31
32  MR. JUSTICE PUMFREY:  I have read it.  I cannot revisit that, but I do encourage
33      you to, because I may put terms on this, which would have the effect of
34      sending the whole thing off with a financial penalty considerably in excess of
35      the ordinary one on failure to meet the ten percent ----
36
37  MR. GOLDRING:  My Lord, I hear what you are saying about the Collins J.'s
38      order; that clearly is sensible.  As to the costs of the matter before your
39      Lordship, that ----
40
41  MR. JUSTICE PUMFREY:  You are entitled to your costs of the matter before me.
42
43  MR. GOLDRING:  Yes.

1  MR. JUSTICE PUMFREY:  I am just not going to make an order either for
2      summary assessment or for detailed assessment at this stage because I want to
3      know what can be done about the other order for detailed assessment.  Would
4      that not be sensible?  Mr. Harris, surely …
5
6  MR. HARRIS:  I think that very sensible, my Lord.
7
8  MR. JUSTICE PUMFREY:  Otherwise it will just proliferate beyond endurance.
9      We have probably already doubled it talking about it.
10
11  MR. GOLDRING:  I think this is all included, my Lord.
12
13  MR. JUSTICE PUMFREY:  Okay.
14
15  MR. GOLDRING:  So the order would be that I have my costs to be agreed; in the
16      absence of agreement --
17
18  MR. JUSTICE PUMFREY:  Come back.
19
20  MR. GOLDRING:  -- come back or written submissions.
21
22  MR. JUSTICE PUMFREY:  But I will be minded to summarily assess.
23
24  MR. GOLDRING:  Written submissions on the question of summary assessment.
25
26  MR. JUSTICE PUMFREY:  Yes.
27
28  MR. GOLDRING:  And obviously Collins J.'s - if there is not agreement, you
29      cannot deal with that.
30
31  MR. JUSTICE PUMFREY:  I cannot deal with it.  I am going to encourage you to
32      agree it.
33
34  MR. GOLDRING:  Absolutely, my Lord.  So the order will be just dismissing the
35      application with costs.  The other order will be provisional liquidator's costs:
36      I would submit, should be payable as an expense of the provisional liquidation,
37      which just deals with any costs which they do not recover from the other side.
38
39  MR. JUSTICE PUMFREY:  Since you have succeeded, I cannot make any other
40      order, can I, because otherwise I would take steps to protect?  Yes, they will be
41      costs in the liquidation.
42
43  MR. GOLDRING:  It is just dealing with the liquidators ----

1  MR. JUSTICE PUMFREY:  Exactly so, your costs will be your costs and it will be
2      expenses in the provisional liquidation.
3
4  MR. GOLDRING:  Absolutely, those are the only orders I seek, my Lord.
5
6  MR. JUSTICE PUMFREY:  Yes, thank you very much.
7
8  MR. HARRIS:  My Lord, the only further order which I am instructed to ask for is
9      permission to appeal.
10
11  MR. JUSTICE PUMFREY:  Yes, grounds?  Irrationality?  (After a pause):   Yes,
12      I appreciate that you are in a very difficult position: you are not acquainted
13      with the case.  I understand therefore the problem in which you find yourself.
14      I will tell you this.  I am going to refuse you permission to appeal because
15      there are two aspects to the judgment.  The first one is the basis upon which
16      the discretion ought to be exercised.  It seems to me that is utterly concluded
17      by the authorities to which I have referred and the judgment of Parker L.J.
18      seems to me really to put the matter beyond further discussion in the <u>NewCap</u>
19      case.
20
21      The second one is how I have applied it in the present case.  If I apply
22      a CPR 24 standard, which I believe I have applied, that is the normal standard
23      for untriable issues and I do not see why I should depart from it.
24
25      As to my treatment of the actual agreement itself, it does seem to me this is
26      actually a surprisingly clear case when you get down to it and, accordingly,
27      I am not persuaded at the moment that this is a matter which ought properly to
28      trouble the Court of Appeal.  That, of course, is not to prevent you from
29      applying to them, but those are my reasons for saying that there is no real
30      prospect of success on an appeal.
31
32      Finally, of course, this is ultimately an exercise of discretion and you are going
33      to have to show that I actually exercised the discretion from a wrong basis.
34      So, for those reasons, I am afraid I am going to refuse you permission to
35      appeal.
36
37      Is that everything?
38
39  MR. GOLDRING:  My Lord, yes, I will draw up an order if that would assist.
40
41  MR. JUSTICE PUMFREY:  Yes, it would assist.  I take it it has got a refusal of
42      permission to appeal attached to it, has it, Mr. Goldring?
43

1    MR. GOLDRING:  My Lord, yes.
2
3    MR. JUSTICE PUMFREY:  Where is it?
4
5    MR. GOLDRING:  No, I will draw it up.
6
7    MR. JUSTICE PUMFREY:  Sorry, I thought you had.
8
9    MR. GOLDRING:  No, I had not anticipated to that extent, my Lord.
10
11   MR. JUSTICE PUMFREY:  No, very well, thank you both very much indeed.
12
13                                    _____