UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X  Civ. Action No. 08-CIV-3435 (RJH)

B.D. COOKE & PARTNERS LIMITED, as Assignee of
Citizens Casualty Company of New York (in liquidation)

Plaintiff,                                                        **DECLARATION OF**
                                                                 **CHRISTOPHER DAVID PILLER**

       -against-

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON,

Defendants.
------------------------------------------------------------------------X

Christopher David Piller deposes and says:

1. I am employed by Resolute Management Services Limited (RMSL) as its

Commutation Manager, Inward Reinsurance.  I am a Fellow of the Chartered Insurance Institute

in the United Kingdom.

2. As a result of my position, I am familiar with the matters described below based on

my handling of  the losses at issue in this proceeding, my meetings, telephone conversations, and

correspondence with representatives from plaintiff B.D. Cooke and Partners Limited (B.D.

Cooke) and ROM Reinsurance Management Co., Inc. (ROM), my discussions with other RMSL

employees, and my review of pertinent business records maintained by RMSL at its London

offices.

3. I have also reviewed the affidavits and annexed exhibits submitted by plaintiff B.D.

Cooke, including: (1) an affidavit dated April 25, 2008 from Thomas B. McNamara (McNamara

Aff.),  ROM's  Treasurer and a Senior Vice-President; and  (2) an affidavit dated May 1, 2008

1

235653.1

from Andrew David Tyler, a Managing Director of B.D. Cooke and a Director of The Dominion Insurance Company Limited (Dominion), the lead company in a pool of U.K. insurers formerly managed by Underwriting Management Agency, Ltd. and C.F. & A.U. Ltd. (B.D. Cooke Pool).

## A. Declarant's Work History

4. From 1979 until 1984, I was a claims broker for three Lloyd's brokers. For a concise description of the Lloyd's market, Lloyd's syndicates, the Names that comprise the syndicates, the role of the Lloyd's broker, and the role of Underwriters who are appointed by the syndicates' Managing Agents to negotiate and assume risks presented by Lloyd's brokers, I respectfully refer this Court to the summary that appears in Roby v. Corporation of Lloyd's, 996 F.2d 1353, 1356-58 (2d Cir. 1993).

5. I began with Stewart Wrightson (North America) Limited and then moved to Hall Harford Jeffreys Ltd. As a claims broker, I was responsible for advising, processing and obtaining approval to pay claims submitted by insureds and reinsureds located in the United States and elsewhere.

6. From 1984 until 1996, I was Claims Manager at three Lloyd's underwriting syndicates. Syndicates are not legal entities and do not incur any legal obligation to insureds or reinsureds. Syndicates are but collections of private individuals known as Lloyd's Names who have organized themselves together to underwrite insurance and reinsurance business at Lloyd's of London. Again, I refer the Court to the short summary that appears in Roby v. Corporation of Lloyd's, 996 F.2d at 1356-58.

235653.1

7. In 1984, I began with a syndicate known as D.W. Graves and Others.  I later moved to syndicate  J. M. Ing and Others where I was also that syndicate's Deputy Underwriter.  I then joined syndicate M.F.M. Wright and Others.

8. In the 1980s and early 1990s, Lloyd's sustained a series of extraordinary losses resulting in large part from asbestos, environmental, and catastrophic claims, e.g., the Piper Alpha claims.  The Equitas Group (Equitas) was created in 1995 and 1996 as  elements of a restructuring of the Lloyd's insurance market known as the Reconstruction and Renewal plan (R & R Plan).  The R & R Plan was designed to guide the Lloyd's market through the crisis and marshal resources to meet the liabilities of the Lloyd's Names.

9. An integral part of the R & R Plan was the reinsurance of all non-life liabilities of the Lloyd's Names who subscribed to policies issued for the 1992 and prior years of account by a new entity that would also act as the Reinsured Names' run-off agent with respect to those liabilities.  The Equitas Group of companies were created for these purposes.

10. After the Names voted overwhelmingly in favor of the R & R Plan, and after British regulatory authorities approved the Plan, Equitas started operations in September of 1996.

11. In January 1997, I joined Equitas as a Senior Claims Handler adjusting worldwide claims (excluding the United States and Canada) and negotiating commutations.  In March 2005, my role changed to that of Technical Account Manager with responsibility for commutations and then in 2006 I became Commutations Manager.

12. Equitas remained as the run-off agent for the Lloyd's Names until March 2007.  As of March 30, 2007, Equitas completed a transaction whereby National Indemnity Company, a

3

subsidiary of the Berkshire Hathaway Group (Berkshire Group), reinsured Equitas' liabilities to the Names.

13. As part of that transaction, Equitas sold Equitas Management Services Limited (the Equitas Group company that was my employer) to another company within the Berkshire Group and it was renamed Resolute Management Services Ltd (RMSL). On April 1, 2007 I became an employee of RMSL and I continue in its employ. RMSL is now the run-off agent for all Lloyd's Names 1992 and prior non-life business. My current responsibilities at RMSL include addressing claims submitted by B.D. Cooke and its run-off agent, ROM.

### B. Agency Managers Pool

14. Certain Lloyd's Underwriters reinsured a pool of individual insurance companies managed by Agency Managers Limited, later Agency Managers, Inc. (Agency Managers) from 1952 until 1973. One of the members of the pool was Citizens Casualty Company of New York (Citizens). Certain Lloyd's Underwriters reinsured Citizens as part of the Agency Managers Pool from 1952 until 1968. The reinsurance of Citizens has given rise to the current dispute between Underwriters and B. D. Cooke.

15. In his affidavit, Mr. McNamara states that Agency Managers purchased reinsurance on behalf of its pool members and attaches nine reinsurance contracts that he refers to "collectively" as the "Lloyd's Reinsurance Contracts." Mr. McNamara states that he is unaware of any "Agency Managers-procured reinsurance contracts, other than the nine contracts" that he attaches to his affidavit.

235653.1

16.  However, on examination of the contracts appended to the McNamara affidavit, only two are relevant to this dispute: (1) an excess contract that operated in a layer of $350,000 excess a $150,000 retention (McNamara Exs. 2, 3, and 4); and (2) an excess contract that operated in a layer of $500,000 excess a $500,000 retention (McNamara Exs. 5, 6, and 7).  This can be confirmed by review of the Lloyd's brokers policy numbers including the references 4642 for the $350,000 xs $150,000 and 5261 for the $500,000 xs $500,000.

17.  Exhibit 12 attached to the McNamara affidavit consists of a contract that operated outside the period during which Citizens participated in the Agency Managers Pool.

### C.  Citizens Claims; ROM Submissions

18.  The reinsurance arm of Willis Faber and Dumas (Willis) served as the Lloyd's broker on the excess reinsurance contracts identified above and at issue in this proceeding.

19.  By the time Equitas began processing claims in late 1996,  Agency Managers had filed for bankruptcy protection.  As set out in Mr. Tyler's affidavit, ¶ 5,  ROM was established to manage the Agency Managers pool after Agency Managers ceased operations.  Mr. McNamara states  in his affidavit that ROM inherited "many of the books and records of Agency Managers" and "a number of former Agency Managers personnel became ROM employees."  McNamara Aff., ¶ 2; see also Tyler Aff. at ¶ 5.

20.  It is my understanding, however, that some of the Agency Managers Pool members did not enter into contracts with ROM as the successor manager for the Pool.  I also understand that the ROM roster of Pool members could and did change over time, often without notice.

21. By 1996, several Agency Managers Pool members in addition to Citizens had been liquidated or were insolvent, including Imperial Insurance, Ltd. and Capitol Indemnity Corp. Highlands Insurance Company (Highlands) came under supervision of state regulators, ceased underwriting, and later became subject to an order of rehabilitation. On information and belief, Highlands' rehabilitator did not enter into a contract with ROM.

22. In 1996, Citizens Liquidator submitted his petition to approve a Plan to expedite the closing of the Citizens estate. Affidavit of John Tafuro, sworn to on February 4, 2003, ¶ 8.

23. That same year, 1996, ROM began submitting losses via Lloyd's broker Willis to Equitas as agent for the Lloyd's Names, but only on behalf of the Agency Managers Pool members that ROM represented at that time. In March 1997, the Supreme Court, New York County, approved the Liquidator's Plan, including the assignment of reinsurance recoverables to B.D. Cooke. Affidavit of Simon Janes, sworn to on February 5, 2003, Ex. 6.

24. Throughout the file, ROM is inconsistent in its description of Citizens. In some proofs, Citizens is not identified as a Pool member at all. In others, B. D. Cooke is identified as having some involvement, but in the same submission Citizens is described as "insolvent" or appears under a heading for the New York Liquidation Bureau.

25. Attached are representative proofs of loss and related submissions from ROM relating to losses sustained by the Dana Corporation (Dana). See Cooke Complaint, ¶33. 1, 2, 25, 26, 27 28, 29, 51, 52, 53 and 54. ROM, acting as the successor for Agency Managers with respect to those Agency Managers Pool members that ROM represented, submitted Dana losses via Lloyd's broker Willis. Willis prepared a London Claim Collection Form (LCCF) Ex. 1. Willis identified the reinsured as "Agency Managers, Inc." but did not refer to or identify

6

Citizens or, for that matter, any other impaired participant's portion of the Pool's losses. Nor did Willis advise that the Citizens' portion of a given loss was subject to an assignment to B.D. Cooke of reinsurance recoverables due Citizens.

26. Included with Willis' submissions were proofs of loss prepared by ROM that contained inconsistent descriptions of Citizens' status and its relationship to the New York Liquidation Bureau or Cooke or Dominion. The November 15, 2001 Proof of Loss attached as Ex. 2 refers to Dominion. On an accompanying second page, the Proof of Loss provides a pool allocation, but refers to Citizens and Cosmopolitan as "Insolvent Members" over the heading: "New York Liq. Bureau."

27. But a ROM "Proof of Loss - Consolidated" prepared on November 15, 2001 for a Dana loss refers to balances due: (1) ROM Members; (2) "BD Cooke/Citizens": (OR); (3) "N.Y. Liquidation Bureau"; and (4) "Non-Represented Cos." Ex. 3 These differences between the Proofs of Loss and the Consolidated Proofs of Loss appear in many other billings and submissions relating to Dana or other insured entities that generated the losses that appear in the Cooke Complaint, ¶ 33. Ex. 4.

28. Mendes & Mount (Mendes), attorneys representing Certain Lloyd's Underwriters, wrote to ROM in May 2005 advising ROM that any recommendations for payment of the Dana claims were subject to reservations of rights. Specifically, Mendes reserved Underwriters rights with respect to "other settlements" and with respect to any other rights Underwriters might have with respect to the subject claims. Finally, Mendes advised that it believed that the "amounts as presented by ROM are an inaccurate presentation of the claim as expenses under Dominion's

policies are treated as part of ultimate net loss." Mendes asked for a response. Letter from A.

Economou, dated May 20, 2005. Attached as Ex. 5. See also Cooke Complaint, ¶ 33.1, et seq.

29. In his affidavit, Mr. Tyler states that an unidentified "reinsurance broker has advised

B.D. Cooke" that this unidentified broker has "presented claim information" for certain claims

set forth in paragraph 33 of the Cooke Complaint. Tyler Aff., ¶ 6. Mr. Tyler further states that,

"[a]s a matter of Lloyd's practice," use of "a signing number, means there is no dispute about that

claim under the reinsurance contract, and that -- barring only an issue outside the reinsurance

contract -- the claim is to be paid." Tyler Aff. ¶ 7

30. To the contrary, while questions concerning the occurrence/time or nature of the loss,

or whether a loss fell within the terms of a reinsurance contract or, outside a reinsurance

contract's terms and conditions, may have been satisfied and hence a signing number given to a

given loss, many questions may remain before we can determine whether a claim is proper.

These unresolved questions could include, but would not be limited to whether the claim: i) had

been previously paid or was subject to offset; or ii) would be credited to the appropriate cedant;

or iii) had been previously released by a prior commutation or was the subject of current

commutation discussion where the parties have agreed to freeze payments; or iv) in the

circumstance of pools, would be credited in the appropriate proportion to a particular pool

member; or v) was from an insolvent estate.

31. Thus the assignment of an Equitas signing number does not concede that disputes

over the category of questions such as those just described immediately above, questions that are

just as serious in their implications as a dispute over the date of loss occurrence or the allocation

of a claim, have been resolved. And so the assignment of a signing number to identify a given

8

loss or claim does not represent a commitment for cash to automatically flow. And finally the fact that a signing number exists certainly does not mean in the context of this proceeding that there is no dispute "arising under" the subject reinsurance contracts.

32. Mr. Tyler's use of the phrase "Lloyd's practice" requires comment. Tyler Aff, ¶ 7. General practices within Lloyd's and the London market before the R & R Plan, during the renewal period, and after Equitas "went live" in 1996, could in some instances vary.

33. Until December 1999, Equitas shared Lloyd's accounting systems in conjunction with its processing of inward claims. Each Lloyd's syndicate and each cedant's broker maintained an account with the Lloyd's Claims Office (LCO) for the purpose of processing claims payments. Those accounts were managed by an area within Lloyd's called the Lloyd's Settlement and Trust Fund Operation (Lloyd's STFO), sometimes referred to as Lloyd's Central Accounting.

34. Until December 1999, when the LCO received a London Claim Collection Form (LCCF) from the Lloyd's broker after approval by the lead underwriter, the LCO would advise the individual syndicates that their accounts would be debited to make the required payment. The LCO would then authorize Lloyd's STFO to debit the syndicate accounts. Each time such an authorization was given, the transaction would be identified by a unique number or Lloyd's signing number and identified by the date of the authorization.

35. The Lloyd's signing numbers and dates would be recorded by the LCO/ and the Lloyd's Policy Signing Office ("LPSO") and would also be provided to the cedant's broker, so that the broker would know payment had been authorized and could track receipt of the payment. The issuance of a Lloyd's signing number and date reflected that a claim was approved and

9

payment authorized on behalf of all syndicates participating. Under the Lloyd's accounting practices, making the payment was solely ministerial.

36. Within ten days of the issuance of Lloyd's signing number, the Lloyd's STFO would simultaneously debit the accounts of all participating syndicates in an amount needed to pay the approved claim. The Lloyd's STFO would transfer the funds to the cedant's broker's account on the same day. Claims that were agreed in this manner were assigned Lloyd's signing numbers beginning with the numbers 2 or 6 or 8.

37. In December 1999, Equitas took on the management of some of the processing services offered by Lloyd's as described above with respect to the business reinsured by Equitas. This was through a process called "Exit from Lloyd's Project," which is described in more detail in the bulletins annexed as Ex. 5. These bulletins went out to all Lloyd's brokers and others advising of this change in practice. One of the purposes of the project was to allow Equitas "greater control over its business and claims processes." These new practices allowed Equitas to take responsibility for settlement of claims and premiums. The signing numbers and dates set out in the schedule that appears at ¶ 33 of the Cooke Complaint are for Equitas' use and not for the Lloyd's market generally.

38. The attached bulletins, See Ex. 6, also describe the Suspended Claims Register system that eventually became the present Equitas Diverted Settlement System, the latter of which was in place at the time Equitas moved away from Lloyd's in late 1999. These systems were established, in part, to address more effectively the problems encountered with claims and losses submitted by insolvent or liquidated reinsureds. Ex. 6.

39.  After December 1999, the Equitas signing numbers began with the number prefix 9, but more importantly,  under certain circumstances, some transactions could be assigned a signing number and date,  but payment might not be immediately forthcoming until all circumstances surrounding the claim as identified in paragraph 30, had been reviewed and resolved.   Consequently, the use of an Equitas signing number beginning with the number 9 did not mean that Equitas had at that point in time determined that it was in order to make  payment.

40.  For example, payments to insolvent estates raised several issues that might need to be addressed.  These circumstances included, for example, the proofs  submitted by different receivers and ancillary receivers, the reconciliation of payments made pre-liquidation and post-liquidation, and how the various Lloyd's syndicates had been or would be treated within any given insolvency.

41.  Each Lloyd's syndicate might have a different status with respect to a liquidated or insolvent company.  Some syndicates could be creditors of the liquidated estate, and others could be debtors,  and each might have different set-off rights.  Equitas required additional review before making payments to an insolvent estate because of post and pre-estate reconciliation requirements and the different set-off rights between some of the syndicates and the insolvent estate.

42.  In respect of proofs from ROM,  the questions arising in paragraph 30 above would have to be answered.  Equitas staff would examine records of payments made to or cash withheld from: (1) each pool participant represented by ROM; (2) failed members of the pool, including pool members that had been liquidated and whose estates had been closed, i.e., entities to which no payment could be made; (3) insolvent estates; and (4) claims arising from Citizens Pool

235653.1

participation that were only related to Dominion ceded business. Procedures described above work, however, only when Equitas can identify a specific cedant. Where the insolvent cedant is embedded in a no-longer functioning pool, the problems are compounded.

43. With respect to the circumstances of this case, however, we note that both parties to this dispute -- ROM acting on behalf of Agency Managers and its Pool members and Equitas and RMSL acting on behalf of the 1992 and prior years of account -- are operating with inherited files and borrowed systems. ROM now relies on records passed down from Agency Managers, a bankrupt and no longer-existing pool manager, and from Citizens, an assuming/ceding reinsurer that has been liquidated and no longer exists. Equitas and RMSL are dealing with claims files and memoranda generated by literally hundreds of syndicates that assumed liabilities before 1992. Mr Tyler's phrase "Lloyd's practice" therefore must be qualified by placing it in this context.

44. For this reason, Equitas may have paid ROM balances for losses that were subject to the B.D. Cooke assignment, but that cannot be identified. This has created issues with respect to the reconciliation of losses now allegedly due.

45. The signing numbers and dates referred to in the Cooke Complaint, ¶ 33, were transmitted electronically to Willis, the broker. In the case of an insolvent cedant, a message was attached confirming that these entries signified a non-cash transaction. Thus, for every item in the Cooke Complaint ¶ 33 schedule, broker Willis would have received an electronic notice that no cash would be transferred.

46. The earliest such notice for a claim identified in the Cooke Complaint appears to have been sent on or about March 31, 2005, but Willis had been receiving similar notices with

respect to Citizens since December 28, 2000. Between December 2000 and March 2005, Willis also would have received more than 100 notices advising it of non-cash transactions involving Citizens.

## C. Cooke Complaint ¶ 33

47.  As part of my responsibilities as Commutations Manager at RMSL, I am able to authorize the release of certain claims with signing numbers and dates once the questions referred to in paragraph 30 above have been resolved.

48.  In September 2006, I was asked to help with a particular question that ROM raised with regard to claims that ROM believed were due and for which they believed payment had not yet been received. This required reconciliation activity to be undertaken.

49.  Throughout this reconciliation period at no time did ROM's representatives mention B.D. Cooke or Citizens or the assignment of Citizens' contracts to B.D. Cooke or litigation involving Nationwide Mutual Insurance Company, an Agency Managers pool member. During my research into these claims, I became familiar with: (1) the Citizens/Cooke assignment; and (2) the closing of the Citizens Casualty estate.

50.  I researched the Equitas records and systems and discovered that between 2003 and 2007, we had assigned signing numbers and dates to claims arising from Citizens that were both Dominion and non Dominion related. Those that were not Dominion related were in respect of Citizens obligations to parties other than Dominion which the closing of the Citizens estate had eliminated. This is an example of a situation where a claim has been given a signing number and date and it is not appropriate to process a cash payment. Referring back to Mr Tyler's affidavit

where he states that the agreement of a claim evidenced by a signing number means that the claim is to be paid, this clearly cannot be true in this case.

51.   In an attempt to demonstra te the complexity surrounding this portfolio, I would highlight that in the absence of clear information and input from Willis and ROM it can be difficult despite our best endeavours to answer the questions referenced in paragraph 30.  My reconciliation found that we had paid at least one claim (Eli Lilly) to B.D. Cooke that was not Dominion related .  In January 2008, B.D. Cooke was still looking into the Eli Lilly payment, but it remains unresolved.  Attached as  Ex. 7.

52.   During a  January 11, 2008 meeting, representatives from B.D. Cooke met with representatives from RMSL to discuss amounts that had been "adjusted," i.e., agreed as to coverage, but held within RMSL/Equitas accounts pending a resolution of  additional questions concerning, among other things,  whether certain  subject losses fell within the terms of the assignment of reinsurance  from Citizens'  liquidator to B.D. Cooke/Dominion.

53.   The information set out in the Cooke Complaint's ¶ 33 was taken from a schedule prepared following  a without prejudice discussion that occurred on  January 11, 2008.  The run-up to that discussion began much earlier in 2006 when ROM began to question the balances withheld overall for the Agency Managers presentations.  Although I attended the January 11, 2008 meeting, I was not personally involved in these earlier ROM discussions.

54.   During that January 11th meeting,  RMSL asked, among other things, that B.D. Cooke produce the list of claims, models,  and associated reserves presented to Citizens' Liquidator in or about 1993 as the basis for the Plan to close the Citizens estate.  E-mail from C. Piller to A. Tyler, dated January 23, 2008  Ex. 7.  See also Letter from S. McCann to J. Tafuro,

14

235653.1

dated October 4, 1993, annexed as Exhibit 8 to the to Veach Affirmation. These lists, models, and reserves were used to project reinsurance recoveries that would follow upon the assignment, if the Plan were approved.

55. In conjunction with these January efforts and in conjunction with RMSL's request for these lists of claims and reserves provided to the Liquidator in connection with the assignment, RMSL presented to B.D. Cooke spreadsheets and other work papers on the adjusted claims. Portions of those spreadsheets now appear at paragraph 33 of the Cooke Complaint. RMSL also offered to settle any balances that could be shown to be included within the list of claims presented to the Liquidator.

56. In subsequent communications later during the month of January 2008, I followed up on my understanding that B.D. Cooke would provide the lists and models. I also asked questions about comments from broker Willis with respect to B.D. Cooke's submissions; including duplicate billings, payments that had been agreed to cedants other than Citizens that might be Citizens losses, and claims that were identified as belonging to Citizens, but should have been agreed to other cedants. RMSL has not -- to my knowledge -- received a response.

57. I was, however, able to identify one item in paragraph 33 of the Cooke Complaint (33.40) where RMSL has paid ROM $44,685.06 allegedly due within a much larger amount in September 2006. The payment was made inadvertently as a result of a processing error that ROM should have noticed and reconciled.

58. My research also revealed that certain payments were made in conjunction with the commutation discussed below and in Mr. Tyler's affidavit, ¶¶ 10, 11, Ex. 1. I first note that the commutation agreement annexed to Mr. Tyler's affidavit is a confidential agreement. By filing

15

this document in open court and without application to seal, B.D. Cooke/Dominion have breached their obligation to avoid publishing the terms of the commutation, its wording, and the commutation amount that Equitas paid.

59. In any event, pursuant to the commutation agreement and a subsequent non-binding mediation or Early Neutral Evaluation, Equitas paid certain balances to Cooke.

60. In his affidavit, Mr. Tyler refers to the commutation agreement between Underwriters, Dominion, and B.D. Cooke, dated February 2002. a copy of which Mr. McNamara attached as Ex. 1 to his affidavit. Mr. McNamara states, correctly, that "Underwriters contended that the assigned Citizens' portion of the Lloyd's Reinsurance Contracts fell within" that commutation agreement. McNamara Aff., ¶ 10. Mr. McNamara seeks to recast arguments raised during an Early Neutral Evaluation that resulted in an opinion and a compromise resolution of certain claims that are not referred to in the Cooke Complaint. McNamara Aff., ¶ 11 -- 12.

61. In its demand for binding arbitration pursuant to the arbitration agreements in the subject excess reinsurance contracts, Underwriters raise the 2002 commutation agreement as a defense to payment of the disputed balances now set out in the Cooke Complaint, ¶ 33.

62. In his affidavit, Mr. Tyler states that the "only dispute" concerning the "agreed Claims" concern the "contention . . . that the terms of the Assignment might impose a 'cap' on the amount of money that B.D. Cooke could collect under the Assignment." Mr. Tyler asserts that RMSL never identified any "dispute" concerning "Agreed Claims."

63.  To the contrary, among other things, and with the reservation that RMSL has not received certain requested information discussed above,  RMSL, acting on behalf of Underwriters, disputes whether:

- certain losses identified in the Cooke complaint, ¶ 33,  are subject to the Citizens' assignment;

- certain losses have been previously paid to B.D. Cooke/Dominion;

- certain losses that may or may not be due B.D. Cooke/Dominion have been paid to other entities;

- the losses sought by B.D. Cooke/Dominion were included within the terms of the 2002 commutation;  and

- the losses now sought can be reconciled and accounted for in respect of previous payments and adjustments made, i.e., have previously distributions made through Willis been properly accounted for by ROM,  B.D. Cooke/Dominion's agent. ; and

- pursuant to the access to records provisions in the subject excess reinsurance agreement and custom and practice within this reinsurance community, B.D. Cooke/Dominion may assert its right to balances due under the assignment without providing the information requested in our January 2008 correspondence.

- contrary to Mr. McNamara's argument that disputes concerning the 2002 Commutation agreement must be raised in the English High Court, McNamara Aff., ¶ 10, Underwriters' assertion that the 2002 commutation agreement released Underwriters from further payment, belongs before a "court of arbitration" appointed pursuant to the excess reinsurance contracts.


64.  At this point, your declarant has nothing more to add, but I respectfully request permission to reply to any affidavits submitted by B.D. Cooke in response.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 5, 2008.

_____
Christopher David Piller

235653.1

## **AFFIDAVIT OF SERVICE**

STATE OF NEW YORK          )

                                  ss:

COUNTY OF NEW YORK   )

        Jacob Mendelsohn, being duly sworn, deposes and says:

        That deponent is not a party to this action, is over the age of 18 years and resides in Brooklyn, New York.

        That on the 5th day of June, 2008 deponent served upon all parties the annexed DECLARATION OF CHRISTOPHER DAVID PILLAR via the Court's ECF System:

                                        Jacob Mendelsohn

Sworn to Before Me This
5th day of June, 2008

Notary Public

**TODD A. BAKAL**
**Notary Public, State of New York**
**No. 02BA5013387**
**Qualified in New York County**
**Commission Expires July 15 20_1/_**

**EXHIBIT 1**

**London Claim Collection Form**

| A Reserved for Lloyd's Future Use | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| | | | | | | |

| 1 Clm/Ref/Rec | 2 Bureau | 3 Broker | | 4 Broker Contact | 5 Special Settlement State 'Yes' and Authorise |
|---|---|---|---|---|---|
| | | Number | Pseudonym | Name | |
| CLM | LPSO | 576 | WIL | JAMES WILSON 020 78609623 Telephone/Exm | NO |

| 6 Bureau Original Signing Reference | 7 Bureau Original Claim Ref | 8 Broker Reference 1 | 9 Broker Reference 2 | 10 Pool Scheme | 11 Attachments |
|---|---|---|---|---|---|
| 65006   140563 | | UC60812AAAA | UXW4642 | | |

| 12 Ccy Code of Claim | 13 100% Order Amount | 14 Rate of Exchange | 15 100% Settlement Amount | 16 Bureau Total Line | 17 No of Lines |
|---|---|---|---|---|---|
| USD | 1,014.40 | | | 93.41 | 30 |

| 18 Sett Ccy | 19 Bureau Settlement Amount | 20 100% VAT Amount | 21 100% Imported Services Amt | 22 100% Imported Serv Narrative |
|---|---|---|---|---|
| USD | 947.55 | | | |

| 23 | | | | Lloyd's Only | | | 24 If Subject to LIRMA SCA State 'Yes' | Slip Leader | 25 | Date of Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| DTI | Audit M | Audit NM (A ) | Audit A V | 'B' Scheme | US Tax code | Year Of Account 63 | | | | From 011063   To |

| 26 100% Order Highest Estimate Amt | 27 100% Order Prev Settled Amount | 28 100% Order O/S Claim Amount | 29 Date of Loss Narrative |
|---|---|---|---|
| | NIL | USD 261,172 | |

| 30 | Narrative Details |
|---|---|
| Insured | DANA CORP. |
| Reinsured | AGENCY MANAGERS INC |
| Interest | 1ST CASUALTY XL |
| Perils/conditions | |
| Location/Voyage/Period | 1 JAN 63 TO 31 DEC 63 |
| Insured Value of Interest | |
| 100% S/I/Limits | HERETO 100% US$ 350,000 |
| 100% Excess Point | US$ 150,000 |
| Vessel/Aircraft | |
| Nature of Claim | |
| Nature and Date of Accident | AGENCY MANAGERS - R/I DOMUK VARIOUS ASBESTOS LOSSES 1 OCT 63 USA |
| Loss Recovery From | NONE |
| Total Claim Details | CLAIM   USD 1,014.40 |

| 31 LIRMA Claim Authority | 32 Passed by/LIRMA SCA |
|---|---|
| Warranted that we have obtained the agreement of all participating LIRMA companies to the settlement except as may be varied by the terms of any private agreement or ship condition. | |
| Signature of Brokers Representative | UC60812AA-AA   P   3   (C)   C   1 |

**EXHIBIT 2**

63 Ba
60812 @

# ROM REINSURANCE MANAGEMENT CO., Inc.

(Run-off Management, Inc./ROM, Inc.)

90 William Street
New York, New York  10038

**PROOF OF LOSS**
Dated:  **November 15, 2001**

RETROCESSION CONTRACT:

M A

| | | |
|---|---|---|
| Layer: | **FIRST CASUALTY EXCESS OF LOSS - 350 xs 150** | |
| Term: | **January 1, 1963 to December 31, 1963** | |
| Number: | **F 0118** | |

| | | |
|---|---|---|
| Original Insured: | **Dana Corp.** | |
| Claimant: | **Various** | Excess ID No.: **A 135  DomUk** |
| Date of Loss: | **1-Oct-63** | Type: **Asbestos** |

**GROSS INCURRED:**

| ORIGINAL REINSURED - Grp # | ROM CLAIM NO. | CURRENT RESERVE | PAID LOSS | PAID EXPENSE | TOTAL PAID |
|---|---|---|---|---|---|
| Dominion - 29 | 61289.0100 | 260,333.00 | 151,007.40 | | 151,007.40 |
| Dominion - " | 61289.0100 | 589.00 | | 1,040.89 | |
| Dominion - " | 61289.0101 | 250.00 | 0.00 | | 1,040.89 |
| Dominion - " | 61289.0101 | 0.00 | | 0.00 | 0.00 |
| | | | | | 0.00 |
| **TOTAL INCURRED TO DATE** | | **261,172.00** | **151,007.40** | **1,040.89** | **152,048.29** |
| **Incurred from Last Proof** | | **176,509.00** | **151,007.40** | **443.04** | **151,450.44** |
| **CHANGES BEING REPORTED NOW** | | **84,663.00** | **0.00** | **597.85** | **597.85** |

**RETENTION**

| | | | | | |
|---|---|---|---|---|---|
| Dominion - 29 | 61289.0100 | 0.00 | 150,000.00 | | 150,000.00 |
| Dominion - " | 61289.0100 | 0.00 | | 594.36 | 594.36 |
| Dominion - " | 61289.0101 | 0.00 | 0.00 | | 0.00 |
| Dominion - " | 61289.0101 | 0.00 | | 0.00 | 0.00 |

**FIRST EXCESS - TOTAL RECOVERY:**

| | | | | | |
|---|---|---|---|---|---|
| Dominion - 29 | 61289.0100 | 260,333.00 | 1,007.40 | | 1,007.40 |
| Dominion - " | 61289.0100 | 589.00 | | 446.53 | 446.53 |
| Dominion - " | 61289.0101 | 250.00 | 0.00 | | 0.00 |
| Dominion - " | 61289.0101 | 0.00 | | 0.00 | 0.00 |
| **Total Recovery - This Contract** | | **261,172.00** | **1,007.40** | | **1,453.93** |
| **Total From Last Proof** | | **176,509.00** | **1,007.40** | 446.53 | **1,010.36** |
| **CHANGES BEING BILLED NOW** | | **84,663.00** | **0.00** | 2.96 | **443.57** |
| | | | | 443.57 | |

PLEASE PAY THE BALANCE OF YOUR SHARE AS REQUESTED
IN THE ATTACHED CONSOLIDATED PROOF OF LOSS.

_PLEASE SEE ATTACHED ALLOCATION TO POOL MEMBERS_

All claims questions should be addressed to: **Mr. Lou Curreri**, Senior Vice President - Claims

## POOL MEMBERS ALLOCATION  -  Excess ID # A 135

| | | LOSSES | | |
|---|---|---|---|---|
| Interoffice:   F0078 | | | | |
| | | | | |
| | | | Group # | |
| | | Codes | 8 29 | |
| COMMERCIAL UNION | | | 27.500% | |
| GREAT AMERICAN | | 887 | 20.000% | |
| NATIONWIDE | | | 10.000% | |
| TRYG BALTICA | | | 5.000% | |
| | | | | |
| SOLVENT MEMBERS | | | 62.500% | |
| | | | | |
| CITIZENS | | 997 | 25.000% | |
| COSMOPOLITAN | | 890 | 12.500% | |
| | | | | |
| NEW YORK LIQ BUREAU | | | 37.500% | |
| | | | | |
| | | | 100.000% | |

**EXHIBIT 3**

**ROM REINSURANCE MANAGEMENT CO., Inc.**

90 William Street, NY, NY 10038

**PROOF OF LOSS - CONSOLIDATED**

Retrocession Agreements Covering the Period from January 1, 1963 thru December 31, 1963

Updated: Sept 30 2001   Prepared: Nov 15 2001

| Original Insured / Claimant: | |
|---|---|
| **D A N A   C O R P.** | |

| (212) 510-9113 | Ask for  Mike |
|---|---|
| Excess ID No.: | **A 135** |
| Date of Loss: | **1-Oct-63** |
| Type: | **Asbestos** |

| Ceding Company/ ROM Claim No. | Current Reserves | Paid Losses | Paid Expenses | Paid Total |
|---|---|---|---|---|
| Dominion - 61289.0100 | | 151,007.40 | | 151,007.40 |
| Dominion - 61289.0100 | 260,333.00 | | | |
| Dominion - 61289.0101 | 589.00 | | 1,040.89 | 1,040.89 |
| Dominion - 61289.0101 | 250.00 | 0.00 | | 0.00 |
| | 0.00 | | 0.00 | 0.00 |
| **Total GROSS INCURRED** | 261,172.00 | 151,007.40 | 1,040.89 | 152,048.29 |
| Facultative Reinsurance | 0.00 | 0.00 | | 0.00 |
| Our Retention | 0.00 | | 0.00 | 0.00 |
| First Excess - F0118 | | 150,000.00 | 594.36 | 150,594.36 |
| Second Excess - F0119 | 261,172.00 | 1,007.40 | 446.53 | 1,453.93 |
| Clash Cover - F0120 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Recoverable Reinsured Losses | 0.00 | 0.00 | 0.00 | 0.00 |
| | 261,172.00 | 1,007.40 | 446.53 | 1,453.93 |

| Retrocession Contracts Applied Total Recoverable Amounts | Facultative | First XS | Second XS | Clash Cover |
|---|---|---|---|---|
| | 0.00 | 1,453.93 | 0.00 | 0.00 |
| BD Cooke / Citizens  (OR) | 0.00 | 363.48 | 0.00 | 0.00 |
| Cosmopolitan (NYLB) | 0.00 | 181.74 | 0.00 | 0.00 |
| ROM Members | 0.00 | 908.71 | 0.00 | 0.00 |

**Your Share:**

| **WILLIS FABER & DUMAS** | First XS 100.00000% | Second XS 100.00000% | Clash Cover 100.00000% |
|---|---|---|---|
| Total 100% Recoverable | 1,453.93 | 0.00 | 0.00 |
| Total Collections/Credits | 0.00 | 0.00 | 0.00 |
| Balance 100% Recoverable | 1,453.93 | 0.00 | 0.00 |
| Non-Represented Cos. (NR/NP): | | | |
| Total Recoverable | 0.00 | 0.00 | 0.00 |
| Total Collections/Credits | 0.00 | 0.00 | 0.00 |
| Balance | 0.00 | 0.00 | 0.00 |
| N Y Liquidation Bureau: (NYLB): | | | |
| Total Recoverable | 181.74 | 0.00 | 0.00 |
| Total Collections/Credits | 0.00 | 0.00 | 0.00 |
| Balance  * | 181.74 | 0.00 | 0.00 |
| BD COOKE / CITIZENS:  (OR): | | | |
| Total Recoverable | 363.48 | 0.00 | 0.00 |
| Total Collections/Credits | 0.00 | 0.00 | 0.00 |
| Balance  * | 363.48 | 0.00 | 0.00 |
| ROM Members: | | | |
| Total Recoverable | 908.71 | 0.00 | 0.00 |
| Total Collections/Credits | 0.00 | 0.00 | 0.00 |
| Balance  * | 908.71 | 0.00 | 0.00 |
| **AMOUNT YOU OWE US NOW *** | 1,453.93 | 0.00 | 0.00 |

Please issue a check for the total amount of
Payable to  ROM REINSURANCE MANAGEMENT CO., Inc.                                    1,453.93

All claims questions should be addressed to: **Mr. Lou Curreri**, Senior Vice President · Claims

**EXHIBIT 4**

# ROM REINSURANCE MANAGEMENT CO., Inc.

(Run-off Management, Inc./ROM, Inc.)

90 William Street
New York, New York 10038

**PROOF OF LOSS**

**Dated:** February 13, 2003

RETROCESSION CONTRACT:

M A

| | |
|---|---|
| Layer: | FIRST CASUALTY EXCESS OF LOSS - 350 xs 150 |
| | SECOND CASUALTY EXCESS OF LOSS - 500 xs 500 |
| Term: | January 1, 1963 to December 31, 1963 |
| Number: | F 0118        F 0119 |

| | | | |
|---|---|---|---|
| Original Insured: | Dana Corp. | | |
| Claimant: | Various | Excess ID No.: | A 135  DomUk |
| Date of Loss: | 1-Oct-63 | Type: | Asbestos |

**GROSS INCURRED:**

| ORIGINAL REINSURED - Grp # | ROM CLAIM NO. | CURRENT RESERVE | PAID LOSS | PAID EXPENSE | TOTAL PAID |
|---|---|---|---|---|---|
| Dominion - 8 29 | 61289.0100 | 357,495.00 | 151,007.40 | | 151,007.40 |
| Dominion - 8 " | 61289.0100 | 9,240.00 | | 1,040.89 | 1,040.89 |
| Dominion - 8 " | 61289.0101 | 250.00 | 0.00 | | 0.00 |
| Dominion - 8 " | 61289.0101 | 0.00 | | 629.73 | 629.73 |
| **TOTAL INCURRED TO DATE** | | 366,985.00 | 151,007.40 | 1,670.62 | 152,678.02 |
| **Incurred from Last Proof** | | 261,172.00 | 151,007.40 | 1,040.89 | 152,048.29 |
| **CHANGES BEING REPORTED NOW** | | 105,813.00 | 0.00 | 629.73 | 629.73 |

**RETENTION**

| | | | | | |
|---|---|---|---|---|---|
| Dominion - 8 29 | | 1,369.02 | 150,000.00 | 1,663.68 | 151,663.68 |

**FIRST EXCESS - TOTAL RECOVERY:**

| | | | | | |
|---|---|---|---|---|---|
| Dominion - 8 29 | 61289.0100 | 348,748.72 | 1,007.40 | | 1,007.40 |
| Dominion - 8 | 61289.0100 | 7,064.42 | | 6.94 | 6.94 |
| Dominion - 8 | 61289.0101 | 243.88 | 0.00 | | 0.00 |
| Dominion - 8 | 61289.0101 | 614.31 | | 0.00 | 0.00 |
| **Total Recovery - This Contract** | | 356,671.33 | 1,007.40 | 6.94 | 1,014.34 |
| **Total From Last Proof** | | 261,172.00 | 1,007.40 | 446.53 | 1,453.93 |
| **CHANGES BEING BILLED NOW** | | 95,499.33 | 0.00 | (439.59) | (439.59) |

**SECOND EXCESS - TOTAL RECOVERY:**

| | | | | | |
|---|---|---|---|---|---|
| Dominion - 8 29 | 61289.0100 | 8,746.28 | 0.00 | | 0.00 |
| Dominion - 8 | 61289.0100 | 176.83 | | 0.00 | 0.00 |
| Dominion - 8 | 61289.0101 | 6.12 | 0.00 | | 0.00 |
| Dominion - 8 | 61289.0101 | 15.42 | | 0.00 | 0.00 |
| **Total Recovery - This Contract** | | 8,944.65 | 0.00 | 0.00 | 0.00 |
| **Total From Last Proof** | | 0.00 | 0.00 | 0.00 | 0.00 |
| **CHANGES BEING BILLED NOW** | | 8,944.65 | 0.00 | 0.00 | 0.00 |

RECEIVED

3 1 MAR 2003

PLEASE PAY THE BALANCE OF YOUR SHARE AS REQUESTED IN THE ATTACHED CONSOLIDATED PROOF OF LOSS.

All claims questions should be addressed to: **Mr. Lou Curreri,** Senior Vice President - Claims

# ROM REINSURANCE MANAGEMENT CO., Inc.    *90 William Street, NY, NY 10038*

**PROOF OF LOSS – CONSOLIDATED**    Updated: Feb. 13, 2003   Prepared: Feb. 13, 2003

**Retrocession Agreements Covering the Period from January 1, 1963 thru December 31, 1963**

| | |
|---|---|
| | **(212) 510-9113**   Ask for Mike |
| *Original Insured / Claimant:* | Excess ID No.: **A 135** |
| **D A N A   C O R P.** | Date of Loss: **1-Oct-63** |
| | Type: **Asbestos** |

| Ceding Company/ ROM Claim No. | Current Reserves | Paid Losses | Paid Expenses | Paid Total |
|---|---|---|---|---|
| Dominion - 61289-0100 | 357,495.00 | 151,007.40 | | 151,007.40 |
| Dominion - 61289-0100 | 9,240.00 | | 1,040.89 | 1,040.89 |
| Dominion - 61289-0101 | 150.00 | 0.00 | | 0.00 |
| Dominion - 61289-0101 | 0.00 | | 629.73 | 629.73 |
| **Total GROSS INCURRED** | **366,985.00** | **151,007.40** | **1,670.62** | **152,678.02** |
| *Facultative Reinsurance* | 0.00 | 0.00 | 0.00 | 0.00 |
| *Our Retention* | 1,369.02 | 150,000.00 | 1,663.68 | 151,663.68 |
| *First Excess - F0118* | 356,671.33 | 1,007.40 | 6.94 | 1,014.34 |
| *Second Excess - F0119* | 8,944.65 | 0.00 | 0.00 | 0.00 |
| *Clash Cover - F0120* | 0.00 | 0.00 | 0.00 | 0.00 |
| *Total Recoverable Reinsured Losses* | 365,615.98 | 1,007.40 | 6.94 | 1,014.34 |

| *Retrocession Contracts Applied* | *Facultative* | *First XS* | *Second XS* | *Clash Cover* |
|---|---|---|---|---|
| *Total Recoverable Amounts* | 0.00 | 1,014.34 | 0.00 | 0.00 |
| *BD Cooke / Citizens (OR)* | 0.00 | 253.59 | 0.00 | 0.00 |
| *Cosmopolitan (NYLB)* | 0.00 | 126.79 | 0.00 | 0.00 |
| *ROM Members* | 0.00 | 633.96 | 0.00 | 0.00 |

| Your Share: | **First XS** | **Second XS** | **Clash Cover** |
|---|---|---|---|
| **WILLIS FABER & DUMAS** | **100.00000%** | **100.00000%** | **100.00000%** |
| **Total 100% Recoverable** | 1,014.34 | 0.00 | 0.00 |
| **Total Collections/Credits** | 0.00 | 0.00 | 0.00 |
| **Balance 100% Recoverable** | 1,014.34 | 0.00 | 0.00 |
| **Non-Represented Cos. (NR/NP):** | | | |
| *Total Recoverable* | 0.00 | 0.00 | 0.00 |
| *Total Collections/Credits* | 0.00 | 0.00 | 0.00 |
| *Balance* | 0.00 | 0.00 | 0.00 |
| **N Y Liquidation Bureau: (NYLB):** | | | |
| *Total Recoverable* | 126.79 | 0.00 | 0.00 |
| *Total Collections/Credits* | 0.00 | 0.00 | 0.00 |
| *Balance*  * | 126.79 | 0.00 | 0.00 |
| **BD COOKE / CITIZENS: (OR):** | | | |
| *Total Recoverable* | 253.59 | 0.00 | 0.00 |
| *Total Collections/Credits* | 0.00 | 0.00 | 0.00 |
| *Balance*  * | 253.59 | 0.00 | 0.00 |
| **ROM Members:** | | | |
| *Total Recoverable* | 633.96 | 0.00 | 0.00 |
| *Total Collections/Credits* | 0.00 | 0.00 | 0.00 |
| *Balance*  * | 633.96 | 0.00 | 0.00 |
| **AMOUNT YOU OWE US NOW *** | **1,014.34** | **0.00** | **0.00** |

**Please issue a check for the total amount of**
**Payable to ROM REINSURANCE MANAGEMENT CO., Inc.**      **1,014.34**

All claims questions should be addressed to: **Mr. Lou Curreri**, Senior Vice President - Claims

**EXHIBIT 5**

E.C.U. R/I DEPT.

2 4 MAY 2005

RECEIVED

**MENDES & MOUNT, LLP**

750 SEVENTH AVENUE
NEW YORK, NY 10019-6829
TELEPHONE: (212) 261-8000
FACSIMILE: (212) 261-8750

LOS ANGELES OFFICE
725 SOUTH FIGUEROA STREET
NINETEENTH FLOOR
LOS ANGELES, CA 90017-5419
TELEPHONE: (213) 955-7700
FACSIMILE: (213) 955-7725

NEW JERSEY OFFICE
ONE NEWARK CENTER
NEWARK, NJ 07102-5259
TELEPHONE: (973) 639-7300
FACSIMILE: (973) 639-7350

DIRECT DIAL: (212) 261-8366

May 20, 2005

**VIA MAIL**

ROM Reinsurance Management
75 Broad Street
New York, NY 10004

Attention: Lou Curreri

Willis Reinsurance
Reinsurance London
**Received**
2 5 MAY 2005

Initial........

RE:    Excess of Loss Reinsurance –Retrocession
First and Second Layers
R/I: Agency Managers
A/C: Dominion/Dana Corporation
Asbestos Claims
Periods: 1960-1962, 1963-1964; 1966-1969
ROM Claim Nos.: 61289; 61290; 61292; 61293; 61294
Our File No.: 341,309

Dear Mr. Curreri:

      As you are aware, we are attorneys who represent the interests of certain Underwriters at Lloyd's, London Market Companies and other solvent Reinsurers ("London Market Reinsurers") who subscribed to the Excess of Loss Treaty for the 10/1/1963-64 and 8/1/1965-68 periods. Our clients received proofs of loss from ROM dated March 16, 2004, July 29, 2004, and August 2, 2004 seeking reinsurance reimbursement of amounts paid by ROM to Dominion in connection with asbestos products liability losses submitted by Dana Corp.

      We wish to advise you that London Market Reinsurers have agreed payment of indemnity and expense amounts sought, subject to the following reservation of rights:

1.   All payments made by the London Reinsurers in connection with this matter are on a "without prejudice" basis and are not to be construed as a waiver of any rights or defenses regarding insurance or reinsurance issues which might have been raised in this case or which may be raised in other cases.

2.   All payments made by London Reinsurers are being made in this case based upon the specific circumstances as presented by this case and this case only. Any payments by the London Reinsurers should not be considered a precedent in connection with any other reinsurance claims even if such claims appear to be substantially similar to this matter.

3.   All payments made by the London Reinsurers are made without prejudice to any past or future positions taken by the London Reinsurers with respect to other

Mendes & Mount, LLP
Our File No.: 341,309
Page 2

settlements with the named insureds, additional insureds, reinsureds or any other insureds or reinsurers, on this or another risk, under this or any other reinsurance contract, policy, treaty, certificate or agreement.

4. All payments made by the London Reinsurers are made without prejudice to the positions taken by the London Reinsurers with respect to the coverage and protections afforded by the Excess of Loss Treaty; or any other reinsurance contracts, policies, treaties, certificates or agreements with ROM or any other insured or reinsureds.

5. All payments made by the London Reinsurers shall not be used by either party to attempt to define the terms and conditions in any of the original policy or treaty language.

The payments are set forth in the chart below:

| Original Period | R/I Period | R/I Limits | Amounts Requested From U/Rs 100% (ind/exp) |
|---|---|---|---|
| 10/1/63-64 | 1/1/63-64 | $350,000 xs $150,000 | $66,038/$26,421 |
| 10/1/64-65 | 1/1/64-65 | $350,000 xs $150,000 | $8,975/$4,468 |
| 8/1/66-67 | 1/1/66-67 | $350,000 xs $150,000 | $0/0 |
| 8/1/67-68 | 1/1/67-68 | $350,000 xs $150,000 | $0/0 |
| 8/1/68-69 | 1/1/68-69 | $350,000 xs $150,000 | $24,871/$4,787 |

Finally, the London Market Reinsurers wish to emphasize that by agreeing to the aforementioned stipulations and payment of the above referenced amounts, they do not waive any of their rights contained in the captioned reinsurance contracts, but rather fully reserve their rights in regard to this claim and any and all other rights they might have in connection with any existing or future claims for reinsurance recoveries.

Please also note that we are recommending the above amounts be paid in accordance with ROM's presentation of losses on a pro rata basis. However, we believe that the amounts as presented by ROM are an inaccurate presentation of the claim as expenses under Dominion's policies are treated as part of ultimate net loss. Therefore, can you please provide an explanation responsive to the above.

Please feel free to call if you have any questions.

Very truly yours,
Mendes & Mount, LLP

By: _____
Anna Economou

cc: Mark Messent, Equitas
    Henry Monaghan, Downlands

**EXHIBIT 6**



**Equitas Bulletin**

EQUITAS LIMITED
33 ST MARY AXE  LONDON  EC3A 8LL
TEL: 0171 342 2000  FAX: 0171 342 2001

Mike Williams
Special Collections
Equitas Ltd
2nd Floor
33 St Mary Axe
London
EC3A 8LL

| | | | |
|---|---|---|---|
| **Date:** | 26th March 1999 | **Reference No:** | SIS/99/254/2 |
| **To:** **Distribution:** | All Lloyd's Brokers 1) Chief Executive Officer 2) Finance Director 3) Claims Director 4) Compliance Officer | | |
| **From:** **Department:** | Rhydian Williams Security, Insolvency & Support | **Location:** | 2nd Floor 33 St Mary Axe London EC3A 8LL |
| **Telephone:** | 0171 342 2679 | **Fax:** | 0171 342 2899 |
| **Subject:** | SUSPENDED CLAIMS PROCESSING - REFERENCE SIS/99/249/1 DATED 22 MARCH 1999 | | |
| **Action Points:** | Please advise all personnel involved in Accounting, Claims and Technical Departments | | |
| **Deadline:** | With immediate effect | | |
| **Pages:** | 2 | | |

Further to our earlier Bulletin concerning changes to the processing of claims through the Suspended Collection Register, please note that this is in respect of insolvent cedants only.

Should you have any queries regarding the above please contact either :-

John Heath on 0171 342 2629, or
Mark Craig on 0171 342 2610

Yours faithfully

Rhydian Williams
Head of Security, Insolvency & Support



**Equitas Bulletin**

EQUITAS LIMITED
33 ST MARY AXE  LONDON  EC3A 8LL
TEL: 0171 342 2000  FAX: 0171 342 2001

Mike Williams
Special Collections
Equitas Ltd
2nd Floor
33 St Mary Axe
London
EC3A 8LL

| | | | |
|---|---|---|---|
| **Date:** | 22nd March 1999 | **Reference No:** | SIS/99/249/1 |

**To:** All Lloyd's Brokers
**Distribution:** 1) Chief Executive Officer 2) Finance Director 3) Claims Director
4) Compliance Officer

| | | | |
|---|---|---|---|
| **From:** | Rhydian Williams | | |
| **Department:** | Security, Insolvency and Support | **Location:** | 2nd Floor 33 St Mary Axe London EC3A 8LL |

| | | | |
|---|---|---|---|
| **Telephone:** | 0171 342 2679 | **Fax:** | 0171 342 2899 |

**Subject:** SUSPENDED CLAIMS PROCESSING

**Action Points:** Please advise all personnel involved in Accounting, Claims and
Technical Departments

**Deadline:** With immediate effect

**Pages:** 2

This Bulletin is to advise you that as part of an ongoing initiative to release claims into the market and also to enable us to convert from the current Suspended Claims Register ("SCR") system to our new system known as PIP, we are initiating a process of signing all existing SCR's as "Non-cash".

As a result of this, brokers have already been asked to re-present some of their files to the Claims Office. In certain circumstances it may not be necessary for the file to be requested and brokers will be notified of any such signings as they are put through. The intention is to have all items which have not as yet been processed "Non-cash", signed through by the end of May this year. Once this project has been completed all claims in respect of insolvent cedants will be converted on to the PIP system. Any new claims in respect of Insolvent Estates will only have to be presented once to the Claims Office for entry on to the PIP system.

Should you have any queries regarding the above please contact either :-

John Heath on 0171 342 2629, or
Mark Craig on 0171 342 2610

Yours faithfully

Rhydian Williams
Head of Security, Insolvency & Support



**EQUITAS**

Equitas Bulletin

EQUITAS LIMITED
33 ST MARY AXE  LONDON  EC3A 8LL
TEL: 0171 342 2000  FAX: 0171 342 2001

Mike Williams
Special Collections
Equitas Ltd
2nd Floor
33 St Mary Axe
London
EC3A 8LL

| | | | |
|---|---|---|---|
| **Date:** | 4th June 1999 | **Reference No:** | F/99/279/26 |
| **To:**<br>**Distribution:** | All Lloyd's Brokers<br>1) Chief Executive Officer 2) Finance Director 3) Claims Director<br>4) Compliance Officer | | |
| **From:**<br>**Department:** | Andrew Jenkinson<br>Insurance Accounting &<br>Settlement | **Location:** | 2nd Floor<br>33 St Mary Axe<br>London EC3 8LL |
| **Telephone:** | 0171 342 2870 | **Fax:** | 0171 342 2918 |
| **Subject:** | EXIT FROM LLOYD'S | | |
| **Deadline:** | Not applicable at this time | | |
| **Action Points:** | For Information Only | | |
| **Pages:** | 4 | | |

# EXIT FROM LLOYD'S

The purpose of this bulletin is to provide you with a briefing on the activities that we are undertaking to stop using some of the Lloyd's processes and replace them with our own. You are not required to take any action as a result of this bulletin.

## What is the Exit From Lloyd's project?

Both Equitas and Lloyd's are seeking to review their ongoing operational relationship. Equitas wishes to be less reliant on third party service providers. Lloyd's needs to be able to support the requirements of the ongoing market without being constrained by the need to support Equitas' potentially different requirements.

With this in mind, Equitas have set up the Exit From Lloyd's project. We have been working very closely with Lloyd's on this project to:

- identify those areas where Equitas will cease taking Lloyd's services;

- identify those services which Equitas wish to continue to take from Lloyd's;

- define a clear plan for moving from the current service arrangement to the future service arrangement;

- ensure that current service arrangements are not impacted by Exit From Lloyd's.

## Key Features

The key features of the review are as follows:

- all inward data, first advice, movements, premiums, etc. in respect of 1992 and prior years of account, will be entered directly onto MAX, the Equitas claims transaction-processing database;

- Equitas will trigger settlements from its own systems but will continue to use Lloyd's centralised settlement processing to make payments;

- changes to third parties will be minimised wherever possible:
    - the outward RI process and specifically the Lloyd's Outwards Reinsurance System (LORS) to remain unchanged;
    - processes/message changes will be constrained to avoid changes to Broker systems.

**Impact of Exit From Lloyd's on Brokers**

Equitas have been liaising with the LIBC since January 1999 to ensure that the Broker community are aware of and briefed on the Exit From Lloyd's project.

More recently, meetings have been held between Equitas, Lloyd's and members of the Broker community to discuss the main impacts of Exit From Lloyd's on Broker processes. These discussions are ongoing but the main conclusions are:

- presentation of claims files to adjusters will remain unchanged;

- the drop off point for claims files prior to processing will be changed from the barrier in Lloyd's 58 building to a point to be designated by Equitas;

- all claims processing activities for transactions relating to 1992 and prior years of account will be carried out by Equitas; -

- processing of transactions which relate to 1993 and post years of account will be carried out by Lloyd's and will remain unchanged;

- with the exception of reinstatement premiums, all premium transactions relating to 1992 and prior years of account must be presented to Equitas Run-off Underwriting for agreement. This will include cases where there is a company market lead;

- reinstatement premiums will be presented to the adjuster for agreement and processing with the claim settlement;

- the payment of funds to Brokers will remain unchanged i.e:
  - signing numbers and dates from a unique range will continue to be assigned;
  - Equitas will continue to make payments via Lloyd's;
  - BSM confirmations of settlement will continue to be produced by Lloyd's;

- the Outwards RI processes will be unchanged.

**Implementation of Exit From Lloyd's**

Equitas and Lloyd's will not begin the cutover from the current to the new service arrangement until the operational, procedural and systems components of this project are in place and have been thoroughly tested.

In addition, both Equitas and Lloyd's believe that a 'big bang' approach would not work well. Equitas and Lloyd's have discussed a phased 'broker by broker' approach which should achieve a smoother transfer to the new arrangement for all affected parties.

Given our current plans, it is unlikely that the cutover will begin until October 1999 at the earliest.

This proposed approach has also been the subject of preliminary discussions with LIBC and members of the Broker community and more detailed discussions will be scheduled in the near future.

**More Information**

We intend to continue to work with Brokers via the LIBC throughout the remainder of this project and further LIBC/Equitas bulletins will be issued as and when any issues of significance are resolved.

In the short term, if you require further information, please contact the following:

John Heath
Special Projects Manager
Insurance Accounting
Equitas
33 St Mary Axe
London
EC3A 8LL

Tel:    0171 342 2629
Fax:    0171 342 2918
e-mail:  john.heath@equitas.co.uk


Signed on behalf of Equitas

Andrew Jenkinson
Head of Insurance Accounting and Settlement


# EQUITAS

**Equitas Bulletin**

EQUITAS LIMITED
33 ST MARY AXE  LONDON  EC3A 8LL
TEL: 0171 342 2000  FAX: 0171 342 2001

Mike Williams
Special Collections
Equitas Ltd
2nd Floor
33 St Mary Axe
London
EC3A 8LL

| | | | |
|---|---|---|---|
| **Date:** | 21st October, 1999 | **Reference No:** | F/99/349/32 |
| **To:** | All Lloyd's brokers | | |
| **Distribution:** | 1) Chief Executive Officer  2) Finance Director  3) Claims Director  4) Compliance Officer | | |
| **From: Department:** | Roger Harvey Exodus Project Manager | **Location:** | 2nd Floor 33 St Mary Axe London  EC3A 8LL |
| **Telephone:** | 0171 342 2310 | **Fax:** | 0171 342 2929 |
| **Subject:** | 'EXIT FROM LLOYD'S' - MAIN CHANGES TO PROCEDURES FOR BROKERS | | |
| **Action Points:** | This bulletin is an update to the bulletin issued by Andrew Jenkinson, Head of Insurance Accounting & Settlements, on 4th June 1999, outlining the reasons for Exit From Lloyd's and the expected impact on brokers. | | |
| **Pages:** | 12 | | |

## What are 'Exit From Lloyd's' and 'Exodus'?

Equitas currently uses a number of services that are provided by Lloyd's. From the end of 1999, Equitas will 'Exit From Lloyd's' and we will provide some of these services ourselves.

'Exodus' is the name given to the implementation phase of the Exit from Lloyd's programme. The aim of Exodus is to enable Equitas to transfer smoothly from the existing services to the new ones.

The aim of this bulletin is to explain why Equitas is taking this route, and to outline the main benefits and changes that the programme will bring for Equitas as a whole and our business partners. The bulletin has been prepared in consultation with the LIBC.

Details of the main procedural changes for brokers, the timetable for migrating to the new procedures, and key contact names and telephone numbers at Equitas in the event of queries about the new procedures are listed at the end of this bulletin.

## Why has Equitas decided to Exit From Lloyd's?

Equitas wants to take on the management of more of the services currently provided by third parties, the biggest of these being Lloyd's. This will allow us to have greater control over our business and claims processes.

We have enhanced our computer systems, which should allow more comprehensive data to be held about each claim. This should, in turn, enable us to provide a better claims service.

Finally, Exit From Lloyd's is intended to reduce our costs by bringing more services in-house, as well as making better use of our own people's skills.

## Will there be changes made to current procedures as a result of Exit From Lloyd's that will affect brokers?

There will be changes to the processing of files, although **adjusting and underwriting will remain the same:** brokers should continue to present their files to their adjusters who currently deal with their files.

Subsequent to an adjuster reviewing a file, the majority of broker files should be taken to **ECU Reception, Equitas, 3rd floor, 33 St Mary Axe, for processing.** Changes applying to the processing of files, and the dates from when brokers should start to bring their own files for processing to Equitas, are noted at the end of this bulletin.

There will, however, be some areas where the LCO will still continue to process the transactions, namely, files for Scheme Canada and 1993 & post year of account.

Arrangements for presenting files to the **LMCS** will remain unchanged, with the exception of any **APH payment** made directly by Equitas. These payments will now be processed at our offices in Farnborough, although brokers can leave files on the 3rd floor, St Mary Axe.

Also, where we are now taking on the **settlement** of claims and premiums, Equitas will allocate the signing number and date to each settlement. Settlement will continue to take place each Friday.

We are also enhancing our computerised system for tracking broker files, to take account of the larger volume of files expected at Equitas, although brokers will **not** be required to make enhancements to their own computer systems as a result of Exit From Lloyd's.

**However, brokers will be responsible for ensuring that their files are collected from Equitas:**

- Files which have been **processed** should be collected from **ECU Reception, 3rd floor, St Mary Axe,** and should be '**logged out**' by Equitas.

- **Premium- and underwriting-related documents** should be collected from **Run-Off Underwriting, 2nd floor, St Mary Axe.**

## When will the new arrangements take effect?

Since early October, we have been piloting a variety of transactions from one broker, Willis, and ensuring that electronic messages can be effectively sent and received, namely, bureau signing messages (BSMs) from Lloyd's to brokers, and data feeds from Equitas to contractors.



We have been ensuring that all new business procedures and IT systems are in place, and have been training our adjusting contractors to use our computerised claims database. With these measures in place, Willis has now agreed to migrate to the new procedures by the end of October.

We have therefore planned for all other brokers to migrate to Equitas over a six week period, **starting Monday 1 November.** The migration will take place on a phased 'broker by broker' basis to enable us to maintain a better level of service for all our business partners.

**The dates when we need specific brokers to switch to the new procedures are set forth on the schedule at the end of this document.** From these dates, the LCO will no longer accept files from these brokers for processing.

Once brokers have moved over to the new procedures, they should present **all** files in respect of 1992 and prior liabilities to Equitas, 33 St Mary Axe. For files which cover both 1992 and 1993 years of account, the elements which relate to 1992 and prior liabilities will be processed at Equitas. The files will then be sent to the ECU Reception, 3rd floor, Equitas, for brokers to collect and take to Lloyd's as necessary.

## What will Exit From Lloyd's mean for contractors?

Following Exit From Lloyd's, adjusting contractors will need to provide a more detailed level of narrative about each claim. In turn, data should be more complete and accurate for the wider benefit of Equitas and our business partners.

## What are the main changes for other departments within Equitas?

The **Reception team** for the **Equitas Claims Unit (ECU)** will continue to receive files from brokers, log them onto the file tracking system, and coordinate the routing of claim files for processing within Equitas.

The **Equitas Claims Unit (ECU)** will operate on the same basis, and will ensure that our in-house claims database, contains an adequate level of detail about each claim.

**Run-Off Underwriting** will continue to check and authorise all premium transactions between Equitas and the (re)insured, other than reinstatement premiums. This applies to all treaty statements, including those with premium elements.

A new department, **Inwards Technical Services (ITS),** was set up in September. ITS will handle the input of data onto our claims database. ITS will have bases in both London and Farnborough. The team in London will process first advices, premiums, and direct fees, plus urgent settlements and movements. Files will be sent to Farnborough for processing proportional treaties, reinstatement premiums, movements and settlements.

**Insurance Accounting** will release settlements to Lloyd's on a daily basis and review settlements for selected cedants, *i.e.* the 'diverted' settlement system.

## Any further questions?

**In discussions with the LIBC, the following topics have arisen, which are considered below:**

### Processing issues

1.  How long will it take for my file to be processed once I have left it at Equitas? Will it make any difference in terms of timescales whether I am leaving files for 'first advices', or for settlement, etc?

    *Timescales and turnaround service levels are still to be finalised. For files that need to be sent to Farnborough (i.e. for all processing with the exception of first advices), expected turnaround times will be notified to brokers as soon as possible.*

    *It is hoped that if a file arrives in London early on the first day, it will be despatched later that morning to Farnborough for processing. Provided processing takes place that afternoon it should be couriered back to London at the close of the first day, ready for collection on day two.*

2.  How can we be confident that there are enough people processing files in Farnborough to avoid backlogs? What action will be taken if a backlog develops?

    *Equitas has taken into account the volumes of transactions processed at Lloyd's, projected to 2004 (we are expecting transaction volumes to fall between now and then), based on 'best case' and 'worst case' scenarios. Headcount has been based on combination of these scenarios.*

3.  What happens if there is a query on a broker's file whilst it is being processed at Farnborough?

    *Financial queries relating to claims will be resolved most probably between the processor and the adjuster, although depending on the nature of the problem, it may be necessary to return the file to London.*

    *More straightforward questions such as illegibility would be handled between the processor and the broker.*

### Settlement issues

4.  Why is settlement now taking an extra week if we leave our files at Equitas on a Friday?

    *Equitas will continue to operate weekly settlement following Exit From*

*Lloyd's, although one extra working day will be added to the settlement process. However, provided brokers submit their files for processing before Friday, then we would normally expect settlement to be made on the following Friday, as at present.*

5. I understand that 'urgent' settlements will be processed in London rather than Farnborough. What are the criteria for a settlement to be treated as 'urgent'?

   *Responsibility lies with the broker to negotiate with the adjuster on the urgency and priority of the settlement.*

6. What will happen with 'diverted settlements'? How will brokers know if a transaction has been suspended and, subsequently, if and when it has been cleared for payment?

   *During processing, Equitas will establish whether a transaction should be diverted from settlement. If so, then a letter will be generated by Equitas to the broker, and attached to the file. The letter will outline:*

   - *The reasons for non-payment at this time;*

   - *Whether payment has been suspended indefinitely, or will be paid within a specified period of time;*

   - *A named contact in the Equitas Insurance Accounting Department in case of further queries.*

   *Files which have been processed will then be returned to ECU Reception, Equitas, 3rd floor St Mary Axe, for collection by the broker.*

   *Files involving premium advice notes (PANs) should be collected from Run-Off Underwriting, 2nd floor, St Mary Axe.*

7. In the case of multiple currency / multiple settlement signings, how will the broker know which components the signings refer to?

   *In the case of marine claims, the signing number, date and settlement currency should be written on the policy. In the case of non-marine claims, the signing number, date and settlement currency should be written on the LCCF. Equitas will **not** split its signing range between currencies.*

## File transit and logistical issues

8. Some broker files are in poor condition, which may be worsened by moving them between London and Farnborough for processing. How will they be transported?

*Every file will be placed in a strong plastic crate that will be locked with security ties and transported by specialist courier between London and Farnborough in secure boxes.*

9. What happens if my file gets lost between London and Farnborough?

*Every file for Farnborough will be placed in a strong, lockable plastic crate and logged into the ITS tracking system as 'Sent to ITS Farnborough'.*

*Also, every crate to be sent to Farnborough will be recorded on a delivery form that will accompany the crates.  The crates will be transported to Farnborough using a dedicated courier van service twice a day.*

*Every delivery of crates received in Farnborough will be checked against the delivery form for correct number of crates and correct crate identification numbers.  Every file received in Farnborough will then be logged into the ITS Tracking System.*

*The same process works in reverse for files being sent from Farnborough to London, although the courier service from Farnborough to London runs only once per day.*

10. How will I know when my file is ready for collection after it has been processed?

*There will be not be any change to arrangements for the collection of files: files for claims and proportional treaties will continue to be left at the ECU Reception at Equitas, 3rd floor, St Mary Axe, for collection by the broker.*

*It is the broker's responsibility to ensure that **all** claims files are logged out by the 3rd floor reception area at Equitas, St Mary Axe, before they leave the building.*

*Files involving premium advice notes (PANs) or which have an underwriting element should be collected from Run-Off Underwriting, 2nd floor, St Mary Axe.*

Roger Harvey
Exodus Project Manager

## SUMMARY OF MAIN PROCEDURAL CHANGES FOR BROKERS

**Presenting files for adjusting** *(applies to all files)*

Following Exit From Lloyd's, **adjusting will remain the same:** brokers should continue to present their files to their current adjusters.

**Where to take files for processing** *(applies to all files)*

*The following files should continue to be presented to the LCO:*

- Scheme Canada

- 1993 & post years of account.

*All other files should be presented to Equitas, i.e.:*

- Files for 1992 & prior years of account.

- For files that cover both 1992 and 1993 years of account, **only** the elements which relate to **1992** will be processed at Equitas.

- The files will then be forwarded to the **ECU Reception**, 3rd floor, Equitas, for brokers to collect and take to Lloyd's for processing the **1993 & post** elements.

- Brokers will be notified as to when they should start bringing their files to Equitas for processing.

**Instructions for processing files at Equitas** *(applies to first advices, movements, settlements, proportional treaties and reinstatement premiums)*

**Broker claim files and bookslips**

- The **drop-off and pick up point** for broker claim files and bookslips from 1992 & prior years of account files to be **processed** will now be **Equitas**, 3rd floor, 33 St Mary Axe.

- Broker to tick **one** box on the file instruction form before presenting the file to Equitas, to show where the file should be directed:

    - ECU (for authorisation)

    - Run-Off Underwriting (for authorisation of the premium element of a treaty)

    - ITS (for processing **only**).

**All other files**

- All other files relating to premiums, additional premiums, return premiums and profit commissions should be presented to / collected from **Run-Off Underwriting** on 2nd floor, St Mary Axe, for agreement and subsequent processing.

## SUMMARY OF MAIN PROCEDURAL CHANGES FOR BROKERS

**New settlement procedures at Equitas**

- Settlement will continue to take place each **Friday.**

- However, **Equitas** (rather than the LPSO) will now allocate **signing number** and **date** for files presented for settlement.  The format will remain the same, although the number range will be between 90000 and 92500.

- Files submitted to Equitas for processing **before** Friday should normally be settled the Friday **after.**  Brokers should allow two working days for processing to enable settlement the following Friday.

- **NB:** Lloyd's will continue to despatch **BSMs** (bureau signing messages), with no change to the format of the message.  .

**Diverted settlements**

- Brokers will be notified by letter of claims which have been placed on the **diverted settlement list** (previously known as the suspended claims register).

- The letter will be attached to the broker file, and left for **collection by the broker** at Equitas on the 3rd floor, St Mary Axe.

**Premium items**

- Brokers should present **all premium item transactions** (other than reinstatement premiums and treaties) relating to 1992 & prior years of account to **Equitas Run-Off Underwriting** for agreement.

**Reinstatement premiums**

- Reinstatement premiums will be presented to the **adjuster** for agreement and processing with the claim settlement.

## BROKER MIGRATION SCHEDULE TO THE NEW PROCEDURES

| Date | Broker |
|------|--------|
| 18 October | Willis Group |
| 1 November | Walsham Brothers |
| 8 November | Jardine Lloyd Thompson<br>Benfields |
| 15 November | Alwen Hough Johnson<br>Helix UK<br>Bradstock Blunt & Thompson<br>C E Heath |
| 22 November | Aon Group |
| 29 November | Marsh Group<br>Resolutions |
| 6 December | All other brokers |

## KEY CONTACT NAMES AND NUMBERS AT EQUITAS

**Inwards Technical Services**

| | |
|---|---|
| Reinsurance | Paula Blakey, 0171 342 2371 |
| Direct | Simon Hennessey, 0171 342 2303 |
| APH | Martin Wynn, (01252) 808042 |

**Insurance Accounting**

| | |
|---|---|
| Settlements | John Heath, 0171 342 2629 |

**Run-Off Underwriting**

| | |
|---|---|
| Marine | Colin Braithwaite, 0171 342 2645 |
| Non-Marine & Aviation | Lee Berry, 0171 342 2637 |
| Treaties | Sue Nevill, 0171 342 2346 |

**Exodus project office**

| | |
|---|---|
| Project manager | Roger Harvey, 0171 342 2310 |
| Project communication | Lesley Cahill, 0171 342 2276 |

# EQUITAS


**Equitas Bulletin**

EQUITAS LIMITED
33 ST MARY AXE  LONDON  EC3A 8LL
TEL: 0171 342 2000  FAX: 0171 342 2001

Mike Williams
Special Collections
Equitas Ltd
2nd Floor
33 St Mary Axe
London
EC3A 8LL

| | | | |
|---|---|---|---|
| **Date:** | 11th January 2000 | **Reference No:** | F/2000/16/1 |
| **To: Distribution:** | All Lloyd's Brokers  1) Claims Director  2) Finance Director  3) Compliance Officer | | |
| **From: Department:** | John Heath  Insurance Accounting | **Location:** | 2nd Floor  33 St Mary Axe  London EC3A 8LL |
| **Telephone:** | 020 7342 2629 | **Fax:** | 020 7342 2918 |
| **Subject:** | Suspended Claims Register (SCR) | | |
| **Deadline:** | Immediate | | |
| **Action Points:** | Please re-present files as indicated below | | |
| **Pages:** | 3 | | |

"Exit From Lloyd's" has been successfully completed.

As a result, the Suspended Claims Register ("SCR") has now been replaced by the Equitas Diverted Settlement System ("EDSS") within EFL/PIP.

As you may recall, the SCR system diverted agreed claims to a suspense account, only releasing the claims for settlement once the appropriate approval had been obtained.

The EDSS undertakes this role within a more robust and controlled environment.

However, certain residual issues remain with the SCR.

## 1. Insolvent SCR

Since the 1st January 1999 all agreed claims presented to the LCO for settlement have been processed via the Equitas PIP-OUT system. Claims processed this way are immediately cleared by a non cash signing message.

During 1999 the LCO requested brokers to resubmit their files in respect of all agreed insolvent claims registered on the SCR prior to 1st January 1999. For the files presented the claims were signed as non cash.

With the cut over to EFL all of the signed SCR insolvent claims were transferred to the EFL/PIP Diverted Settlement system.

However, there are some files recorded on the SCR system that are still to be signed through as non-cash. One of the purposes of this bulletin is to request that these files be presented to Equitas immediately.

Files should be sent to Mark Craig (Equitas SIS) to log receipt. They will then be passed immediately to Equitas Inwards Technical Services (ITS) for processing via EFL/PIP. These claims will then be signed as non cash.

Mark Craig will be issuing a final chasing list of outstanding SCR files to each errant broker during January 2000.

## 2. Solvent SCR (Referrals)

For claims from solvent cedants the SCR has been more of a tracking system to record the progress of agreed claims through to settlement, and required a broker to discuss the balances due from the cedant.

When the SCR was closed at the end of November 1999 there were many claims that, apparently, had not been re-presented. The other purpose of this bulletin is to encourage brokers to re-present these files to ITS as soon as possible - for processing under EFL/PIP.

It is recognised that the solvent SCR is less likely to reflect the true position due to the high volume of transactions and the ease with which claims can be re-presented. However, a list of claims can be provided if requested from John Heath or Samantha Tucker.

No further reminders will be issued.

**Key Contact Names:**

**Insurance Accounting:**

John Heath – 020 7342 2629
Samantha Tucker – 020 7342 2745

**Inwards Technical Services (ITS)**

Linda Kidd – 020 7342 2007

**Security, Insolvency & Support:**

Mark Craig – 020 7342 2610

John Heath



# EQUITAS

**Equitas Bulletin**

EQUITAS LIMITED
33 ST MARY AXE LONDON EC3A 8LL
TEL: 020 7342 2000  FAX: 020 7342 2001

Andrew Jenkinson
Insurance Accounting
Equitas Ltd
2nd Floor
33 St Mary Axe
London
EC3A 8LL

| | | | |
|---|---|---|---|
| **Date:** | 29th August 2000 | **Reference No:** | F/2000/112/3 |
| **To:** **Distribution:** | All Lloyd's Brokers and LIBC Claims Directors & Finance Directors | | |
| **From:** **Department:** | Andrew Jenkinson Finance | **Location:** | 2nd Floor 33 St Mary Axe London EC3A 8LL |
| **Telephone:** | 020 7342 2870 | **Fax:** | 020 7342 2918 |
| **Subject:** | EQUITAS CLAIMS SETTLEMENTS | | |
| **Deadline:** | 1st September 2000 | | |
| **Action Points:** | | | |
| **Pages:** | 2 | | |

The purpose of this bulletin is to advise brokers of changes to Equitas' procedures for payment of claims. These will apply to all claims with an Equitas signing date on or after 1st September.

Following the issuing of a signing number and date for a claim, payment will normally occur via central settlement. This may not apply to certain reinsurance companies who have assumed Equitas business. Such counterparties will be notified directly by Equitas of the settlement terms being applied.

The existing arrangement whereby brokers are advised by letter that a claim has been 'diverted' will no longer apply. As before, brokers should not assume Equitas will be settling the claims until they receive their BSM.

ANDREW JENKINSON
Head of Insurance Accounting & Settlements

**EXHIBIT 7**

> Sent:        23 January 2008 10:12
> To:    'atyler@dominion-ic.co.uk'; 'sjanes@dominion-ic.co.uk'
> Subject:        Lloyd's Underwriters represented by Resolute / Citizens Casualty / Dominion
>
> Andy / Simon
>
> Further to our meeting on Friday last (11th January) in which you requested that we provide a list of what we thought were the claims amounts that had been adjusted but "held" in our systems, (due to the insolvent state of Citizens) for Dominion ceded business via Citizens Casualty, please find the attached workbook.
>
> Our systems recognise Citizens, but it is not always straightforward to identify the ceding route, therefore to assist us in determining the Dominion ceded items we have cross referenced data against a spreadsheet provided by Marianne Petillo at ROM for claims billed up to 30th September 2007 (provided at around November 2007) This we believe, was the amount billed and not yet paid for Dominion / Citizens business in ROM's records at that time. Please note that we did find some amounts on Marianne's list that we do not believe we have yet seen for adjusting, these too are identified in the workbook. To cover claims adjusted post 30th September 2007 we have provided a separate list of what is flagged as Citizens these may or may not be Dominion related. Would you please review these to assist us to identify which relate to that business? Finally we have included the listing from the ENE settlement. It would appear that at least one the claims on closer inspection may not have been Dominion ceded business, the Eli Lilly claim. Perhaps again you can assist us with confirmation of identification.
>
> At our meeting you undertook to provide us with the list of claims and associated reserves that you presented to the Citizens estate and subsequently withdrew at Citizens' wind-up , we still await this. We understand that the list was the product of a model developed by B D Cooke where during the pre-amble to the wind-up of Citizens, Cooke had calculated its asbestos exposure to Citizens on a claim by claim basis. This then allowed those reserves to be applied against a replica of Citizens reinsurance programme in order to provide the liquidator with estimates of "how much money would be recoverable from each reinsurer". In addition to the above this list would also be extremely useful in pinning down which claims would be currently payable as we agreed in the meeting.
>
> Finally, we are continuing to expedite the advice that we have sought from our US correspondant however in the meantime look forward to hearing from you.
>
> Kind regards
>
> cdp
>
> > . <<Citizens Casualty workbook.xls>>
>
*******************************************************************************************************

Resolute Management Services Limited, 33 St Mary Axe, London EC3A 8LL, UK
NOTICE: This message is intended only for use by the named addressee and may contain privileged and/or confidential information. If you are not the named addressee you should not disseminate, copy or take any action in reliance on it. If you have received this message in error please notify postmaster@resmsl.co.uk and delete the message and any attachments accompanying it immediately.

RMSL reserve the right to monitor and/or record emails, (including the contents thereof) sent and received via its network for any lawful business purpose to the extent permitted by applicable law

Registered in England: Registered no. 3136297 Registered address above
*******************************************************************************************************